**EOD  SEP 1 4 2001**

**F I L E D**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

SEP 1 3 2001

KENNETH S. GARDNER, CLERK
PS REP. - SB

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 01-31751 |
| | ) | (Jointly Administered) |
| GOSS HOLDINGS, INC., et al., | ) | Chapter 11 |
| | ) | Hon. Carol A. Doyle |
| | ) | Hearing Date:  9/20/2001 |
| Debtors. | ) | Hearing Time:  10:00 a.m. |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PUR-
SUANT TO 11 U.S.C. §§ 105(a), 366, 503, AND 507 OF THE BANK-
RUPTCY CODE (I) PROHIBITING UTILITIES FROM ALTERING,
REFUSING OR DISCONTINUING SERVICES ON ACCOUNT OF
PREPETITION INVOICES AND (II) ESTABLISHING PROCEDURES
FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE**

Goss Holdings, Inc. and its wholly-owned operating subsidiary, Goss

Graphic Systems, Inc., debtors and debtors-in-possession in the above-captioned

cases (the "Debtors"), hereby move this Court (the "Motion") for entry of an order

pursuant to Sections 105(a), 366, 503, and 507 of Title 11 of the United States Code,

11 U.S.C. §§101, et seq., as amended (the "Bankruptcy Code"), (i) prohibiting

utilities from altering, refusing or discontinuing services on account of prepetition

invoices and (ii) establishing procedures for determining requests for additional

adequate assurance.  In support of this Motion, the Debtors rely on the Affidavit of

Joseph P. Gaynor, III in Support of Chapter 11 Petitions and First Day Orders filed

contemporaneously herewith.  In further support of this Motion, the Debtors respect-

fully represent as follows:

## BACKGROUND

A.   The Chapter 11 Filings

1.   On September 10, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.   No committee of unsecured creditors has yet been appointed in these cases, and no trustee or examiner has been appointed.

3.   This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.   The statutory predicates for the relief requested herein are Sections 105(a), 366, 503, and 507 of the Bankruptcy Code.

B.   Business Operations

5.   The Debtors are among the world's leading producers of newspaper and insert printing press systems and are a major producer of commercial printing press systems. The Debtors' products fall into three broad categories:

- newspaper press systems for publishers of national, regional and local news;

2

- commercial press systems for printers of brochures and promotional
  materials, catalogues, magazines, books, financial publications, and
  directories; and

- insert press systems for printers of advertising inserts, including
  Sunday newspaper inserts and direct mail/point-of-purchase inserts.

6.     The Debtors are only one of six major global suppliers of
newspaper printing press systems, and are the only U.S.-based producer of newspa-
per printing presses.  The Debtors are headquartered in Westmont, Illinois.  Prior to
the Petition Date, they conducted their domestic engineering and manufacturing
operations at their headquarters and at a large manufacturing facility in Cedar
Rapids, Iowa.

7.     Through their foreign subsidiaries and related entities, the
Debtors also conduct significant operations in England, France, Japan, and China.
During fiscal year 2000, approximately 54% of the Debtors' consolidated revenue
was generated from sales by their international operations.  Prior to the Petition Date,
the Debtors employed approximately 2,700 employees worldwide.

8.     The Debtors' core business, in which they and their predeces-
sors have engaged for over 116 years, is the production of newspaper printing press
systems.  Over 50% of all daily newspapers worldwide print on the Debtors' presses.
The Debtors produce "large newspaper" press systems, which use 50" and wider
paper, for use by large national and metropolitan newspapers.  The Debtors also

3

produce "small newspaper" press systems, which use 36" wide paper for smaller regional and local newspapers. The Debtors custom design and engineer each press system to meet the specific printing requirements and space limitations of their customers.

9.      All of the Debtors' newspaper printing press systems are sold under the "Goss" tradename. The Debtors' principal products for large newspaper printing presses are their Newsliner and Colorliner press systems, whereas their principal products for smaller newspaper printing presses are their Universal and Community press systems. Sales of large printing systems accounted for roughly 47% of the Debtors' sales during fiscal 2000, and sales of smaller printing systems accounted for approximately 25% of the Debtors' sales during fiscal 2000.

10.      As stated above, the Debtors also manufacture insert printing press systems. Sales of such systems, through the Magnum and C700 models, accounted for approximately 10% of the Debtors' sales in fiscal 2000. The Debtors' sales of commercial printing presses, through the M16, G18, and G25 models, represented roughly 1% of sales in fiscal 2000.

11.      Finally, the Debtors provide aftermarket parts and customer service in connection with the presses and related equipment they have sold. Sales of aftermarket parts and equipment comprised approximately 17% of the Debtors' sales in fiscal 2000. Service and technical support include site preparation and inspection,

4

equipment installation, preventive and corrective maintenance, paper width changes, and color capability upgrades. Such support is provided by a staff of approximately 275 field service engineers and other agents around the world.

C.     Corporate Structure and Ownership

12.     Goss Holdings, Inc. ("Holdings") is a holding company that owns all the capital stock of Goss Graphic Systems, Inc. ("Systems"). Stonington Capital Appreciation 1994 Fund, L.P. ("Stonington") owns approximately 65% of the capital stock of Holdings. Another 31% of Holdings' stock is owned by certain debtholders (summarized below). Finally, Rockwell International Corporation owns approximately 3.5% of Holdings' stock.

13.     Systems owns all the capital stock of four foreign subsidiaries: Goss Graphic Systems Limited, a company organized under the laws of England ("Goss UK"); Goss Systemes Graphiques Nantes, S.A., an entity organized under the laws of France ("Goss France"); Goss Graphic Systems Japan Corporation, a corporation organized under the laws of Japan ("Goss Japan"); and Goss Graphic Systems Australasia Pty. Ltd., a company organized under the laws of Australia ("Goss Australia"). System also owns a majority interest in Shanghai Goss Graphic Systems Co., Ltd., J.V. ("Goss China"), a joint venture with a large manufacturing facility in the Peoples Republic of China.

5

14.     None of Goss UK, Goss France, Goss Japan, Goss Australia, or Goss China are debtors in these proceedings. Each of these companies continues to be operated in the ordinary course of business under the laws of its own jurisdiction.

D.     Prepetition Indebtedness

15.     Systems, Goss UK, Goss France, and Goss Japan are parties to that certain Second Amended and Restated Multicurrency Credit Agreement dated November 19, 1999, as amended (the "Credit Agreement") with Bankers Trust Company ("BTCo"), as lender and administrative agent for the lenders parties thereto (collectively, the "Lenders"). The debt evidenced by the Credit Agreement is comprised of several components, or "tranches," in the total principal amount of approximately $265 million.

16.     Systems has guaranteed the obligations of Goss UK under the Credit Agreement. Holdings in turn has guaranteed all of Systems' obligations under the Credit Agreement. The obligations under the Credit Agreement are secured by substantially all of Systems' real and personal property, including 66% of its ownership interests in Goss UK, Goss France, Goss Japan, Goss Australia, and Goss China. Holdings' guarantee is secured by all of the stock in Systems.

17.     Holdings is obligated on roughly $139 million principal amount of those certain 12.25% Senior Subordinated Notes due 2005 (the "Notes").

6

The original issue was in the face amount of $112.5 million, however interest has been payable in additional Notes since their issuance and will continue to be so through May 2002. The Notes are unsecured. Payment of the Notes is subordinated to the bank debt under the Credit Agreement.

E.    Events Leading to the Chapter 11 Filings

18.    On July 30, 1999, Systems and Holdings' predecessor filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtors commenced that case because of increased competition and cyclical declines that had resulted in severe operating losses and the Debtors' use of virtually all liquidity.

19.    At the time of that filing, the Debtors owed approximately $200 million in secured bank debt to a group of lenders led by BTCo (the "Original Credit Agreement"), plus $225 million principal amount of Senior Subordinated Notes due 2006 (the "Original Notes"). Upon commencement of the case, the Debtors filed a pre-negotiated plan of reorganization designed to restructure this indebtedness. In particular, the Plan cancelled the Debtors' obligations with respect to the Original Notes. Holders of the Original Notes received instead $112.5 million principal amount of the Notes described above, plus 31% of the equity in Holdings.

20.    Although the Debtors' prior bankruptcy reduced their unsecured indebtedness and provided the Debtors with significant new liquidity, the

Debtors have been negatively impacted by the downturn in economic conditions that
began after the Debtors' emergence from their first bankruptcy. This downturn has
affected the newspaper publishing industry in general, resulting in substantial losses
in advertising revenue and layoffs nationwide.

21.    Moreover, the Debtors have experienced operational, product
quality, and installation issues with respect to certain newspaper presses and related
equipment manufactured by their North American operations. These issues have
resulted in delays in installations, increased production and substantial re-work costs,
and the loss of customer goodwill. These factors have significantly affected the
Debtors' operational performance and liquidity, especially in recent months.

F.    The Debtors' Restructuring Plan

22.    Earlier this year, the Debtors retained The Blackstone Group,
L.P. ("Blackstone") as investment banking and restructuring advisors, and also
retained Skadden, Arps, Slate, Meagher & Flom (Illinois) and its affiliated law
practice entities to assist the Debtors in evaluating their strategic alternatives. As
part of this process, the Debtors, with the assistance of Blackstone and their other
advisors, have developed a business plan for the restructuring of the Debtors'
operations and capital structure. The Debtors commenced these cases in order to
finalize and implement this plan.

23.    The plan contemplates the restructuring of the Debtors' affairs around their international operations, including Goss UK, Goss France, Goss Japan, Goss Australia, and Goss China. However, the Debtors will still conduct substantial operations in the United States. The reorganized enterprise will remain headquartered in the United States; will own the stock of the foreign operations; and will continue the Debtors' parts and services business. There will also be a significant sales force in the United States, and each of the foreign subsidiaries will continue to service and market to significant United States customers.

24.    The Debtors have prepared a Joint Plan of Reorganization of Goss Holdings, Inc. and Goss Graphic Systems, Inc. (the "Plan") designed to implement their operational and financial restructuring. Under the Plan, the Debtors will eliminate almost $293 million of secured and unsecured debt. This amount is comprised of roughly $153 million in bank debt owed to certain of their Lenders under the Credit Agreement, plus the full $139 million owed on the Notes (including accrued interest). The bank debt to be eliminated will be converted into substantially all the stock of the reorganized enterprise, subject to certain amounts to be distributed to holders of general unsecured claims.

25.    The Plan is the result of significant negotiations among the Debtors, the Lenders, and holders of a majority of the Notes. The Plan is supported by the Debtors' Lenders, holders of a majority of the Notes, and holders of a majority

9

of the Debtors' existing equity. The Plan therefore represents a consensual resolution

of the Debtors' operational and financial issues. The Plan thus should allow the

Debtors to emerge from Chapter 11 with a more efficient operation and significantly

reduced debt, unhindered by the operational and financial issues that have plagued

them in the past.

RELIEF REQUESTED

26.    By this Motion, the Debtors request the Court to enter an order

providing that the Utility Companies (as defined below) are prohibited from altering,

refusing or discontinuing services to, or discriminating against, the Debtors on the

basis of the commencement of these cases or on account of any unpaid invoice for

services provided prior to the Petition Date.

27.    Additionally, the Debtors request that the order provide that

any Utility Company seeking adequate assurance from the Debtors (a "Request") in

the form of a deposit or other security be required to make a Request in writing,

setting forth the location for which utility services were provided, so that the Request

is actually received by the Debtors within twenty-five (25) days of the date of the

order granting this Motion (the "Request Deadline"). The Debtors further request

that any such Request must set forth the location for which the utility services are

provided, a payment history for the most recent six (6) months, and a description of

any prior material payment delinquency or irregularity.

28.    The Debtors also request that the order provide that the Debtors be required to file a Motion for Determination of Adequate Assurance of Payment (the "Determination Motion") and set such motion for hearing (the "Determination Hearing") within forty-five (45) days of a Utility Company's timely and proper request from the Debtors for additional adequate assurance, which the Debtors believe to be unreasonable.  Under the requested order, if a Determination Motion is filed or a Determination Hearing scheduled, Utility Companies shall be deemed to have adequate assurance of payment under Section 366 of the Bankruptcy Code until this Court enters a final order finding otherwise.

29.    Finally, the Debtors request that the order provide that any Utility Company that does not make a written Request pursuant to the above procedures and by the Request Deadline shall be deemed to have adequate assurance under Section 366 of the Bankruptcy Code.  The Debtors shall be authorized to supplement the list of Utility Companies in Exhibit A to the attached order (the "Order") to add Utility Companies not listed on Exhibit A, but subsequently discovered.

BASIS FOR RELIEF

30.    In the normal conduct of their operations, the Debtors use gas, water, electric, telephone, paging, and other services provided by numerous utility companies (the "Utility Companies"), including those contained in the list attached as Exhibit A to the proposed Order.  A number of the Debtors' operations depend

11

upon an uninterrupted supply of such utilities for their continued operations and to preserve the value of their assets. Specifically, the Debtors require utility services at their corporate headquarters and manufacturing facilities to continue their production of newspaper printing press systems and to provide continuity of service to their customers.

31.     The Debtors submit that the administrative expense priority provided pursuant to Sections 503(b) and 507(a)(1) of the Bankruptcy Code, the Debtors' prepetition payment history, and the Debtors' proposed debtor-in-possession financing, adequately assure continued payment for utility services provided by the Utility Companies without the need for deposits or other security. In particular, the Debtors have, or will continue to have, sufficient funds from operations and the terms of the proposed debtor-in-possession financing to make timely postpetition payments to all Utility Companies.

<u>APPLICABLE AUTHORITY</u>

32.     Section 366 of the Bankruptcy Code provides as follows:

(a)  Except as provided in subSection (b) of this Section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b)  Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the

12

order for relief, furnishes adequate assurance of payment, in the form
of a deposit or other security, for service after such date.  On request
of a party in interest and after notice and a hearing, the court may
order reasonable modification of the amount of the deposit or other
security necessary to provide adequate assurance of payment.

11 U.S.C. § 366.

33.    Thus, Section 366 protects a debtor against termination of its

utility service immediately upon the commencement of its Chapter 11 case, while

simultaneously providing utility companies with adequate assurance of payment for

postpetition utility service.  See H.R. Rep. No. 595, 95th Cong., 1st Sess. 350,

reprinted in 1978 U.S.C.C.A.N. 6306.  Whether a utility is subject to an unreasonable

risk of nonpayment for postpetition services and whether, therefore, it is entitled to

receive a new deposit must be determined from the facts and circumstances of each

case.  See Massachusetts Elec. Co. v. Keydata Corp. (In re Keydata Corp.), 12 B.R.

156 (B.A.P. D. Mass. 1981); see also In re Woodland Corp., 48 B.R. 623 (Bankr.

D.N.M. 1985).

34.    Absent a pre-bankruptcy default, Section 366(b) of the

Bankruptcy Code does not require a debtor to provide deposits and/or other security

to utility companies as adequate assurance of payment.  Indeed, Congress recognized

that "[i]t will not be necessary to have a deposit in every case" to provide adequate

assurance.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 350, reprinted in 1978

U.S.C.C.A.N. 6306.  See also In re Penn Jersey Corp., 72 B.R. 981, 986 (Bankr. E.D.

Pa. 1987) (utility company's request for additional security was denied when the

debtor had not been delinquent in payment of utility bills before bankruptcy); In re

Shirey, 25 B.R. 247, 249 (Bankr. E.D. Pa. 1982) ("Section 366(b) of the Code does

not permit a utility to request adequate assurance of payment for continued services

unless there has been a default by the debtor on a prepetition debt owed for services

rendered"); In re Demp, 22 B.R. 331, 332 (Bankr. E.D. Pa. 1982) ("where the debtor

has a history of prompt and complete payment, in addition to being completely

current on prepetition utility payments, a cash deposit would be unnecessary"); In re

George C. Frye Co., 7 B.R. 856, 857 n.2 (Bankr. D. Me. 1980).

   35. Section 366 contemplates that a utility must receive assurance

of payment which is sufficient given the debtor's financial situation.  As indicated

above, Courts have recognized that no deposit is required when (a) the debtor has a

history of prompt and complete utility payments, (b) the debtor owes insignificant, if

any, amounts for prepetition utility services, (c) an administrative expense priority is

granted to the utility, and (d) the debtor has substantial and liquid assets.  For

example, in In re Penn Jersey Corp., a utility company sought a security deposit from

a Chapter 11 debtor in an amount equal to twice the debtor's average monthly bill.  In

rejecting the utility's request for a deposit, the court concluded as follows:

> We believe that situations exist where the debtor should not be
> obliged to do anything -- except, of course, to maintain postpetition
> payments -- to continue to have a right to receive postpetition utility

14

> service. The situation which quickly comes to mind as an
> example . . . is where the debtor is not and has not been delinquent in
> payment of utility bills prepetition. This situation has been before this
> Court frequently, and the results have uniformly been that no deposit
> is necessary . . . .

Penn Jersey, 72 B.R. at 986. See also In re Utica Floor Maintenance, Inc., 25 B.R.

1010, 1018 (Bankr. N.D.N.Y. 1982) (where the debtor "has a sufficiently substantial

and liquid estate, no further security [other than an administrative claim] is re-

quired").

36.    Prior to the Petition Date, the Debtors paid the Utility Compa-

nies' bills consistently and on a regular basis. Further, the Debtors are unaware of

any outstanding defaults or arrearages of any significance with respect to any bill for

utility service. Thus, the Debtors believe that any Utility Company seeking a deposit

from the Debtors is doing so in accordance with a "per se" policy followed when one

of its customers files a petition for relief under the Bankruptcy Code.

37.    Indeed, the Debtors' history of payment in full to the Utility

Companies, coupled with their demonstrated ability to pay future utility bills from

ongoing operations and postpetition financing, constitute adequate assurance of

payment for future utility services within the meaning of Section 366 of the Bank-

ruptcy Code. The fact that the Debtors have sufficient assets to pay their postpetition

costs of administration on a timely basis and will continue to pay their utility bills as

they become due provides adequate assurance of future payment without the need to

15

provide additional security deposits, bonds or any other payments to the Utilities.

38.     The Debtors will serve a copy of the Order, once entered, upon each Utility, thereby notifying them of their rights. That Order also authorizes the Debtors to provide notice and a copy of the Order to Utility Companies not presently on Exhibit A to the Order. It provides that a Utility Company so served is subject to the scope of the Order from the date of service and is afforded twenty-five (25) days from the date of such service to make a request, if any, to the Debtors for additional adequate assurance. Such request must otherwise comply with the requirements of the Order or shall be deemed an untimely and invalid adequate assurance request. Contemporaneously with the service of the Order upon Utility Companies not presently on Exhibit A to the Order, as described above, the Debtors will file with the Court a supplement to Exhibit A to the Order adding the name of any new Utility Companies so served.

39.     Courts in this District in other major business cases have routinely granted the same or similar relief to chapter 11 debtors. See, e.g., In re Comdisco, Inc., Case No. 01-24795 (Bankr. N.D. Ill. July 16, 2001); In re Outboard Marine Corporation, Case No. 00-37405 (Bankr. N.D. Ill. December 22, 2000); In re Mercury Finance Company, Case No. 98-20763 (Bankr. N.D. Ill. July 6, 1998).

40.     No previous request for the relief sought in this Motion has been made to this Court or any other court.

16

WHEREFORE, the Debtors respectfully request that the Court enter

an order pursuant to 11 U.S.C. §§ 105(a), 366, 503, and 507 (i) prohibiting the

Utility Companies from altering, refusing, or discontinuing services on account of

prepetition invoices; (ii) establishing procedures for determining requests for

additional assurance; and (iii) granting such other and further relief as is just and

proper.

Dated: Chicago, Illinois    GOSS HOLDINGS, INC., et al.,
   September 13, 2001

            By: _____
            David S. Kurtz (ARDC No. 0312561)
            Mark A. McDermott (ARDC No. 06209460)
            SKADDEN, ARPS, SLATE, MEAGHER
             & FLOM (ILLINOIS)
            333 West Wacker Drive, Suite 2100
            Chicago, Illinois 60606-1285
            Tel: (312) 407-0700

            Attorneys for Debtors and
            Debtors-in-Possession

<u>Exhibit A</u>

List of Utility Companies

| NAME/ADDRESS | ACCOUNT NO. | UTILITY SERVICE | MONTHLY AVERAGE BILL |
|---|---|---|---|
| Alliant Energy<br>IES Utilities Inc.<br>P.O. Box 77004<br>Madison, WI 53707-1004 | 22-11-832-1750-03 | Electricity<br>Cedar Rapids | 59,055.56* |
| Otter Tail Energy Services<br>PO Box 886<br>Sioux Falls, SD 57101-0886 | Utility Acct: 1704081010 | GAS<br>Cedar Rapids | 26,401.40* |
| City of Cedar Rapids<br>Water Department<br>1111 Shaver Road, N.E.<br>Cedar Rapids, IA 52402 | OTESCO Acct. No. 1155<br>7053712029 | Water<br>Cedar Rapids | $623.85* |
| AMERITECH<br>P.O. Box 4620<br>Carol Stream, IL 60197-4650 | 708-240-5334-293 5 and<br>708-780-4746 620 1 | Telecommunications<br>(Pay phone, security lines,<br>circuit id # s) | $7009.00* |
| AT&T<br>P.O. Box 78225<br>Phoenix, AZ 85062-8225 | 051 939-2117 001 | Long Distance Service | $2,422.00* |
| AT&T<br>P.O. Box 9001209<br>Louisville, KY 40290-1309 | 020 534 0663 001 | | |
| AT&T WIRELESS<br>P.O.Box 650726<br>Dallas TX 75265-0726 | 310197900 | Wireless | |
| B AND H INDUSTRIES<br>1000 East Central Road<br>Arlington Heights, IL 60005 | 18475 | Blueprinters and supplies for<br>blueprint machines | $3,221.00* |

A-2

| NAME/ADDRESS | ACCOUNT NO. | UTILITY SERVICE | MONTHLY AVERAGE BILL |
|---|---|---|---|
| COM ED P.O. Box 784 Chicago, IL 60690-0784 | 0347228004 and 7347311001 | Electric Service Westmont | $39,276.00* |
| Hinsdale Sanitary District 6975 Commonwealth Avenue Burr Ridge, IL 60521-5790 | 45 4 1047 | Sewer Service and User Charge Westmont | $174.00* |
| Nextlink Illinois - XO Communications 810 Jorie Blvd Suite 200 Oak Brook, IL 60523-2187 | Ref. #: 000913007 Acct. #: 78693 | Local Telephone Service | $4583.33 |
| Corporate Headquarters: XO™ Communications 11111 Sunset Hills Road Reston, VA 20190-5339 | | | |
| Nextel 300 Park Blvd., Suite 100 Itasca, IL 60134-2604 | 0009450820-7 | Field Service Pagers | $6,359.00* |
| NICOR P.O. Box 2020 Aurora, IL 60607-2020 | 2-05-34-07702 | Natural Gas Supplier Westmont | $13,947.00* |
| Nuvision Technologies Inc. 1750 Valley View Lane Suite 200 Dallas, TX 75234-9003 | Order #: 501136 Rental #161039 (No Acct. # listed) | Video Conferencing | $2066.00 |

A-3

| NAME/ADDRESS | ACCOUNT NO. | UTILITY SERVICE | MONTHLY AVERAGE BILL |
|---|---|---|---|
| Sky Tel Communications Inc.<br>1600 Golf Road, Suite 1100<br>Rolling Meadows, IL 60008-4263 | P.O. #55966 | Pagers | $3,600.00 |
| SkyTel Corp.<br>200 S. Lamar Street<br>Jackson, MS 39201-4013 | | | |
| Southern Bell Communications<br>SBC Global Services Inc.<br>225 W. Randolph Street<br>HQ23C<br>Chicago, IL 60606<br>ATTN: Vice President/General Counsel | P.O.# 41333 | E-911 | $225.00 |
| Sprint Communications Company, L.P.<br>5600 N. River Road<br>2nd Floor<br>Rosemont, IL 60018-6705 | Master ID#: 922462460<br><br>Invoice Acct. ID#<br>922462468 | Telecommunications Service | $50,000.00 |
| 8320 Ward Parkway<br>4th Floor<br>Kansas City, MO 64114-2027<br>Attn: Law Department<br>Sprint Communications Company L.P.<br>Broadband Wireless Group<br>6260 Joliet Road<br>Countryside, IL 60525 | Broadband:<br>Customer #: 300053724<br><br>Data Services:<br>Customer #: 1311303S | Internet Service Provider | $7,000.00 |

A-4

| NAME/ADDRESS | ACCOUNT NO. | UTILITY/SERVICE | MONTHLY AVERAGE BILL |
|---|---|---|---|
| TEL ASSIST P.O. Box 4 Glenview, IL 60025 | Cust. Ref. #: 000913007 Acct. #: 78693 | Answering service | $666.66 |
| Waste Management P.O. Box 9001054 Louisville, KY 40290-1054 | 150-0316706-2009-0 | Disposal Company | $4142.00* |
| Verizon 777 Big Timber Road Elgin, IL 60123-1488 | 63053343300001 | Cellular | $459.00* |

\* - These numbers are 7 month averages

A-5