FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

OCT 09 2001

KENNETH S. GARDNER, CLERK
PS REP. - AR

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 01-31751 |
| | ) | (Jointly Administered) |
| GOSS HOLDINGS, INC., et al., | ) | Chapter 11 |
| | ) | Hon. Carol A. Doyle |
| | ) | Hearing Date: 10/10/2001 |
| Debtors. | ) | Hearing Time: 1:30 p.m. |

**GROUP EXHIBIT A TO DEBTORS' RESPONSE TO COMMITTEE'S OBJEC-
TION TO EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING
POST-PETITION FINANCING;(II) GRANTING LIENS AND SUPER
PRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH COLLAT-
ERAL; AND (IV) GRANTING ADEQUATE PROTECTION**

Goss Holdings, Inc. and its wholly-owned operating subsidiary, Goss Graphic

Systems, Inc., debtors and debtors-in-possession in the above-captioned cases (collec-

tively, the "Debtors"), hereby file this Group Exhibit A to their response to the objection

to the emergency motion for entry of an order approving post-petition financing,

granting liens and super priority claims, authorizing use of cash collateral, and granting

adequate protection.

Dated: Chicago, Illinois
      October 9, 2001

GOSS HOLDINGS, INC., et al.,

By: _____
David S. Kurtz (ARDC No. 0312561)
Mark A. McDermott (ARDC No. 06209460)
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM (ILLINOIS)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
Tel: (312) 407-0700

Group Exhibit A

# Financing Orders Approving Refinancing of Pre-Petition Bank Debt, Cross- Collateralization and/or Waivers of Charges Under 506(c)

| Case | Provisions of DIP Order |
|------|------------------------|
| **TAB 1**<br>In re The Warnaco Group, Inc. (S.D.N.Y. 2001) | First $150 million of post-petition receipts applied to pre-petition bank debt and re-advanced as post-petition loan secured by all assets, including post-petition collateral (¶¶ 3, 6(a), & 9); Section 506(c) claims waived (¶ 32). |
| **TAB 2**<br>In re Casual Male Corp. (S.D.N.Y. 2001) | Authorized DIP facility of $135 million to be used, in part, to pay in full all pre-petition bank obligations; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ (iv) & 4); Section 506(c) claims waived (¶ 17). |
| **TAB 3**<br>In re Diamond Brands Oper-ating Corp. (Del. 2001) | Authorizing a DIP facility to be used, in part, to pay the lenders' pre-petition Tranche B commitment; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ 3 & 6); Section 506(c) claims waived (¶ 10). |
| **TAB 4**<br>In re Eagle Centers, Inc. (Del. 2000) | Interim order authorized grant of cross-collateralization of pre-petition indebtedness to the extent of diminution in value of pre-petition collateral (¶ 6); Section 506(c) claims waived (¶ 10). |
| **TAB 5**<br>In re Circuit Systems, Inc. (N.D. Ill. 2000) | Interim order authorized grant of cross-collateralization of pre-petition indebtedness to the extent of diminution in value of pre-petition collateral (¶ 8); Section 506(c) claims waived (¶ 12). |
| **TAB 6**<br>In re Outboard Marine Corp. (N.D. Ill. 2000) | Approving DIP facility secured by a priming lien on all en-cumbered assets and a first lien on all pre-petition unencum-bered assets of the debtors, and requiring that all pre-petition unencumbered assets be applied first to repay DIP. |
| **TAB 7**<br>In re ICG Communi-cations, Inc. (Del. 2000) | Authorized DIP facility of $350 million to be used, in part, to pay in full all pre-petition bank obligations; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ 8, 9 & 11). |
| **TAB 8**<br>In re Stone & Webster, Inc. (Del. 2000) | Authorized grant of cross-collateralization of pre-petition indebtedness to the extent of diminution in value of pre-peti-tion collateral (¶ 6); Section 506(c) claims waived (¶ 10). |

| | |
|---|---|
| **TAB 9**<br>In re Brazos Sportswear, Inc. (Del. 1999) | Authorized DIP facility of $62 million to be used, in part, to pay in full all pre-petition bank obligations; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ 3 & 6); Section 506(c) claims waived (¶ 5). |
| **TAB 10**<br>In re Conxus Communications, Inc. (Del. 1999) | Interim order authorized DIP facility to pay off $2 million in unsecured bridge obligations; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ G, 3 & 7); Section 506(c) claims waived (¶ 6). |
| **TAB 11**<br>In re Jitney-Jungle Stores of America (Del. 1999) | Authorized DIP facility of $260 million, $200 million of which was used to pay in full certain pre-petition bank obligations; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ 4 & 12); Section 506(c) claims waived (¶ 16). |
| **TAB 12**<br>In re FPA Medical Management (Del. 1998) | Interim order authorized DIP facility to pay off pre-petition bank obligation; facility to be secured by all existing and after-acquired assets of the debtors (¶¶ 3 & 6); Section 506(c) claims waived (¶ 10). |

# Attachment 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| | Case Nos. 01 (41643) (RLB) |
| THE WARNACO GROUP, INC., et al., | through 01 (41680) (RLB) |
| | (Jointly Administered) |
| Debtors. | |

FINAL ORDER (I) AUTHORIZING DEBTORS IN
POSSESSION TO ENTER INTO POST-PETITION CREDIT
AGREEMENT PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT
TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING
ADEQUATE PROTECTION PURSUANT TO SECTIONS 363 AND
364 OF THE BANKRUPTCY CODE, AND (IV) SCHEDULING
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

Upon the motion, dated June 11, 2001 (the "Motion"), of The Warnaco

Group, Inc. ("Warnaco") and its affiliated debtors, as debtors and debtors in possession

(each individually a "Debtor" and, collectively, the "Debtors"), (a) for the entry of Orders

authorizing them to (i) obtain post-petition financing pursuant to sections 363 and 364 of

title 11 of the United States Code (the "Bankruptcy Code") by entering into that certain

Secured Super-Priority Debtor in Possession Revolving Credit Agreement, dated as of

June 11, 2001, as the same may be amended, supplemented or otherwise modified from

time to time (the "Post-Petition Credit Agreement"),[1] with the lenders and the letter of

credit issuing bank from time to time parties thereto (collectively, the "Post-Petition

---

[1] Unless otherwise defined herein, all capitalized terms used herein have the meanings
ascribed to such terms in the Post-Petition Credit Agreement.

Lenders"), Citibank, N.A. ("Citibank"), as Administrative Agent (in such capacity, the

"Post-Petition Agent"), and Salomon Smith Barney Inc., The Bank of Nova Scotia

("Scotiabank") and J.P. Morgan Securities, Inc., as Joint Lead Arrangers (collectively,

the "Arrangers"), subject to the terms and conditions set forth herein and therein, (ii)

grant mortgages, security interests, liens and superpriority claims to the Post-Petition

Collateral Agent acting on behalf of, and for the benefit of, itself, the Post-Petition Agent

and the Post-Petition Lenders (including as specifically set forth herein and in the Post-

Petition Credit Agreement a priority pursuant to section 364(c)(1) of the Bankruptcy

Code, liens pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code and priming

liens pursuant to section 364(d) of the Bankruptcy Code), (iii) provide adequate

protection to certain pre-petition lenders to the Debtors, all as more fully set forth herein,

and (iv) pending a final hearing on the Motion (the "Final Hearing"), obtain emergency

postpetition loans under the Post-Petition Credit Agreement to and including the date on

which the Final Order, as hereinafter defined, is entered (the "Interim Facility"), and (b)

in accordance with Bankruptcy Rule 4001(c)(2), requesting that this Court schedule the

Final Hearing and approve notice with respect thereto; and the Court having considered

the Motion and the Exhibits attached thereto, including, without limitation, the Post-

Petition Credit Agreement; and in accordance with Bankruptcy Rule 4001(c)(2) and

(c)(3), due and proper notice of the Motion having been given; and by order, dated June

11, 2001 (the "Interim Order"), the Court having (1) approved, among other things, the

Interim Facility and the execution and delivery of the Post-Petition Credit Agreement and

(2) established the date and time for the Final Hearing; and limited objections

(collectively, the "Objections") to the Motion and the relief requested therein having been

interposed by (x) Simon Property Group, L.P. ("Simon"), (y) General Electric Capital

Corporation ("GE Capital") and (z) The Macerich Company, Donahue Shriber and The

Forbes Company (collectively, the "Landlords"); and the Final Hearing to consider final

approval of the Motion and the relief requested therein, including, without limitation,

execution of and performance in accordance with the Post-Petition Credit Agreement

having been held and concluded on the date hereof ; and upon all of the pleadings filed

with the Court and all of the proceedings held before the Court; and after due deliberation

and consideration and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS:

       A.     On June 11, 2001 (the "Petition Date") each of the Debtors filed

with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The Debtors are operating their businesses and managing their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On June 19,

2001, the United States Trustee appointed a statutory committee of unsecured creditors in

the Debtors' chapter 11 cases in accordance with section 1102 of the Bankruptcy Code

(the "Creditors' Committee"). No request has been made for the appointment of a trustee

or examiner in the Debtors' chapter 11 cases.

       B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The

statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of

the Bankruptcy Code and Rule 4001(b) and (c) of the Federal Rules of Bankruptcy

Procedure. Venue of the Debtors' chapter 11 cases and this Motion in this District is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Pursuant to those certain credit agreements, financing

arrangements and other documents (collectively, the "Pre-Petition Covered Facilities"),

each as amended and restated in accordance with that certain Amendment, Modification,

Restatement and General Provisions Agreement, dated as of October 6, 2000, by and

among Warnaco, Warnaco Inc., certain of Warnaco's subsidiaries, Scotiabank and

Citibank, as Debt Coordinators (the "Debt Coordinators"), Scotiabank, as Administrative

Agent, and State Street Bank and Trust Company, as Collateral Trustee (the "Pre-Petition

Collateral Trustee" and together with the Debt Coordinators and the Administrative

Agent are sometimes hereinafter collectively referred to as the "Pre-Petition Facility

Agents") and the lenders from time to time party thereto (the "Pre-Petition Lenders"; the

Pre-Petition Lenders and the Post-Petition Lenders are hereinafter referred to collectively

as the "Lenders") (as amended, modified or otherwise supplemented from time to time,

the "Pre-Petition Facility Agreement", and together with all agreements, documents,

notes, instruments and any other agreements delivered pursuant thereto or in connection

therewith, the "Pre-Petition Financing Documents"), the Pre-Petition Lenders made loans

and advances to, issued letters of credit for and/or provided other financial

accommodations (collectively, the "Pre-Petition Indebtedness") to the Debtors to, <u>inter</u>

<u>alia</u>, fund the operations of the Debtors.  In connection with the Pre-Petition Facility

Agreement, the Debtors and the Pre-Petition Lenders entered into that certain

Intercreditor Agreement, dated as of October 6, 2000, by and among Warnaco, Warnaco

Inc., certain of Warnaco's subsidiaries, the Pre-Petition Facility Agents, Société

Générale, as Security Agent (together with the Pre-Petition Facility Agents, the "Pre-

Petition Agents"; the Pre-Petition Agents and the Post-Petition Agent are hereinafter

collectively referred to as the "Agents"), the lead arrangers and arrangers named therein, and the Pre-Petition Lenders (the "Pre Petition Intercreditor Agreement").

D.     The Debtors, other than Warnaco of Canada ("Warnaco Canada"), have jointly and severally unconditionally guaranteed all obligations under the Pre-Petition Financing Documents.  The Debtors admit that, as of the Petition Date, the aggregate amount of approximately Two Billion Four Hundred Thirteen Million Dollars ($2,413,000,000.00) was outstanding in respect of loans (together with accrued and unpaid interest thereon) made by the Pre-Petition Lenders pursuant to the Pre-Petition Covered Facilities, plus interest thereon and fees and expenses incurred in connection therewith to the extent as provided in the Order without prejudice to any claims that the Pre-Petition Lenders may have in accordance with the Bankruptcy Code.  For purposes of this Order, each of the terms Post-Petition Indebtedness, as hereinafter defined, Pre-Petition Indebtedness and Designated Post-Petition Loans, as hereinafter defined, shall include the principal of, and, to the extent payable and allowable hereunder or under the Bankruptcy Code, all interest, fees and other charges owing in respect of, such loans or indebtedness (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the relevant agreements relating to such loans or other indebtedness).

E.     To secure the Pre-Petition Indebtedness, the Debtors granted to the Collateral Trustee, as defined in the Pre-Petition Facility Agreement, on behalf of and for the benefit of the Pre-Petition Agents and the Pre-Petition Lenders, pursuant to various security agreements, pledge agreements, mortgages and other agreements, pledges, liens and security interests (collectively, the "Liens"), subject to certain exclusions, in

A:\FINALORDER.DOC                              5

substantially all of their personal property and other assets, wherever located, then owned

or thereafter acquired or arising, and the proceeds, products, rents and profits of all of the

foregoing (all of the foregoing collateral generally described above, together with all of

the proceeds, products, rents and profits thereof shall be referred to herein collectively as

the "Pre-Petition Collateral" and such Liens shall be referred to herein as the "Pre-

Petition Liens").

    F.  Without prejudice to the rights of third parties as provided herein,

the Debtors acknowledge and agree that the Pre-Petition Liens constitute valid, binding,

enforceable (other than in respect of the stay of enforcement arising from section 362 of

the Bankruptcy Code) and perfected first priority Liens subject only to prior Liens

described in or otherwise permitted by the Pre-Petition Facility Agreement, and are not

subject to avoidance or subordination (except insofar as such Liens are subordinated to

the Post-Petition Liens, the Designated Post-Petition Liens, the Adequate Protection

Liens and the Carveout (each as hereinafter defined) in accordance with the provisions of

this Order) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  Without

prejudice to the rights of third parties as provided herein, the Debtors further

acknowledge and agree that the Pre-Petition Indebtedness constitutes legal, valid and

binding obligations of the Debtors, enforceable in accordance with its terms (other than in

respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no

offsets, defenses or counterclaims to the Pre-Petition Indebtedness exist, and no portion

of the Pre-Petition Indebtedness is subject to avoidance or subordination pursuant to the

Bankruptcy Code or applicable non-bankruptcy law.

G.      An immediate and critical need exists for the Debtors to obtain

funds in order to continue the operation of their businesses.  Without such funds, the

Debtors will not be able to pay their payroll and other direct operating expenses and

obtain goods and services needed to carry on their businesses during this critical period in

a manner that will avoid irreparable harm to the Debtors' estates.  At this time, the ability

of the Debtors to finance their operations and the availability to them of sufficient

working capital and liquidity through the incurrence of new indebtedness for borrowed

money and other financial accommodations are vital to the confidence of the Debtors'

vendors and suppliers of other goods and services, to their customers and employees and

to the preservation and maintenance of the going concern value of the Debtors' estates.

The Debtors are unable to obtain the required funds in the form of unsecured credit or

unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an

administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code,

unsecured debt having the priority afforded by section 364(c)(1) or debt secured only as

described in section 364(c)(2) or (3).

H.      Subject to certain exceptions, substantially all of the Debtors'

assets are subject to the Pre-Petition Liens.  The Pre-Petition Lenders have objected to (i)

the priming of the Pre-Petition Liens pursuant to this Order and the other Post-Petition

Financing Documents (as hereinafter defined), except on the terms of this Order and (ii)

the use by the Debtors of their Pre-Petition Collateral, including their cash collateral,

except pursuant to the terms of this Order.

I.      The Pre-Petition Agents and the Pre-Petition Lenders have

indicated a willingness to consent and agree to the Debtors' entering into the financing

arrangements contemplated by the Interim Order, this Order and the Post-Petition

Financing Documents, and the Post-Petition Agent and Post-Petition Lenders are willing

to provide the additional financing contemplated herein, all subject to the terms and

conditions set forth herein, the Post-Petition Credit Agreement and in the other Post-

Petition Financing Documents and the provisions of this Order assuring that the Post-

Petition Liens, the Designated Post-Petition Liens, the Adequate Protections Liens (each

as hereinafter defined) and the various claims, super-priority claims and other protections

granted pursuant to this Order, the Post-Petition Credit Agreement and the other Post-

Petition Financing Documents will not be affected by any subsequent reversal or

modification of this Order or any other order, as provided in section 364(e) of the

Bankruptcy Code, which is applicable to the post-petition financing arrangements

contemplated by this Order.  The Post-Petition Agent, each of the Post-Petition Lenders,

each of the Pre-Petition Agents and each of the Pre-Petition Lenders has acted in good

faith in consenting to and in agreeing to provide the post-petition financing contemplated

by the Interim Order, this Order, the Post-Petition Credit Agreement and the other Post-

Petition Financing Documents and the reliance of the Post-Petition Agent, each of the

Post-Petition Lenders, each of the Pre-Petition Agents and each of the Pre-Petition

Lenders on the assurances referred to above is in good faith.

        J.      Pursuant to the Bankruptcy Code and in light of the foregoing, the

Debtors are required to provide adequate protection to the Pre-Petition Agents and the

Pre-Petition Lenders in respect of their use of the Pre-Petition Collateral, the potential

decline in value thereof and their granting of the priming Post-Petition Liens.  The

Debtors believe that the treatment requested by the Debtors for the Lenders and provided

by this Order will minimize disputes and litigation over collateral values, priming, use of

cash collateral, and the need to segregate the Pre-Petition Collateral and the proceeds

thereof from the Post-Petition Collateral (as hereinafter defined) and the proceeds thereof.

      K.    In accordance with the provisions of the Interim Order, notice of

the Final Hearing on the Motion and this Order has been provided (by hand, telecopy,

overnight mail or courier) to counsel to the Pre-Petition Agents, counsel to the Debt

Coordinators, counsel to the Post-Petition Agent, counsel to the Post-Petition Lenders,

the United States Trustee, counsel to the Creditors' Committee, and the holders of the

thirty (30) largest unsecured claims against the Debtors. In view of the urgency of the

relief requested, such notice constitutes sufficient notice under Bankruptcy Rule 4001 and

no other notice need be given.

      L.    Good cause has been shown for the entry of this Order. Among

other things, entry of this Order will minimize disruption of the Debtors' businesses and

operations and permit them to meet payroll and other operating expenses, obtain needed

supplies and retain customer, employee and supplier confidence by demonstrating an

ability to maintain normal operations. The financing arrangements authorized hereunder

are vital to avoid immediate and irreparable harm to the Debtors' estates. Consummation

of such financing arrangements therefore are in the best interests of the Debtors' estates.

      M.    The financing and adequate protection arrangements authorized

hereunder have been negotiated in good faith and at arm's length among the Debtors, the

Post-Petition Agent, each of the Post-Petition Lenders and each of the Pre-Petition

Agents on behalf of themselves and the Pre-Petition Lenders, and the terms of such

financing and adequate protection arrangements are fair and reasonable under the

circumstances, reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties and are supported by reasonably equivalent value and fair

consideration.

N.    The Debtors have requested entry of this Order pursuant to

Bankruptcy Rule 4001(b)(2) and (c)(2).  The permission granted herein to enter into the

Post-Petition Financing Documents and obtain funds, incur indebtedness and other

financial accommodations thereunder is necessary to avoid immediate and irreparable

harm to the Debtors.  This Court concludes that entry of this Order is in the best interests

of the Debtors and their estates and creditors as its implementation will, among other

things, allow for the continued operation and rehabilitation of the Debtors' existing

businesses.

O.    The Debtors, other than Warnaco Canada, are jointly and severally

unconditionally guaranteeing the Post-Petition Indebtedness and all other obligations

under the Post-Petition Loan Documents.

P.    The Debtors maintain records of all intercompany transfers.

Q.    The Creditors' Committee consents to the relief requested in the

Motion in accordance with the provisions provided for herein.

R.    The Objection of GE Capital has been resolved based upon the

representations and clarifications placed on the record at the Final Hearing.

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.  The Debtors be, and hereby are, authorized to enter into the Post-

Petition Credit Agreement (the Post-Petition Credit Agreement, together with all

agreements, documents, notes and instruments delivered pursuant hereto or thereto or in

A:\FINALORDER.DOC                    10

connection herewith or therewith, including this Order and the Final Order (as hereinafter defined), are hereinafter collectively referred to as the "Post-Petition Financing Documents") in substantially the form annexed to the Motion, and to borrow money, incur indebtedness and perform their obligations hereunder and thereunder in accordance with, and subject to, the terms of this Order and the other Post-Petition Financing Documents, including, without limitation, the repurchase of the Debtors' accounts receivable. The Debtors are authorized to enter into such modifications and amendments to the Post-Petition Financing Documents, without further order of this Court, as may be agreed upon in writing by the Debtors, the Post-Petition Agent and all of the Post-Petition Lenders (or a majority or supermajority subgroup thereof, as applicable under the terms of the Post-Petition Financing Documents), except for (i) any increase in the Commitments, other than in accordance with Section 13.1(a) of the Post-Petition Credit Agreement, (ii) any increase in the applicable interest rates on the Loans, (iii) any modification of the maturity of the Loans or the Designated Post-Petition Loans, or (iv) any other modification which imposes any additional material burden on the Debtors. Any written modification or amendment to the Post-Petition Credit Agreement not requiring any order of this Court shall not become effective until two (2) business days after notice of such modification or amendment has been given to counsel for the Debt Coordinators and counsel for the Creditors' Committee. Upon execution and delivery of the Post-Petition Financing Documents, the Post-Petition Financing Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms.

2.      From and after the Effective Date (as hereinafter defined) until (i)

the indefeasible payment in full in cash of the Post-Petition Indebtedness, including the

Loans and all obligations constituting unreimbursed drawings under Letters of Credit

(and the replacement or the cash collateralization of outstanding Letters of Credit) in

accordance with the Post-Petition Credit Agreement and (ii) the termination of any

commitments or obligations on the part of the (aa) Post-Petition Lenders to make Loans

and the Issuer to issue Letters of Credit, and (bb) Pre-Petition Lenders to make

Designated Post-Petition Loans under this Order, the Debtors are hereby authorized and

required to remit to the Post-Petition Agent immediately upon the Debtors' receipt

thereof or otherwise in accordance with the Debtors' current practices, all cash collateral

(as defined in section 363(a) of the Bankruptcy Code) in their possession or control

arising from, or constituting proceeds of, the Pre-Petition Collateral (the "Cash

Collateral"). For administrative convenience, all Cash Collateral required to be remitted

to the Post-Petition Agent under this Paragraph 2 shall, unless the Post-Petition Agent

notifies the Debtors to the contrary (which notification shall not be given unless (i) a

Default or Event of Default has occurred and is continuing under the Post-Petition Credit

Agreement or (ii) the Agents reasonably believe that any certificate furnished by the

Debtors pursuant to Paragraph 3 of this Order is, or was, inaccurate or misleading in any

material respect when so furnished), be deemed timely remitted (and applied and re-

advanced, where applicable, subject to and in accordance with the provisions of this

Order) as if the Post-Petition Agent received the Cash Collateral (and, where applicable,

re-advanced by the Post-Petition Agent on behalf of the Pre-Petition Lenders as

Designated Post-Petition Loans) on the same day as remitted to the Post-Petition Agent

or the Debtors' concentration accounts maintained at Citibank or an affiliate thereof. Provisions in the Pre-Petition Facility Agreement requiring notice, and restricting the time and amount of, borrowings and prepayments shall not apply to such deemed remittances. Cash Collateral remitted (or deemed remitted) to the Post-Petition Collateral Agent shall be applied as and to the extent specified in Paragraph 6 hereof. For purposes of this Order, "proceeds" of any collateral shall mean proceeds (as defined in the Uniform Commercial Code) of such collateral as well as (x) any and all proceeds of any insurance, indemnity or warranty or guaranty payable to the Debtors from time to time with respect to any of such collateral, (y) any and all payments (in any form whatsoever) made or due and payable to the Debtors in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such collateral by any governmental body, authority, bureau or agency (or any person under color of governmental authority) and (z) any other payments, dividends, interest or other distributions on or in respect of any of such collateral.

      3.     Subject to the applicable provisions of the Post-Petition Financing Documents and the terms of this Order, Cash Collateral which is remitted (or deemed remitted) to the Post-Petition Agent for application pursuant to Paragraph 6(a) of this Order to the Pre-Petition Indebtedness shall be re-advanced (or deemed re-advanced in accordance with Paragraph 2 of this Order) to the Debtors by the Post-Petition Agent on behalf of the Pre-Petition Lenders as loans ("Designated Post-Petition Loans") on the same day as remitted or deemed remitted to the Post-Petition Agent; provided, however, that, for purposes of this Order, the amount of Designated Post-Petition Loans shall be

limited to the first One Hundred Fifty Million Dollars ($150,000,000.00) of Cash

Collateral deemed re-advanced and the balance thereof shall be deemed to be the use of

Cash Collateral only with the consent of the Pre-Petition Agents and the Pre-Petition

Lenders, subject to the other provisions contained herein.  In the case of applications of

Cash Collateral to Pre-Petition Indebtedness and re-advances thereof as Designated Post-

Petition Loans, such applications and re-advances shall be deemed to have occurred as to

all Pre-Petition Lenders ratably in proportion to the principal amount of the Pre-Petition

Indebtedness held by them, whether or not such Pre-Petition Lenders are signatories to

the Post-Petition Financing Documents, and whether or not cash is actually transferred in

respect thereof by or on behalf of the Debtors, the Agents or such Lenders.  If, and to the

extent that, it may not be practicable for the Debtors to separate, on their books and

records, collections or sales of inventory and accounts receivable constituting Cash

Collateral ("Cash Collateral Collections") from other collections or sales of inventory and

accounts receivable, inventory and accounts receivable shall be deemed to have been

disposed of and the proceeds thereof collected on a first-in, first-out basis, or on any other

basis agreed to by the Debtors, the Agents and the Lenders; provided, however, that

counsel for the Creditors' Committee shall be notified, in writing, of any intended change

in allocation methodology with respect to collections of receivables and inventory

described above at least two (2) business days in advance thereof; and, provided, further,

that nothing herein shall impair or affect any right of any creditor to require an

accounting of its collateral by the Debtors under section 363 of the Bankruptcy Code or

otherwise.   Until such time as the use of Cash Collateral equals One Hundred Fifty

Million Dollars ($150,000,000.00), a Responsible Officer of the Debtors shall deliver in

writing to the Agents on Wednesday of each week, commencing with the second (2nd)

Wednesday following the Petition Date, a certificate setting forth the aggregate amount

of collections of Cash Collateral received by the Debtors during the immediately

preceding week ending Friday (except with respect to the first such certificate, which

shall set forth the aggregate amount of Cash Collateral received by the Debtors during the

period commencing on the Petition Date through and including the immediately

succeeding Friday), the outstanding principal amount of Pre-Petition Indebtedness as of

such date after giving effect to the application of such Cash Collateral in accordance with

Paragraphs 2 and 6 of this Order and the outstanding principal amount of Designated

Post-Petition Loans as of such date.

4.      Any and all payments or proceeds remitted, or deemed to be

remitted, to the Post-Petition Agent pursuant to the provisions of Paragraph 2 of this

Order shall be received, or deemed received, by the Post-Petition Agent for the benefit of

the relevant Lenders free and clear of any claim, charge, assessment or other liability,

including, without limitation, any such claim or charge arising out of or based on, directly

or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the

Debtors) or 552(b) of the Bankruptcy Code, other than the obligation to re-advance funds

in accordance with the provisions herein.

5.      From and after the Effective Date through the Termination Date

(as hereinafter defined), and subject to the terms and conditions of this Order, the Debtors

are hereby authorized to borrow and reborrow funds and incur indebtedness pursuant to

the terms and provisions of this Order, the Post-Petition Credit Agreement and the other

Post-Petition Financing Documents.

6.    a.    The first One Hundred Fifty Million Dollars

($150,000,000.00) of Cash Collateral remitted, or deemed to be remitted, to the Post-

Petition Agent pursuant to Paragraph 2 of this Order shall, except as set forth in

Paragraph 6(b) of this Order, be applied to the payment of any outstanding Pre-Petition

Indebtedness and, pursuant to and in accordance with Paragraphs 2 and 3 of this Order,

shall be re-advanced (or deemed re-advanced) to the Debtors by the Pre-Petition Lenders

as Designated Post-Petition Loans on the same day remitted, or deemed to be remitted, to

the Post-Petition Agent.  Thereafter, all Cash Collateral may be used by the Debtors in

accordance with this Order.

b.    All Cash Collateral remitted, or deemed to be remitted, to

the Post-Petition Agent pursuant to Paragraph 2 of this Order that (x) is so remitted or

deemed remitted at any time on or after the Termination Date or (y) arises from

transactions outside the ordinary course of business and all proceeds of the sale,

collection or other disposition of Post-Petition Collateral that does not also constitute Pre-

Petition Collateral and any proceeds, recoveries and amounts received by the Debtors in

respect of Avoidance Action Collateral, as defined below, shall be applied, subject to the

Carveout (as defined below) (i) first, to the payment of the Post-Petition Indebtedness,

including the Loans and all obligations constituting unreimbursed drawings under Letters

of Credit (and the cash collateralization of outstanding Letters of Credit) in accordance

with the Post-Petition Financing Documents, and (ii) second, after the indefeasible

payment in full in cash of the Post-Petition Indebtedness, including the Loans and all

obligations constituting unreimbursed drawings under Letters of Credit (and the

replacement or the cash collateralization of outstanding Letters of Credit) in accordance

with the Post-Petition Financing Documents and the termination of any commitments or

obligations on the part of the Post-Petition Lenders, including the Issuer, to make Loans

or extend other credit and/or to issue Letters of Credit, to the payment of the Designated

Post-Petition Loans; provided, however, that proceeds of Post-Petition Collateral applied

to the payment of Designated Post-Petition Loans shall not include proceeds of

Avoidance Action Collateral received from the Pre-Petition Lenders.

c.   All amounts applied to the payment of the Post-Petition

Indebtedness or the Pre-Petition Indebtedness, as the case may be, shall be applied

thereto in the manner set forth in the relevant Post-Petition Financing Documents and

Pre-Petition Financing Documents, as the case may be.  All amounts applied to the

payment of the Designated Post-Petition Loans shall be applied thereto in the same

manner as set forth in the Pre-Petition Financing Documents for the Pre-Petition

Indebtedness.  All amounts applied to the payment of the Adequate Protection

Obligations shall be applied thereto in the same manner as set forth in the Pre-Petition

Financing Documents for the Pre-Petition Indebtedness.

7.     Payment of the Pre-Petition Indebtedness, the Designated Post-

Petition Loans and Adequate Protection Obligations shall, at all times, be subordinated to

the indefeasible payment in full in cash of the Post-Petition Indebtedness, including the

Loans and all obligations constituting unreimbursed drawings under Letters of Credit

(and the replacement or the cash collateralization of all outstanding Letters of Credit) in accordance with the Post-Petition Financing Documents.  Without limiting the generality of the foregoing, unless and until all outstanding Post-Petition Indebtedness is indefeasibly paid in full in cash, all other amounts due and owing under the Post-Petition Financing Documents are indefeasibly paid in full in cash (including, without limitation, all obligations with respect to Letters of Credit) and the Post-Petition Credit Agreement and all commitments therein are terminated, under no circumstances shall any holder of Pre-Petition Indebtedness, Designated Post-Petition Loans or Adequate Protection Obligations have, with respect thereto, any enforcement rights against, or with respect to, the Pre-Petition Collateral or Post-Petition Collateral or any other rights or remedies that may interfere with or otherwise restrict the rights and remedies of the Post-Petition Agent or the Post-Petition Lenders hereunder, under the other Post-Petition Financing Documents or otherwise with respect to the Post-Petition Indebtedness.

       8.   As security for all loans, advances, letters of credit and any other indebtedness or obligations, contingent or absolute which may now or from time to time hereafter be owing by the Debtors to the Post-Petition Agent or the Post-Petition Lenders hereunder or under any of the other Post-Petition Financing Documents (all such loans, advances, letters of credit and other indebtedness or obligations, together with any obligations at any time incurred by the Debtors on or after the Petition Date to any of the Agents or any of the Lenders in connection with the Debtors' cash management system, but in all events excluding the Designated Post-Petition Loans and Adequate Protection Obligations, collectively, the "Post-Petition Indebtedness"), subject to the provisions

contained herein, the Post-Petition Agent is hereby granted for the sole benefit of the

Post-Petition Agent and the Post-Petition Lenders valid, binding, enforceable and

perfected Liens (the "Post-Petition Liens") in all currently owned or hereafter acquired

property and assets of the Debtors of any kind or nature, whether real or personal,

tangible or intangible, wherever located, now owned or hereafter acquired or arising and

all proceeds, products, rents and profits thereof, including, without limitation, all cash

(including all Cash Collateral, wherever held), goods, accounts receivable, inventory,

cash-in-advance deposits, real estate, machinery, equipment, vehicles, trademarks, trade

names, licenses, causes of action, rights to payment including tax refund claims,

insurance proceeds and tort claims (including actions for preferences, fraudulent

conveyances, and other avoidance power claims and any recoveries under sections

506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code,

provided that the lien on such actions shall be limited to a fifty percent (50%) interest in

such actions) (the "Avoidance Action Collateral") and the proceeds, products, rents and

profits of all of the foregoing (all of the foregoing, the "Post-Petition Collateral"), (i)

subject only to the Carveout and to any valid, binding, enforceable and perfected Liens

(other than the Pre-Petition Liens ) existing in the Post-Petition Collateral on the Petition

Date (collectively, the "Senior Liens"), and (ii) senior and superior pursuant to section

364(d) of the Bankruptcy Code to the Pre-Petition Liens, the Designated Post-Petition

Liens, the Adequate Protection Liens and all other present and future Liens in and to the

Post-Petition Collateral other than Senior Liens (such other Liens collectively, the "Other

Liens").

9.   As security for all Designated Post-Petition Loans from time to time owing by the Debtors to the Pre-Petition Agents or the Pre-Petition Lenders, subject to the provisions contained herein, the Post-Petition Agent is hereby granted for the sole benefit of the Pre-Petition Lenders and the Pre-Petition Agents as holders of the Designated Post-Petition Loans valid, binding, enforceable and perfected Liens (the "Designated Post-Petition Liens") in all Post-Petition Collateral (including the Avoidance Action Collateral other than avoidance actions and proceeds of Avoidance Action Collateral received from the Pre-Petition Lenders) (a) subject only to (i) the Post-Petition Liens and (ii) the Carveout and any Senior Liens, and (b) senior and superior pursuant to section 364(d) of the Bankruptcy Code to the Other Liens, the Adequate Protection Liens and the Pre-Petition Liens.

10. As adequate protection in accordance with sections 363(e) and 364(d) of the Bankruptcy Code, the Post-Petition Agent is hereby granted for the sole benefit of the Pre-Petition Agents and the Pre-Petition Lenders valid, binding, enforceable and perfected Liens (the "Adequate Protection Liens") in all Post-Petition Collateral (including the Avoidance Action Collateral, other than avoidance actions and proceeds of Avoidance Action Collateral received from the Pre-Petition Lenders, to secure an amount of Pre-Petition Indebtedness equal to the sum (the "Adequate Protection Obligations") of, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Pre-Petition Collateral, by (i) the aggregate reduction in the amount of the Pre-Petition Collateral available to satisfy Pre-Petition Indebtedness as a consequence of the priming authorized hereunder, (ii) the use, sale, loss, decline in market price or

otherwise (other than by payment of the Pre-Petition Indebtedness which is not secured

by the Adequate Protection Liens) and (iii) the sum of the aggregate amount of all cash

proceeds of Pre-Petition Collateral and the aggregate fair market value of all non-cash

Pre-Petition Collateral which is applied in accordance with this Order or otherwise in

payment of the Post-Petition Indebtedness, previously created Adequate Protection

Obligations or any other obligations or expenses of the Debtors other than the Pre-

Petition Indebtedness.  The Adequate Protection Obligations shall be allocated pro rata to

the Pre-Petition Indebtedness.  The Adequate Protection Liens are (a) subject only to (i)

the Post-Petition Liens, (ii) the Carveout and any Senior Liens, and (iii) the Designated

Post-Petition Liens, and (b) senior and superior pursuant to section 364(d) of the

Bankruptcy Code to the Other Liens and the Pre-Petition Liens.

11. As additional adequate protection in accordance with sections 363(e)

and 364(d) of the Bankruptcy Code, except as otherwise provided in this Order, the Post-

Petition Credit Agreement, or any order of this Court, the Debtors shall comply with the

provisions of Sections 2.5(k) and 2.6 of the Pre-Petition Facility Agreement to the extent

that such provisions require any Debtor to cause any direct or indirect subsidiary or

subsidiaries of Warnaco that are not Debtors to take action (or refrain from acting) with

respect to the matters specified in such sections.

12. Except as expressly set forth in this Order, the Liens granted in this

Order shall not be (i) upon entry of the Final Order, subject to any Lien which is avoided

and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy

Code or (ii) subordinated to or made pari passu with any other Lien under section 364(d)

of the Bankruptcy Code or otherwise.  As used in this Order, "Carveout" means (i) the

unpaid fees of the clerk of the Bankruptcy Court and of the United States Trustee

pursuant to 28 U.S.C. § 1930(a) and (b), (ii) the unpaid fees and expenses of a mediator

or an examiner or an expert witness which may be appointed by the Bankruptcy Court in

accordance with section 1104 of the Bankruptcy Code or Federal Rule of Evidence 706,

respectively, or the local rules and orders of the Bankruptcy Court, and (iii) the aggregate

allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy

Code to professional persons retained pursuant to an order of the Court by the Debtors or

any statutory committee appointed in these chapter 11 cases (other than the fees and

expenses, if any, of any such professional persons incurred, directly or indirectly, in

respect of, arising from or relating to, the initiation or prosecution of any action for

preferences, fraudulent conveyances, other avoidance power claims or any other claims

or causes of action against the Agents or the Lenders or with respect to the Post-Petition

Indebtedness or the Pre-Petition Indebtedness), not to exceed Ten Million Dollars

($10,000,000.00) in the aggregate plus additional amounts as may be approved by the

Arrangers based upon additional retention orders; provided, however, that, among the

beneficiaries of the Carveout, the claims set forth in subsection (i) hereof shall have

priority in right of payment over those set forth in subsections (ii) and (iii) hereof.  So

long as no Event of Default shall have occurred and be continuing, the Debtors shall be

permitted to pay compensation and reimbursement of expenses allowed and payable

under sections 330 and 331 of the Bankruptcy Code, as the same may be due and

payable, and the same shall not reduce the Carveout.

13. In addition, (i) the Post-Petition Indebtedness shall have priority in all of these chapter 11 cases in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code ("Superpriority"), except that the Superpriority Claim shall not attach to fifty percent (50%) of recoveries from actions under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code, subject only to the Carveout, (ii) the Designated Post-Petition Loans shall constitute an administrative expense claim, subject only to the Carveout, and the aforementioned priority of the Post-Petition Indebtedness; provided, however, that such administrative expense claim status for Designated Post-Petition Loans shall be limited to One Hundred Fifty Million Dollars ($150,000,000.00) and that such administrative expense status shall be pari passu with all other administrative expenses in accordance with section 507(a)(1) of the Bankruptcy Code and (iii) the Adequate Protection Obligations, to the extent the Adequate Protection Liens are not adequate to protect against the diminution in value of the Pre-Petition Collateral, shall have Superpriority, except that the superpriority claim shall not attach to (x) fifty percent (50%) of recoveries from actions under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code or (y) all recoveries received from the Pre-Petition Lenders as a result of such actions, subject only to the Carveout and the aforementioned priority of the Post-Petition Indebtedness and the Designated Post-Petition Loans.  Except as expressly set forth herein, no costs or administrative expenses which have been or may be incurred in the Debtors' chapter 11 cases, in any conversion of the Debtors' chapter 11 cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation,

any other Superpriority claims, are or will be prior to or on a parity with the claims of the

Agents or the Lenders against the Debtors arising, as applicable, out of the Post-Petition

Indebtedness or Adequate Protection Obligations, or any provision of this Order or with

the Liens granted herein and in the other Post-Petition Financing Documents in and to the

Post-Petition Collateral.  Notwithstanding the Superpriority or administrative claims and

Liens afforded to the Designated Post-Petition Loans and the Adequate Protection

Obligations pursuant to this Order and further notwithstanding any other provision hereof

to the contrary, all holders of such administrative claims and Liens shall be bound by the

agreement of such holders to the treatment of such administrative claims and Liens

proposed in any plan of reorganization if the holders of at least two-thirds in amount of

such administrative claims accept such plan.

14. Interest on the Loans and other Post-Petition Indebtedness shall accrue

at the rates (including any default rates, if applicable) and shall be paid at the times as

provided in the Post-Petition Financing Documents.  Interest on the Designated Post-

Petition Loans shall accrue and be allowed only to the extent interest is allowed on the

Pre-Petition Indebtedness.  The Post-Petition Indebtedness and, subject to the last

sentence of Paragraph 13 hereof, the Designated Post-Petition Loans shall become due

and payable, without notice or demand, on the Termination Date, as provided herein and

in the other Post-Petition Financing Documents and from and after the Termination Date,

the Debtors shall have no authority to use Pre-Petition Collateral (including Cash

Collateral) of the Pre-Petition Agents or the Pre-Petition Lenders except upon further

order of the Court upon notice to the Pre-Petition Agents and a hearing.

15. The Debtors shall use the proceeds of the Post-Petition Indebtedness, the Designated Post-Petition Loans and the issuance of the Letters of Credit solely for the purposes provided in the Post-Petition Financing Documents and in this Order.

16. From and after the Effective Date, the proceeds of the Post-Petition Indebtedness, Designated Post-Petition Loans, the issuance of the Letters of Credit, the Pre-Petition Collateral and the Post-Petition Collateral shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except for (i) those expenses and/or disbursements that are expressly permitted under the Post-Petition Financing Documents, (ii) compensation and reimbursement of expenses allowed by this Court to attorneys, accountants, investment bankers, financial advisors or other professional persons retained by the Debtors or any official committees that may be appointed in these chapter 11 cases and (iii) amounts due to the Agents and/or the Lenders and their accountants, appraisers, attorneys or other professionals hereunder or under the other Post-Petition Financing Documents; provided, however, that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in the preceding clause (ii) and shall not affect the right of the Agents or the Lenders to object to the allowance and payment of such amounts.  Except to the limited extent of the Carveout, no administrative claims, including fees and expenses of professionals, shall be assessed against or attributed to, or sought to be assessed against or attributed to, any of the Post-Petition Agent, any of the Post-Petition Lenders, any of the Pre-Petition Agents or any of the Pre-Petition Lenders with respect to their interests in the Post-Petition Collateral pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by,

through or on behalf of the Debtors, without the prior written consent of the Agents and the Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the Agents or the Lenders or otherwise.  Except for the purposes set forth in the first sentence of this Paragraph 16, neither the Lenders nor the Agents have consented or agreed to the use of the proceeds of the Post-Petition Indebtedness, the Designated Post-Petition Loans, the Pre-Petition Collateral or the Post-Petition Collateral.

17. The automatic stay extant under section 362(a) of the Bankruptcy Code shall be, and it hereby is, modified to the extent necessary to permit the Agents for the sole benefit of the Lenders to receive, collect and apply payments and proceeds in respect of the Pre-Petition Collateral and the Post-Petition Collateral in accordance with the terms and provisions of this Order, the Post-Petition Credit Agreement, and the other Post-Petition Financing Documents.

18. Notwithstanding anything herein or in the other Post-Petition Financing Documents, the Debtors shall no longer, pursuant to this Order, the other Post-Petition Financing Documents, or otherwise, be authorized to borrow funds or incur indebtedness hereunder or under the other Post-Petition Financing Documents or to use any proceeds of the Post-Petition Indebtedness or Designated Post-Petition Loans already received (and any obligation of the Lenders to make loans or advances or issue Letters of Credit hereunder or under the other Post-Petition Financing Documents shall be terminated and notice thereof shall be provided in writing to counsel to the Creditors' Committee and counsel to the Debt Coordinators) upon the earliest to occur of any of the

following events (any such event shall be referred to as a "Termination Event" and the

date of any such event shall be referred to as the "Termination Date"):

> (i) any Event of Default shall have occurred and be
continuing, and any notice required pursuant to the Post-Petition Financing Documents to
cause the Post-Petition Indebtedness to become due and payable shall have been given;
and

> (ii) the Scheduled Termination Date.

Notwithstanding the occurrence of the Termination Date or anything herein, all of the

rights, remedies, benefits and protections provided to the Agents and the Lenders under

this Order shall survive the Termination Date. Subject to the last sentence of Paragraph

13 hereof, upon the Termination Date, the principal of and all accrued interest and fees

and all other amounts owed to the Agents or the Lenders hereunder or under the other

Post-Petition Financing Documents shall be immediately due and payable and the Agents

and the Lenders shall have all other rights and remedies provided in the Post-Petition

Financing Documents. Notwithstanding anything herein to the contrary, no Post-Petition

Indebtedness, Designated Post-Petition Loans or any proceeds of Pre-Petition Collateral

or Post-Petition Collateral or Letters of Credit (collectively, "Lender Funds") may be

used by any of the Debtors, any statutory committee or any other person or entity to

object to or contest in any manner, or raise any defenses to, the validity, perfection,

priority or enforceability of the Pre-Petition Indebtedness or the Pre-Petition Liens, or to

assert or prosecute any action for preferences, fraudulent conveyances, other avoidance

power claims or any other claims or causes of action against any of the Pre-Petition

Lenders or any of the Pre-Petition Agents; without limitation of the foregoing, (i) at no

time shall any such committee or other person or entity have the right to use Lender

Funds to prosecute any such claims, causes of action, objections, contests or defenses

(collectively, "Claims and Defenses"), (ii) any such committee or other person or entity

shall have the right, without further order of the Bankruptcy Court, to assert Claims and

Defenses only in an action commenced in the Bankruptcy Court on or before October 22,

2001, which date may be extended by the Bankruptcy Court only upon a showing by the

Creditors' Committee that the Pre-Petition Lenders did not cooperate with respect to the

Creditors' Committee's reasonable requests, (iii) if no such action is commenced on or

before such date, all Claims and Defenses shall be deemed, immediately and without

further action by the Agents or the Lenders, to have been forever relinquished and waived

as to such committee and other person or entity, (iv) if such an action is commenced on

or before such date, all Claims and Defenses shall be deemed, immediately and without

further action by the Agents or the Lenders, to have been forever relinquished and waived

as to such committee and other person or entity, except with respect to Claims and

Defenses that are expressly asserted in such action and (v) the terms of this Order

pertaining to the granting of Liens and Superpriority claims for, and the repayment of,

Pre-Petition Indebtedness, Designated Post-Petition Loans and Adequate Protection

Obligations shall be without prejudice to the right of any such committee or other person

or entity to commence and prosecute Claims and Defenses as set forth above; and,

provided, further, that, as to the Debtors, all such Claims and Defenses are hereby

relinquished and waived as of the Effective Date.  Notwithstanding anything contained

herein to the contrary, to the extent it is determined by a final order that the Pre-Petition

Lenders do not have valid and perfected liens and security interests, then the provisions

hereof with respect to adequate protection, including the Designated Post-Petition Loans,

shall be void and of no force and effect to the extent of such invalid or unperfected lien or security interest. In addition to the foregoing, no Lender Funds may be used by any of the Debtors, any statutory committee or any other entity to object to or contest in any manner the Post-Petition Indebtedness or the Post-Petition Liens or to assert or prosecute any actions, claims or causes of action against any of the Post-Petition Agents or any of the Post-Petition Lenders.

19. If it shall be necessary for the Post-Petition Agent or the Post-Petition Lenders, at any time, to exercise any of their respective rights and remedies hereunder, under the Post-Petition Financing Documents, or under applicable law in order to effect repayment of the Post-Petition Indebtedness, to receive any amounts or remittances due hereunder or for the Pre-Petition Agents and the Pre-Petition Lenders to exercise any of their respective rights or remedies with respect to a default under the provisions of Paragraph 11 hereof, including, without limitation, foreclosing upon and selling all or a portion of the Post-Petition Collateral, the Post-Petition Agent, the Pre-Petition Agents, the Pre-Petition Lenders and the Post-Petition Lenders shall have the right without any further action or approval of this Court to exercise such rights and remedies available to them under applicable law as to all or such part of the Post-Petition Collateral as the Post-Petition Agent, the Pre-Petition Agents, the Pre-Petition Lenders or the Post-Petition Lenders shall, in their sole discretion, elect; provided, however, that none of the Post-Petition Agent, the Pre-Petition Agents, the Pre-Petition Lenders or the Post-Petition Lenders, as applicable, shall exercise such rights or remedies without having provided the Debtors, counsel for the Creditors' Committee, and counsel for the Debt Coordinators with at least five (5) business days' advance written notice by fax, overnight, or hand

Case 01-31751   Doc 146-1   Filed 10/09/01   Entered 10/10/01 00:00:00   Desc
Pleading   Page 34 of 423

delivery. The Agents and the Lenders shall be entitled to apply the payments or proceeds

of the Pre-Petition Collateral and the Post-Petition Collateral in accordance with the

provisions of this Order, and in no event shall any of the Agents or any of the Lenders be

subject to the equitable doctrine of "marshaling" or any other similar doctrine with

respect to any of the Pre-Petition Collateral or Post-Petition Collateral or otherwise.

20. The Debtors shall execute and deliver to the Agents and the Lenders

all such agreements, financing statements, instruments and other documents as the

Agents or any of the Lenders may reasonably request to evidence, confirm, validate or

perfect the Liens granted pursuant hereto.

21. Without limiting the rights of access and information afforded the

Agents and the Lenders under the Post-Petition Financing Documents, the Debtors shall

permit representatives, agents and/or employees of the Agents or the Lenders to have

reasonable access to their premises and their records during normal business hours

(without unreasonable interference with the proper operation of the Debtors' businesses)

and shall cooperate, consult with, and provide to such persons all such non-privileged

information as they may reasonably request.

22. The Debtors shall promptly (a) reimburse the Post-Petition Agent and

the Post-Petition Lenders for their costs and expenses provided for in Sections 13.3(a)

and 13.3(b) of the Post-Petition Credit Agreement and (b) pay the costs, fees and

expenses of the Debt Coordinators and the Pre-Petition Collateral Trustee (as each of

such terms is defined in Paragraph C of this Order) as set forth in Section 8.2(a) of the

Pre-Petition Facility Agreement. Notwithstanding anything contained in this Order to the

contrary, any costs, fees and expenses and interest payable to any of the Pre-Petition

Lenders or to any agent or representative of any of the Pre-Petition Lenders pursuant to

the Pre-Petition Intercreditor Agreement or the Pre-Petition Covered Facilities and not

referred to in clause (b) above shall accrue and be payable as part of the secured claim of

such claimant to the extent provided in the Bankruptcy Code. None of such costs and

expenses shall be subject to the approval of this Court, and no recipient of any such

payment shall be required to file with respect thereto any interim or final fee application

with this Court; provided, however, that the Post-Petition Lenders, the Pre-Petition

Collateral Trustee and the Debt Coordinators' professionals shall provide copies of their

invoices to counsel for the Creditors' Committee at the same time such invoices are

submitted to the Debtors for payment and such invoices shall set forth a brief summary of

services provided and a list of professionals who worked on the matter and, to the extent

that such professionals' fees are determined on an hourly basis, their respective hourly

rates and the number of hours that each such professional worked during the subject time

period. All Liens granted herein and in the other Post-Petition Financing Documents to

secure repayment of the Post-Petition Indebtedness, and all Liens granted herein to secure

repayment of the Designated Post-Petition Loans and Adequate Protection Obligations,

shall pursuant to this Order be, and they hereby are, deemed perfected effective as of the

Effective Date, and no further notice, filing or other act shall be required to effect such

perfection; provided, however, that, if the Agents shall, in their sole discretion, choose to

file such mortgages, financing statements, notices of liens and security interests and other

similar documents, all such mortgages, financing statements or similar instruments shall

be deemed to have been filed or recorded at the time and on the date of entry of this

Order; and, <u>provided</u>, <u>further</u>, that, in the event that the granting of any Liens pursuant to the terms provided for herein shall give rise to an asserted default or event of default under any underlying agreement or instrument, the Liens granted herein shall be valid and binding to the fullest extent that applicable bankruptcy and non-bankruptcy law, including, without limitation, the automatic stay extant pursuant to section 362 of the Bankruptcy Code, prevents such default or event of default from occurring or becoming effective; <u>provided</u>, <u>however</u>, that such Liens shall be deemed not to have been granted, or shall be limited, <u>ab initio</u>, to the extent, and solely to the extent, that the rights of the Debtors under such agreement or instrument with respect to the other party thereto would be impaired under such agreement or instrument by reason of the granting of such Lien. Without limiting the generality of the foregoing, no party asserting a default, event of default or rights under an agreement or instrument by reason of the granting of the Liens hereunder, shall assert such default, event of default or rights thereunder unless such party first seeks and obtains relief from the automatic stay pursuant to section 362 of the Bankruptcy Code.

23. The provisions of this Order shall be binding upon and inure to the benefit of each of the Pre-Petition Agents, each of the Post-Petition Agent, each of the Pre-Petition Lenders and each of the Post-Petition Lenders and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors).

24. For purposes of this Order, the "Effective Date" shall be the Petition
Date.

25. Based on the findings set forth in this Order and in accordance with
section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing
arrangements contemplated by this Order, in the event any or all of the provisions of this
Order or any other Post-Petition Financing Documents are hereafter modified, amended
or vacated by a subsequent order of this or any other Court, no such modification,
amendment or vacature shall affect the validity, enforceability or priority of any Lien or
claim authorized or created hereby or thereby.  Notwithstanding any such modification,
amendment or vacature, any claim granted to the Agents or the Lenders hereunder or
under the other Post-Petition Financing Documents arising prior to the effective date of
such modification, amendment or vacature shall be governed in all respects by the
original provisions of this Order and the other Post-Petition Financing Documents, and
the Agents and the Lenders, as the case may be, shall be entitled to all of the rights,
remedies, privileges and benefits, including the Liens and priorities granted herein and
therein, with respect to any such claim.

26. The Debtors are authorized to do and perform all acts, to make,
execute and deliver all instruments and documents (including, without limitation, the
execution of additional security agreements, mortgages and financing statements) and to
pay fees and expenses which may be required or necessary for the Debtors' performance
under the Post-Petition Financing Documents, including, without limitation:  (i) the
execution of the Post-Petition Financing Documents, and (ii) the payment of the fees and

other expenses described in the Post-Petition Financing Documents as such become due,

including, without limitation, agent fees, commitment fees, letter of credit fees and

facility fees and reasonable attorneys', financial advisers', appraisers' and accountants'

fees and disbursements as provided for in the Post-Petition Financing Documents.

27. The obligations of the Debtors in respect of the Post-Petition

Indebtedness, including the Loans and all obligations in respect of the Letters of Credit

and, subject to the last sentence of Paragraph 13 hereof, the Designated Post-Petition

Loans and the Adequate Protection Obligations, unless otherwise paid in full or provided

as otherwise agreed upon, shall not be discharged by the entry of an order (i) confirming

a plan of reorganization in any of the Debtors' chapter 11 cases and, pursuant to section

1141(d)(4) of the Bankruptcy Code, the Debtors having hereby waived such discharge or

(ii) dismissing any or all of the Debtors' chapter 11 cases.  Without limiting the

foregoing, no order dismissing any of the Debtors' chapter 11 cases under section 1112

of the Bankruptcy Code or otherwise shall be entered unless prior to the entry thereof,

either (i) all obligations and indebtedness owing to the Post-Petition Agent and the Post-

Petition Lenders shall have been paid in full or with respect to outstanding Letters of

Credit, the same shall have been fully cash collateralized in accordance with the

provisions of the Post-Petition Credit Agreement or (ii) all material assets of the Debtors

shall have been liquidated and the proceeds thereof distributed in accordance with the

priorities established by this Order and the Bankruptcy Code or (iii) agreed to in writing

by the Post-Petition Agent.

28. Notwithstanding anything herein, but subject to the last sentence of
Paragraph 13 hereof, the entry of this Order is without prejudice to, and does not
constitute a waiver of, expressly or implicitly, or otherwise impair, (x) any of the rights of
the Agents or the Lenders under the Bankruptcy Code or under non-bankruptcy law,
including, without limitation, the right of the Agents or the Lenders to (i) request
additional adequate protection of their interests in the Pre-Petition Collateral or the Post-
Petition Collateral or relief from or modification of the automatic stay extant under
section 362 of the Bankruptcy Code, (ii) request conversion of any of the Debtors'
chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and (iii) propose,
subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or
plans or (y) any of the rights, claims or privileges (whether legal, equitable or otherwise)
of the Agents, or the Lenders.

29. Consistent with the terms and provisions of this Order, any moneys
held by or transferred to Citibank or its affiliate, as Post-Petition Agent, shall constitute
Post-Petition Collateral and shall be held and, to the extent provided hereunder and in the
Post-Petition Credit Agreement, applied for the benefit of the Post-Petition Agent, the
Post-Petition Lenders, the Pre-Petition Agents and the Pre-Petition Lenders in accordance
with the Post-Petition Financing Documents and their interests and priorities as set forth
in this Order.

30. Any Debtor's Affiliate which hereafter becomes a debtor in a case
under chapter 11 of the Bankruptcy Code in this Court shall automatically, immediately
upon the filing of a petition for relief for such Affiliate, be deemed to be one of the

"Debtors" hereunder in all respects, and all of the terms and provisions of this Order,
including, without limitation, those provisions granting liens and security interests in all
assets and properties of each of the Debtors and Superpriority claims in each of the
Debtors' chapter 11 cases, shall immediately be applicable in all respects to such Affiliate
and its chapter 11 estate.

31. This Order shall constitute findings of fact and conclusions of law and
shall take effect immediately upon execution hereof.

32. Any claim or charge asserted against the Pre-Petition Lenders arising
out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether
asserted or assessed by, through or on behalf of the Debtors) with respect to their interests
in the Pre-Petition Collateral are hereby waived and relinquished.

33. To the extent of any inconsistency between the terms of this Order and
the Post-Petition Credit Agreement, the terms and provisions of this Order shall govern.

34. The Objections of Simon and the Landlords are overruled to the extent
not otherwise resolved at the Final Hearing.

Dated: New York, New York
     July 9, 2001

                                     *s/Richard L. Bohanon*
                                   United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CASUAL MALE CORP. | |
| Debtors | Case No. 01-41404<br>Jointly Administered |

**FINAL ORDER (i) APPROVING POSTPETITION FINANCING, (ii) GRANTING
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
TREATMENT, (iii) PROVIDING ADEQUATE PROTECTION, AND (iv) MODIFYING
AUTOMATIC STAY, PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 4001**

THIS MATTER having come before the Court upon the Motion (the "**Motion**") of Casual Male Corp. and the entities listed on Schedule 1 hereto, each as a debtor and debtor in possession (collectively, the "**Debtors**") seeking the entry of interim and final orders including authority to:

(i)　　Obtain credit and incur debt up to the aggregate principal amount of $135,000,000.00 secured by liens (as defined in Section 101(37) of Title 11, U.S.C., as amended (the "Bankruptcy Code") and referred to herein as "Liens") on property of the Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code.

(ii)　　Establish that financing arrangement (the "**DIP Credit Facility**") as provided in that certain Loan and Security Agreement, substantially in the form attached to the Motion as Exhibit A (the "**Loan Agreement**") by and among the Debtors, Fleet Retail Finance Inc., a Delaware corporation, as administrative and collateral agent (the "**Agent**"), for itself, the Revolving Credit Lenders (as defined in the Loan Agreement), the Tranche B Lender and the Tranche C Lender (each as defined in the Loan Agreement and together with the Revolving Credit Lenders, the "**Lenders**").

(iii)　　Provide the Agent (for the benefit of itself and the Lenders) with Liens upon the Debtors' property as provided in and as contemplated by the Loan Documents as supplemented by this Order (the Loan Agreement and all such instruments and documents as may be executed and delivered in connection therewith or which relate thereto being referred to hereinafter collectively, as the "**Loan Documents**").

(iv)　　Utilize the proceeds of the first borrowing under the DIP Credit Facility after the entry of this Interim Order to retire the Debtors' Pre-Petition Obligations (as

defined in Finding L below) arising under that certain Loan and Security Agreement dated February 3, 2001, as amended and in effect (the "**Pre-Petition Loan Agreement**"), by and among Fleet Retail Finance Inc. as agent (solely in such capacity, the "**Pre-Petition Agent**") and other financial institutions identified therein as "Lenders" (solely in such capacities, the "**Pre-Petition Lenders**"), which obligations shall include, but are not limited to, unpaid principal, accrued and unpaid interest, and unpaid fees, attorneys' fees and expenses for which the Debtors are responsible, *provided however*, subject to the terms and conditions set forth in Paragraph 9 of this Order, such payment is without prejudice to the right of the Official Committee of Unsecured Creditors appointed by the United States Trustee on May 24, 2001 (the "**Creditors' Committee**") appointed in these proceedings to seek to disallow any claim of the Pre-Petition Lenders or the Pre-Petition Agent, to avoid any security or collateral interest in the assets of the Debtors claimed by the Pre-Petition Lenders or the Pre-Petition Agent, to seek the disgorgement of all or any part of any payment made by the Debtors to the Pre-Petition Lenders, including the payment authorized in Paragraph 7, below, or to otherwise seek recovery from the Pre-Petition Lenders on account of the relationship between the Pre-Petition Lenders and the Debtors.

(v)     Grant the Agent (for the benefit of itself and the Lenders) a Super-Priority Claim over any and all administrative expenses other than as set forth in Paragraph 15 below.

(vi)     Provide adequate protection to Leasing (as defined below) for any diminution of its collateral resulting from the use of Leasing's collateral and the incurrence by the Debtors of the DIP Credit Facility secured by senior liens on certain of Leasing's collateral

(vii)     Modify the automatic stay to the extent necessary and required by the DIP Credit Facility.

It appearing that absent the relief requested herein, the Debtors will suffer immediate and irreparable harm; and it further appearing that notice of this final hearing is sufficient under the circumstances and complies with the requirements of Bankruptcy Rules 4001(c) and 4001(d); a final hearing having been held and concluded on July 18, 2001; and for good cause shown:

<u>IT IS HEREBY FOUND THAT:</u>

A.     On May 18, 2001 (the "**Petition Date**"), the Debtors each filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtors' cases have been administratively consolidated.

B.     On May 18, 2001 the Court, upon the Motion, approved an Interim Order authorizing the Debtors to incur secured borrowing from the Agent pursuant to the terms of the DIP Credit Facility on an interim basis pending a final hearing (the "**Final Hearing**") on the Motion. In accordance with the provisions of the Interim Order, the Debtors entered into the DIP Credit Facility with the Agent and the Lenders and used the first drawing thereunder to satisfy

the Pre-Petition Obligations.  On June 22, 2001, the Court entered an Order Extending the Interim Order through the conclusion of the Final Hearing on July 18, 2001.

C.    The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been appointed in these cases.  An official creditors committee has been formed and has retained counsel.

D.    This Court has jurisdiction, pursuant to 28 U.S.C.   § 1334, over these proceedings, and over the persons and property affected hereby.  Consideration of this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (G).

E.    An immediate need exists for the Debtors to obtain funds with which to purchase inventory, continue their operations, and administer and preserve the value of their estates.  The ability of the Debtors to finance their operations requires the additional availability of working capital, the absence of which would immediately and irreparably harm the Debtors, their estates, and their creditors and the possibility for a successful reorganization.

F.    The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense.

G.    The Debtors are  also unable to obtain secured credit, allowable only under Bankruptcy Code Sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the Loan Documents and this Order.  The Debtors are unable to obtain credit for borrowed money without the Debtors' granting to the Agent and the Lenders (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) (subject to the Carve-Out, as defined below), and (ii) securing pursuant to Bankruptcy Code Sections 364(c)(2), 364(c)(3) and 364(d) such indebtedness and obligations with security interests in and Liens on substantially all of the assets of the Debtors, as described below (subject to the Carve-Out).

H.    The ability of the Debtors to finance their operations and the availability of sufficient working capital through the incurrence of indebtedness for borrowed money and other financial accommodations is vital to the Debtors' ability to preserve and maintain the Debtors' going concern value and their ability to consummate a successful reorganization.

I.    The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their property.

J.    It is in the best interest of Debtors' estates to be allowed to establish the DIP Credit Facility contemplated by the Loan Documents.

K.    The terms and conditions of the DIP Credit Facility and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances.

L.     The Loan Agreement was negotiated in good faith and at arms length between the Debtors, Agent, and Lenders.  Credit to be extended under the DIP Credit Facility will be so extended in good faith, in consequence of which the Agent and the Lenders are entitled to the protection and benefits of Bankruptcy Code Section 364(e).

M.     Prior to the Petition Date, Morse Shoe, Inc., JBI, Inc., JBI Apparel, Inc., The Casual Male, Inc., WGS Corp., and TCMB&T, Inc. entered into the Pre-Petition Loan Agreement, pursuant to which the Pre-Petition Lenders extended a working capital facility providing for revolving credit loans and letters of credit, and a term loan facility, which credit facilities were guaranteed by Jared Corporation, Morse Shoe (Canada) Ltd., Casual Male Corp., LP Innovations, Inc., Spencer Companies, Inc., TCM Holding Company, Inc., JBI Holding Company, Inc., Buckmin, Inc., Elm Equipment Corp., White Cap Footwear, Inc., Morse Shoe International, Inc., and ISAB, Inc.  The Debtors stipulate and agree that as of the Petition Date, the Debtors were indebted to the Pre-Petition Lenders in the principal sum (including amounts available to be drawn under outstanding pre-petition letters of credit) of $97,989,531.76, plus accrued interest, costs, fees, and professional fees and expenses, and all other Liabilities as defined in the Pre-Petition Loan Agreement (collectively, hereinafter the **"Pre-Petition Obligations"**).

N.     The Debtors stipulate and agree that the Pre-Petition Obligations are secured by substantially all of the Debtors' personal property including, but not limited to, accounts, inventory, general intangibles, equipment, goods, fixtures, chattel paper, investment property, money, cash and cash equivalents relating thereto, proceeds, accessions, substitutions, replacements, rents, profits, and products of the aforementioned property (the **"Pre-Petition Collateral"**).

O.     Prior to the Petition Date, Morse Shoe, Inc., JBI, Inc., The Casual Male, Inc., WGS Corp., and TCMB&T, Inc. executed a Chattel Promissory Note in favor of Fleet Capital Corporation. (f/k/a BancBoston Leasing, Inc.) (**"Leasing"**) in the principal amount of $9,000,000.00, pursuant to which the Leasing extended credit to such Debtors for the acquisition of equipment (the obligations under which have been guaranteed by Casual Male Corp., JBI Apparel, Inc., Jared Corporation, Morse Shoe (Canada) Ltd., Casual Male Corp., LP Innovations, Inc., Spencer Companies, Inc., TCM Holding Company, Inc., JBI Holding Company, Inc., Buckmin, Inc., Elm Equipment Corp., White Cap Footwear, Inc., Morse Shoe International, Inc., and ISAB, Inc.).

P.     The Debtors stipulate and agree that as of the Petition Date, the Debtors were indebted to the Leasing in the principal sum of $3,008,272.73, plus accrued interest, costs, fees, and professional fees and expenses (the foregoing obligation, hereinafter the **"Pre-Petition Leasing Obligations"**).  In addition, Leasing asserts that as of the Petition Date, the Debtors were indebted to Leasing in the principal sum of $35,100.00, plus accrued interest, costs, late charges, fees, and professional fees and expenses in connection with a lease with EMC Corporation which has been assigned to Leasing (the foregoing obligation, the **"EMC Leasing Obligation"**), which obligation Leasing asserts constitutes a Pre-Petition Leasing Obligation; provided however that the Debtors and the Committee reserve the right to review and contest whether the EMC Leasing Obligation constitutes a Pre-Petition Leasing Obligation.

Q.    The Debtors stipulate and agree that the Pre-Petition Leasing Obligations are secured pursuant to the Pre-Petition Loan Agreement, a certain Master Security Agreement and a Security Agreement, each dated as of August 26, 1999 (the Note, the Pre-Petition Loan Agreement, the Security Agreement, the Master Security Agreement, the guaranties from certain of the Debtors and all other instruments, documents, and agreements relating thereto being collectively referred to as the "**Leasing Loan Documents**").    Such collateral includes, without limitation, substantially all of the Debtors' personal property including, but not limited to, accounts, inventory, general intangibles, equipment, goods, fixtures, chattel paper, investment property, money, cash and cash equivalents relating thereto, proceeds, accessions, substitutions, replacements, rents, profits, and products of the aforementioned property (the "**Pre-Petition Leasing Collateral**").

R.    The Debtors intend to continue to use the Pre-Petition Leasing Collateral in the operation of their business and have requested Leasing (i) to consent to such usage and (ii) to consent to the DIP Credit Facility, and in connection therewith, to confirm that Leasing's liens on certain of the Pre-Petition Leasing Collateral are subordinate to the liens to be granted the Agent and the Lenders under the DIP Credit Facility.

S.    Leasing is entitled pursuant to Sections 361, 363, and 364 of the Bankruptcy Code to adequate protection of its interests, including, without limitation, for any diminution resulting from the incurrence by the Debtors of the DIP Credit Facility secured by senior liens on certain of the Pre-Petition Leasing Collateral and the use, sale or lease of the Debtors' assets.    In order to enter into the DIP Credit Facility, the Debtors have agreed to furnish Leasing with adequate protection.

T.    The notice of this final hearing has been provided by the Debtors to (i) the United States Trustee, (ii) counsel to the Pre-Petition Lender, (iii) counsel to Leasing, (iv) the twenty (20) largest unsecured creditors of the Debtors, (v) the Internal Revenue Service, (vi) the Securities and Exchange Commission, (vii) any other party which has filed a request for special notice with this Court and served such request upon the Debtors' counsel, (viii) counsel for any statutory committee, (ix) all creditors who have recorded a UCC-1 financing statement on the personal property of the Debtors or a Lien on any of the Debtors' real estate, (x) all immediate landlords that are direct parties to leases with the Debtors, (xi) the United States Trustee, and (xii) Attorneys General for all jurisdictions in which the Debtors do business, and constitutes sufficient and adequate notice   in light of the nature of the relief requested in the Motion. No further notice of the relief sought in the Motion is required for the entry of this Order.

U.    Good and sufficient cause has been shown for the entry of this Order.    Among other things, the entry of this Order will enable the Debtors to continue the operation of their businesses; increase the possibility for a successful reorganization; and will be in the best interest of the Debtors, their creditors, and their estates.

V.    To address certain concerns raised by parties in interest to the DIP Credit Facility, the Debtors, the Agent and the Lenders have agreed to enter into a First Amendment to Debtor in Possession Loan and Security Agreement in the form annexed hereto (the "**First Amendment**").

-5-

NOW, THEREFORE, on the Motion of the Debtors and the record before the Court with respect to the Motion, and with the consent of the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders, Leasing, the Agent, and the Lenders to the form and entry of this Order, and all the objections to the entry of this Order having been resolved or overruled; and good cause appearing,

IT IS ON THIS 18th day of JULY, 2001 ORDERED that:

1.      The Motion is granted in accordance with the terms of this Final Order.

## APPROVAL OF AND AUTHORIZATION AS TO BORROWING

2.      The terms and the conditions of the DIP Credit Facility are hereby approved, as amended by the First Amendment. The Debtors are authorized to:

(a)     Establish the DIP Credit Facility.

(b)     Execute each of the Loan Documents to which any debtor is a party.

(c)     Borrow up $100,000,000.00 under Tranche A of the Loan Agreement (with a sublimit of $15,000,000.00 with respect to letters of credit), borrow $20,000,000.00 under Tranche B of the Loan Agreement, and borrow $15,000,000.00 under Tranche C of the Loan Agreement, in each case in accordance with the terms and conditions of the Loan Documents.

3.      The Debtors are hereby authorized, empowered, and directed to do and perform all acts, pay all fees and expenses and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtors under the Loan Documents and the creation and perfection of the Liens described in and provided for by this Order and the Loan Documents and to assure the priority thereof as contemplated herein, provided, however, that the Agent shall furnish a copy of any invoices for legal fees and expenses of counsel for the Agent, the Lenders, their Participants to the United States Trustee and to counsel for the Debtors and the Creditors Committee fourteen (14) days prior to charging the Debtors' Loan Account therefor. If an objection to such fees and expenses is filed within such fourteen (14) day period, the contested portion of such fees and expenses shall not be charged to the Loan Account until the objection is resolved by the parties or pursuant to an order of this Court. Nothing contained herein shall require counsel to the Agent, the Lenders, and Participants to file any fee applications with the Court, the foregoing procedures being the sole process for payment of legal fees and expenses of counsel for the Agent, the Lenders, and their Participants.

4.      To induce the Lenders to provide the DIP Credit Facility, the Debtors grant to the Agent (for the benefit of itself and the Lenders), and the Agent (for the benefit of itself and the Lenders) pursuant to the Loan Documents and this Order is granted (a) pursuant to Bankruptcy Code Section 364(d), a valid, binding, enforceable and perfected first priority Lien on the Collateral (as defined below) which is presently encumbered on the properties of the Debtors other than (i) equipment, as to which Leasing's Lien will have the priority set forth in the Loan Agreement, and (ii) property subject to Permitted Encumbrances (as defined in the

-6-

Loan Agreement); (b) pursuant to Bankruptcy Code Section 364(c)(2), a valid, binding, enforceable and perfected first priority Lien on the Collateral not encumbered as of the Petition Date, and (c) pursuant to Bankruptcy Code Section 364(c)(3), a valid, binding, enforceable and perfected junior Lien on the Collateral which was subject to Permitted Encumbrances (as defined in the Loan Agreement) existing immediately prior to the Petition Date.   All of the following property is collectively referred to as the "**Collateral**":

> All real and personal property of the Debtors, including without limitation, inventory, accounts, equipment, fixtures, general intangibles (including, without limitation, tax refunds, trademarks, and tradenames), instruments, documents, investment property, chattel paper, and goods, (respectively as defined in the Uniform Commercial Code), all real estate, all leaseholds, and all other "Collateral" (as defined in the Loan Agreement), all of the foregoing now owned or in which the Debtors have any interest (and without regard to whether acquired prior or subsequent to the Petition Date) or hereafter acquired or in which the Debtors obtain an interest; and the products and proceeds thereof, (but excluding all proceeds of any avoidance action under Chapter 5 of the Bankruptcy Code, other than actions brought pursuant to Section 549 of the Bankruptcy Code).

The Liens granted herein shall be subject to the Carve-Out and shall secure all Liabilities (as defined in the Loan Agreement) incurred by the Debtors pursuant to the Loan Documents.

5.     The automatic stay imposed under Bankruptcy Code Section 362(a)(4) is hereby modified solely to the extent necessary to permit the Debtors to grant the aforesaid Liens and to perform the Debtors' liabilities and obligations to the Agent and the Lenders under the DIP Credit Facility.

6.     Each officer of the Debtors, acting singly, and such other individuals as may be so authorized by the Board of Directors of the Debtors, likewise acting singly, is hereby authorized to execute and deliver each of the Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

7.     The payment made by the Debtors to the Pre-Petition Agent and Pre-Petition Lenders in accordance with Paragraph 7 of the Interim Order is hereby ratified and confirmed subject only to the rights of the Creditors' Committee set forth in Paragraph 9 of this Final Order.   All outstanding letters of credit which the Pre-Petition Lenders have issued or caused to be issued for the benefit of the Debtors shall be deemed to have been issued under the Loan Agreement and shall constitute letters of credit under the Loan Agreement and Loan Documents.

8.     Subject only to Paragraph 9 of this Order, the Debtors on behalf of themselves and their estates and their successors, including any subsequently appointed Trustee hereby: (i) releases and discharges the Pre-Petition Agent and the Pre-Petition Lenders together with their affiliates, agents, attorneys, officers, directors and employees from any and all claims

and causes of action arising out of, based upon or related to the Pre-Petition Loan Agreement and other pre-petition loan documents; (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability (under sections 510, 544, 545, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Obligations or the security interests and liens granted to secure Pre-Petition Obligations, and (iii) agree, without further Court order, to the allowance of the pre-petition claims of the Pre-Petition Agent and the Pre-Petition Lenders as fully secured claims pursuant to sections 502 and 506 of the Bankruptcy Code. The release, discharge, waivers and agreements set forth in this Paragraph 8 will be deemed effective upon the date this Order is entered, subject only to the Creditors' Committee right to object on the terms and conditions set forth in Paragraph 9 below.

9.      The provisions of paragraph 8 above and the payment to the Pre-Petition Lenders, as provided in the Interim Order, shall be without prejudice to the right of the Creditors' Committee to seek to disallow the Pre-Petition Lenders' or Pre-Petition Agent's claims, avoid any security or collateral interest in the assets of the Debtors claimed by the Pre-Petition Agent or the Pre-Petition Lenders, to seek the disgorgement of all or any part of any payment made by the Debtors to the Pre-Petition Lenders (including, without limitation, by virtue of the Pre-Petition Lenders' claim being determined to be unsecured or undersecured or for any other reason) or to otherwise seek recovery from the Pre-Petition Lenders on account of the relationship between the Pre-Petition Lenders and the Debtors. The Creditors' Committee shall have (x) one hundred fifty (150) calendar days from the entry of a court order authorizing retention of counsel to the Creditors' Committee within which to file an objection or commence an adversary proceeding with respect to any claim that the guaranty by JBI Apparel, Inc. of the Pre-Petition Obligations and the grant of a security interest by JBI Apparel, Inc. to secure the Pre-Petition Obligations constituted a fraudulent conveyance, and (y) ninety (90) calendar days after receipt by counsel to the Creditors' Committee of the documentation evidencing the Pre-Petition Obligations within which to file any other objection or commence an adversary proceeding with respect to any other aspects of the Pre-Petition Lenders' claims or security interests, payments made to the Pre-Petition Lenders, or any other claims or causes or actions as to the Pre-Petition Agent or Pre-Petition Lenders. Any such objection or action may be filed by the Creditors Committee in the name of the Debtors without further leave of the Court. In the event that no objection or complaint is timely filed: (a) the waiver and release granted by paragraph 8 above shall become final and binding on all parties (including the Creditors' Committee, any creditor, or any subsequently appointed trustee); (b) the Pre-Petition Obligations, and the Pre-Petition Agent's and Pre-Petition Lenders' liens in the Pre-Petition Collateral shall be valid, perfected, nonavoidable, and in full force and effect, not subject to any claims, counterclaims, setoffs, or defenses; and (c) the payment of the Pre-Petition obligations in accordance with the Interim Order shall not be subject to disgorgement. To the extent any such objection or complaint is filed and the Pre-Petition Agent or Pre-Petition Lenders successfully defends same, the Pre-Petition Agent and Pre-Petition Lenders shall be entitled to recover all costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending the objection or complaint, which costs and expenses shall be secured by a lien in the collateral subject only to the lien of the Agent and shall constitute a super-priority claim, as defined below, with priority under Bankruptcy Code Section 364(c)(1) and otherwise over all administrative expense claims and unsecured claims against the Debtors (other than the claims of the Agent and the Lenders and the Carve-Out), now existing or hereafter arising, of any kind or nature

whatsoever. Without limiting the foregoing provisions of this paragraph 9, (i) if the court enters an order adjudging that the Pre-Petition obligations are undersecured, any payments of post-petition interest by the Debtors to the Pre-Petition Agent or the Pre-Petition Lenders shall be recharacterized as the payment of principal on the Pre-Petition Obligations and (ii) except as specifically provided herein, nothing contained in this paragraph shall constitute a release of any third-party claims against the Pre-Petition Agent and the Pre-Petition Lenders.

10.     This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein, *provided, however,* the Agent may file or record financing statements or other instruments to evidence and to perfect the Liens authorized hereby, provided further, however, no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

11.     The Agent, in its discretion, may file a  xerographic copy of this Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall file or record such copy of this Order, which shall not be subject to stamp tax or similar tax as set forth in Section 1146 of the Bankruptcy Code.

12.     The Loan Agreement and each of the Loan Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors in accordance with their terms.

### ADMINISTRATIVE CLAIM

13.     The Liabilities under the Loan Agreement shall be an allowed administrative expense claim (the "**Super-Priority Claim**") with priority in payment over all administrative expense claims (except as otherwise provided in Paragraph 15 below), now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 330 (except as otherwise provided in Paragraph 15, below), 331, 503(a), 503(b), 507(a), 507(b), 546(c), and 1114, provided that the rights of the Agent and the Lenders with respect to any avoidance actions and the proceeds thereof under Chapter 5 of the Bankruptcy Code (other than actions brought pursuant to Section 549 of the Bankruptcy Code as to which the Agent and the Lenders shall have a first priority) shall have equal priority with other administrative expenses under Section 507(a)(1) of the Bankruptcy Code.  For clarification, the Super-Priority Claim is not intended to have priority over administrative expenses of the kind specified in section 726 of the Bankruptcy Code.

14.     Except for:

(a)     the Carve Out (Paragraph 15, below); and

-9-

(b)  the liens of Leasing having priority to the Liens of the Agent and the Lenders under the Loan Agreement and Permitted Encumbrances (as defined in the Loan Agreement),

(c)  any costs and expenses payable by the Agent and the Lenders pursuant to Paragraph 24 hereof,

no costs or expenses of administration including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 330 and 331 that have been or may be incurred in these proceedings, or in any case or case pursuant to Chapter 7 of the Bankruptcy Code into which these cases may be converted, or in any other proceedings related thereto (hereinafter, any "**Successor Cases**"), and no priority claims to the Collateral are, or will be, senior to, prior to, or on a parity with the Liabilities, or with any other claims of the Agent of the Lenders arising hereunder.

15.  Notwithstanding any provision of this Order or the Loan Documents to the contrary, the Liens and Superpriority Claims granted to the Agent and the Lenders pursuant to the Loan Documents and this Order are subject and subordinate to the Carve-Out for (a) following the occurrence of an Event of Default pursuant to which the Agent furnishes notice of its intended exercise of remedies pursuant to Paragraph 22 hereof (whether or not such exercise is stayed by the Court) (a "**Carve-Out Event**"), the payment of all accrued and unpaid allowed professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by the Debtors or the Creditors' Committee and reimbursement of expenses for the members of the Creditors' Committee pursuant to Bankruptcy Code Section 327 or 1103(a), whether incurred prior to or following the occurrence of a Carve-Out Event (the "**Professional Fees and Expenses**"); provided that the Professional Fees and Expenses to be included in the Carve Out and entitled to priority over the Super-Priority Claim shall not exceed the lesser of (i) the sum of $250,000.00 plus an additional $250,000.00 as of the first day of each week after the Petition Date, commencing May 28, 2001, or (ii) $2,000,000.00 in the aggregate, and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a) and any fees payable to the Clerk of the Bankruptcy Court (collectively, the "**Carve-Out**"). The Carve-Out shall be calculated as of the first occurrence of any Carve-Out Event and shall not increase after that date. The Carve-Out shall exclude any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counter claim, action, proceeding application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating , setting aside, avoiding, subordinating, in whole or in part, (i) the Liabilities, (ii) the Pre-Petition Obligations, (iii) the Pre-Petition Agent's or Pre-Petition Lenders' Lien in the Pre-Petition Collateral, (iv) the Agent's or Lenders' Liens in the Collateral, or (v) the claims and liens of Leasing, or (B) preventing, hindering or delaying whether directly or indirectly, the Agent's or Lenders' assertions or enforcement of their Liens, security interest or realization upon any Collateral, (y) in using cash collateral of the Agent or the Lenders, selling or otherwise disposing of any other Collateral, or incurring any Indebtedness not permitted under the Loan Agreement, without the Agent's consent or (z) arising after the conversion of any of the Chapter 11 cases to a case under chapter 7 of the Bankruptcy Code. As long as no Carve-Out Event shall have occurred, payments made by the Debtors for compensation and reimbursement of expenses allowed and payable under Bankruptcy Code Sections 330 or 331 or pursuant to any order of this Court providing for the payment of such

-10-

compensation or expenses shall not reduce the Carve Out. Except as otherwise provided in this paragraph, nothing contained in this Order shall be deemed a consent by the Agent or Lenders to any charge, lien, assessment or claim against the Collateral under Section 506(c) of the Bankruptcy Code or otherwise. The foregoing shall not be construed as consent by the Agent or the Lenders to the allowance of any Professional Fees and Expenses and shall not affect the right of the Agent or the Lenders to object to the allowance and payment of such amounts.

        16.    Unless the Agent has provided its prior written consent or all Liabilities have been paid in full, there shall not be entered in these proceedings, or in any Successor Cases, any order which authorizes any of the following:

        (a)    the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to that granted to the Agent herein; or

        (b)    the enforcement of any claimed security, mortgage, or collateral interest or other lien of any person other than of the Agent or Leasing on all or any portion of the Collateral, except to the extent that such enforcement does not have a material adverse effect on the Agent and the Lenders.

        (c)    except as permitted under the Loan Agreement, the Debtors' return of goods constituting Collateral pursuant to Section 546(g)* of the Bankruptcy Code.

        17.    Except as otherwise provided in Paragraphs 15 and 24 or in the Loan Agreement, no cost or expense which may be incurred in connection with or on account of the preservation and/or disposition of any Collateral or which otherwise could be chargeable to the Agent or the Lenders or the Collateral pursuant to Bankruptcy Code Sections 105, 506(c), 552 or otherwise, shall be so chargeable.

        18.    Without limiting the provisions and protections of Paragraph 16, above, if at any time prior to the repayment in full of all Liabilities and the termination of the Agent's and Lenders' obligation to make loans and advances under the Loan Documents, including subsequent to the confirmation of any plan of reorganization respecting the Debtors, the Debtors or any Trustee subsequently appointed shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b) (for borrowed money only), 364(c) or 364(d), then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Agent in reduction of the Liabilities.

        19.    The Liabilities of the Debtors to the Agent and the Lenders under the DIP Credit Facility and the Loan Documents are due and payable upon the earliest to occur of:

        (a)    May 18, 2003 (or such later date to which the Lenders and the Debtors agree in writing);

        (b)    the occurrence of an Event of Default (as defined in the Loan Agreement); or

(c)     the effective date of a plan of reorganization for the Debtors.

Unless and until the Liabilities are repaid in full, the protections afforded to Agent and the Lenders under the Loan Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a plan of reorganization or converting these cases into Successor Cases, and the Liens in and to the Collateral and the Super-Priority Claim shall continue in these proceedings and in any Successor Cases, and such Liens and Super-Priority Claim shall maintain their priority as provided by this Order until the Liabilities have been satisfied in full.

20.     The time and manner of payment of the Liabilities pursuant to the Loan Agreement and the Liens in and to the Collateral and the Super-Priority Claim shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed or by any further order which may hereafter be entered.

21.     The Debtors may use the proceeds of the loans and advances made pursuant to the DIP Credit Facility only for the purposes specifically set forth in the Loan Agreement. Notwithstanding anything herein or in the Loan Agreement to the contrary no such loans or advances or any proceeds of the Collateral may be used by the Debtors, the Creditors Committee or any other person or entity to object to or contest in any manner, or raise any defenses to, the validity, extent, perfection, priority or enforceability of the Pre-Petition Obligations, the Liabilities, the claims of Leasing, or any liens or security interests with respect thereto or any other rights or interests of the Pre-Petition Agent, Pre-Petition Lenders, Leasing Agent, or the Lenders, or to assert any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Pre-Petition Agent, Pre-Petition Lenders, Leasing, Agent, or the Lenders.

<u>EVENTS OF DEFAULT</u>

22.     Any automatic stay otherwise applicable to the Agent and Lenders is hereby modified so that after the occurrence of any Event of Default (as defined in the Loan Agreement) under (x) any of the provisions of Article 9 or Sections 12-1 or 12-2 of the Loan Agreement and at any time thereafter upon four (4) business days prior notice of such occurrence, and (y) any other provision of the Loan Agreement and at any time thereafter upon five (5) business days prior notice of such occurrence, in each case given to the Debtors, the Debtors' counsel, counsel for the Creditors' Committee and the United States Trustee, the Agent and the Lenders shall be entitled to exercise their rights and remedies in accordance with the Loan Documents. Following the giving of notice by the Agent of the occurrence of an Event of Default, the Debtors shall be entitled to an emergency hearing before this Court for the purpose of contesting whether an Event of Default has occurred or asserting any other grounds on which the exercise of remedies by the Agent and the Lenders should be stayed. If the Debtors do not contest the right of the Agent and the Lenders to exercise their remedies within such time period, or if the Debtors do timely contest the Agent's and the Lenders' rights and the Court, after hearing, declines to stay the enforcement thereof, the automatic stay, as to the Agent and the Lenders, shall automatically terminate. Notwithstanding the Debtors' right to contest the existence of an Event of Default or to seek to stay the enforcement of remedies on other grounds, after the Agent furnishes such notice of an Event of Default, (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of Collateral to the Agent as provided in the Loan

Agreement and this Order; (ii) the Agent shall continue to apply such proceeds in accordance with the provisions of this Order and of the Loan Agreement; (iii) the Debtors shall have no right to use any of such proceeds, nor any other cash collateral (as defined in Bankruptcy Code Section 363(a)) other than towards the satisfaction of the Liabilities and the Carve-Out; and (iv) any obligation otherwise imposed on the Agent or the Lenders to provide any loan or advance to the Debtors pursuant to the DIP Credit Facility shall be suspended.

23.    If the Agent or the Lenders exercise any of their rights and remedies upon the occurrence of an Event of Default under the Loan Documents, the Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral.  In any exercise of their rights and remedies upon an Event of Default under the Loan Documents, the Agent and Lenders are authorized to proceed under or pursuant to the Loan Documents.

24.    In the exercise of the Agent's rights and remedies upon default,

(a)    the Agent may by written notice to the Debtors require the Debtors to file a Motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Agent.  The Debtors shall file such Motion within ten (10) Business Days of the Agent's request and shall diligently prosecute such Motion.  If the Debtors fail to so file the Motion, the Agent may file and prosecute such a Motion in the name of the Debtors; and/or

(b)    the Agent may by written notice to the Debtors require the Debtors to file a Motion or Motions seeking to sell, assume, assign, or otherwise dispose of any or all of the real estate (including, without limitation, leasehold interests) of the Debtors pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to the Agent.  The Debtors shall file such Motion or Motions within ten (10) business days of the Agent's request and shall diligently prosecute such Motion.  If the Debtors fail to so file such Motion(s), the Agent may, file and prosecute such a Motion(s) in the name of the Debtors; and/or

(c)    the Agent may proceed under or pursuant to the Loan Agreement and other Loan Documents.

All net proceeds realized from any of the foregoing (after payment of costs and expenses relating to such actions, including, without limitation, the payment of post-petition rent in accordance with any prior or contemporaneous order that this Court may enter, if any, relating to such post-petition rent for the locations at which such sales are conducted or with respect to leases to be assigned and assumed) shall be turned over to the Agent for application to the Obligations under, and in accordance with the provisions of, the Loan Agreement and other Loan Documents.  The Agent shall consult with counsel to the Creditors' Committee in connection with the exercise of any of its remedies described in this Order or any Loan Document and solicit such counsel's advice as to the manner to maximize the return on the Collateral, but nothing contained herein shall obligate the Agent to undertake any specific action requested by the Creditors' Committee or limit the rights of the Agent hereunder or under the Loan Documents.

Nothing contained herein or in the Loan Agreement in any way shall prejudice the rights of landlords and other parties in interest to object and be heard on matters pertaining to the

conduct of any sale or disposition described herein, including, without limitation, the payment or non-payment of post-petition rent for the locations from which any sales of Collateral are to be conducted and/or the assignment, assumption, sale or disposition of any leases.

25.    In connection with the Agent's exercise of its remedies upon default, including, without limitation, the conduct of any going out of business sale or other disposition of the Collateral in accordance with the terms and conditions of this Order or the Loan Documents:

(a)    All parties and persons of every nature and description, including, but not limited to, landlords, utilities, governmental agencies, sheriffs, marshals, and other public officers, creditors, and all those acting for or on their respective behalf, shall be, restrained and enjoined from interfering, in any way with, or otherwise impeding the conduct of any such sale or other disposition at any location of the Debtors; the maintenance of inventory at such locations; the use of such operational infrastructure;  or from seeking process before any court or other administrative body (other than this Court), the object of which is to directly or indirectly impede, in any way, the conduct of any such sale or other disposition.

(b)    The conduct of any such sale or other disposition may be made without compliance with any licensing law, statute, ordinance, or regulation of any governmental authority, provided, however, the foregoing shall not affect in any way any obligation of the Agent or any such agent to comply with any law, statute, ordinance, or regulation of any governmental authority incident to the protection of public safety.

26.    Nothing included herein shall prejudice, impair, or otherwise affect the Agent's or Lenders' rights to seek any other or supplemental relief in respect of the Debtors nor the Agent's  or Lenders' rights, as provided in the Loan Agreement, to suspend or terminate the making of loans under the Loan Agreement.  In the event that the Agent, in the exercise of the Agent's rights and remedies upon default _itself_ seeks to conduct "going out of business sales" of the Collateral at the Debtor's premises, the Agent will file a motion with this Court with respect to the conduct of such sales and issues relating to the payment or non-payment of post-petition rent (which motion shall be served on, among others, any affected landlord) to be heard on an expedited basis (subject to the Court's calendar) but not sooner than five business days after such motion is filed with the Court and the affected landlords shall have the right to file an objection to such motion with the Court prior to the end of such five business day period.

## LEASING ADEQUATE PROTECTION

27.    Subject only to Paragraph 9 of this Order (which is incorporated by reference herein and shall furnish the Creditors' Committee with the same rights and limitations to challenge the Pre-Petition Leasing Obligations and Pre-Petition Leasing Collateral as the Creditors Committee has with respect to the Pre-Petition Obligations and Pre-Petition Collateral), the Debtors on behalf of themselves and their estates and their successors, including any subsequently appointed Trustee hereby: (i) release and discharge Leasing together with its affiliates, agents, attorneys, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to the Pre-Petition Leasing Obligations; (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or

kind) as to the validity, perfection, priority, enforceability, and avoidability (under sections 510, 544, 545, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Leasing Obligations or the security interests and liens granted to secure Pre-Petition Leasing Obligations, and (iii) agree, without further Court order (except as to any disputed amounts), to the allowance of the pre-petition claims of Leasing as fully secured claims pursuant to sections 502 and 506 of the Bankruptcy Code.

28.    In consideration of and as adequate protection for the use of the Pre-Petition Leasing Collateral and Leasing's secured claim, and only to the extent of any diminution in the value of the Pre-Petition Leasing Collateral, Leasing is hereby granted a security interest, mortgage, and collateral assignment in all of the following:

> All real and personal property of the Debtors, including without limitation, inventory, accounts, equipment, fixtures, general intangibles (including, without limitation, tax refunds, trademarks, and tradenames), instruments, documents, investment property, chattel paper, and goods,(respectively as defined in the Uniform Commercial Code), all real estate, all leaseholds, and all other "Collateral" (as defined in the Loan and Security Agreement evidencing the DIP Credit Facility), all of the foregoing now owned or in which the Debtors have any interest (and without regard to whether acquired prior or subsequent to the Petition Date) or hereafter acquired or in which the Debtors obtain an interest; and the products and proceeds thereof, (but excluding all proceeds of any avoidance action under Chapter 5 of the Bankruptcy Code, other than actions brought pursuant to Section 549 of the Bankruptcy Code).

The liens granted herein shall be subject to the Carve Out, the Liens in favor of the Agent and the Lenders under the DIP Credit Facility (except to the extent otherwise provided herein and in the Loan Agreement), and Permitted Encumbrances (as defined in the Loan Agreement) existing immediately prior to the Petition Date. The liens granted to Leasing herein shall be deemed valid and perfected notwithstanding the requirements of non-bankruptcy law with respect to filing and/or perfection. However, upon the request of Leasing, the Debtors shall execute and deliver to Leasing such documents as Leasing deems appropriate in order to effect, perfect, confirm, or vest more securely in Leasing any and all rights provided hereunder. The post-petition grant, if any, of the security interests, mortgages, and collateral assignments hereunder shall be supplemental and in addition to the security interest, mortgages and collateral assignments which Leasing possesses pursuant to the Leasing Loan Documents. The automatic stay imposed by 11 U.S.C. §362 is hereby modified solely to the extent necessary for Leasing to perfect and enforce the security interests, mortgages and collateral assignments granted herein.

29.    As further adequate protection for the use of the Pre-Petition Leasing Collateral and Leasing's secured claim, the Debtors agree to make the following payments to Leasing:

(a)     Interest on the principal balance of the Pre-Petition Leasing Obligations, monthly in arrears at the non-default rate set forth in the Leasing Loan Documents.

(b)     Regularly scheduled payments of principal in the amounts, at the times, and for application to the Pre-Petition Leasing Obligations as provided in the Leasing Loan Documents.

(c)     Payments of the net proceeds realized from the Pre-Petition Leasing Collateral and any property in which a lien is granted as adequate protection hereunder, in accordance with the priorities set forth in the Loan Agreement

(d)     All costs and expenses, including reasonable attorneys' fees, heretofore or hereafter incurred by Leasing and any of its participants (to the extent provided under the Leasing Loan Documents), within five (5) business days after receipt of an invoice therefor, other than those items which are disputed.

(e)     In the event that the DIP Credit Facility is refinanced with a lender other than Fleet Retail Finance Inc. or a lending group for which Fleet Retail Finance Inc. does not act as agent,  all obligations of the Debtors to Leasing shall be immediately paid in full, including, without limitation, all principal, interest, costs and expenses, including reasonable attorneys' fees (to the extent provided under the Leasing Loan Documents) currently outstanding or hereafter accrued, contemporaneously with such refinancing.

30.     In the event that the adequate protection granted Leasing is insufficient to protect Leasing's interests, the Pre-Petition Leasing Obligations shall be an allowed administrative expense claim (the **"Super-Priority Claim"**) with priority in payment over all administrative expense claims (except as otherwise provided with respect to the Carve-Out and the DIP Credit Facility), now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 330 (except with respect to the Carve-Out and the DIP Credit Facility), 331, 503(a), 503(b), 507(a), 507(b), 546(c) and 1114, provided that the rights of Leasing with respect to any avoidance actions and the proceeds thereof under Chapter 5 of the Bankruptcy Code (other than actions brought pursuant to Section 549 of the Bankruptcy Code as to which Leasing shall have a second priority after the rights of the Agent and the Lenders) shall have equal priority with other administrative expenses under Section 507(a)(1) of the Bankruptcy Code.

31.     The Debtors shall continue to comply in all material respects with the terms and covenants of the Leasing Loan Documents.

32.     The occurrence of any one or more of the following shall constitute a " Leasing Event of Default":

(a)     The failure of the Debtors to make any adequate protection payment or comply with any material obligation under the Leasing Loan Documents, in each case as required by this Order;

(b)     The reversal or modification of this Order prior to the final hearing;

(c)     The appointment of a Trustee or of an examiner having expanded powers pursuant to 11 U.S.C. Section 1104;

(d)     Conversion of any of the Debtors' cases to a Chapter 7 case;

(e)     The occurrence of any Event of Default under  the DIP Credit Facility pursuant to which the Agent furnishes notice under Paragraph 22 of this Order.

(f)     The refinancing of the DIP Credit Facility with a lender other than Fleet Retail Finance Inc. or a lending group for which Fleet Retail Finance Inc. does not act as Administrative Agent.

33.     Upon the occurrence of any Leasing Event of Default, any automatic stay otherwise applicable to Leasing is hereby modified so that upon five (5) business days prior notice of such Leasing Event of Default, in each case given to the Debtors, the Debtors' counsel, counsel for the Creditors' Committee and the United States Trustee, Leasing shall be entitled to exercise its rights and remedies with respect to any Collateral on which Leasing has a first priority lien under the Loan Agreement and in accordance with the Leasing Loan Documents. Following the giving of notice by Leasing of the occurrence of a Leasing Event of Default, the Debtors shall be entitled to an emergency hearing before this Court for the purpose of contesting whether a Leasing Event of Default has occurred or asserting any other grounds on which the exercise of remedies by Leasing should be stayed.  If the Debtors do not contest the right of Leasing to exercise its remedies within such time period, or if the Debtors do timely contest Leasing's rights and the Court, after hearing, declines to stay the enforcement thereof, the automatic stay, as to the Collateral in which Leasing has a first priority lien, shall automatically terminate.

34.     The provisions of Paragraphs 3, 14, 16, 17, 18, and 21 of this Order shall be equally applicable and for the benefit of Leasing as if Leasing were specifically named therein.

35.     As between Leasing and the Agent, until all obligations under the DIP Credit Facility have been irrevocably paid in full and all obligations of the Lenders to make loans thereunder terminated, Leasing shall not have the right to exercise any remedies of a secured creditor against or with respect to any property subject to its lien other than that property on which Leasing has a first priority lien. In that regard, in the event that any consent or approval or waiver by a secured creditor is necessary in connection with the sale, use, refinancing, encumbrance, transfer or other disposition of any of the Debtors' properties (other than that in which Leasing has a first priority lien), the Agent under the DIP Credit Facility shall have the sole and exclusive right, as against Leasing, to grant such consent, approval, or waiver and Leasing shall execute all such documents which may be required to release or subordinate its lien or security interest in order that any such property may be sold, conveyed or refinanced, *provided that* any and all liens of Leasing shall attach to net proceeds of such transactions with the same priority, validity and perfection and to the same extent as such liens of Leasing on the property so disposed.  The foregoing provisions are not intended to affect any other of Leasing's rights and Leasing may exercise such rights as it deems appropriate in order to protect its interests.  In addition, nothing contained herein shall modify the right of Leasing to receive a

-17-

payment from the net proceeds of the Debtors' properties in which it has a subordinate lien with priority to the administrative claims and claims of unsecured creditors, upon liquidation of or sale of any such properties. The provisions of this Paragraph 35 are for the sole and exclusive benefit of the Agent and the Lenders and do not confer any rights upon, and are not enforceable by, any of the Debtors. Nothing contained in this Paragraph 35 shall modify or abrogate any of the rights of Leasing or any of the obligations of the Debtors, each of which remain in full force and effect.

36.     The adequate protection furnished Leasing hereunder shall not be altered, amended, or modified without the express written consent of the Agent.

## MISCELLANEOUS PROVISIONS

37.     If any provision of this Order is hereafter modified, vacated or stayed by subsequent order of this or any other Court for any reason, such modification, vacation, or stay shall not affect the validity of any Liability incurred pursuant to this Order and prior to the later of (a) the effective date of such modification, vacation, or stay, or (b) the entry of the order pursuant to which such modification, vacation, or stay was established, nor the validity, priority, or enforceability of any Lien granted by the Debtors to the Agent.

38.     The payments made, and the Liens and Super-Priority Claims granted to the Agent under the DIP Credit Facility and this Order, and the priority thereof, shall be binding on the Debtors, any successor trustee for the Debtors, and all creditors of the Debtors, as provided in Bankruptcy Code Section 364(e).

39.     All depository banks, blocked account banks, and credit card processors shall continue to comply, for the benefit of the Agent and the Lenders, with the terms and conditions of any Blocked Account Agreement, DDA Notifications, or Credit Card Notifications received or in existence Pre-Petition whether or not, and as if, an additional agreement or notification is executed or furnished in connection with the Loan Agreement.

40.     The Agent's failure to seek relief or otherwise exercise its rights and remedies under the DIP Credit Facility or this Order shall not constitute a waiver of any of the Agent's rights hereunder, thereunder, or otherwise.

41.     This Order does not create any rights for the benefit of any third party, creditor, or any direct, indirect, or incidental beneficiary.

42.     The Debtors and the Agent may amend or waive any provision of the DIP Credit Facility, provided that such amendment or waiver, in the judgment of the Debtors and the Agent, is either nonprejudicial to the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by the parties hereto and approved by the Court.

43.     In the event of any inconsistency between the terms and conditions of any Loan Document and of this Order, the provisions of this Order shall govern and control.

44.     Nothing contained herein or in the Loan Agreement shall prejudice the rights of landlords to file a motion to compel the Debtors' payment of post-petition rent or other charges due under leases for nonresidential real property pursuant to Section 365(d)(3) of the Bankruptcy Code in the event of the Debtors' failure to make such payments when due, or any other motion with respect to a right or remedy available to a landlord under the Bankruptcy Code or Bankruptcy Rules that is not inconsistent with the terms of this Order.

SO ORDERED by the Court this 18th day of July, 2001.


_Robert E. Gerber_

UNITED STATES BANKRUPTCY JUDGE

FIRST AMENDMENT TO DEBTOR IN POSSESSION
LOAN AND SECURITY AGREEMENT

This First Amendment to Debtor In Possession Loan and Security Agreement is made as of this 18th day of July, 2001 by and among

CASUAL MALE CORP. (the **"Borrowers' Representative"**), a Massachusetts corporation, having a principal place of business at 555 Turnpike Street, Canton, Massachusetts 02021, as agent for the Borrowers, being those Persons named on Exhibit 1 hereto, debtors and debtors in possession;

The Borrowers;

each of the Revolving Credit Lenders party to the Loan Agreement (defined below) (together with each of their successors and assigns, referred to individually as a **"Revolving Credit Lender"** and collectively as the **"Revolving Credit Lenders"**), and

FLEET RETAIL FINANCE INC., as Administrative Agent and Collateral Agent, a Delaware corporation, having its principal place of business at 40 Broad Street, Boston, Massachusetts 02109; and

BACK BAY CAPITAL FUNDING LLC, as Tranche B Lender and as Tranche C Lender,

in consideration of the mutual covenants herein contained and benefits to be derived herefrom.

W I T N E S S E T H

A.      Reference is made to the Debtor In Possession Loan and Security Agreement (the **"Loan Agreement"**) dated as of May 18, 2001 by and among the Borrowers' Representative, the Borrowers, the Revolving Credit Lenders, the Tranche B Lender, the Tranche C Lender, the Administrative Agent and the Collateral Agent.

B.      The parties to the Loan Agreement desire to modify and amend certain provisions of the Loan Agreement, as provided herein.

Accordingly, the parties hereto agree as follows:

1.      Definitions.   Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

2.      Amendment to Article 2.   The provisions of Section 2-16(a) of the Loan Agreement are hereby amended by deleting the words "eighteen months" appearing in the second line thereof and inserting the words "twelve months" in their stead.

3.     Amendment to Article 3.   The provisions of Section 3-3(b) of the Loan Agreement are hereby amended by deleting clause (ii) thereof in its entirety.

4.     Amendments to Exhibits to the Loan Agreement.   (a) The provisions of Exhibit 2:2-12 are hereby amended by adding the following after the chart appearing therein:

The Base Margin and the Libor Margin based upon the Pricing Grid shall initially be determined on the Pricing Grid Change Date and shall be reset every three months thereafter.

(b)     EXHIBIT 7:7-11 to the Loan Agreement is hereby deleted in its entirety and a new EXHIBIT 7:7-11 in the form annexed to this First Amendment is substituted in its stead.

5.     Conditions Precedent to Effectiveness.   This First Amendment shall not be effective until each of the following conditions precedent have been fulfilled to the satisfaction of the Administrative Agent:

a.     This First Amendment shall have been duly executed and delivered by the respective parties hereto and, shall be in full force and effect and shall be in form and substance satisfactory to the Administrative Agent and the Lenders.

b.     All action on the part of the Borrowers necessary for the valid execution, delivery and performance by the Borrowers of this First Amendment shall have been duly and effectively taken and evidence thereof satisfactory to the Administrative Agent shall have been provided to the Administrative Agent.

c.     The Final Borrowing Order shall have been entered in the Proceedings, which Final Borrowing Order shall incorporate, among other things, approval of this First Amendment.

d.     The Borrowers shall have provided such additional instruments and documents to the Administrative Agent as the Administrative Agent and Administrative Agent's counsel may have reasonably requested.

6.     Miscellaneous.

a.     This First Amendment may be executed in several counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, and all of which together shall constitute one instrument.

b.     This First Amendment expresses the entire understanding of the parties with respect to the transactions contemplated hereby.   No prior negotiations or discussions shall limit, modify, or otherwise affect the provisions hereof.

c.     Any determination that any provision of this First Amendment or any application hereof is invalid, illegal or unenforceable in any respect and in any instance shall not effect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provisions of this First Amendment.

-2-

d.      The Borrowers shall pay on demand all costs and expenses of the Agents and the Lenders, including, without limitation, reasonable attorneys' fees in connection with the preparation, negotiation, execution and delivery of this First Amendment.

e.      The Borrowers warrant and represent that the Borrowers have consulted with independent legal counsel of the Borrowers' selection in connection with this First Amendment and is not relying on any representations or warranties of the Agents, the Lenders or their counsel in entering into this First Amendment.

IN WITNESS WHEREOF, the parties have duly executed this First Amendment as of the day and year first above written.

CASUAL MALE CORP.

By: _____
    Name:
    Title:

THE BORROWERS

    MORSE SHOE, INC.
    JBI, INC.
    JBI APPAREL, INC.
    THE CASUAL MALE, INC.
    WGS CORP.
    TCMB&T, INC
    LP INNOVATIONS, INC.
    SPENCER COMPANIES, INC.
    THE CASUAL MALE, INC.
    BUCKMIN, INC.
    ELM EQUIPMENT CORP.
    JBI HOLDING COMPANY, INC.
    TCM HOLDING COMPANY, INC.
    ISAB, INC.
    MORSE SHOE INTERNATIONAL, INC.
    WHITE CAP FOOTWEAR, INC

By: _____
    Name:
    Title:

FLEET RETAIL FINANCE INC.,
    as Administrative Agent, as Collateral
    Agent, as Swingline Lender, and as
    Revolving Credit Lender


By: _____

Name:_____

Title:_____


BACK BAY CAPITAL FUNDING, LLC
    as Tranche B Lender and Tranche C Lender


By: _____

Name:_____

Title:_____

    The following Lenders consent to the amendments set forth herein with the exception of the amendment to **EXHIBIT 7:7-11**, as to which their consent is not required.

FOOTHILL CAPITAL CORPORATION


By: _____

Name:_____

Title:_____


HELLER FINANCIAL, INC.


By: _____

Name:_____

Title:_____

LASALLE BUSINESS CREDIT, INC

By: _____

Name:_____

Title:_____

NATIONAL CITY COMMERCIAL
    FINANCE, INC.

By: _____

Name:_____

Title:_____

IBJ WHITEHALL BUSINESS CREDIT CORP.

By: _____

Name:_____

Title:_____

THE PROVIDENT BANK

By: _____

Name:_____

Title:_____

## FINANCIAL PERFORMANCE COVENANTS

*Minimum Cumulative EBITDAR.*  The Borrowers shall not permit or suffer the following, tested as of the last day of each month (commencing with June 30, 2001 and through December 31, 2001) on a cumulative basis dating back to January 31, 2001, to be less than the following minimum cumulative amount: (a) Consolidated EBITDAR *minus* (b) 100% of any adequate protection payments made by the Borrowers during such period and not reflected in the Business Plan (without regard to any updating of the Business Plan), to the extent that such adequate protection payments were not otherwise included as reductions to EBITDAR for the period of measurement:

| MONTH ENDING: | MINIMUM CUMULATIVE EBITDAR: $ MILLIONS |
|---|---|
| June, 2001* | 6.0 |
| July, 2001* | 5.3 |
| August, 2001* | 5.0 |
| September, 2001* | 7.7 |
| October, 2001 | 10.3 |
| November, 2001 | 14.2 |
| December, 2001 | 27.1 |

\*    The Borrowers' compliance with the Minimum Cumulative EBITDAR test for the subject months will be waived unless Excess Availability is less than $17,500,000 for any three consecutive days during such period (the "Test Condition").   If the Test Condition occurs, the Borrower shall be obligated to comply with the Minimum Cumulative EBITDAR test for the subject month in which the Test Condition occurs and shall also be required to be in compliance with the Minimum Cumulative EBITDAR test for each month both preceding, and subsequent to, the month in which the Test Condition occurs (failing which an Event of Default shall be deemed to have arisen).   In any event, whether or not the Test Condition has occurred, the Borrowers must comply with the Minimum Cumulative EBITDAR test for October, 2001 and each month thereafter.

*Minimum Rolling Four Quarter EBITDAR.*  The Borrowers shall not permit or suffer the following, tested as of the last day of each month (commencing with January, 2002) on a trailing twelve month basis, to be less than the following minimum cumulative amount: (a) Consolidated EBITDAR *minus* (b) 100% of any adequate protection payments made by the Borrowers during such period and not reflected in the Business Plan (without regard to any updating of the Business Plan), to the extent that such adequate protection payments were not otherwise included as reductions to EBITDAR for the period of measurement:

| MONTH ENDING: | MINIMUM EBITDAR (ROLLING 12 MONTH BASIS): $ MILLIONS |
|---|---|
| January, 2002 | 22.5 |
| February, 2002 | 22.6 |
| March, 2002 | 21.8 |
| April, 2002 | 22.0 |
| May, 2002 | 23.1 |
| June, 2002 | 23.5 |
| July, 2002 | 25.7 |
| August, 2002 | 25.8 |
| September, 2002 | 25.8 |
| October, 2002 | 25.9 |
| November, 2002 | 26.0 |
| December, 2002 | 25.9 |
| January, 2003 | 26.0 |
| February, 2003 | 26.0 |
| March, 2003 | 26.0 |
| April, 2003 | 26.0 |
| May, 2003 | 26.0 |

*Capital Expenditures*.   The Borrower shall not permit or suffer its Consolidated Capital Expenditures to exceed the following:

| FISCAL YEAR | MAXIMUM FOR ENTIRE FISCAL YEAR | MAXIMUM FOR EACH QUARTER |
|---|---|---|
| 2002 | $5,000,000 | $2,500,000 |
| 2003 | 6,000,000 | 2,500,000 |

*Excess Availability.*   The Borrower shall at all times have Excess Availability of not less than the following:

| FROM | TO | MINIMUM EXCESS AVAILABILITY ($ MILLIONS) |
|---|---|---|
| Closing | November 30, 2001 | 5.0 |
| December 1, 2001 | Maturity Date | 11.0 |

# Attachment 2

# Attachment 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | CHAPTER 11 |
| | ) | |
| | ) | |
| DIAMOND BRANDS OPERATING | ) | CASE NO. |
| CORP., et al., | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | JOINTLY ADMINISTERED |
| | ) | |
| | ) | |
| | ) | |

FILED 2001 JUL 10 PM 5:14 CLERK US BANKRUPTCY COURT DISTRICT OF DELAWARE

## FINAL ORDER AUTHORIZING SECURED
## AND SUPERPRIORITY POST-PETITION
## FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364 AND AUTHORIZING
## USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363

Upon the motion (the "Motion") dated May 30, 2001 of Diamond Brands Operating

Corp. ("Diamond"), Diamond Brands Incorporated ("Holdings"), Diamond Brands Kansas, Inc.

("DBK"), and Forster Inc. ("Forster"), debtors and debtors in possession (collectively, the

"Debtors"), (a) seeking this Court's authorization pursuant to Sections 105, 361, 362 , 364(c)(1),

364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et

seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c), Rule 9014 of the Federal

Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the

Local Rules adopted by the United States Bankruptcy Court for the District of Delaware, for

inter alia, (i) Diamond[1] to obtain post-petition financing (the "Post-Petition Financing"), and for

Holdings, DBK and Forster (the "Guarantors") to guarantee the payment of such obligations, in

connection with a revolving credit loan not to exceed $8,200,000 (the "Tranche A Commitment")

and, after the entry of a Final Order approving the extension of such facility, a term loan facility

not to exceed $84,050,000 (including the obligations of Diamond for reimbursement of draws

under the Pre-Petition Letter of Credit) plus (A) all unpaid accrued interest, fees, and expenses in

connection therewith plus (B) funding obligations and early termination obligations in

connection with the Pre-Petition Interest Rate Agreements to the extent such obligations are

secured by the Pre-Petition Loan Documents, as defined below (the "Tranche B Commitment,"

and, collectively with the Tranche A Commitment, the "Commitments") from Wells Fargo Bank,

National Association ("Wells Fargo"), as administrative agent (in its capacity as agent for the

Lenders referred to below, the "Agent"), and a syndicate of other financial institutions (including

Wells Fargo, the "Lenders"), and for Diamond and the Guarantors to execute a Credit Agreement

with respect to the Post-Petition Financing (as amended, supplemented or otherwise modified

from time to time, the "Credit Agreement"); and for Diamond to execute revolving credit notes

and term notes (the "Notes"); and for each Guarantor to guarantee the Notes and all obligations

of Diamond and each other Guarantor under the Credit Agreement (the Credit Agreement, the

Notes, and all ancillary documents at any time executed in connection therewith, collectively, the

"Loan Documents"); (ii) the Debtors to grant to the Lenders, pursuant to Bankruptcy Code

§§ 364 (c) and 364 (d), security interests in all of the Debtors' presently owned and after-

acquired property to secure the Debtors' obligations under the Loan Documents, including

---

[1]   Capitalized terms used but not defined herein have the meanings assigned to such terms
      in the Credit Agreement.

without limitation a continuing security interest of first priority in, all of the right, title and

interest of such Debtor in, to and under all of the following, whether now existing or hereafter

from time to time acquired:  (A) each and every Receivable, (B) all Contracts (other than

Excluded Contracts except to the extent provided in the definition thereof), together with all

Contract Rights arising thereunder, (C) all Inventory, (D) all Equipment, (E) all Investment

Property, (E) all Marks, together with the registrations and right to all renewals thereof, and the

goodwill of the business of such Debtor symbolized by the Marks, (F) all Patents and

Copyrights, (G) all computer programs of such Debtor and all intellectual property rights therein

(to the extent not constituting Excluded Contracts to the extent provided in the definition thereof)

and all other proprietary information of such Debtor, including, but not limited to, trade secrets,

(H) all other Goods, General Intangibles, Chattel Paper, Documents and Instruments, (I) all bank

accounts and deposit accounts, including, without limitation, the Concentration Account, the

Safekeeping Account, and the Borrower's Account and all monies, securities and instruments

deposited or required to be deposited in any such account, (J) all Real Property, whether owned

or leased, including, without limitation, all land, buildings, improvements and fixtures, any lease

or sublease relating thereto and all general intangibles relating thereto, (K) proceeds of all causes

of action (exclusive of avoidance actions under Chapter V of the Bankruptcy Code), and (L) all

Proceeds and products of any and all of the foregoing, and (iii) the Debtors to grant to the

Lenders priority in payment with respect to such obligations over any and all administrative

expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as

described below; (b) seeking this Court's authorization, pursuant to Bankruptcy Code § 363 (c),

to use Cash Collateral (as defined below) and to provide adequate protection (as described

below), pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d), to the secured lenders (the

"Pre-Petition Lenders") to Diamond pursuant to the Credit Agreement dated as of April 21, 1998

(as amended, supplemented or otherwise modified prior to the commencement of these Chapter

11 cases, the "Pre-Petition Credit Agreement"), among Diamond, the Pre-Petition Lenders and

Wells Fargo, as administrative agent (in such capacity, the "Pre-Petition Agent") for the Pre-

Petition Lenders, on account of their pre-petition debt (the "Pre-Petition Obligations");

(c) seeking a preliminary hearing (the "Interim Hearing") on the Motion to consider entry of an

interim order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing Diamond,

inter alia, to utilize the Tranche A Commitment for up to an aggregate of $5,300,000 (subject to

the Available Amount) of loans (together with such other amounts of the Post-Petition Financing

as may be authorized prior to the Final Hearing referred to below, the "Interim Financing")all

upon the terms and conditions set forth in the Loan Documents and the Interim Order pending

the Final Hearing referred to below; authorizing the use by the Debtors of Cash Collateral and

granting the adequate protection hereinafter described; and (d) requesting that a final hearing (the

"Final Hearing") be scheduled by this Court to consider entry of a final order (this "Order")

authorizing on a final basis, inter alia, the balance of the Post-Petition Financing; and due and

sufficient notice under the circumstances of the Motion and the Interim Hearing having been

given; and the Interim Hearing on the Motion having been held before this Court on May 30,

2001 and the Interim Order granting the interim relief requested in the Motion having been

approved by the Court at the Interim Hearing; and upon the Response of the Official Committee

of Unsecured Creditors appointed in these Chapter 11 Cases (the "Committee") to the Motion

dated June 22, 2001 under which the Committee objected to the relief requested in the Motion on

various grounds (the "Objection"); and upon the entire record made at the Interim Hearing and

the Final Hearing held on June 27, and July 9, 2001, respectively; and this Court having found

good and sufficient cause appearing therefor,

BASED ON THE RECORD PRESENTED TO THE COURT BY THE DEBTORS, IT

APPEARS that:

A.    On May 22, 2001 (the "Filing Date"), voluntary chapter 11 petitions were filed

with this Court by each of the Debtors (the "Chapter 11 Cases"). The Debtors are continuing in

possession of their property, and operating and managing their businesses, as debtors in

possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to

28 U.S.C. §§ 157(b) and 1334. The Motion constitutes a core proceeding as defined in 28 U.S.C.

§ 157(b)(2).

C.    Without prejudice to the rights of any party in interest including any statutory

committee of unsecured creditors (but subject to the limitations thereon described below in

decretal paragraph 17), the Debtors admit that they are truly and justly indebted to the Pre-

Petition Lenders, pursuant to the Pre-Petition Credit Agreement and all collateral and ancillary

documents executed in connection therewith (collectively, the "Pre-Petition Loan Documents"),

without defense, counterclaim or offset of any kind as of the Filing Date in the aggregate

principal amount of $84,050,000 (such principal amount includes $1,900,000 represented by the

undrawn face amount of the Pre-Petition Letter of Credit as of the Filing Date ) plus all accrued

and unpaid interest, fees, indemnity amounts, and expenses thereon plus Debtors' funding

obligations and early termination obligations in connection with the Pre-Petition Interest Rate

Agreements entered into pursuant to the Pre-Petition Credit Agreement and all collateral and ancillary documents executed in connection therewith.[2]

D.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 17), the Debtors further admit that the Pre-Petition Obligations are secured by liens and security interests granted by the applicable Debtors to the Pre-Petition Agent, for the ratable benefit of the Pre-Petition Lenders, upon and in substantially all of Diamond's and the other applicable Debtors' assets and property (including any setoff rights arising by operation of law, the "Pre-Petition Collateral"), including without limitation, inventory, real property, accounts receivable, equipment, general intangibles, and other tangible and intangible personal property and the proceeds thereof. All the Debtors' cash constitutes proceeds of the Pre-Petition Collateral and, therefore, is cash collateral of the Pre-Petition Lenders within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral").

E.      The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Post-Petition Financing. The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, to purchase and supply new inventory and otherwise finance their

---

[2]     Under the Pre-Petition Credit Agreement, the Pre-Petition Lenders provided Diamond with revolving and term loan credit facilities and other financial accommodations including, as of the Petition Date, (a) revolving loans in an aggregate principal balance outstanding of $9,900,000.00 and a letter of credit issued with an undrawn Face Amount of $1,900,000.00, each extended under the revolving credit facility, plus (b) a principal balance outstanding of $72,250,000.00 under two term loans, plus (c) accrued and unpaid interest, fees, costs, expenses and indemnities related thereto or incurred pursuant to the Pre-Petition Credit Agreement, plus (d) two Pre-Petition Interest Rate Agreements (as defined herein) having periodic funding obligations together with any obligation payable upon an early termination (to the extent such obligations are secured by the Pre-Petition Loan Documents, as provided in paragraph 16 hereof).

operations, is essential to the Debtors' continued viability. In addition, the Debtors' critical need

for financing is immediate. In the absence of the Post-Petition Financing, the continued

operation of the Debtors' businesses would not be possible, and serious and irreparable harm to

the Debtors and their estates would occur. The preservation, maintenance and enhancement of

the going concern value of Diamond and the other Debtors are of the utmost significance and

importance to a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy

Code.

      F.     By the Interim Order approved at the Interim Hearing on May 30, 2001, the

Debtors were authorized to borrow $ 5,300,000 from the Lenders on the terms and conditions set

forth in the Interim Order and the Credit Agreement and other Loan Documents. The proceeds

of the Interim Financing were used, among other things, to finance the Debtors' operations

pending the Final Hearing.

      G.     Given the Debtors' current financial condition, financing arrangements and capital

structure, the Debtors cannot obtain unsecured credit allowable under Bankruptcy Code

§ 503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise

available without the Debtors (i) granting, pursuant to Bankruptcy Code § 364(c)(1), claims

having priority over any and all administrative expenses of the kinds specified in Bankruptcy

Code §§ 503(b) and 507(b), other than as described below, and (ii) securing, pursuant to

Bankruptcy Code §§ 364(c) and (d), such indebtedness and obligations with security interests in

and liens upon the property described below, all in accordance with and subject to the terms of

this Order and the Loan Documents. Under the circumstances, no other source of financing is

available on more favorable terms than the Post-Petition Financing.

40139594_4.DOC

H.      Pursuant to Bankruptcy Code §§ 364(c) and 364(d), notice of the Final Hearing,

which has been held pursuant to Bankruptcy Rule 4001(c) and Bankruptcy Code § 102(1), and

the relief requested in the Motion has been given to (i) the Office of the United States Trustee,

(ii) the Pre-Petition Lenders and the Pre-Petition Agent, (iii) the creditors holding the 30 largest

unsecured claims against the Debtors, (iv) the Indenture Trustee for Diamond's subordinated

notes, and (v) counsel for the Committee.

I.       The Post-Petition Financing has been negotiated in good faith and at arm's length

between the Debtors and the Lenders, and any credit extended and loans made to the Debtors

pursuant to the Loan Documents shall be deemed to have been extended, issued or made, as the

case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

J.       The terms of the Post-Petition Financing are fair and reasonable, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are

supported by reasonably equivalent value and fair consideration.

K.      The Debtors have requested immediate entry of this Order pursuant to Bankruptcy

Rule 4001(c)(2).  The permission granted herein to enter into the Post-Petition Financing and

obtain funds thereunder, and to use the Cash Collateral, is necessary to avoid immediate and

irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best

interest of the Debtors' respective estates and creditors as its implementation will, among other

things, allow for the continued operations necessary to sustain the Debtors' existing businesses

and enhance the Debtors' prospects for successful reorganization.

L.      Following negotiations among the parties, (I) the Lenders have agreed to waive

the Event of Default that has occurred by virtue of the entry of this Order more than forty-five

days following the Petition Date, (II) the Debtors , with the Lenders' agreement, have modified

their requests for relief as to (a) the interest rates payable on the Tranche B Loans, (b) the levels

of EBITDA that the Debtors must generate, (c) the limitations on capital expenditures by the

Debtors, and (d) the Lenders' ability to immediately declare an Event of Default upon a

successful challenge to the Pre-Petition Lenders' liens, (III) the Committee has withdrawn its

Objection, and (IV) the Debtors and the Lenders shall amend the Credit Agreement in a form

acceptable to the Debtors, the Lenders and the Committee to (a) reduce each of the interest rates

applicable to the Tranche B Loans by 2% per annum, (b) reduce the required minimum EBITDA

covenant levels as agreed upon among Debtors, the Lenders and the Committee, (c) modify the

restrictions on the use of cash to make capital expenditures by the Debtors as agreed upon among

Debtors, the Lenders and the Committee, (d) limit the Lenders' ability to accelerate the Loans

and exercise remedies pursuant to the Credit Agreement for a period of thirty (30) days

following the entry of an order adversely affecting the Pre-Petition Obligations or liens securing

such Pre-Petition Obligations, finding that the Pre-Petition Obligations are not fully secured, or

that the liens securing the Pre-Petition Obligations are avoidable for any reason.

Based upon the foregoing findings and conclusions, and upon the record made before this

Court at the Interim Hearing and the Final Hearing, and good and sufficient cause appearing

therefor;

**IT IS HEREBY ORDERED** that:

1.     The Motion (as modified as set forth in paragraph L) is granted, subject to the

terms and conditions set forth in this Order.

2.     The Debtors are expressly authorized and empowered to execute and deliver the

Credit Agreement (as amended), the Notes and any other Loan Document to be executed and

delivered in connection therewith.  Diamond and the Guarantors are authorized to comply with

and perform the terms and conditions contained in the Loan Documents, and Diamond is

directed to repay amounts borrowed and all other amounts due under the Loan Documents, and

each Guarantor is further directed to repay amounts guaranteed, with interest to the Lenders in

accordance with and subject to the terms and conditions set forth in the Loan Documents and this

Order.  The Debtors are further authorized and directed to pay all facility, commitment and other

fees and expenses, including, without limitation, all reasonable fees and expenses of

professionals engaged by the Agent and the Lenders, in accordance with the terms of the Credit

Agreement.  All loans made under the Credit Agreement (the "Loans") and interest thereon, and

all fees, costs, expenses, indebtedness, obligations and liabilities of Diamond and each Guarantor

to the Agent and the Lenders under the Loan Documents and this Order, are hereinafter referred

to as the "Obligations."

      3.     The Company is expressly authorized to obtain Loans from the Lenders, and the

Guarantors are expressly authorized to guarantee all Obligations in respect of such Loans, all on

the terms and subject to the conditions set forth in the Loan Documents and this Order, as

follows: (a) under the Tranche A Commitment, a total of $ 8,200,000 (subject to the Available

Amount) of Tranche A Loans and Swing Line Loans (as such terms are defined in the Credit

Agreement) (these amounts are inclusive of the amounts of Interim Financing authorized under

the Interim Order and do not constitute an increase in the Tranche A Commitment), and (b)

under the Tranche B Commitment, Tranche B Loans equal to the balance of the Pre-Petition

Obligations plus the provisions for credit extensions under Tranche B Loans in connection with

(i) reimbursement obligations for draws under the Pre-Petition Letter of Credit and (ii) for

periodic funding and early termination obligations under the Pre-Petition Interest Rate

Agreements if otherwise unpaid and to the extent such obligations are secured by the Pre-Petition

Loan Documents.  Diamond is authorized to use the proceeds of the Loans and to use Cash

Collateral in the operation of the Debtors' businesses, provided that (i) the proposed Loans or use

of Cash Collateral is consistent with the terms of the Credit Agreement and this Order, (ii) on the

date of entry of this Order (the "Final Order Repayment Date") Diamond shall utilize the

Tranche B Commitment to obtain Tranche B Loans (including the provisions for credit

extensions under Tranche B Loans in connection with (a) reimbursement obligations for draws

under the Pre-Petition Letter of Credit and (b) for periodic funding and early termination

obligations under the Pre-Petition Interest Rate Agreements if otherwise unpaid and to the extent

such obligations are secured by the Pre-Petition Loan Documents as provided in paragraph 16

hereof), to repay the Pre-Petition Obligations to which the Tranche B Loan relates , and (iii) the

proposed Tranche A Loan or Swing Line Loan is necessary after the Company's use of all

available cash (other than cash permitted to be retained pursuant to the Credit Agreement).

Diamond is authorized to use the proceeds of the Tranche B Loans for the purpose of repaying

the Pre-Petition Obligations to which the Tranche B Loan relates pursuant to the Credit

Agreement.

   4.  If an Event of Default occurs, the Agent, acting with the consent or at the

direction of the requisite Lenders whose consent or direction is required as set forth in Section

6.02 of the Credit Agreement with respect to the type of Event of Default that has occurred and

is continuing, may terminate the Post-Petition Financing and declare the Loans to be due and

payable, and, subject to the requirement set forth in the Credit Agreement that Diamond and any

statutory unsecured creditors' committee appointed in the Cases receive five business days' prior

written notice thereof, the automatic stay pursuant to Bankruptcy Code § 362(a) shall be deemed

lifted and modified, without further order of this Court, to permit the Agent and the Lenders to

exercise any and all of their rights and remedies under the Credit Agreement, the other Loan

Documents and this Order.  In addition, the Debtors' right to use the Cash Collateral shall

terminate automatically on the Termination Date; provided, however, that after the date of a

Default or an Event of Default, the Debtors may use Cash Collateral to pay fees required to be

paid pursuant to 28 U.S.C. § 1930 and to pay allowed and unpaid professional fees and

disbursements incurred by the Debtors and any statutory unsecured creditors' committee

appointed in the Cases, in an amount up to the amount of the Carve-Out (as defined below) for

the purposes of such Carve-Out (it being acknowledged that both Cash Collateral Use and the

use of the proceeds of other Collateral will be calculated in determining when the Carve-Out has

been fully used).  Notwithstanding anything herein to the contrary, no portion of the Loans

(including the Pre-Petition Letter of Credit), the Collateral and/or the Carve-out (as defined

below) may be used by any Debtor to investigate, commence or prosecute any action or

objection with respect to the Pre-Petition Lenders, the Pre-Petition Obligations or the liens

securing the Pre-Petition Obligations, and no more than $75,000, in the aggregate, of the Carve-

Out (as defined below) may be used by the Committee to investigate any such action or objection

or to respond to a motion filed by the Pre-Petition Lenders or any of them regarding the Pre-

Petition Interest Rate Agreement.

    5.    In accordance with Bankruptcy Code § 364(c)(1), subject to Paragraph 7 below,

the Obligations shall constitute claims (the "Superpriority Claims") with priority in payment over

any and all administrative expenses of the kinds specified or ordered pursuant to any provision of

the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 503(b), 507(b), and 726,

and shall at all times be senior to the rights of the Debtors, and any successor trustee or any

creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code.

Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code

§§ 503(b), 506(c), 507 (b) or otherwise, including those resulting from the conversion of any of

the Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with,

the Superpriority Claims of the Lenders arising out of the Obligations, provided, however, that

the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and

payable under 11 U.S.C. §§ 330 and 331, as the same may be due and payable, and any

compensation and expenses previously paid, or accrued but unpaid, prior to the occurrence of a

Default or Event of Default shall not reduce the Carve-Out (as defined below).  Nothing herein

shall limit the rights of the Agent and the Pre-Petition Agent to object to any request to this Court

for payment or reimbursement of fees and expenses of professionals.  To the extent that assets of

the Debtors' estates constitute cash proceeds of avoidance actions under Chapter V of the

Bankruptcy Code against the Pre-Petition Lenders, such amounts shall not be used to satisfy the

Superpriority Claims granted herein, provided, however, that the foregoing limitation shall not

be deemed to affect any pre-existing contractual subordination rights in existence between the

Pre-Petition Lenders and any other creditors.

6.     As security for the Obligations, the Agent and the Lenders shall have and are

hereby granted (effective upon the date of this Order and without the necessity of the execution

by the Debtors of, or the filing or recordation by the Agent or any Lender of, mortgages, security

agreements, pledge agreements, financing statements or otherwise), valid and perfected security

interests in, and liens upon (the "Liens"), all present and after-acquired property of the Debtors of

any nature whatsoever, including, without limitation, a continuing security interest of first

priority in, all of the right, title and interest of each Debtor in, to and under all of the following,

whether now existing or hereafter from time to time acquired: (i) each and every Receivable,

(ii) all Contracts (other than Excluded Contracts except to the extent provided in the definition

thereof), together with all Contract Rights arising thereunder, (iii) all Inventory, (iv) all

Equipment, (v) all Investment Property, (vi) all Marks, together with the registrations and right

to all renewals thereof, and the goodwill of the business of such Debtor symbolized by the

Marks, (vii) all Patents and Copyrights, (viii) all computer programs of such Debtor and all

intellectual property rights therein (to the extent not constituting Excluded Contracts, except to

the extent provided in the definition thereof) and all other proprietary information of such

Debtor, including, but not limited to, trade secrets, (ix) all other Goods, General Intangibles,

Chattel Paper, Documents and Instruments, (x) all bank accounts and deposit accounts,

including, without limitation, the Concentration Account, the Safekeeping Account, the

Borrowers' Account, and all monies, securities and instruments deposited or required to be

deposited in any such account, (xi) all Real Property, whether owned or leased, including,

without limitation, all land, buildings, improvements and fixtures, any lease or sublease relating

thereto and all general intangibles relating thereto, (xii) proceeds of all causes of action

(exclusive of avoidance actions under Chapter V of the Bankruptcy Code), and (xiii) all Proceeds

and products of any and all of the foregoing (all of the above, collectively with the collateral

described in clauses (a), (b), and (c) below, and collectively with all proceeds and products of

any of the foregoing, the "Collateral"):

      (a)    pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral (including the Pre-Petition Collateral after the Final Order Repayment Date) and that is not otherwise encumbered by a validly perfected security interest or lien on the Filing Date;

      (b)    pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior, priming, perfected Lien upon all of the Debtors' right, title and interest in, to and under the Pre-Petition Collateral; and

      (c)      pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral (including the Pre-Petition Collateral after the Final Order Repayment Date) which is subject to a validly perfected security interest or lien in existence as of the Filing Date, or a valid lien perfected (but not granted) after the Filing Date to the extent such perfection in respect of a pre-Filing Date claim is expressly permitted under the Bankruptcy Code.

The Collateral shall not be subject to any right of offset or recoupment by any account debtor to any Debtor arising prior to the Filing Date and such offsets and/or recoupments shall not be applied against the Collateral by the Debtor, any account debtor, or any third party. All Liens, including the priming lien granted in 6(b) herein, shall be superior to and have priority over any and all rights of offset or recoupment arising prior to the Filing Date. The Debtors shall take all steps under applicable nonbankruptcy law to prevent any and all account debtors of any Debtor from applying such offsets and/or recoupments to the Collateral.

      7.      Notwithstanding any provision of this Order or the Credit Agreement to the contrary, the Liens and Superpriority Claims granted to the Agent and the Lenders pursuant to the Credit Agreement and this Order shall be subject and subordinate to, after the occurrence of a Default or Event of Default and the payment of fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Bankruptcy Court, the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases in an aggregate amount not in excess of $1,000,000 ( plus all unpaid professional fees and disbursements incurred prior to the occurrence of such Default or Event of Default to the extent allowed by the Bankruptcy Court) (collectively, the "Carve-Out"); provided, however, the Carve-Out shall not include professional fees and disbursements incurred in connection with investigating or asserting any claims or causes of action against the Pre-Petition Lenders or the Pre-Petition Agent, including formal discovery proceedings in anticipation thereof, and/or

investigating or challenging or raising any defense to the Pre-Petition Obligations, any lien of the

Pre-Petition Agent or the Pre-Petition Lenders (except to the extent of $75,000, in the aggregate,

that may be incurred by the Committee in connection with investigating any claims or causes of

action against the Pre-Petition Agent or Pre-Petition Lenders, investigating any claims or causes

of action seeking to invalidate the Pre-Petition Obligations, or responding to a motion filed by

the Pre-Petition Lenders or any of them regarding the Pre-Petition Interest Rate Agreement).

      8.     As more fully set forth in paragraph 8 of the Interim Order, the Pre-Petition Agent

and the Pre-Petition Lenders were granted the following adequate protection from the Filing

Date against any diminution in the value of their interests arising from:

      (a)     the priming of the Pre-Petition Agent's and Pre-Petition Lenders' liens by the Liens in favor of the Agent and the Lenders granted in this Order and the Loan Documents pursuant to Bankruptcy Code § 364(d);

      (b)     the use of the Cash Collateral; and

      (c)     the imposition of the automatic stay pursuant to Bankruptcy Code § 362;

the Pre-Petition Agent and the Pre-Petition Lenders were granted the following:

      (i) Pursuant to Bankruptcy Code § 364(c)(i), a Superpriority Claim junior only to the Superpriority Claim granted to the Agent and the Lenders under the Interim Order,

      (ii) Effective upon the Filing Date and without the necessity of execution by the Debtors of, or filing or recordation by the Agent or any Lender of, mortgages, security agreements, pledge agreements, financing statements or otherwise, valid and perfected replacement security interests in, and liens upon all of the Debtors' right, title and interest in, to and under the Collateral (the "Replacement Liens"), having a priority immediately junior to the priming and other Liens granted in favor of the Agent and the Lenders hereunder (subject and subordinate, in the case of clauses (i) and (ii) above, to the Carve-Out and valid and perfected Liens which are senior (after giving effect to the Interim Order) to the Liens granted to the Agent and the Lenders pursuant to the Interim Order);

      (iii) the payment on the Closing Date of all other fees, costs and charges owing under the Pre-Petition Credit Agreement on such date (including, without limitation, the fees and expenses of attorneys and financial consultants of the Pre-Petition Agent),

(iv) the right to accrue interest on the Pre-Petition Obligations at the default rate determined in accordance with Section 2.2(E) of the Pre-Petition Credit Agreement,

(v) the payment of all interest accrued prior to the Petition Date on the Pre-Petition Obligations at the default rate in accordance with the terms of the Pre-Petition Credit Agreement, and

(vi) the current payment of all interest accrued and accruing on the Pre-Petition Obligations at the default rate in accordance with the terms of the Pre-Petition Credit Agreement.

9.      Under the circumstances, and given the Pre-Petition Lenders' consent and that the grant of adequate protection set forth in paragraph 8 of the Interim Order is also consistent with Bankruptcy Code § 506(b), the adequate protection provided therein is reasonable and sufficient to protect the interests of the Pre-Petition Lenders.  Notwithstanding any other provision hereof, the grant of adequate protection to the Pre-Petition Agent and the Pre-Petition Lenders pursuant to the Interim Order is without prejudice to the right of the Pre-Petition Agent and the Pre-Petition Lenders to seek modification of the grant of adequate protection provided thereby so as to provide different or additional adequate protection, and without prejudice to the right of any party in interest to contest any such modification.  From and after the entry of the Interim Order, the rights of the Pre-Petition Agent and the Pre-Petition Lenders in respect of any grant of adequate protection shall be governed by the Interim Order, this Order and the Loan Documents.

10.      Except as set forth in paragraphs 6, 7 and 8 above, the Liens and Replacement Liens shall be prior and senior to all liens and encumbrances of all other secured creditors in and to such Collateral granted, or arising, after the Filing Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors).  Other than the Carve-Out, the Debtors shall not assert a claim under Bankruptcy Code § 506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or

40139594_4.DOC

realization by the Agent, the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders upon

the Collateral or the Pre-Petition Collateral. The Liens and Replacement Liens granted pursuant

to this Order shall constitute valid and duly perfected security interests and liens, and the Agent,

the Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall not be required to file or

serve financing statements, notices of lien or similar instruments which otherwise may be

required under federal or state law in any jurisdiction, or take any action, including taking

possession, to validate and perfect such security interests and liens; and the failure by the

Debtors to execute any documentation relating to the Liens or Replacement Liens shall in no

way affect the validity, perfection or priority of such Liens or Replacement Liens. If, however,

the Agent, any Lender, the Pre-Petition Agent or any Pre-Petition Lender, in its sole discretion,

shall determine to file any such financing statements, notices of lien or similar instruments, or to

otherwise confirm perfection of such Liens or Replacement Liens, the Debtors are directed to

cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is

hereby lifted to allow the filing and recording of a certified copy of this Order or any such

financing statements, notices of lien or similar instruments, and all such documents shall be

deemed to have been filed or recorded at the time of and on the date of this Order.

11.    As long as any portion of the Obligations remains unpaid, or any Loan Document

remains in effect, it shall constitute an Event of Default under the Credit Agreement (and

automatic occurrence of the Termination Date) if any of the Debtors seeks, or there is entered,

any order (a) dismissing any of the Chapter 11 cases, (b) except as otherwise provided in

paragraph 8 hereof or as expressly permitted under the Credit Agreement, authorizing under any

section of the Bankruptcy Code, including Bankruptcy Code §§ 105 or 364, (i) granting any lien

or security interest in any property of the Debtors in favor of any party other than the Agent and

the Lenders or (ii) obtaining credit or incurring indebtedness that is entitled to superpriority

administrative status equal or superior to that granted to the Agent and the Lenders pursuant to

this Order (except to the extent that the proceeds of such credit or indebtedness are used to repay

the Obligations in full). The Credit Agreement also specifies certain other Events of Default.

12.     Upon the occurrence of and during the continuance of an Event of Default, the

Agent, acting with the consent of or at the direction of the requisite Lenders set forth in Section

6.02 of the Credit Agreement with respect to the type of Event of Default that has occurred and

is continuing, may exercise rights and remedies and take all or any of the following actions

without further modification of the automatic stay pursuant to Bankruptcy Code § 362 (which is

hereby deemed modified and vacated to the extent necessary to permit such exercise of rights

and remedies and the taking of such actions) or further order of or application to this Court:  (a)

terminate the Tranche A Commitment; (b) declare the principal and accrued interest, fees and

other liabilities constituting the Obligations to be due and payable; (c) set off amounts in the

Concentration Account, the Safekeeping Account and the Borrower's Account or any other

accounts maintained with any Lender, or otherwise enforce rights against any other Collateral in

the possession of the Agent or any Lender; and/or (d) take any other action or exercise any other

right or remedy permitted to the Lenders under the Loan Documents, this Order or by operation

of law; provided, however, the Agent and the Lenders may take the actions described in clauses

(c) or (d) above only after providing five business days' prior written notice to the Debtors, the

United States Trustee and any statutory committee of unsecured creditors appointed in the

Chapter 11 Cases and, provided further, that no order prohibiting such actions is entered by this

Court during such five business day period.  The Debtors waive any right to seek relief under the

Bankruptcy Code, including without limitation, under Bankruptcy Code § 105, to the extent any

such relief would restrict or impair the rights and remedies of the Agent and the Lenders set forth

in this Order and in the Loan Documents. All proceeds of Collateral and any other payments

received by the Agent or any Lender after the Termination Date or pursuant to the exercise of

any such rights and remedies upon the occurrence and during the continuance of an Event of

Default, shall be applied to the Obligations in the manner set forth in the Credit Agreement and

this Order (including giving effect to the Carve-Out).

     13.     The Debtors are authorized to perform all acts, and execute and comply with the

terms of such other documents, instruments and agreements in addition to the Loan Documents,

as the Agent or the Lenders may reasonably require, as evidence of and for the protection of the

Obligations, or which otherwise may be deemed reasonably necessary by the Agent or the

Lenders to effectuate the terms and conditions of this Order and the Loan Documents. The

Debtors, the Agent and the Lenders are hereby authorized to implement, in accordance with the

terms of the Credit Agreement, any non-material modifications (including without limitation,

any change in the number or composition of the Lenders) of the Credit Agreement without

further Order of this Court.

     14.     Having been found to be extending credit and making Loans to the Debtors in

good faith and the use of Cash Collateral having been extended in good faith, the Agent and the

Lenders shall be entitled to the full protections of Bankruptcy Code §§ 364(e) and 363(m) with

respect to the Obligations, Liens and adequate protection created or authorized by this Order in

the event that this Order or any authorization contained herein is stayed, vacated, reversed or

modified on appeal. Any stay, modification, reversal or vacation of this Order shall not affect

the validity of any obligation of the Debtors to the Agent or the Lenders incurred pursuant to this

Order. Notwithstanding any such stay, modification, reversal or vacation, all Loans made

pursuant to this Order and the Credit Agreement, all uses of Cash Collateral and all Obligations

incurred by the Debtors pursuant hereto or the Loan Documents prior to the effective date of

such stay, modification, reversal or vacation, shall be governed in all respects by the original

provisions hereof and the Agent, the Lenders, the Pre-Petition Agent and the Pre-Petition

Lenders shall be entitled to all the rights, privileges and benefits, including without limitation,

the Liens, Replacement Liens and Superpriority Claims granted herein.  In determining to make

any Loan under the Loan Documents, in consenting to the use of the Cash Collateral, or in

exercising any rights or remedies as and when permitted pursuant to this Order or the Loan

Documents, the Agent, the Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall not

be deemed to be in control of the operations of the Debtors or to be acting as a "responsible

person" or "owner or operator" with respect to the operation or management of the Debtors (as

such terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar

federal or state statute).

15.     The provisions of this Order and any actions taken pursuant hereto shall survive

entry of any order which may be entered (a) confirming any plan of reorganization in any of the

Chapter 11 Cases (and the obligations shall not be discharged by the entry of any such order or

pursuant to Bankruptcy Code § 1141(d)(4), the Debtors having hereby waived such discharge);

(b) converting any of the Chapter 11 Cases to a Chapter 7 case; (c) appointing or electing any

Chapter 11 trustee or examiner; or (d) dismissing any of the Chapter 11 Cases, and the terms and

provisions of this Order as well as the Superpriority Claims, Liens and Replacement Liens

granted pursuant to this Order and the Loan Documents shall continue in full force and effect

notwithstanding the entry of such order, and such Superpriority Claims, Liens and Replacement

Liens shall maintain their priority as provided by this Order until all of the Obligations and all

obligations in respect of the matters set forth in paragraph 8 are indefeasibly paid in full and

discharged.

16.    Notwithstanding anything contained in this Order to the contrary, on the Final

Order Repayment Date, (a) Diamond is hereby authorized and directed to repay the Pre-Petition

Obligations with the proceeds of the applicable Tranche B Loans, (b) simultaneous with the

repayment of the Pre-Petition Obligations by the applicable Tranche B Loans, the Replacement

Liens and Superpriority Claims granted as adequate protection in respect of the Pre-Petition

Obligations shall be deemed terminated, (c) Diamond's reimbursement obligation in the event of

a draw under the $1,900,000 Pre-Petition Letter of Credit shall be deemed to be a Tranche B

Loan under the Tranche B Commitment as set forth in the Credit Agreement, and (d) to the

extent this Court hereafter determines after notice and a hearing that obligations under the Pre-

Petition Interest Rate Agreements are obligations of Diamond Brands Operating Corp. and

therefore are secured by the Pre-Petition Loan Documents, or by agreement of the Lenders,

Debtor, and Committee, a reserve shall be provided under the Tranche B Commitment for the

Tranche B Loan in respect of the Pre-Petition Interest Rate Agreements in accordance with and

as set forth in the Credit Agreement.

17.    The findings contained in paragraphs C and D shall be binding upon the Debtors

and all parties in interest (including but not limited to any statutory committee of unsecured

creditors), unless (a) an adversary proceeding or contested matter challenging the validity,

enforceability, perfection or priority of the Pre-Petition Obligations or the Pre-Petition Agent's

and the Pre-Petition Lenders' liens on the Pre-Petition Collateral in respect thereof is timely

commenced no later than October 31, 2001 and (b) a final order is entered in favor of the

plaintiff or movant in any such timely filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is timely commenced as of such date, the Pre-Petition Obligations shall constitute allowed claims for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 case, the Pre-Petition Agent's and the Pre-Petition Lenders' liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to subordination and otherwise unavoidable, and the Pre-Petition Obligations and the Pre-Petition Agent's and the Pre-Petition Lenders' liens on the Pre-Petition Collateral shall not be subject to subordination, avoidance or any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor thereto. If any such proceeding or contested matter is timely commenced as of such date, this Court shall determine the validity, enforceability, perfection and priority of the liens of the Pre-Petition Agent or Pre-Petition Lenders, but only with respect to and to the extent of the objections raised in such adversary proceeding or contested matter and all other matters and objections not raised in such adversary proceeding or contested matter shall be deemed forever waived. Provided, however, that the preceding clause shall not apply to the Pre-Petition Interest Rate Agreements to the extent that an adversary proceeding or contested matter has not been commenced with regard to the Pre-Petition Interest Rate Agreements. If any proceeding or contested matter is timely commenced as of such date and results in the invalidation or unenforceability of any liens securing the Pre-Petition Obligations, then any portion of the Pre-Petition Obligations that as a result of such invalidity or unenforceability is determined to have been unsecured as of the Petition Date shall be subtracted from the aggregate principal balance of the Tranche B Loans and shall be deemed to constitute allowed unsecured claims (the "Allowed Unsecured Claims"). In accordance with section 10.02 of that certain Indenture dated April 21, 1998 among Diamond,

as issuer, and State Street Bank and Trust Company, as trustee for the benefit of the holders of

Diamond's 10 1/8% Senior Subordinated Notes (the "Indenture"), such Allowed Unsecured

Claims shall accrue interest from and after the petition date at the default rates set forth in the

Pre-Petition Credit Agreement and such provision will ensure that any distributions made to the

beneficiaries of such Indenture will first be paid to the holders of Senior Debt, as defined in the

Indenture, until such holders have been paid in full, including interest at the default rate set forth

in the Pre-Petition Credit Agreement. Any amounts paid by the Debtors for interest accruing

from and after the Petition Date in respect of any portion of the Tranche B Loans that is

ultimately determined to constitute Allowed Unsecured Claims shall be treated as having been

made as principal payments on the Tranche B Loans on and as of the date such interest payments

were actually made, and, the amount of each interest payment made in respect of the Tranche B

Loans, through and including the date on which the amount of any Allowed Unsecured Claims is

determined, shall be recalculated to reflect the appropriate allocation of the amount of such

payment between principal and interest, in accordance with the first clause of this sentence.

18.    Notwithstanding anything to the contrary contained herein, no provision of this

Order shall be deemed to be a factual finding regarding, or to limit (subject to the time limitation

imposed by paragraph 17 hereof) the rights, if any, of any party in interest (except the Debtors or

any Loan Party) to challenge the legality, validity, enforceability, priority or amount of the Pre-

Petition Obligations or the legality, validity, enforceability, priority or perfection of the Pre-

Petition Liens. Further, notwithstanding anything to the contrary contained herein, no provision

of this Order shall be deemed to limit the power of this Court to fashion relief with respect to the

grant of adequate protection provided to the Pre-Petition Lenders prior to the date on which this

Order becomes final and non-appealable or the authorization of the Tranche B Commitment of

Case 01-31751   Doc 146-1   Filed 10/09/01   Entered 10/10/01 00:00:00   Desc
Pleading   Page 94 of 423

the Post-Petition Financing in the event that any party in interest (except the Debtors or any Loan

Party) timely and properly brings a challenge to the legality, validity, enforceability, priority or

amount of the Pre-Petition Obligations or the legality, validity, enforceability, priority or

perfection of the Pre-Petition Liens.  Nothing contained in this paragraph 18 shall create any

rights of any party in interest.

19.     Entry of this Order shall be without prejudice to any and all rights, remedies,

claims and causes of action which the Pre-Petition Agent or the Pre-Petition Lenders may have

against the Debtors or third parties, and without prejudice to the right of the Pre-Petition Agent

and the Pre-Petition Lenders to seek relief from the automatic stay in effect pursuant to

Bankruptcy Code § 362, or any other relief in the Chapter 11 Cases, and the right of the Debtors

to oppose any such relief.  The provisions of this Order shall be binding upon and inure to the

benefit of the Agent, the Lenders, the Pre-Petition Agent, the Pre-Petition Lenders, the Debtors,

and their respective successors and assigns, including any trustee or other fiduciary hereafter

appointed in the Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

20.     Except as specifically amended, modified or supplemented hereby, all of the

provisions of the Interim Order shall remain in full force and effect and are ratified by this Order.

In the event of any inconsistency between the terms of this Order and the terms of the Interim

Order or the Loan Documents, the terms of this Order shall control.

21.     In order to facilitate the processing of claims, to ease the burden upon the Court

and to reduce any unnecessary expense to the Debtors' estates (a) the Pre-Petition Agent is

authorized to file master proofs of claim on behalf of the Pre-Petition Lenders on account of their

claims arising under the Pre-Petition Loan Documents and the Pre-Petition Agent shall not be

required to file a verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy

Procedure and (b) the Agent is authorized to file master proofs of claim on behalf of the Lenders

on account of their claims arising under the Loan Documents and hereunder and the Agent shall

not be required to file a verified statement pursuant to Rule 2019 of the Federal Rules of

Bankruptcy Procedure (the master proofs of claim collectively referred to in this paragraph 20,

the "Master Proofs of Claim").

22.     Upon the filing of a Master Proof of Claim against a Debtor or Debtors, each Pre-

Petition Lender or Lender, as the case may be, shall be deemed to have filed a proof of claim in

the amount set forth opposite its name therein in respect of its claims against the Debtors arising

under the Pre-Petition Loan Documents or Loan Documents, as the case may be, and the claim of

each Pre-Petition Lender or Lender named in the Master Proof of Claim shall be allowed or

disallowed as if such Pre-Petition Lenders or Lender had filed a separate proof of claim in the

amount set forth opposite each name in the Master Proof of Claim; provided that the Pre-Petition

Agent and the Agent may but shall not be required to amend the Master Proofs of Claim from

time to time to, among other things, reflect a change in the holders of claims set forth therein

and/or a reallocation among such holders of the claims asserted therein resulting from any

transfer of any such claims; and provided further that each Pre-Petition Lender and Lender (or

their respective successors in interest) may file additional proofs of claim for additional claims

based on the same or additional documents.

23.     The provisions set forth in paragraphs 21 and 22 above and the Master Proofs of

Claim are intended solely for the purpose of administrative convenience and, except to the extent

set forth herein or therein, neither the provisions of paragraph 21 and 22 nor the Master Proofs of

Claim shall affect the substantive rights of any Debtor, any party in interest or any Pre-Petition

Lender or Lender (or its successor in interest) including, without limitation, the right of each Pre-

Petition Lender or Lender (or its successor in interest) to vote separately or any plan of

reorganization proposed in the Debtors Chapter 11 Cases.

24.    The Debtors shall, on or before July __, 2001, mail copies of a notice of entry of

this Final Order to the parties which were given notice of the Final Hearing and to any other

party which has filed a request for notices with this Court.]


Dated:    Wilmington Delaware
          July 2, 2001

_____    _____
                                              JUDGE
_____    _____




(signatures on the following page)

AGREED TO FORM:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

*Patricia A Widdoss*

Gregg M. Galardi (I.D. No. 3810)
Patricia A. Widdoss (I.D. No. 3786)

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)
David S. Kurtz
Chris L. Dickerson
Brian P. Karpuk

Attorneys for Debtors and Debtors-in-Possession

RICHARDS, LAYTON & FINGER, P.A.

John Knight (I.D. No. 3848)

-and-

GIBSON, DUNN & CRUTCHER LLP
Kathryn A. Coleman

Co-counsel to Wells Fargo Bank, National Association,
as Agent and Pre-Petition Agent

BLANK ROME COMISKY & MCCAULEY LLP

Lee Harrington (No. 4046)

-and-

BLANK ROME COMISKY & MCCAULEY LLP
Raymond L. Shapiro
Joel C. Shapiro
Erin O'Brien Harkiewicz

Counsel to the Official Committee of Unsecured Creditors

40139594_4.DOC

AGREED TO FORM:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP


_____

Gregg M. Galardi (I.D. No. 3810)
Patricia A. Widdoss (I.D. No. 3786)

      -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)
David S. Kurtz
Chris L. Dickerson
Brian P. Karpuk

Attorneys for Debtors and Debtors-in-Possession

RICHARDS, LAYTON & FINGER, P.A.

_____

John Knight (I.D. No. 3848)

      -and-

GIBSON, DUNN & CRUTCHER LLP
Kathryn A. Coleman

Co-counsel to Wells Fargo Bank, National Association,
as Agent and Pre-Petition Agent

BLANK ROME COMISKY & MCCAULEY LLP


_____

Lee Harrington (No. 4046)

      -and-

BLANK ROME COMISKY & MCCAULEY LLP
Raymond L. Shapiro
Joel C. Shapiro
Erin O'Brien Harkiewicz

Counsel to the Official Committee of Unsecured Creditors

AGREED TO FORM:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP


_____

Gregg M. Galardi (I.D. No. 3810)
Patricia A. Widdoss (I.D. No. 3786)

        -and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)
David S. Kurtz
Chris L. Dickerson
Brian P. Karpuk

Attorneys for Debtors and Debtors-in-Possession

RICHARDS, LAYTON & FINGER, P.A.


_____

John Knight (I.D. No. 3848)

        -and-

GIBSON, DUNN & CRUTCHER LLP
Kathryn A. Coleman

Co-counsel to Wells Fargo Bank, National Association,
as Agent and Pre-Petition Agent

BLANK ROME COMISKY & MCCAULEY LLP


_____

Lee Harrington (No. 4046)

        -and-

BLANK ROME COMISKY & MCCAULEY LLP
Raymond L. Shapiro
Joel C. Shapiro
Erin O'Brien Harkiewicz

Counsel to the Official Committee of Unsecured Creditors



ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - x
                          :
In re:                    :        Chapter 11
                          :
EAGLE FOOD CENTERS, INC., :        Case No. 00-1311(RRM)
                          :
        Debtor.           :
                          :
- - - - - - - - - - - - - x

INTERIM ORDER (1) AUTHORIZING EAGLE FOOD CENTERS, INC., AS
DEBTOR-IN-POSSESSION, TO INCUR POST-PETITION SECURED
INDEBTEDNESS, (2) GRANTING SECURITY INTERESTS AND PRIORITY
PURSUANT TO 11 U.S.C. SECTION 364, (3) MODIFYING AUTOMATIC
STAY AND (4) SETTING FURTHER HEARING, IF NECESSARY

*This is an interim Order entered pursuant to Bankruptcy
Rule 4001(c), and as provided in ordering paragraph 27, is
subject to objections of parties-in-interest and a further
hearing, if necessary.  If no objection to the terms of this
interim Order is properly filed and served prior in accordance
with ordering paragraph 27, this interim Order shall be
considered final and no final hearing will be conducted*

Upon the motion, dated March 1, 2000 (the "Motion"),

of Eagle Food Centers, Inc. (as pre-petition debtor, "Eagle"),

of the above-captioned debtor and debtor-in-possession (the

"Debtor") for the entry of an order (the "Order") in the above-

captioned chapter 11 case (the "Case") (1) authorizing it to

enter into certain financial arrangements with Congress

Financial Corporation (Central) ("Congress"), a pre-petition

secured creditor, (2) granting additional security interests and liens to Congress and granting Congress priority claims pursuant to 11 U.S.C. § 364, (3) modifying the automatic stay, and (4) setting a further hearing on the Motion, if necessary; and upon the Affidavit of S. Patric Plumley in Support of Chapter 11 Petition and First-Day Orders sworn to on February 29, 2000; and it appearing that, pursuant to Bankruptcy Rule 4001(c), proper and adequate notice has been given and that no other or further notice is necessary and a hearing was held before this Court on March 1, 2000 (the "Hearing"); and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor:

BASED ON THE FOLLOWING STIPULATIONS BETWEEN THE DEBTOR, EAGLE AND CONGRESS AND THE EVIDENCE PRESENTED IN THE MOTION AND AT THE HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.   <u>Filing of Petition.</u>  On February 29, 2000 (the "Petition Date"), Eagle filed with this Court its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor has retained possession of its

2

assets and is authorized to continue the operation and
management of its business as debtor-in-possession.

    B.  The Motion; Notice.  The Motion was filed on
March 1, 2000.  The Debtor served by telecopy or hand delivery
on February 29, 2000 notice of the Motion on, among others,
(i) its twenty largest creditors and (ii) all of its known
secured creditors, and a copy of the Motion and a proposed form
of this Order on the United States Trustee.  Copies of the
Conversion and Amendment (as defined herein) and the other DIP
Credit Documents (as defined herein) were made available to the
parties-in-interest at the offices of the Debtor's counsel.
Such notice is appropriate and adequate under the circumstances
set forth herein and presented to this Court.  Consequently, no
further notice relating to this proceeding is necessary or
required.

    C.  Jurisdiction; Core Proceeding.  Consideration of
the Motion constitutes a "core proceeding" as defined in 28
U.S.C. § 157. This Order is subject to, and Congress is entitled
to the benefits of, the provisions of section 364(e) of the
Bankruptcy Code.  This Court has jurisdiction over this
proceeding and the parties and property affected hereby pursuant
to 28 U.S.C. §§ 157 and 1334.

3

D.    <u>No Creditors' Committee</u>.  No creditors' committee
has yet been appointed in the Case pursuant to section 1102 of
the Bankruptcy Code.  Any creditors' committee subsequently
appointed shall hereinafter be referred to as the "Committee."

E.    <u>Nature and History of Business.</u>  The Debtor is a
Delaware corporation with its principal place of business and
chief executive office in Milan, Illinois.  As of the end of
fiscal 1999, the Debtor was a leading regional supermarket chain
operating 84 supermarkets under the trade names "Eagle Country
Market"" and "BOGO's") in Illinois, Iowa and Indiana.  Most Eagle
supermarkets offer a full line of groceries, meats, fresh
produce, dairy products, delicatessen and bakery products,
health and beauty aids and other general merchandise, and in
certain stores prescription medicine, video rental, floral
service, in-store banks, dry cleaners and coffee shops.

F.    <u>Pre-Petition Indebtedness to Congress and</u>
<u>Security Therefor; Pre-DIP Documents</u>.  On the Petition Date,
Eagle was indebted to Congress as described below:

(i)    The Debtor and Congress are parties to a
Loan and Security Agreement dated as of May 25, 1995 (as amended
by the Amendment No. 1 to Loan and Security Agreement, dated as
of August 21, 1995, the Amendment No. 2 to Loan and Security

4

Agreement, dated as of April 1, 1998 and the Amendment No. 3 to
Loan and Security Agreement, dated as of February 9, 2000, the
"Pre-Petition Credit Agreement," and together with all Financing
Agreements (as defined in the Pre-Petition Credit Agreement) and
all other agreements and documents relating to the Pre-Petition
Indebtedness (as defined below) and executed prior to the
Petition Date, collectively, the "Pre-Petition Credit
Documents").  The Pre-Petition Credit Agreement provides for
Loans and Letter of Credit Accommodations (each as defined
therein) to be made by Congress to Eagle in an aggregate amount
not to exceed $50,000,000 (subject to certain reduction
formulas) and within that amount, a Letter of Credit
Accommodation cap of $20,000,000.  A list of substantially all
of the Pre-Petition Credit Documents and a copy of the Pre-
Petition Credit Agreement are contained in the proof of claim
(the "Proof of Claim") previously provided to Debtor and filed
with the Court by Congress on or within three business days of
the Petition Date.[1]

------------------------------------

[1]    A copy of the Proof of Claim will be furnished to Committee
counsel promptly upon counsel's appointment. A copy of the
Proof of Claim will also be made available for inspection
and copying at the offices of Congress's counsel, as well
as counsel for the Debtor.

5

(ii)    The Pre-Petition Credit Agreement provided for Revolving Loans to be made from Congress to Eagle based upon, *inter alia*, the following formula: in amounts requested by Eagle up to the amount equal to (i) the lesser of (A) the sum of fifty-five percent (55%) of the Value of Eligible Inventory (each as defined in the Pre-Petition Credit Agreement) or (B) amount equal to (1) the Maximum Credit at such time minus (2) the then undrawn amounts of the outstanding Letter of Credit Accommodations, *less* (ii) the Sales Tax Reserve most recently reported to Lender by Borrower, *less* (iii) any Availability Reserves (all as defined in the Pre-Petition Credit Agreement).

(iii)    Pursuant to the terms of the proposed Conversion Agreement and Amendment to Financing Agreements attached hereto as Annex A (the "Conversion and Amendment"), the Availability Reserves will be increased by an amount equal to all outstanding principal under the Pre-Petition Credit Agreement and all interest, charges, fees, costs and expenses as of the commencement of the case, including any amounts attributable to the foregoing that Congress may from time to time assert and including the amount of the "Carve-Out" as defined in this Order.

6

(iv)    As of the Petition Date, the principal amount of the Pre-Petition Indebtedness (as defined below) owed to Congress, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than $2,000,000.

(v)    Pursuant to the Pre-Petition Credit Documents, Eagle granted to Congress a continuing lien and security interest to secure the Pre-Petition Indebtedness (as defined below) in, and a right to setoff against, all of Eagle's right, title and interest in, to and under all Inventory, whether then-owned or thereafter acquired or existing, wherever located.

(vi)    For purposes of this Order, all of the indebtedness and obligations of Eagle (including all of the Obligations, as defined in the Pre-Petition Credit Agreement) to Congress pursuant to the Pre-Petition Credit Documents, together with all pre-petition and post-petition interest and expenses now or hereafter accrued on such indebtedness and obligations, shall hereinafter collectively be referred to as the "Pre-Petition Indebtedness." All Collateral (as defined in the Pre-Petition Credit Agreement) that existed as of the Petition Date and all proceeds thereof (including post-petition proceeds

7

thereof) shall hereafter be referred to as the "Pre-Petition Collateral."

G.    Value of Pre-Petition Collateral.    The Debtor believes that the value of the Pre-Petition Collateral has exceeded the amount of the Pre-Petition Indebtedness at all times from the execution of the Pre-Petition Credit Agreement through the Petition Date.  As of the Petition Date, the Pre-Petition Collateral, including Eligible Inventory (as defined in the Pre-Petition Credit Agreement), had a value (based upon Eagle's lower of cost or book value) of over $50,000,000.

H.    Perfection of Congress's Security Interests. Congress has asserted and the Debtor hereby waives its right to contest that Congress's security interests are perfected in the Pre-Petition Collateral by the filing of a series of UCC-1 financing statements (the "Pre-Petition Financing Statements") with the proper state and county offices for the perfection of such security interests.  A list summarizing the filing locations, dates of filing and file numbers for each Pre-Petition Financing Statement is included with the Exhibits to the Motion.

I.    Right to Amend Exhibits.  The Proof of Claim was prepared by Congress in cooperation with the Debtor, and the

8

parties believe the copies of the Pre-Petition Credit Documents
included in the Proof of Claim to be true and correct copies of
same.  Congress shall be entitled to amend or supplement the
Proof of Claim, and any failure by Congress to list or include
any Pre-Petition Credit Document, Pre-Petition Financing
Statement or other loan, security or perfection document shall
not be deemed a waiver by Congress.

J.   Validity and Allowance of Pre-Petition
Indebtedness. As of the Petition Date, (i) the Pre-Petition
Credit Documents are valid and binding agreements and
obligations of the Debtor, (ii) the amount of the Pre-Petition
Indebtedness is due and payable to Congress as a fully secured
claim in an amount not less than the amount set forth in finding
paragraph F(iv) above plus the amounts set forth in clause (iii)
of this paragraph, (iii) pursuant to section 506(b) of the
Bankruptcy Code, Congress is entitled to be paid post-petition
interest on the Pre-Petition Indebtedness, if any, as well as
reasonable fees, costs and charges related to the Pre-Petition
Indebtedness, all as provided in the Pre-Petition Credit
Documents, (iv) Congress's liens on and security interests in
the Pre-Petition Collateral are valid, perfected, enforceable,
non-avoidable and first priority liens and security interests

9

and Congress's pre-petition claim against the Debtor and the
estate created by the filing of the petition (the "Estate") is
allowed and is valid, enforceable and non-avoidable in the
amount of the Pre-Petition Indebtedness, (v) the Debtor may not
assert any claim, counterclaim, setoff, or defense of any kind
or nature which would in any way affect the validity,
enforceability and non-avoidability of the Pre-Petition
Indebtedness or Congress's security interests in and liens on
the Pre-Petition Collateral or reduce or affect the obligation
to pay the Pre-Petition Indebtedness unless otherwise agreed to
by Congress, and (vi) Congress and its agents and employees are
released and discharged from all claims and causes of action of
Eagle or the Debtor arising out of the Pre-Petition Credit
Documents or Congress's relationship with Eagle prior to the
Petition Date.

K.    Need for Funding.   In the ordinary course of its
business, the Debtor has substantial cash needs and its ability
to timely meet those needs is critical to maintain the
confidence of its service providers, suppliers, vendors and
customers.   In the event that the Debtor failed to have
sufficient liquidity the Debtor would not be able to pay service
providers, suppliers and vendors or to provide the customers

10

with the products and diversity of selection that they demand.
Under the circumstances, the DIP Financing is therefore
necessary to avoid any immediate and irreparable harm to the
Debtor that may be occasioned by the commencement of this case
and any resulting material changes in credit terms or unexpected
cash flow issues that might arise.

L. Congress's Willingness To Extend DIP Financing.
Congress is willing to allow the Debtor to convert the Pre-
Petition Credit Agreement as modified in certain respects to a
postpetition facility without assumption of the Pre-Petition
Indebtedness except as set forth herein, and is willing to
advance post-petition funds (the "DIP Financing") in the form of
revolving loans and letter of credit accommodations (the "DIP
Revolving Loans") to the Debtor during the period from the
Petition Date until March 31, 2000 (the "Interim Financing
Period") on substantially the same terms and conditions as
applied prior to the Petition Date, all as more fully set forth
in the Conversion and Amendment. In addition to all of the
conditions set forth in the Conversion and Amendment, Congress's
willingness to provide DIP Financing is conditioned upon the
entry of this Order. Furthermore, Congress's willingness to
advance DIP Financing beyond the Interim Financing Period is

11

conditioned upon this interim Order having become final pursuant
to the terms of ordering paragraph 27 or the entry of a final
order acceptable to Congress.  The Pre-Petition Credit
Agreement, as amended by the Conversion and Amendment, shall be
referred to herein as the "Amended Credit Agreement."

   M. <u>Cash Collateral</u>.  For purposes of this Order,
"Cash Collateral" shall consist of all property of Eagle and the
Debtor that constitutes cash collateral in which Congress has an
interest as provided in section 363(a) of the Bankruptcy Code
and shall include, without limitation all cash proceeds arising
from the collection, sale, lease or other disposition, use or
conversion of any property upon which Congress holds a lien or a
replacement lien, whether as part of the Pre-Petition Collateral
or other DIP Collateral (as defined below) or pursuant to an
order of the Court or applicable law or otherwise.

   N. <u>No Other Sources of Funds.</u>  Prior to the Petition
Date, the Debtor investigated the possibility of obtaining
alternative sources of cash or credit on an unsecured basis or
secured basis on more favorable terms than Congress.  The Debtor
has been unable to find any entity willing to provide financing
other than Congress, and believes, based on that investigation,
its historical experience with potential lenders, and its

knowledge of the lending terms provided to supermarkets that, under the circumstance, no financing on terms more favorable than those proposed by Congress in available.

O.   <u>Good Faith</u>.  Congress has acted in good faith in agreeing to extend credit and other financial accommodations to the Debtor in accordance with the Amended Credit Agreement and this Order.  The terms of the DIP Financing authorized by this Order set forth below are for reasonably equivalent value and fair consideration. The agreements and arrangements authorized in this Order have been negotiated at arms' length with all parties represented by experienced counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their terms and have been entered into in good faith.  Any credit extended and loans made to the Debtor by Congress pursuant to the Amended Credit Agreement shall be deemed to have been extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

P.   <u>Events of Default</u>.  Among other things, the Conversion and Amendment amends the definition of "Events of Default" in the Credit Agreement by adding several additional bankruptcy-related Events of Default.  Upon the occurrence of

13

any Event of Default, Congress shall be entitled to the rights and remedies provided in the Amended Credit Agreement.

Q. <u>Cause Shown</u>. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the Debtor's business as a going concern, will increase the possibility of maximizing the value of the Debtor's assets, which will in turn maximize the prospects for generating a dividend to unsecured creditors, will avoid immediate and irreparable harm to, and is in the best interests of, the Debtor, its creditors and its Estate. Moreover, by converting the Pre-Petition Credit Agreement to the Amended Credit Agreement, the Debtor will save its Estate the significant expense of negotiating and memorializing an entirely new, post-petition credit facility. Therefore, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1. <u>Authorization To Borrow; DIP Credit Documents</u>. The Motion is granted and the Debtor is authorized to enter into or assume, as applicable, and be bound by the following documents and to borrow money during the Interim Financing Period, and if no objection to this Order is properly filed and served in accordance with ordering paragraph 27, thereafter, and perform its obligations thereunder in accordance with the terms thereof:

14

(a)  the Conversion and Amendment in substantially the
     form attached hereto as Annex A;

(b)  the Amended Credit Agreement;

(c)  all other Pre-Petition Credit Documents, as
     amended by the Conversion and Amendment;

(d)  all such financing statements, notices,
     schedules, other security agreements, deeds of
     trust, mortgages, instruments, guaranties,
     subordination agreements, acceptance agreements
     and documents as may be necessary or required to
     evidence its obligations to Congress, to
     consummate the terms and provisions of the
     Motion, and this Order and to evidence perfection
     of the liens and security interests to be given
     to Congress pursuant hereto and thereto; and

(e)  such other agreements and documents as set forth
     in the foregoing documents as a condition to
     Congress's willingness to make loans or other
     extensions of credit pursuant thereto or as
     Congress shall reasonably require in connection
     with or to evidence the DIP Financing. whether
     now or hereafter executed by or on behalf of the
     Debtor and delivered to Congress.

For purposes of the Motion and this Order, the documents listed

in subparagraphs (a) through (e) above shall hereinafter

collectively be referred to as the "DIP Credit Documents," and

each of the terms and conditions of the DIP Credit Documents is

incorporated herein by this reference.  The DIP Credit Documents

shall be and become obligations of the Debtor upon entry of this

Order.  All indebtedness and obligations incurred on or after

the Petition Date by the Debtor to Congress pursuant to the DIP

Credit Documents (including principal, accrued and unpaid

15

interest, and costs and expenses, including reasonable attorneys' fees and expenses) are referred to herein as the "DIP Indebtedness," and together with the Pre-Petition Indebtedness as the "Indebtedness."

2.   Maximum Amount of Borrowing.  The maximum aggregate outstanding principal amount of DIP Indebtedness arising during the Interim Financing Period and owing by Debtor at any point in time to Congress pursuant to this Order and the DIP Credit Documents shall be $5,000,000 (the "Interim Authorized Amount"); provided, however, that if Congress advances funds in excess of this amount, such advances shall be entitled to the benefits of the DIP Credit Documents and this Order.  If this Order becomes a final order pursuant to ordering paragraph 27, the maximum aggregate outstanding principal amount of Indebtedness, including amounts arising during the Interim Financing Period, shall be as set forth in the DIP Credit Documents.

3.   Interest; Facility Fees.  The rate of interest to be charged for Loans and other extensions of credit to the Debtor under the Amended Credit Agreement shall be the rates set forth in the Amended Credit Agreement (which are the same rates that were charged prior to the Petition Date under the Pre-

16

Petition Credit Agreement).  For so long as there are no postpetition Events of Default as defined in the Amended Credit Agreement, Congress has agreed to charge interest on the DIP Loan at the non-default rate provided in the Credit Agreement, but has reserved the right to charge interest at the default rate (an increase of two percentage points) on amounts owed under the Pre-Petition Credit Agreement prior to the Petition Date.  Interest on the Indebtedness shall be payable monthly when billed, and such interest and all fees and reimbursable expenses set forth in the Amended Credit Agreement may be charged to the loan account in accordance with the Amended Credit Agreement.  Notwithstanding any provision of this Order or the DIP Credit Documents, all provisions for payments of interest and professional fees and expenses to Congress shall be without prejudice to the right of any party-in-interest to subsequently seek a determination from the Court as to whether Congress was oversecured as of the Petition Date; if the Court determines that Congress was undersecured as of the Petition Date, all payments of interest and professional fees and expenses to Congress hereunder shall be subject to partial or total reapplication to principal, as the Court may determine. Congress has reserved the right to seek additional fees under

17

the Amended Credit Agreement, including an early termination fee under Section 12.1(c), if applicable, and the Debtor has reserved the right to dispute such fees. Moreover, the Debtor reserves the right to challenge the application of the default rate of interest to amounts owed under the Pre-Petition Credit Agreement prior to the Petition Date.

4.   <u>Termination of DIP Revolving Loans; Term of Amended Credit Agreement</u>. The Amended Credit Agreement, and Congress's willingness to make DIP Revolving Loans thereunder, shall immediately and automatically terminate (except as Congress may otherwise agree in writing), and all Indebtedness shall be immediately due and payable (except as Congress may otherwise agree in writing) upon the earliest to occur of:

a.   April 15, 2002;

b.   the date of final payment and satisfaction in full of the Indebtedness and termination of the DIP Financing pursuant to the Amended Credit Agreement;

c.   the effective date of any confirmed plan of reorganization in the Case;

d.   the dismissal of the Case; or

e.   Congress's election, in its sole discretion (subject to the terms of the Amended Credit Agreement), to

18

terminate such DIP Revolving Loans upon the occurrence of any

Event of Default (as defined in the Amended Credit Agreement).

5.   <u>Security for Indebtedness; Limited Cross-</u>

<u>Collateralization</u>.  Subject only to the limitations in paragraph

6 of this Order, the Indebtedness shall be secured by, and

Congress is hereby granted, pursuant to sections 364(c)(2) and

364(c)(3) of the Code, a first lien (subject only to non-

avoidable, valid, enforceable and perfected liens and security

interests in Eagle's assets which existed on the Petition Date

(i) in favor of Congress, or (ii) in favor of such third parties

holding liens or security interests which are superior in

priority, after giving effect to any existing subordination

arrangements, to Congress's security interests in and liens on

Eagle's assets) on all inventory of the Debtor, of any kind or

nature whatsoever, and all proceeds or profits thereof

(collectively, the "DIP Collateral"), including all of the Pre-

Petition Collateral, which lien shall at all times be senior to

the rights of the Debtor and any successor trustee(s) in these

or any subsequent proceedings under the Bankruptcy Code.  The

grant of security in the preceding sentence shall include all

Inventory (as defined in the Amended Credit Agreement), all of

the Debtor's books and records with respect to any of the

19

foregoing, and any and all income, proceeds, insurance proceeds, products, revenues and rents thereof or arising therefrom, and whether now owned or hereafter acquired by the Debtor and whether existing before or after the commencement of the Case, all as more fully described in the DIP Credit Documents. The lien granted to Congress hereunder shall in all respects be senior to any pre-petition lien that is determined to be avoidable pursuant to 11 U.S.C. § 544 or otherwise.

6.    <u>Extent of Cross-Collateralization and New Liens</u>. Notwithstanding anything in the DIP Credit Documents or this Order, the post-petition liens and security interests granted thereunder and hereunder shall secure the Pre-Petition Indebtedness only to the extent of the diminution in value of the Pre-Petition Collateral occurring from and after the Petition Date (whether as a result of physical deterioration, consumption, use, shrinkage, decline in market value or otherwise).

7.    <u>Perfection of New Liens</u>. Congress shall not be required to file financing statements, mortgages, deeds of trust, or other documents in any jurisdiction or take any other action in order to validate or perfect the security interests and liens granted to it by this Order or by any of the DIP

20

Credit Documents.  If Congress shall, in its sole discretion,
choose to file such financing statements, mortgages, deeds of
trust or other documents or otherwise confirm perfection of such
security interests and liens, Congress is authorized to effect
such filings and recordations, and all such financing
statements, deeds of trust or similar documents shall be deemed
to have been filed or recorded as of the Petition Date.

     8.  <u>Waiver of DIP Rights</u>.  In consideration of the
financing made available pursuant hereto, the Debtor hereby
irrevocably waives any right, (a) without Congress's prior
written consent, or (b) without prior payment and satisfaction
in full of the Indebtedness: (i) to grant or impose, or request
that the Court grant or impose, under section 364 of the
Bankruptcy Code or otherwise, liens on or security interests in
any DIP Collateral, equal or superior to Congress's liens on and
security interests in such DIP Collateral; (ii) to use Cash
Collateral (other than the proceeds of DIP Loans as provided in
this Order); or (iii) to modify or affect any of Congress's
rights under this Order, the Amended Credit Agreement or the
other DIP Credit Documents by any plan of reorganization
confirmed in this Case or any subsequent order entered in this
Case.  If this interim Order does not become final pursuant to

21

the terms of ordering paragraph 27 and no final order is
entered, all of Congress's rights under Bankruptcy Rule 4001 are
expressly reserved.

    9.  <u>Modification of Automatic Stay</u>.

    a.  The automatic stay pursuant to section 362
of the Bankruptcy Code is hereby modified with respect to the
Debtor to the extent necessary (i) to permit Congress to receive
collections of proceeds of the DIP Collateral and to apply them
to the Indebtedness in accordance with the Amended Credit
Agreement and this Order, (ii) to enable Congress to file any
financing statements, deeds of trust, mortgages or other
instruments and documents, if any, evidencing its security
interests in and liens on the DIP Collateral and (iii) to allow
Congress to give the Debtor any notice provided for in any of
the DIP Credit Documents or this Order.

    b.  Upon the entry of a final order or this
Order becoming final pursuant to the terms of paragraph 27
hereof, the automatic stay pursuant to section 362 of the
Bankruptcy Code shall be further modified to allow Congress to
take any and all actions permitted by the DIP Credit Documents
in the event of an Event of Default (as defined in the Amended
Credit Agreement); <u>provided</u>, <u>however</u>, Congress shall be required

22

to give the Debtor, the United States Trustee, and counsel for
any Committee, advance written notice of at least three business
days prior to taking any action to enforce Congress's liens and
security interests except for collection and application of DIP
Collateral proceeds or the giving of notices to the Debtor.

10. <u>Priority Claims; No Section 506(c) Charges</u>. Upon
the entry of a final order or this Order becoming final pursuant
to the terms of paragraph 27 hereof, except for the limited
provisions for professional fees contained in the following
paragraph, in addition to the liens granted to Congress
hereunder, the DIP Indebtedness shall constitute an
administrative priority equivalent in priority to a claim under
section 364(c)(1) of the Bankruptcy Code, and shall have
priority over all other costs and expenses of administration of
the kinds specified in, or ordered pursuant to, sections 105,
326, 503(b), 507(a), or 507(b) of the Bankruptcy Code, and shall
at all times be senior to the rights of the Debtor or any
successor trustee in this or any subsequent proceeding under the
Bankruptcy Code. No costs or expenses of administration of any
person or entity which have been or may be incurred in this
Case, any conversion of this Case pursuant to section 1112 of
the Bankruptcy Code, or in any other proceedings related hereto,

23

and no priority claims, are or will be prior to or on a parity
with any claim of Congress against the Debtor arising out of
loans and extensions of credit made by Congress to the Debtor or
with the security interests in and liens of Congress upon the
DIP Collateral; and no costs or expenses of administration shall
be imposed against Congress, its claims, or the DIP Collateral
under section 506(c) of the Bankruptcy Code or otherwise.
Notwithstanding the foregoing, post-petition claims against the
Debtor for statutory fees due the United States Trustee shall be
prior to the liens and administrative priority of Congress.

11.  _Professional Fees_.  Congress agrees that funds
loaned pursuant to the Amended Credit Agreement and the proceeds
of the DIP Collateral may be used to pay, and Congress's
administrative priority claims granted herein shall be
subordinate to the administrative expense claims approved by the
Court for, the fees, expenses and costs (or any retainers for
the payment of same) of (a) professionals properly retained by
the Debtor (the "DIP Professionals") and all other professionals
retained by the Debtor, provided that the pre-petition retainer
provided to such professionals shall first be used to pay any
Court-approved fees and expenses of the professional for the
Debtor, and (b) any Committee appointed pursuant to section 1102

24

of the Bankruptcy Code and any professionals properly retained

thereby ("Committee Professionals") in the Case, provided that

any retainers provided to such Committee Professionals shall

first be used to pay any Court-approved fees and expenses of

such Committee Professionals; provided, however, that claims for

services rendered by any of the DIP Professionals or Committee

Professionals in connection with the assertion of or joinder in

any claim, counterclaim, action, proceeding, application,

motion, objection, defense or other contested matter, the

purpose of which is to seek or the result of which would be to

obtain any order, judgment, determination, declaration or

similar relief (i) invalidating, setting aside, avoiding or

subordinating, in whole or in part, the Indebtedness or

Congress's liens and security interests in the Pre-Petition

Collateral or other DIP Collateral, or (ii) preventing,

hindering or otherwise delaying, whether directly or indirectly,

Congress's assertion, enforcement or realization upon any Pre-

Petition Collateral or other DIP Collateral, may not be paid

from funds loaned by Congress or from the proceeds of the Pre-

Petition Collateral or other DIP Collateral.  Nothing in this

paragraph shall be construed to restrict the activities of the

Committee Professionals or the DIP Professionals, only the

25

extent to which DIP Financing can be used to pay for those
professionals and nothing in this paragraph shall be construed
to limit the right of any professional to seek reimbursement for
the investigation of any of the foregoing.  Notwithstanding any
provision of this Order or the Amended Credit Agreement to the
contrary, all liens and superpriority and administrative claims
granted to Congress shall be subject to and subordinated to a
carve-out (the "Carve-Out") for:  (a) the payment of allowed
professional fees and disbursement incurred by the professionals
retained, pursuant to Bankruptcy Code sections 327 and 1103(a),
by the Debtor and any Committee appointed in this chapter 11
case in an amount not to exceed $250,000 (the "Post-Default
Carve-Out Amount") on account of such professional fees and
disbursements incurred following the "Default Point" (as defined
below), and the aggregate amount (the "Pre-Default Carve-Out
Amount") of all unpaid professional fees and disbursements
incurred, accrued or invoiced from the Petition Date until the
Default Point; and (b) quarterly fees required to be paid
pursuant to 28 U.S.C. 1930(a)(6) and any fees payable to the
Clerk of the Bankruptcy Court; provided, however, the Carve-Out
shall not include professional fees and disbursements excluded
from reimbursement pursuant to this paragraph.  Until the

26

Default Point, the Debtor shall be permitted to pay compensation
and reimbursement of expenses, allowed and payable under
Bankruptcy Code sections 330 and 331, as the same may be
payable and the amount so paid shall be free and clear of the
liens and the superpriority or administrative claims of
Congress. As used herein, "Default Point" means the date when
both (x) an Event of Defaults has occurred and (y) Congress
and/or any lenders under the DIP Financing cease making advances
to the Debtor under the Amended Credit Agreement. Congress
shall retain the rights it has as a party-in-interest to object
to any claims of any of the DIP Professionals or Committee
Professionals.

12. Cash-Collection Procedures. From and after the
date of the entry of this Order, all Cash Collateral and all
proceeds of sales of any other DIP Collateral or services
provided by the Debtor and all other cash which shall come into
the Debtor's possession or control, or to which the Debtor shall
become entitled shall be deposited pursuant to section 6.3 of
the Pre-Petition Credit Agreement in the same manner and to the
same extent as done so prior to the Petition Date, and such
proceeds upon such deposit shall become the sole and exclusive
property of Congress, and shall be applied by Congress against

27

the Pre-Petition Indebtedness and the DIP Indebtedness as
provided below in paragraph 14 of this Order.

13.   Use of Proceeds of DIP Financing.   Funds borrowed
under the Amended Credit Agreement shall be used by the Debtor
solely in the ordinary course of its business unless otherwise
ordered by the Court, provided, however, that the foregoing
shall not be construed to prohibit the Debtor from using funds
advanced by Congress under the Amended Credit Agreement to pay
expenses as otherwise authorized in this Order.   It is
understood that Congress may assume that the Debtor will comply
with this requirement, and Congress shall have no duty to
monitor such compliance.

14.   Application of Collateral Proceeds; Interest on
Pre-Petition Indebtedness; Fees.

a.   The Debtor shall immediately pay to Congress
all the proceeds of any disposition of any DIP Collateral.
Congress may apply or reverse and reapply any such payments to
the DIP Indebtedness only, unless the failure to apply or
reverse and reapply such payments to the Pre-Petition
Indebtedness would cause the Pre-Petition Indebtedness to be
undersecured after taking into account the effect of ordering
paragraph 6 hereof, in which case Congress shall be entitled to

28

apply or reverse and reapply such payments to the Pre-Petition
Indebtedness.  Provided that the DIP Financing has not been
terminated, Congress will apply all proceeds of sales of
Inventory received in the ordinary course of business to pay the
Indebtedness in the following order of priority: (i) first, to
any Pre-Petition Indebtedness only to the extent the failure to
apply such proceeds would cause the Pre-Petition Indebtedness to
be undersecured, and (ii) second, to any DIP Indebtedness, if
any.

       b.    All interest and fees with respect to the
Pre-Petition Indebtedness shall continue to accrue and be
payable at the rate and times set forth in the Pre-Petition
Credit Documents, subject to the Debtor's right to contest the
application of the default interest rate under the Pre-Petition
Credit Agreement to the Pre-Petition Indebtedness.

       c.    Congress shall be promptly reimbursed by the
Debtor without order of the Court for all costs and expenses
(including, without limitation, all filing and recording fees,
reasonable attorneys' and paralegals' fees and expenses and out-
of-pocket audit expenses) incurred by Congress in connection
with: (i) the preparation of this Order, the DIP Credit
Documents and related instruments, documents and agreements;

29

(ii) the preservation and protection of Congress's rights hereunder and thereunder; and (iii) the collection of all DIP Indebtedness. Fees and expenses incurred by Congress in connection with the DIP Credit Documents shall be charged to the Indebtedness, provided, however, that nothing herein shall be construed to limit Congress's right to otherwise seek reimbursement under the Pre-Petition Credit Documents of its pre-prepetition fees, costs or expenses.  Nothing contained herein shall preclude the Debtor or any party-in-interest from challenging the reasonableness of any fees or expenses incurred by Congress after the Petition Date.  If at any point in the Case all Indebtedness other than Indebtedness attributable to post-petition professional fees or expenses incurred by Congress is paid in full, then Congress shall be required to serve upon the Debtor, counsel for the Committee, and the United States Trustee copies of any invoices for post-petition professional fees and expenses, along with a notice to each of such parties that such parties shall have thirty days after the date of receipt to file an objection with respect to the reasonableness of any such fees or expenses; if any such objection is timely filed, any dispute over the reasonableness of such fees or expenses shall be resolved by the Court.

30

15. <u>Sale of Assets</u>.  All sales, leases or disposition
of DIP Collateral outside of the ordinary course of business may
only be done with prior Court approval and with notice to
Congress.  Congress expressly reserves its right to (a) contest
any proposed sale or disposition of any DIP Collateral except as
provided herein, or (b) credit bid any portion of the
Indebtedness in conjunction with any such sale.  In the event
that a combined sale of DIP Collateral and non-DIP Collateral is
conducted, if the source of funds generated by such sale is not
clearly identifiable, such funds will first be deemed to be
proceeds of DIP Collateral.

16.  <u>No Requirement To Accept Title to Collateral</u>.
Congress shall not be obligated to accept title to any portion
of the DIP Collateral in payment of any of the Indebtedness, in
lieu of payment in cash or cash equivalents, nor shall Congress
be obligated to accept payment in cash or cash equivalents that
is encumbered by any interest of any person or entity other than
Congress.

17.  <u>No Liability to Third Parties</u>.  Upon the entry of
a final order or this Order becoming final pursuant to the terms
of paragraph 27 hereof, in making decisions to advance loans or
other extensions of credit to Debtor, in administering any loans

31

or other extensions of credit, or in taking any other actions reasonably related to this Order or the DIP Credit Documents, Congress shall have no liability to any third party (including creditors of the Debtor) and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.

18.  Effect of Plan.  The liens, security interests, rights and remedies granted to Congress pursuant to this Order and the DIP Credit Documents shall not be modified, altered or impaired in any manner by any plan of reorganization for the Debtor, unless otherwise agreed to by Congress.

19.  Authorized Signatories.  The signature of any officer of the Debtor appearing on any one or more of the DIP Credit Documents to be executed after the entry of this Order shall bind the Debtor.  No board of director or other approval shall be necessary.

20.  Additional Rights of Congress.  Congress may petition this Court for any such additional protection as it may reasonably require with respect to the Pre-Petition Indebtedness, the DIP Indebtedness, or otherwise.  Except as otherwise specifically provided herein, Congress does not waive

32

any rights it has pursuant to the Pre-Petition Credit Documents, and Congress shall retain all rights available pursuant to the Bankruptcy Code or any other applicable law.

21. No Waiver.  The rights and obligations of the Debtor and the rights, claims, liens, security interests and priorities of Congress arising under this Order are in addition to, and not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by Eagle under the Pre-Petition Credit Documents.

22. Service of Pleadings.  The Debtor shall deliver to Congress, its counsel of record, and any other persons reasonably requested by Congress from time to time, as soon as is practicable, copies of any pleading, notice or other document filed by the Debtor in the Case.

23. No Adequate Protection.  Nothing contained in this Order shall be deemed a finding with respect to adequacy of the protection of the interests of Congress in the Pre-Petition Collateral.

24. No Dismissal.  If the Case is dismissed, converted, otherwise superseded or substantively consolidated, to the extent permitted by applicable law, Congress's rights and

33

remedies under this Order and the DIP Credit Documents shall be and remain in full force and effect as if the Case had not been filed or the Case had not been dismissed, converted or superseded. Furthermore, notwithstanding any such dismissal, conversion, supercission or consolidation, all of the terms and conditions of this Order, including, without limitation, the liens granted hereunder, shall remain in full force and effect, to the extent permitted by applicable law.

25. **Effect of Challenge to Congress's Claims or Liens.** Notwithstanding anything to the contrary contained in this Order or in any of the DIP Credit Documents, Congress may, in its sole discretion, discontinue without notice of any kind, any further extensions of credit under the Amended Credit Agreement, upon the institution by any person or entity of any action seeking to challenge the validity or priority of, or to subordinate, any of the Indebtedness or liens on any of the DIP Collateral, other than the rights of any Committee to investigate and bring an action challenging the extent, validity or priority of such claims or liens within 45 days after the entry of this Order.

26.  <u>Effect of Modification of Order</u>.

a.   If, for any reason, any of the provisions of this Order are hereafter stayed, modified, terminated, or vacated, on any material matter without Congress's written consent, including, without limitation, by subsequent order of this or any other Court, then in such event: (i) Congress shall be entitled, but not obligated, to discontinue any further loans, extensions of credit or financial accommodations hereunder or under the DIP Credit Documents; and (ii) the DIP Indebtedness, together with all interest, fees, cost, expenses and charges of any nature that may have accrued in connection therewith, shall upon notice to the Debtor from Congress, become due and payable upon delivery of such notice, without further notice or order of the Court.

b.   The Debtor shall not, without Congress's prior written consent, seek to modify, vacate or amend this Order or any DIP Credit Documents.  Notwithstanding anything to the contrary in this Order (including, without limitation, the provisions of paragraph 27 of this Order), if any of the provisions of this Order are hereafter modified, vacated or stayed by subsequent order of this or any other court, such stay, modification or vacation shall not affect the validity of

35

any Indebtedness incurred prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any lien or priority authorized hereby with respect to any such Indebtedness. Notwithstanding any such stay, modification or vacation, any Indebtedness incurred by the Debtor prior to the effective date of such modification, stay or vacation shall be governed in all respects by the original provisions of this Order, and Congress shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such Indebtedness.

27.  **Final Hearing; Procedure for Objections and Entry of Final Order.**

a.   The Motion is set for a final hearing before this Court at 1:30 p.m. (Prevailing Eastern Time) on March 21, 2000 (the "Final Hearing"). Such date may be adjourned or continued by the Court without further notice other than that given in open court.

b.   The Debtor shall promptly serve a copy of this Order and a notice of the Final Hearing by regular mail upon at least the parties identified in finding paragraph B of this Order. Any objections by creditors or other parties-in-

36

interest to any of the provisions of this Order shall be deemed waived unless filed and served in accordance with this paragraph.

c.   Any objections to the provisions of this Order shall be in writing and shall be filed with the Clerk of the Bankruptcy Court in Wilmington, Delaware with a copy served upon and received by (i) Gregg M. Galardi, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware 19801; (ii) Timothy A. Barnes, Esq., Latham & Watkins, Sears Tower, 233 South Wacker Drive, Suite 5800, Chicago, IL 60606 and Francis A. Monaco, Jr., Esq., Walsh, Monzack & Monaco, P.A., 1201 North Orange Street, Suite 400, Wilmington, Delaware 19801, and (iii) The Office of the United States Trustee, Suite 905, 601 Walnut Street, Philadelphia, Pennsylvania 19106, on or before 5:00 p.m. (Prevailing Eastern Time) on March 17, 2000.

d.   Pursuant to Rule 4001(d)(3) of the Bankruptcy Rules, this Order shall be considered a final order and no final hearing will be conducted if no party-in-interest files an objection to the provisions of this Order in accordance with the procedures and within in the time set forth in this paragraph 27.

37

e.    Except as otherwise provided in this paragraph (which paragraph is subject to the provisions of ordering paragraph 26), the terms of this Order shall be valid and binding upon the Debtor, its creditors and all other parties-in-interest from and after the entry of this Order by this Court.  If this Court modifies any of the provisions of this Order at or following the Final Hearing, such modifications shall not affect the rights and priorities of Congress granted pursuant to this Order with respect to that portion of the Indebtedness which is advanced prior to such modifications, and this Order shall remain in full force and effect as a final order authorizing interim borrowing by the Debtor until the entry of a subsequent order entered with respect to the Motion or this Order becoming final pursuant to the terms of ordering paragraph 27.

f.    Notwithstanding the preceding and without being deemed to be a waiver of any provision of the Amended Credit Agreement, nothing in this Order shall be deemed to preclude any Committee from requesting a further interim hearing on the Motion, provided, however, that any portion of the Indebtedness which is advanced prior to such a hearing is granted the same protections in ordering paragraph 27.e.

38

28.  <u>Limitations on Borrowing Pending a Final Order</u>.
The Debtor shall limit its borrowings under the DIP Credit
Documents to the Interim Authorized Amount as defined in
paragraph 2 of this Order pending further order of this Court at
the Final Hearing or this Order becoming final pursuant to the
terms of ordering paragraph 27.

29.  <u>Objections Overruled</u>.  Except to the extent
specifically set forth herein, all objections to the entry of
this Order are hereby overruled.

30.  <u>Order Effective</u>.  This Order shall be effective
as of the date of signature by the Court.

Dated:   Wilmington, Delaware
         March 2—, 2000

                                    _____
                                    United States District Judge

CH_DOCS\223987.8 [W97]

39



EOD ⁹OCT 27 2000

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Circuit Systems, Inc., et al., | ) | (Jointly Administered) |
| | ) | |
| | ) | Case No. 00 B 25916 |
| Debtors. | ) | |

FINAL ORDER AUTHORIZING (A) SECURED POST-PETITION
FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO
11 U.S.C. § 364, (B) USE OF CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. §§ 363 AND 364

Upon the motion (the "Motion") dated September 5, 2000 of Circuit Systems, Inc.

("Circuit Systems"), Circuit Systems of Tennessee, L.P. ("CS-Tennessee") and SVPC Circuit

Systems, Inc. ("SVPC"), and Infovision, Inc. ("Infovision") debtors and debtors-in-possession

(collectively, the "Debtors"), (a) seeking this Court's authorization pursuant to Sections 363(c),

364(c)(1), 364(c)(2) and 364(c)(3) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et

seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), inter alia, (i) for Circuit Systems, CS-

Tennessee and SVPC to obtain post-petition financing (the "Post-Petition Financing"), up to an

aggregate principal amount not to exceed $1,500,000 plus accrued interest on the aggregate

principal amount (the "Commitment") (subject to the staging of the availability of the

Commitment described in ordering paragraph 3 of this Order) from LaSalle Bank National

Association (the "Lender"); (ii) for the Debtors to grant the Lender, pursuant to Bankruptcy Code

§ 364(c), security interests in all of the Debtors' currently owned and after acquired property to

secure the Debtors' obligations under the Post-Petition Financing and (iii) for the Debtors to

CH_DOCS\258601.16 [W97]

grant the Lender priority in payment with respect to such obligations over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below; (b) seeking this Court's authorization to use the Lender's cash collateral within the meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to provide adequate protection, pursuant to Bankruptcy Code §§ 361, 362, 363(e) and 364(d) to the Lender; (c) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing Circuit Systems, CS-Tennessee and SVPC to borrow from the Lender under the Post-Petition Financing up to an aggregate amount set forth in paragraph 3 of this Order upon the terms and conditions set forth in this Order pending the Final Hearing referred to below (including, without limitation, the staging of the availability of the Commitment described in ordering paragraph 3 of this Order); and (d) requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order (this "Order") authorizing on a final basis, inter alia, the Post-Petition Financing; and due and sufficient notice of the Motion under the circumstances having been given; and the Preliminary Hearing on the Motion having been held before this Court; and upon the entire record made at the Preliminary Hearing, the Interim Order having been entered by this Court on September 28, 2000; and the Final Hearing on the Motion having been held before this Court; and upon the entire record made at the Preliminary Hearing and at the Final Hearing, and this Court having found good and sufficient cause appearing therefor;

The Debtors and the Lender STIPULATE for all purposes in these Chapter 11 cases (as defined below), and the Court hereby makes the following FINDINGS:

CH_DOCS\258601.16 [W97]

A.    On September 5, 2000 (the "Filing Date"), the Debtors filed voluntary petitions

for relief with this Court under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

The Debtors are continuing in possession of their property, and operating and managing their

businesses, as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to

28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as

defined in 28 U.S.C. § 157(b)(2).

C.    The Lender, as lender, and Circuit Systems, CS-Tennessee and SVPC

(collectively, the "Borrowers"), as borrowers, are party to that certain Credit Agreement, dated as

of January 6, 1999 (as amended, supplemented or otherwise modified prior to the

commencement of these Chapter 11 Cases, the "Pre-Petition Credit Agreement") and all

collateral and ancillary documents executed in connection therewith (the "Pre-Petition Loan

Documents").  A true and correct copy of the Pre-Petition Credit Agreement and the amendments

thereto is attached as Exhibit A hereto and incorporated herein by reference.  Unless otherwise

specified, all capitalized terms used but not defined herein shall have the meanings given in the

Pre-Petition Credit Agreement.  Without limiting the foregoing, the term "Event of Default" shall

mean any of the events specified in Section 8.1 of the Pre-Petition Credit Agreement.

D.    Pursuant to that certain Guaranty dated as of January 1, 2000 executed by

Infovision in favor of Lender (the "Infovision Guaranty"), Infovision, a wholly owned subsidiary

of Circuit Systems, has unconditionally guaranteed all of Borrowers' Pre-Petition Indebtedness

to Lender.  Pursuant to that certain Security Agreement, Collateral Assignment and Equity

Pledge executed by Infovision in favor of Lender, dated as of February 4, 2000 (the "Infovision

CH_DOCS\258601.16 [W97]

Security Agreement"), Infovision pledged substantially all of its assets to secure the Obligations

(as defined in the Pre-Petition Credit Agreement) of the Borrowers. The Infovision Guaranty

and the Infovision Security Agreement shall each be deemed to be Pre-Petition Loan Documents.

      E.      Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors admit that, in accordance with the terms

of the Pre-Petition Loan Documents, the Borrowers are truly and justly indebted to the Lender

under the Pre-Petition Credit Agreement, without defense, counterclaim or offset of any kind,

and that as of the Filing Date (i) the Debtors were liable to the Lender in the aggregate principal

amount of approximately $20,676,157 in respect of loans made by the Lender to the Debtors

pursuant to the Pre-Petition Credit Agreement (plus attorneys' fees, costs and interest accrued

and unpaid thereon) (the "Pre-Petition Indebtedness") and (ii) as of the Filing Date, the Debtors,

in consideration of the Post-Petition Financing to be made under the Commitment, waive and

release any and all causes of action and claims against the Lender and its agents, representatives,

assigns and successors. The provisions of this paragraph E constitute a stipulation by the

Debtors and not a finding by the Court, subject to the provisions of ordering paragraph 26 of this

Order.

      F.      Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors further admit that, by reason of the Pre-

Petition Loan Documents, the Pre-Petition Indebtedness is secured by enforceable liens and

security interests granted by the Debtors to the Lender, upon and in substantially all of the

Debtors' assets and property, including, but not limited to, all of the Debtors' real property and

all of the Debtors' assets and property in which a security interest can be obtained under the

CH_DOCS\258601.16 [W97]

Uniform Commercial Code (including the setoff rights described below, the "Pre-Petition

Collateral"), including without limitation, equipment, inventory, accounts receivable,

instruments, chattel paper, general intangibles, contracts, documents of title, and all other

tangible and intangible personal property and the proceeds and products thereof.  The provisions

of this paragraph F constitute a stipulation by the Debtors and not a finding of the Court, subject

to the provisions of ordering paragraph 26 of this Order.

        G.    The Lender and certain of the Debtors are party to the following subordination

agreements:  (1) Subordination Agreement dated September 10, 1999 among Circuit Systems,

P.J. Patel and Lender; (2) Subordination Agreement dated September 10, 1999 among Circuit

Systems, P.J. Patel, as assignee of Stan Menezes, and Lender; (3) Subordination Agreement

dated September 10, 1999 among Circuit Systems, P.J. Patel, as assignee of Brijesh Shah, and

Lender; (4) Subordination Agreement dated September 10, 1999 among Circuit Systems,

Tribhovan Patel, as assignee of Stan Menezes, and Lender; (5) Subordination Agreement dated

September 10, 1999 among Circuit Systems, Tribhovan Patel, as assignee of Brijesh Shah, and

Lender; (6) Subordination Agreement dated September 10, 1999 among Circuit Systems,

Hasumati Patel and Lender; (7) Subordination Agreement dated September 10, 1999 among

Circuit Systems, D.S. Patel and Lender; (8) Subordination Agreement dated September 10, 1999

among Circuit Systems, Kiran Patel and Lender; (9) Subordination Agreement dated as of

February 10, 2000 among Circuit Systems, Sejal Patel and Lender; (10) Subordination

Agreement dated as of February 10, 2000 among Circuit Systems, Samir Patel and Lender; (11)

Subordination Agreement dated as of February 10, 2000 among Circuit Systems, Impex

Electronics, Inc. and Lender; (12) Subordination Agreement dated as of February 10, 2000

5

among Circuit Systems, Tribhovan Patel and Lender; (13) Subordination Agreement dated as of

January 4, 1999 among Circuit Systems, H.O.T.L.R.T., Inc., SVPC and Lender; and (14)

Subordination Agreement dated as of January 1, 2000 among Infovision, Project Control

Solutions, Inc. and Lender (collectively, the "Subordination Agreements"). Pursuant to the terms

of the Subordination Agreements, all of the subordinated parties pursuant to the Subordination

Agreements have been properly notified by the Lender of the existence of certain Events of

Default under the Pre-Petition Credit Agreement. As a result, such subordinated parties may not

ask, demand, sue for, accept or receive, and Borrowers may not pay to such subordinated parties,

any payment of any Subordinated Debt (as defined in the Subordination Agreements) until the

Indebtedness (as defined below) is paid in full.

      H.     The Debtors do not have sufficient available sources of working capital and

financing to carry on the operation of their businesses without the Post-Petition Financing and

the use of Lender's Cash Collateral. The ability of the Debtors to maintain business relationships

with their vendors and suppliers, to purchase new inventory and otherwise finance their

operations, is essential to the Debtors' continued viability. In addition, the Debtors' critical need

for financing is immediate. In the absence of the Post-Petition Financing and such use of the

Cash Collateral, the continued operation of the Debtors' businesses would not be possible and

serious and irreparable harm to the Debtors and their estates would occur. The preservation,

maintenance and enhancement of the going concern value of the Debtors are of the utmost

significance and importance to a successful reorganization of the Debtors under Chapter 11 of

the Bankruptcy Code.

CH_DOCS\258601.16 [W97]

I.      Given the Debtors' current financial condition and capital structure, the Debtors
are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an
administrative expense.  Financing on a post-petition basis is not otherwise available without the
Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and
all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b),
other than as described below, and securing such indebtedness and obligations with the security
interests in and the liens upon the property described below pursuant to Bankruptcy Code
§ 364(c).

J.      Notice of the Final Hearing and the relief requested in the Motion has been given
to (i) the Office of the United States Trustee, (ii) all creditors of the Debtors; (iii) known holders
of pre-petition liens against the Debtors' property; and (iv) counsel for the official committee of
unsecured creditors (the "Committee") appointed in the Circuit Systems Chapter 11 Case.

K.      Based on the record presented to this Court by the Debtors, it appears (and the
Debtors and the Lender have stipulated) that the Post-Petition Financing has been negotiated in
good faith and at arm's-length between the Debtors and the Lender, and any credit extended and
loans made to the Debtors pursuant to this Order shall be deemed to have been extended, issued
or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy
Code § 364(e).

L.      Based on the record before this Court, it appears (and the Debtors and the Lender
have stipulated) that the terms of this Order, including, without limitation, the terms of the Post-
Petition Financing, are fair and reasonable, reflect the Debtors' exercise of prudent business

CH_DOCS\258601.16 [W97]

judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value

and fair consideration.

M.       This Court concludes that entry of this Order is in the best interests of the

Debtors' respective estates and creditors as its implementation will, among other things, allow

for the flow of supplies and services to the Debtors necessary to sustain the operation of the

Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

N.       The Boards of Directors of the Debtors have given Dale Marcus of Brent I.

Kugman and Associates and Thomas Rieck of Rieck and Crotty, PC, jointly, sole power and

authority with respect to all matters relating to the shut down and winding up of the Debtors'

operations in Tennessee, the proposed sale of the Antioch Property (as hereinafter defined), the

proposed sale of all stock of SigmaTron International, Inc. ("SigmaTron") owned by the Debtors,

the proposed sale of the Nonessential Equipment (as hereinafter defined) and the proposed sale

of SVPC and Infovision or all or substantially all of their assets, including, without limitation,

determining what expenditures should be made in connection with such shut down, winding up

and sales and determining the highest and best price at which the assets of the Tennessee

operations, the Antioch Property, the SigmaTron stock, the Nonessential Equipment, SVPC and

Infovision or all or substantially all of their assets should be sold.  If Thomas Rieck and Dale

Marcus are unable to reach a unanimous decision with respect to any of the matters described in

this Paragraph N, then Thomas Rieck and Dale Marcus shall call a meeting of a committee that

shall be comprised of Thomas Rieck, Alan Cuthbertson and Joseph Incrocci (the "Outside

Director Subcommittee"), whose decision shall be final and conclusive with respect to the

matters in dispute.  Other than as provided above, no officer or director of any of the Debtors

8

shall have any authority with respect to these matters, nor shall any officer or director other than Thomas Rieck be entitled to any compensation with respect to these matters.

O.      American Chartered Bank asserts that it holds a properly perfected security interest in and lien on substantially all of the assets of Infovision, and American Chartered Bank asserts that such security interest and lien is prior and superior to the security interest and lien of Lender in the assets of Infovision.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Preliminary Hearing and at the Final Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.      Motion Granted.  The Motion is granted, subject to the terms and conditions set forth in this Order.

2.      Authorization.  The Debtors are expressly authorized and empowered to (i) borrow money, use Cash Collateral, and perform their obligations pursuant to the provisions of this Order and (ii) enter into such agreements, instruments and documents (collectively, if any, the "DIP Loan Documents") as may be necessary or required to evidence their obligations to Lender, to consummate the terms and provisions of the Motion and this Order and to evidence perfection of the liens and security interests to be given to Lender pursuant hereto and thereto; provided that such DIP Loan Documents are consistent with this Order.  All post-petition loans and all other indebtedness and obligations incurred on or after the Filing Date by the Debtors to Lender pursuant to this Order and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are referred to herein as the "DIP Indebtedness," and, together with the Pre-Petition Indebtedness, as the "Indebtedness."

9

CH_DOCS\258601.16 [W97]

3.    <u>Borrowing: Use of Cash Collateral</u>.  Subject to the terms and conditions of this

Order and the DIP Loan Documents, (a) Lender hereby consents to the Debtors' limited use of

Lender's Cash Collateral and (b) Lender will make post-petition loans to Circuit Systems, CS-

Tennessee and SVPC, not to exceed in the aggregate the lesser of (i) the Commitment or (ii) with

all other Indebtedness, the Borrowing Base (as defined below), adjusted by the applicable

amount set forth on Exhibit B hereto.  For purposes of this Order, and notwithstanding anything

to the contrary in the Pre-Petition Loan Documents, "Borrowing Base" shall mean the sum of (A)

the outstanding principal balance of the Term Loan plus (B) the lesser of $16,000,000 or the sum

of (i) 80% of the face amount of Eligible Accounts, (ii) the lesser of $4,000,000 or the sum of (1)

50% of the value of Eligible Finished Goods and (2) 75% of the value Eligible Finished Goods

on Consignment, (iii) the lesser of $2,000,000 or the sum of (1) 40% of the value of SVPC's

Raw Materials Inventory plus (2) the product of (a) the value of all other Borrowers' Raw

Materials Inventory minus $592,000 multiplied by (b) 50%, (iv) 30% of the current market value

of the common stock of SigmaTron held by Circuit Systems, as such market value is quoted on a

recognized securities exchange, but no event greater than $2,000,000, and (v) an overadvance of

$1,500,000.  The Cash Collateral and the proceeds of any such post-petition loans shall be used

to fund only the budgeted expenditures set forth in the Approved Budget in accordance with the

provisions of ordering paragraph 15 hereof; provided, however, that notwithstanding anything set

forth in the Approved Budget, Infovision may use Cash Collateral at Infovision for the purpose

of paying American Chartered Bank $9,363.07 (consisting of an $8,333.33 principal payment

and a $1,029.74 interest payment) on the first business day of each month and $1,765.27 (all of

which represents the payment of interest) on or before the fourteenth day of each month, during

10

each month prior to the Termination Date that the obligations of Infovision to American

Chartered Bank remain outstanding. The unused portion of any budgeted half-month amount

shall be carried forward into the immediately subsequent half-month period; provided, however,

that no such amounts may be carried forward more than once. Notwithstanding any of the

foregoing, if Lender in its sole discretion advances funds or other extensions of credit in excess

of these limitations (or any other limitations in the DIP Loan Documents), such advances (and

any other indebtedness in excess of such amount) shall constitute DIP Indebtedness entitled to

the benefits of the DIP Loan Documents and this Order.

       4.    Existing Events of Default. Nothing herein or in any of the DIP Loan Documents

shall constitute or be deemed to constitute a waiver by Lender of any existing or future Events of

Default (including, without limitation, the Events of Default arising from the commencement of

these Cases). Without prejudice to, or waiver of, Lender's rights and remedies against any

Debtor in respect of any Events of Default other than the Existing Defaults (as defined below),

Lender agrees to forbear from foreclosing its liens on any DIP Collateral or otherwise taking

enforcement action against any Debtor based solely on any Event of Default which occurred

prior to the entry of this Order and of which Lender had actual knowledge as of such date

(collectively, the "Existing Defaults"); provided that such forbearance shall terminate upon the

earlier of (i) the occurrence of any Event of Default other than an Existing Default or (ii) the

Termination Date and thereafter the Lender shall be entitled to exercise its rights provided under

this Order.

       5.    Interest, Fees, Costs and Expenses. All Indebtedness shall bear interest at the

Default Rate provided in the Pre-Petition Credit Agreement (i.e. 2% plus the applicable interest

rate plus the Applicable Margin as set forth in Section 2.5b(iv) of the Pre-Petition Credit

Agreement). Interest shall be payable monthly in arrears on the last day of each month. There

shall be no provision for LIBOR-Rate Loans under the Post-Petition Financing. All fees payable

under the Pre-Petition Credit Agreement shall be applicable to the Post-Petition Financing. On a

monthly basis, the Lender shall be entitled to recover all of its reasonable out-of-pocket

expenses, including an audit expense of $750 per day for each day audited plus any additional

out-of-pocket expenses, and including reasonable consultants', attorneys' and paralegals' fees,

costs and expenses incurred in connection with the Indebtedness to the extent provided in the

Pre-Petition Credit Agreement, subject to disgorgement only pursuant to a final non-appealable

order of this Court determining that the fees and expenses incurred and paid were unreasonable.

In consideration for providing the Post-Petition Financing, the Lender will be entitled to (a)

recover a $75,000 fee, which shall be earned and payable on the date hereof, (b) receive a

$25,000 collateral management fee, payable each month and (c) in the event that all of the

Indebtedness is paid in full in cash on or after March 31, 2001, then the Lender shall be entitled

to receive a $100,000 success fee, payable in full in cash on the date that the Indebtedness is

paid.

   6.  <u>Termination of Post-Petition Credit</u>. Lender's willingness to make loans

hereunder and Lender's consent to the Debtors' use of Cash Collateral shall immediately and

automatically terminate (except as Lender may otherwise agree in writing in its sole discretion)

upon the earliest to occur of the following (the "<u>Termination Date</u>"):

    (i)  March 31, 2001;

    (ii)  the date of final indefeasible payment and satisfaction in full in
cash of the Indebtedness;

12

(iii)   the effective date of any confirmed plan of reorganization in any or all of the Chapter 11 Cases;

(iv)   the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors;

(v)   the occurrence of any violation by any Debtor of this Order (including, but not limited to, the Debtors' failure to adhere to the Approved Budgets as set forth in ordering paragraph 15 of this Order or violation of the covenants set forth in ordering paragraph 16 of this Order), except for a violation of any of paragraphs 16(a) through 16(p) of this Order, or any Event of Default other than the Existing Defaults;

(vi)   the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

(vii)   a trustee or an examiner with enlarged powers (beyond those set forth in §§ 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of any Debtor is appointed in any of the Chapter 11 Cases without the prior written consent of the Lender (which consent may be withheld in its sole discretion), or any Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the Lender (which consent may be withheld in its sole discretion);

(viii)   this Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of Lender (which consent may be withheld in its sole discretion);

(ix)   this or any other Court enters an order or judgment in any of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of Lender's pre-petition or post-petition liens on any DIP Collateral or imposing, surcharging or assessing against Lender or its claims or any DIP Collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise;

(x)   Thomas Rieck or Dale Marcus refuses to accept or ceases to have or exercise the power and authority described in Paragraph N of this Order, and the Debtors have not found a replacement for Mr. Rieck or Mr. Marcus, as applicable, that is acceptable to the Lender in its sole discretion (after consultation with the Committee), within five (5) days after such refusal or cessation;

(xi)   any member of the Outside Director Subcommittee resigns or is otherwise removed from the Board of Directors of any of the Debtors; or

(xii)   the Debtors, acting through the Outside Director Subcommittee or otherwise, terminate for any reason the retention of any "Liquidating Agent" appointed pursuant to paragraph 11 of this Order.

Upon the occurrence of any of the events set forth in subparagraphs 6(i) through 6(xii), above

(the "Loan Payment Date"), all Indebtedness shall be immediately due and payable in cash

(except as Lender may otherwise agree in writing in its sole discretion), and Debtors shall not

thereafter seek, assert, argue for, encourage or support the use of Cash Collateral of the Lender

by the Debtors except as expressly permitted and consented to by the Lender pursuant to the

terms of this Order

      7.    Security for Indebtedness.

          (a)    The Lender is hereby granted as security for the repayment of all

amounts of the Lender's Cash Collateral used by the Debtors and for the DIP Indebtedness,

pursuant to §§ 363, 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a valid and perfected first

lien, subject only to Prior Claims (as defined below), on all present and after-acquired personal

and real property of the Debtors of any nature whatsoever, including, without limitation, all cash

contained in any account maintained by the Debtors, all causes of action existing as of the Filing

Date and the proceeds thereof, and all real property, the title to which is held by any Debtor, or

possession of which is held by any Debtor pursuant to leasehold interest (collectively with all

proceeds and products of any or all of the foregoing, the "DIP Collateral"). As used herein, the

term "Prior Claims" shall mean (i) the pre-petition liens and security interests of Lender and

(ii) any non-avoidable valid, enforceable and perfected liens and security interests in favor of any

person or entity on or in the assets of any Debtor, as pre-petition debtor, which existed on the

Filing Date and are not subject to § 552(a) of the Bankruptcy Code, but only to the extent such

liens and security interests are superior in priority to the liens and security interests of the

Lender, after giving effect to any existing subordination or intercreditor arrangements. Other

CH_DOCS\258601.16 [W97]

than the first priority liens and security interests in favor of Lender pursuant to the DIP Loan

Documents and this Order and the Prior Claims, no other claims, liens or security interests

whether prior to or pari passu with the claims, liens or security interests of Lender shall attach to

the DIP Collateral in these or any subsequent or superseding cases (including, without limitation,

any conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code

or any other proceeding related hereto or thereto, collectively, "Successor Case") without the

express written consent of Lender (which consent may be withheld in its sole discretion).  Lender

at its option may release at any time from its liens and security interests any assets determined by

Lender to have a risk of environmental liabilities which Lender in its sole discretion deems

unacceptable.  In addition, subject to paragraph 26 of this Order and except to the extent

otherwise expressly set forth in this Order, or in a written instrument, agreement or other

document executed by one or more duly authorized representatives of Lender, no liens or

security interests granted to Lender, and no claim of Lender, shall be subject to subordination to

any other liens, security interests or claims under § 510 of the Bankruptcy Code or otherwise.

Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for

the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code

shall be subordinate to the security interests in and liens of Lender upon the DIP Collateral.

        (b)     Subject to the limitation on cross-collateralization set forth in

paragraph 8 below, all Cash Collateral used by the Debtors and all DIP Indebtedness shall be

deemed to be part of the Obligations (as defined in the Pre-Petition Credit Agreement) of the

Debtors, as well as obligations and indebtedness of the Debtors hereunder.

CH_DOCS\258601.16 [W97]

8.    <u>Limitations on Post-Petition Liens and Cross-Collateralization</u>.  The post-petition

liens and security interests granted in the DIP Collateral under the DIP Loan Documents and this

Order shall secure the Pre-Petition Indebtedness only to the extent the value of the Pre-Petition

Collateral plus all net proceeds of sales or collections of Pre-Petition Collateral applied to the

Pre-Petition Indebtedness as of any post-petition date of determination is less than the value of

the Pre-Petition Collateral as of the Filing Date (whether such decline in value is attributable to

physical deterioration, consumption, use, shrinkage, decline in market value or otherwise), and

(ii) Lender shall be entitled to all of the rights accorded to it pursuant to § 507(b) of the

Bankruptcy Code.

9.    <u>Perfection of New Liens</u>.  All liens and security interests on or in the DIP

Collateral granted to Lender by this Order and the DIP Loan Documents shall be, and they

hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws

as of the date hereof, and no notice, filing, mortgage recordation, possession, further order,

landlord or warehousemen lien waivers or other third party consents or other act, shall be

required to effect such perfection; <u>provided, however</u>, that notwithstanding the provisions of

§ 362 of the Bankruptcy Code, (i) Lender may, at its sole option, file or record or cause the

Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents

or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of

liens and security interests, mortgages and other similar documents as Lender may require, and

(ii) Lender may require the Debtors to deliver to Lender any chattel paper, instruments or

securities evidencing or constituting any DIP Collateral, and the Debtors are directed to

cooperate and comply therewith.  If Lender, in its sole discretion, shall elect for any reason to

16

cause to be obtained any landlord or warehouse lien waivers or other third party consents or

cause to be filed or recorded any such notices, financing statements, mortgages or other

documents with respect to such security interests and liens, or if Lender, in accordance with the

DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or

warehouse lien waivers or other third party consents, financing statements or similar documents

or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11

Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth

herein. Lender may (in its discretion) but shall not be required to, file a certified copy of this

Order in any filing or recording office in any county or other jurisdiction in which any Debtor

has real or personal property and such filing or recording shall be accepted and shall constitute

further evidence of perfection of Lender's interests in the DIP Collateral.

      10.   <u>Waiver</u>. The Debtors and their estates (and any party in interest acting on behalf

of any Debtor) hereby irrevocably waive, and are barred from asserting or exercising any right,

(a) without Lender's prior written consent (which may be withheld in its sole discretion), or (b)

without prior indefeasible payment and satisfaction in full of the Indebtedness: (i) to grant or

impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or

otherwise, liens on or security interests in any DIP Collateral, which are <u>pari passu</u> with or

superior to Lender's liens on and security interests in such DIP Collateral; (ii) to return goods

pursuant to § 546(g) of the Bankruptcy Code to any creditor of any Debtor or to consent to any

creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any

such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise; or (iii) to modify or

17

affect any of the rights of Lender under this Order or any DIP Loan Documents by any order

entered in any of the Chapter 11 Cases or any Successor Case.

11.     Modification of Automatic Stay; Other Remedies.

(a)     Except as set forth in subparagraph (b) of this paragraph, which governs

any action by Lender to foreclose on its liens on any DIP Collateral or to exercise any other

default-related remedies (other than those specifically referenced in the next sentence), the

automatic stay pursuant to § 362 of the Bankruptcy Code is hereby vacated as to Lender to

permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits,

privileges and remedies pursuant to this Order and the other DIP Loan Documents without

further application or motion to, or order from, the Court, and regardless of any change in

circumstances (whether or not foreseeable) neither § 105 of the Bankruptcy Code nor any other

provision of the Bankruptcy Code or applicable law shall be utilized to prohibit Lender's

exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies.

Lender is hereby granted leave, among other things, to (i) receive and apply payments of the

Indebtedness and collections on and proceeds of the Pre-Petition Collateral and the DIP

Collateral to the Indebtedness in the manner specified in this Order and the DIP Loan

Documents, (ii) file or record any financing statements, mortgages or other instruments or other

documents to evidence the security interests in and liens upon the DIP Collateral, (iii) to the

extent permitted by § 506(b) of the Bankruptcy Code, charge and collect any interest, fees, costs,

and expenses and other amounts accruing at any time under the DIP Loan Documents or this

Order as provided therein, (iv) to give any Debtor any notice provided for in any of the DIP Loan

Documents or this Order, (v) cease making loans or other extensions of credit and/or suspend or

18

terminate any obligation of Lender to make loans or other extensions of credit under the DIP

Loan Documents or this Order, and (vi) upon the Loan Payment Date, and without application or

motion to, or order from the Court or any other court, (A) terminate the Pre-Petition Credit

Agreement and the Post-Petition Financing under this Order and the other DIP Loan Documents,

(B) declare all Indebtedness immediately due and payable, and require that all contingent

Indebtedness (if any) be cash collateralized or terminated without liability to Lender, and

(C) revoke the Debtors' right, if any, under this Order and/or the other DIP Loan Documents to

use Cash Collateral.

       (b)    Upon the occurrence of any Event of Default other than any Existing

Defaults, or upon the Termination Date, Lender (x) shall be entitled (i) to file an emergency

motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing its

liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies

under the DIP Loan Documents, this Order or applicable law, and (ii) to obtain an expedited

hearing on such motion upon three (3) business days' notice to counsel for the Debtors, counsel

for the Committee, counsel for American Chartered Bank, the U.S. Trustee and any party that

has filed a motion requesting notices in these cases whose motion appears on the Court's internet

docket for these cases on the date the notice is sent or (y) may, in Lender's discretion, request

that the Debtors seek Court approval, pursuant to section 327 of the Bankruptcy Code, to retain a

person or entity acceptable to Lender in Lender's sole discretion, as "Liquidating Agent" for all

of the Debtors, with sole power and authority to operate the businesses of the Debtors, otherwise

maintain the going concern value of the Debtors and take all actions necessary or appropriate to

sell all of the assets of the Debtors as expeditiously as practicable, provided, however, that any

assets of the Debtors so sold shall be sold pursuant to a plan of reorganization or a motion

brought pursuant to section 363 of the Bankruptcy Code. Lender shall be entitled to relief from

the automatic stay sought pursuant to the preceding clause (x) upon a showing that one or more

Events of Default (other than any Existing Default) have occurred and are then continuing or that

the Termination Date has occurred. In the event that Lender requests that the Debtors seek Court

approval to retain a Liquidating Agent as set forth in the preceding clause (y), and a Court order

is not entered approving the retention of a Liquidating Agent acceptable to Lender in Lender's

sole discretion within three (3) business days after Lender has made such request, then the

Lender shall automatically, without further order of this Court, be entitled to relief from the

automatic stay to enforce its liens or to exercise any remedies available to Lender under this

Order, the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents or applicable

law, including to foreclose on the Pre-Petition Collateral and the DIP Collateral. In the event

that Lender files an emergency motion for relief from the automatic stay for the purpose of

foreclosing or otherwise enforcing its liens on the assets of Infovision (including but not limited

any such motion permitted by paragraph 11(d) of this Order), then (i) American Chartered Bank

may (i) file an emergency motion for relief from the automatic stay for the purpose of foreclosing

or otherwise enforcing its liens on the assets of Infovision, and (ii) obtain an expedited hearing

on such motion upon three (3) days' notice to counsel for Lender, counsel for the Debtors,

counsel for the Committee, the U.S. Trustee and any party that has filed a motion requesting

notices in these cases whose motion appears on the Court's internet docket for these cases on the

date the notice is sent.

CH_DOCS\258601.16 [W97]

(c)   Notwithstanding anything in this Order to the contrary, the sole remedy

for a violation of any of paragraphs 16(a) through (d) of this Order shall be that Lender may, in

Lender's discretion, request that SVPC seek Court approval, pursuant to section 327 of the

Bankruptcy Code, to retain a person or entity acceptable to Lender in Lender's sole discretion, as

"Liquidating Agent" for SVPC, with sole power and authority to operate the business of SVPC,

otherwise maintain the going concern value of SVPC and take all actions necessary or

appropriate to sell all of the assets of SVPC as expeditiously as practicable, provided, however,

that any assets of SVPC so sold shall be sold pursuant to a plan of reorganization or a motion

brought pursuant to section 363 of the Bankruptcy Code.  In the event that Lender so requests

that SVPC seek Court approval to retain Liquidating Agent, and a Court order is not entered

approving retention of a Liquidating Agent acceptable to Lender in Lender's sole discretion

within three (3) business days after Lender has made such request, then the Lender shall

automatically, without further order of this Court, be entitled to relief from the automatic stay to

enforce its liens or to exercise any remedies available to Lender under this Order, the Pre-Petition

Credit Agreement and other Pre-Petition Loan Documents or applicable law, including to

foreclose on the Pre-Petition Collateral and the DIP Collateral.

(d)   Notwithstanding anything in this Order to the contrary, the sole remedy

for a violation of any of paragraphs 16(e) through (h) of this Order shall be that Lender may, in

Lender's discretion, request that Infovision seek Court approval, pursuant to section 327 of the

Bankruptcy Code, to retain a person or entity acceptable to Lender in Lender's sole discretion, as

"Liquidating Agent" for Infovision, with sole power and authority to operate the business of

Infovision, otherwise maintain the going concern value of Infovision and take all actions

21

necessary or appropriate to sell all of Infovision's assets as expeditiously as practicable, provided,

however, that any assets of Infovision so sold shall be sold pursuant to a plan of reorganization or

a motion brought pursuant to section 363 of the Bankruptcy Code. In the event that Lender so

requests that Infovision seek Court approval to retain a Liquidating Agent, and a Court order is

not entered approving the retention of a Liquidating Agent acceptable to Lender in Lender's sole

discretion within three (3) business days after Lender has made such request, then the Lender

shall automatically, without further order of this Court, be entitled to relief from the automatic

stay to enforce its liens or to exercise any remedies available to Lender under this Order, the Pre-

Petition Credit Agreement and other Pre-Petition Loan Documents or applicable law, including

to foreclose on the Pre-Petition Collateral and the DIP Collateral.

      (e)    Notwithstanding anything in this Order to the contrary, the sole remedy

for a violation of any of paragraphs 16(i) through (k) of this Order shall be that Lender may, in

Lender's discretion, request that the Debtors seek Court approval, pursuant to section 327 of the

Bankruptcy Code, to retain a person or entity acceptable to Lender in Lender's sole discretion, as

"Liquidating Agent" for the Debtors, with sole power and authority to operate and maintain the

Antioch Property, and take all actions necessary or appropriate to sell all of the Antioch Property

as expeditiously as practicable, provided, however, that any sale of the Antioch Property shall be

pursuant to a plan of reorganization or a motion brought pursuant to section 363 of the

Bankruptcy Code. In the event that Lender so requests that the Debtors seek Court approval to

retain a Liquidating Agent, and a Court order is not entered approving the retention of a

Liquidating Agent acceptable to Lender in Lender's sole discretion within three (3) business days

after Lender has made such request, then the Lender shall automatically, without further order of

CH_DOCS\258601.16 [W97]

this Court, be entitled to relief from the automatic stay to enforce its liens or to exercise any

remedies available to Lender under this Order, the Pre-Petition Credit Agreement and other Pre-

Petition Loan Documents or applicable law, including to foreclose on the Pre-Petition Collateral

and the DIP Collateral.

       (f)      Notwithstanding anything in this Order to the contrary, the sole remedy

for a violation of any of paragraphs 16(l) through (o) of this Order shall be that Lender may, in

Lender's discretion, request that the Debtors seek Court approval, pursuant to section 327 of the

Bankruptcy Code, to retain a person or entity acceptable to Lender in Lender's sole discretion, as

"Liquidating Agent" for the Debtors, with sole power and authority to operate and maintain the

Nonessential Equipment and take all actions necessary or appropriate to sell the Nonessential

Equipment as expeditiously as practicable, provided, however, that any sale of the Nonessential

Equipment shall be pursuant to a plan of reorganization or a motion brought pursuant to section

363 of the Bankruptcy Code.  In the event that Lender so requests that the Debtors seek Court

approval to retain a Liquidating Agent, and a Court order is not entered approving the retention

of a Liquidating Agent acceptable to Lender in Lender's sole discretion within three (3) business

days after Lender has made such request, then the Lender shall automatically, without further

order of this Court, be entitled to relief from the automatic stay to enforce its liens or to exercise

any remedies available to Lender under this Order, the Pre-Petition Credit Agreement and other

Pre-Petition Loan Documents or applicable law, including to foreclose on the Pre-Petition

Collateral and the DIP Collateral.

       (g)      Notwithstanding anything in this Order to the contrary, the sole remedy

for a violation of any of paragraph 16(p) of this Order shall be that Lender may, in Lender's

CH_DOCS\258601.16 [W97]

discretion, request that the Debtors seek Court approval, pursuant to section 327 of the

Bankruptcy Code, to retain a person or entity acceptable to Lender in Lender's sole discretion, as

"Liquidating Agent" for the Debtors, with sole power and authority to maintain the SigmaTron

stock and take all actions necessary or appropriate to sell all of the SigmaTron Stock as

expeditiously as practicable, provided, however, that any sale of the SigmaTron Stock shall be

pursuant to a plan of reorganization or a motion brought pursuant to section 363 of the

Bankruptcy Code.  In the event that Lender so requests that the Debtors seek Court approval to

retain a Liquidating Agent, and a Court order is not entered approving the retention of a

Liquidating Agent acceptable to Lender in Lender's sole discretion within three (3) business days

after Lender has made such request, then the Lender shall automatically, without further order of

this Court, be entitled to relief from the automatic stay to enforce its liens or to exercise any

remedies available to Lender under this Order, the Pre-Petition Credit Agreement and other Pre-

Petition Loan Documents or applicable law, including to foreclose on the Pre-Petition Collateral

and the DIP Collateral.

      (h)     Upon Lender's obtaining relief from the automatic stay to enforce its liens

or to exercise any other default-related remedies (whether upon further order of this Court or

automatically as provided in this Order), (i) the Lender may exercise any remedies available to

Lender under this Order, the Pre-Petition Credit Agreement and other Pre-Petition Loan

Documents or applicable law, including to foreclose on the Pre-Petition Collateral and the DIP

Collateral and (ii) provided that Lender in its sole discretion has made available to Debtors

(through additional post-petition Loans or by consenting to Debtors' use of Cash Collateral)

sufficient funds to pay the costs thereof, the Debtors shall cooperate with the Lender in

24

connection with any enforcement action by Lender by, among other things, (A) providing access to their premises to representatives of the Lender, (B) providing Lender access to their books and records, (C) performing all other obligations set forth in the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, this Order and/or the other DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the Pre-Petition Collateral and the DIP Collateral until Lender can make adequate provision to protect and safeguard the Pre-Petition Collateral and the DIP Collateral, and Debtors shall not otherwise interfere or encourage others to interfere with the Lender's enforcement of its rights. In addition, upon the occurrence of any Event of Default (as determined by mutual agreement of the Debtors and the Lender, or in the absence of such agreement, by the Court) other than any Existing Default, or upon the Termination Date, and provided that Lender in its sole discretion has made available to Debtors (through additional post-petition loans or by consenting to Debtors' use of Cash Collateral) sufficient funds to pay the costs thereof, the Debtors shall, at the request by the Lender, use commercially reasonable efforts to sell or otherwise dispose of the DIP Collateral on terms and conditions acceptable to Lender and shall turn over the proceeds of such sale(s) or other disposition(s) to the Lender for application to the Indebtedness in accordance with the provisions hereof and the DIP Loan Documents.

12.  <u>Priority Claims; No 506(c) Charges</u>. Subject to the Carve-Out described in ordering paragraph 13 below, the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the

Bankruptcy Code or otherwise (whether incurred in any of the Chapter 11 Cases or any

Successor Case), and shall at all times be senior to the rights of any Debtor, any successor trustee

or estate representative in any of the Chapter 11 Cases or any Successor Case. No costs or

expenses of administration or other charge, lien, assessment or claim incurred at any time

(including, without limitation, any expenses set forth in any Approved Budget or any other

budget) by any person or entity shall be imposed against the Lender, its claims, or its collateral

under § 506(c) of the Bankruptcy Code or otherwise, unless, prior to incurring such costs or

expenses (i) the party proposing to incur such cost or expense shall obtain the written consent of

the Lender allowing such charge to be imposed against Lender, its claims or its collateral under

§ 506(c) of the Bankruptcy Code, or (ii) this Court enters an order allowing such charge to be

imposed against Lender, its claims or its collateral under § 506(c) of the Bankruptcy Code.

Nothing in this Order or the Approved Budget or any other budget shall constitute the consent by

Lender to the imposition of any costs or expense of administration or other charge, lien,

assessment or claim (including, without limitation, any amounts set forth in the Approved

Budget or any other budget) against the Lender, its claims or its collateral under § 506(c) of the

Bankruptcy Code or otherwise.

     13.    <u>Carve-Out</u>.

     (a)    Subject to the remaining provisions of this paragraph, Lender's liens on

and security interests in the DIP Collateral and its administrative claims under § 364(c)(1) of the

Bankruptcy Code shall be subject only to (a) the payment of any unpaid fees payable pursuant to

28 U.S.C. § 1930, and (b) the payment of allowed and unpaid fees and disbursements incurred by

Greenburg Traurig, LLP and Brent I. Kugman and Associates pursuant to the terms of this Order,

pursuant to § 327 of the Bankruptcy Code (collectively, the "Debtor Professionals") in an aggregate amount not to exceed $200,000 and the professionals retained by the Committee pursuant to § 1103(a) of the Bankruptcy Code (collectively, "Committee Professionals") in an aggregate amount not to exceed $50,000, less (in each case) the sum of all unused pre-petition retainers (as of the Filing Date) (the amounts specified in clauses (a) and (b) including the limitations therein, collectively, the "Carve-Out"). Notwithstanding the occurrence of an Event of Default, the occurrence of the Termination Date, the lifting of the automatic stay or any other breach of this Order, the Carve-Out shall remain in place. As long as no unwaived Event of Default has occurred and the Termination Date has not occurred (each a "Carve-Out Event") and such payments may be made under the Approved Budget, the Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to a Carve-Out Event authorized to be paid under sections 330 and 331 of the Bankruptcy Code or otherwise pursuant to an order of the Bankruptcy Court, as the same may be due and payable, and such payments shall not reduce the Carve-Out.

(b)    Notwithstanding anything to the contrary in this Order or the DIP Loan Documents, the pre-petition and post-petition liens and security interests and the administrative priority claims of the Lender shall be senior to, and no proceeds of Indebtedness or Cash Collateral (including any pre-petition retainer funded by the Lender pursuant to the Pre-Petition Loan Documents) nor any Pre-Petition Collateral or DIP Collateral (or proceeds thereof) may be used to pay, any and all claims for services rendered by any of the Debtor Professionals or the Committee Professionals in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested

27

matter, the purpose of which is to seek or the result of which would be to obtain any order,

judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or

subordinating, in whole or in part, the Indebtedness or the liens and security interests of the

Lender in the Pre-Petition Collateral or the DIP Collateral; or (y) preventing, hindering or

otherwise delaying, whether directly or indirectly, the exercise by Lender of any of its rights and

remedies under this Order and/or the DIP Loan Documents or the Lender's enforcement or

realization upon any of the liens on or security interests in any Pre-Petition Collateral or DIP

Collateral in accordance with the terms of this Order; provided, however, that the foregoing

limitations shall not apply to claims for services rendered by the Committee Professionals in

connection with the investigation of the validity, extent, priority, avoidability or enforceability of

the Pre-Petition Indebtedness or the Lender's pre-petition liens and security interests on the Pre-

Petition Collateral.  The Lender shall retain its rights as a party in interest to object to any claims

of any of the Debtor Professionals and the Committee Professionals and the Committee shall

retain the right to object to any claims and motions of the Lender and seek payment of the

Committee Professionals' fees and expenses as administrative claims.

14.    Cash Collection Procedures.  From and after the date of the entry of this Order all

collections and proceeds of any DIP Collateral or services provided by Circuit Systems, CS-

Tennessee or SVPC and all other cash or cash equivalents which shall at any time come into the

possession or control of Circuit Systems, CS-Tennessee or SVPC, or to which Circuit Systems,

CS-Tennessee or SVPC shall become entitled at any time, unless determined by the Court to be

subject to a Prior Claim and ordered by the Court to be delivered to the holder of such Prior

Claim, shall be deposited in the same bank accounts into which the collections and proceeds of

CH_DOCS\258601.16 [W97]

the Pre-Petition Collateral were deposited under the Pre-Petition Credit Agreement (or in such

other accounts as are designated by Lender from time to time), and such collections and proceeds

upon such deposit shall become the sole and exclusive property of Lender and shall be applied

against the Pre-Petition Indebtedness and the DIP Indebtedness as provided in this Order.

Notwithstanding anything in this Order to the contrary, all cash and cash equivalents of Circuit

Systems, CS-Tennessee or SVPC currently in any account of Circuit Systems, CS-Tennessee or

SVPC or otherwise in the possession or control of Circuit Systems, CS-Tennessee or SVPC

constitutes proceeds of the Pre-Petition Collateral and shall be immediately remitted to Lender

for application against the Pre-Petition Indebtedness. All financial institutions in which any

lockboxes, blocked accounts or other accounts of Circuit Systems, CS-Tennessee or SVPC are

located are hereby authorized and directed to comply with any request of Lender to turnover to

Lender all funds therein without offset or deduction of any kind.

       15.      <u>Budget; Use of Loan and Collateral Proceeds</u>.

       (a)      Attached as Exhibit C hereto and incorporated herein by reference is a budget

(which has been approved by Lender) setting forth by line item all projected sales, cash receipts

and cash disbursements for the time period from September 1, 2000 through March 31, 2001

("<u>Initial Approved Budget</u>"). The Initial Approved Budget may be modified or supplemented

from time to time by additional budgets (covering any time period covered by a prior budget or

covering additional time periods) to which Lender and the Debtors agree in their respective sole

discretion (each such additional budget, a "<u>Supplemental Approved Budget</u>"). The aggregate of

all items approved by Lender in the Initial Approved Budget and any and all Supplemental

Approved Budgets (acceptable to Lender in its discretion) shall constitute an "Approved

Budget."

(b)     The sales and cash receipts of the Debtors for the periods included in the

Approved Budget shall not in any event be less than (i) for the period from September 1, 2000

until October 15, 2000, ninety-five percent (95%) of the amounts budgeted for sales and cash

receipts, respectively, for such period pursuant to the Approved Budget, and (ii) for each half-

month period after October 15, 2000, ninety-five percent (95%) of the cumulative amounts

budgeted for sales and cash receipts, respectively, for the period from September 1, 2000 through

the end of such half-month period pursuant to the Approved Budget.  Within five (5) days after

October 15, 2000, and within five (5) days after each half-month period thereafter, the Debtors

shall provide the Lender and the Committee with a statement comparing actual sales and cash

receipts with budgeted sales and cash receipts for such six week period.

(c)     In addition, the Debtors' expenditures under any line item for any half-month

period shall not exceed one hundred percent (100%) of the budgeted amount for such

expenditure line item for such half-month period, and the unused portion of any amount

budgeted for any expenditure line item for a particular half-month period may be carried forward

to the immediately subsequent half-month period; provided, however, that no amounts may be

carried forward more than once.  Within five (5) days after each half-month period, the Debtors

shall provide the Lender and the Committee with a statement comparing actual expenditures with

budgeted expenditures for such half-month period by line item (taking into account carry

forwards for such expenditure line item from the immediately prior half-month period).

(d)    Except as otherwise provided in ordering paragraphs 17 and 18 hereof, the

proceeds of any loans or other extensions of credit made by Lender to Debtors pursuant to this

Order and the DIP Loan Documents, all proceeds of DIP Collateral and all Cash Collateral shall

be used only as follows: (i) prior to the Termination Date, for the payment of the expenses set

forth in any Approved Budget (subject to the limitations and exceptions set forth in this ordering

paragraph), or any fees and expenses of the Debtor Professionals and the Committee

Professionals (to the extent of any unused portion of the Carve-Out), and any portion of the

Indebtedness, and (ii) on or after the Termination Date, first for the payment of any amounts

constituting any part of the unused Carve-Out, second, for payment of the Indebtedness, and

third, upon payment in full thereof in cash, then for the payment of any allowed administrative

expenses or other claims in accordance with the provisions of the Bankruptcy Code and orders of

this Court (including any expenses which remain unpaid as of the Termination Date, but were

authorized by the Approved Budget and incurred prior to the Termination Date). Lender shall

have no obligation with respect to the Debtors' use of the proceeds of the Post-Petition

Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor

the Debtors' compliance with any Approved Budget or to pay (directly or indirectly from its DIP

Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget.

Funds borrowed under this Order and Cash Collateral used under this Order shall be used by the

Debtors in accordance with this Order. The Lender's consent to any Approved Budget shall not

be construed as a consent to the use of any Cash Collateral or a commitment to continue to

provide Post-Petition Financing after the occurrence of an Event of Default (other than the

Existing Defaults) or beyond the Termination Date, regardless of whether the aggregate funds

31

shown on the Approved Budget have been expended. Nothing herein contained shall: (a) affect

or impair the Lender's right to seek adequate protection of its interests in the Pre-Petition

Collateral; or (b) be deemed to constitute a waiver of any Event of Default by the Borrowers or

the Debtors under the Pre-Petition Credit Agreement or the Pre-Petition Loan Documents. To

induce the Lender to permit the Debtors to use Cash Collateral and borrow additional funds, the

Debtors have agreed, and this Court hereby orders, that as long as any DIP Indebtedness is

outstanding, the Debtors shall not seek, assert, argue for, encourage or support the use of Cash

Collateral of the Lender by the Debtors except as expressly permitted and consented to by the

Lender pursuant to the terms of this Order.

16.    Covenants. The Debtors shall timely comply with all of the covenants set forth in

the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, this Order and the other

DIP Loan Documents. In addition, the Debtors shall comply with the following covenants:

(a)    Within ten calendar days after the Filing Date the Debtors shall have

entered into an engagement letter with, and filed a motion for the retention of, an investment

banker acceptable to the Lender (the "SVPC Investment Banker") for the purpose of assisting the

Debtors in selling SVPC or all or substantially all of the assets thereof.

(b)    Within 30 calendar days after the Filing Date, the Debtors shall have

retained the SVPC Investment Banker and obtained from the SVPC Investment Banker and

delivered to the Lender materials for the purpose of marketing SVPC or all of the assets thereof.

(c)    Within 90 calendar days after the Filing Date, the Debtors shall have

obtained and delivered to the Lender one or more letters of intent for the purchase of SVPC or all

or substantially all of the assets thereof, in form and substance acceptable to the Lender.

32

(d)    Within 120 calendar days after the Filing Date, the Debtors shall have consummated the sale of SVPC or of all or substantially all of the assets thereof with the prior written consent of Lender.

(e)    Within 15 calendar days after the Filing Date the Debtors shall have either (i) entered into an engagement letter with, and filed a motion for the retention of, an investment banker acceptable to the Lender (the "Infovision Investment Banker") for the purpose of assisting the Debtors in selling Infovision or all or substantially all of the assets thereof or (ii) received and delivered to Lender a letter of intent, in form and substance acceptable to the Lender, for the purchase of Infovision or substantially all of the assets thereof.

(f)    Unless the Debtors have received and delivered to Lender a letter of intent for the purchase of Infovision or substantially all of the assets thereof within 15 days after the filing date as described in subparagraph 16(e) above, the Debtors, within 40 calendar days after the Filing Date, shall have retained the Infovision Investment Banker and obtained from the Infovision Investment Banker and delivered to the Lender materials for the purpose of marketing Infovision or all of the assets thereof.

(g)    Within 90 calendar days after the Filing Date, the Debtors shall have obtained and delivered to the Lender one or more letters of intent for the purchase of Infovision or all or substantially all of the assets thereof, in form and substance acceptable to the Lender.

(h)    Within 120 calendar days after the Filing Date, the Debtors shall have consummated the sale of Infovision or of all or substantially all of the assets thereof with the prior written consent of Lender.

33

(i)     By no later than November 6, 2000, (a) the Debtors shall have retained a real estate broker acceptable to the Lender for the purpose of selling the Debtors' real property located at 896 Anita Avenue, Antioch, Illinois (the "Antioch Property") or (b) the Lender shall have received evidence demonstrating to the Lender's satisfaction in the Lender's sole discretion the financial wherewithal of SEJASMI Corp., an Illinois corporation ("SEJASMI"), to purchase the Antioch Property ("Satisfactory Financial Evidence").  If the Lenders receive Satisfactory Financial Evidence by no later than November 6, 2000, then, by no later than November 30, 2000 (x) the Debtors shall have retained a real estate broker acceptable to the Lender for the purpose of selling the Antioch Property or (y) the sale of the Antioch property to SEJASMI shall have been consummated and all of the proceeds of such sale shall have been delivered to the Lender in accordance with the provisions of this Order.

(j)     Within 175 calendar days after the Filing Date, the Debtors shall have consummated a sale of the Antioch Property with the prior written consent of the Lender.

(k)     The Debtors shall exit the Antioch Property and leave it in broom clean condition at least five calendar days prior to the sale of such property.

(l)     Within 30 calendar days after the Filing Date, the Debtors shall deliver to the Lender a detailed analysis of the Debtors' equipment, produced by an independent third party acceptable to the Lender, which identifies the Debtors' equipment that is located in Illinois that is financed by Lender and that is not essential for operations (the "Nonessential Equipment").

(m)     On or prior to November 13, 2000, the Debtors shall retain a broker that is acceptable to the Lender to sell the Nonessential Equipment.

34

(n)    Within 90 calendar days after the Filing Date, the Debtors shall have obtained a minimum guaranteed bid from a broker or auctioneer or a stalking horse bid from a potential purchaser for all of the Nonessential Equipment.

(o)    Within 120 calendar days after the Filing Date, the Debtors shall have consummated the sale of all of the Nonessential Equipment with the prior written consent of the Lender.

(p)    Within 150 calendar days after the Filing Date, the Debtors shall have sold all of the stock of SigmaTron owned by the Debtors; provided, however, that if the Debtors shall have sold the Nonessential Equipment, SVPC (or substantially all of the assets thereof) and Infovision (or substantially all of the assets thereof) (i) within 120 calendar days after the Filing Date and (ii) for a sale price equal to or greater than $12 million in the aggregate for the Nonessential Equipment and for all of the stock or assets of SVPC and Infovision, then Debtors shall not have to comply with the covenant set forth in this subparagraph 16(p), and the covenant set forth in this subparagraph 16(p) shall be deemed waived.

(q)    The Debtors, their officers and their directors shall not in any way interfere, impede, hinder or delay the actions of Thomas Rieck and Dale Marcus or any subsequent "Liquidating Agent" appointed pursuant to paragraph 11 hereof in connection with the shut down and winding up of the Debtors' operations in Tennessee, the proposed sale of the Antioch Property, the proposed sale of the Nonessential Equipment, the proposed sale of the SigmaTron stock or the proposed sale of Infovision and SVPC or all or substantially all of their assets.

35

(r)     The Debtors shall provide the Lender and the Committee with copies of all written expressions of interest, letters of intent, offers and purchase agreements with respect to the Nonessential Equipment, the SigmaTron stock, the Antioch Property, SVPC, Infovision or all or substantially all of the assets thereof, within five (5) days after receipt of such correspondence by the Debtors.

(s)     On or prior to January 31, 2001, the Debtors shall have (a) filed a confirmable plan of reorganization that provides for indefeasible payment in full in cash of all Indebtedness on the effective date of confirmation of such plan or (b) consummated the sale of all of the Debtors' assets and operations.

(t)     On or prior to March 31, 2001, the effective date of confirmation of the Debtors' plan of reorganization shall have occurred and all Indebtedness shall have been indefeasibly paid in full in cash.

(u)     Each business day, the Debtors shall provide the Lender with a completed and executed Borrowing Base Certificate, substantially in the form attached hereto as Exhibit D.

17.     <u>Application of Collateral Proceeds</u>.  Prior to the Termination Date, all proceeds of Pre-Petition Collateral and DIP Collateral consisting of inventory sold in the ordinary course of the Debtors' business shall be applied (A) first, to the DIP Indebtedness (in such order as determined by Lender in its sole discretion) until paid in full, and (B) second, to the Pre-Petition Indebtedness (in such order as determined by Lender in its sole discretion).  The Debtors shall not have the right to direct the manner of application of any payments to Lender or any other receipts by Lender of proceeds of any of the Pre-Petition Collateral or DIP Collateral

CH_DOCS\258601.16 [W97]

other than in the manner set forth in this ordering paragraph, ordering paragraph 18 and the Pre-

Petition Credit Agreement.

18.    <u>Non-Ordinary Course Dispositions</u>. No sale, lease or other disposition of

Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any

auction or other similar sales) may be done without the Lender's written consent. Prior to the

Termination Date, all proceeds of Pre-Petition Collateral, and to the extent permitted under

ordering paragraph 8 of this Order, proceeds of any DIP Collateral, from any sale, lease or other

disposition of any Pre-Petition Collateral or DIP Collateral outside of the ordinary course of

business, and all other payments received by Lender which are permitted to be applied to the Pre-

Petition Indebtedness pursuant to the DIP Loan Documents and this Order, shall be applied (A)

first, to the Pre-Petition Indebtedness (in such order as determined by Lender in its sole

discretion) until paid in full, and (B) second, to the DIP Indebtedness (in such order as

determined by Lender in its sole discretion). All other proceeds of DIP Collateral and payments

received by Lender under the DIP Loan Documents and/or this Order shall be applied to the DIP

Indebtedness (in such order as determined by Lender in its sole discretion).

19.    <u>Books and Records</u>. The Debtors shall permit Lender and any authorized

representatives designated by Lender (including, without limitation, its auditors, appraisers and

financial advisors) to visit and inspect any of the properties of any Debtor, including the Debtors'

respective financial and accounting records, and to make copies and take extracts therefrom, and

to discuss any Debtor's affairs, finances and business with such Debtor's officers and

independent public accountants, at such reasonable times during normal business hours and as

often as may be reasonably requested. Without limiting the generality of the foregoing, the

CH_DOCS\258601.16 [W97]

Debtors shall promptly provide to Lender and Lender's designated representatives any information or data reasonably requested to monitor the Debtors' compliance with the covenants in the Pre-Petition Credit Agreement and the provisions of the DIP Loan Documents and this Order and to perform appraisals or other valuation analyses of any property of any Debtor.

20.   <u>Authorized Signatories</u>.  The signature of D.S. Patel, or any subsequent "Liquidating Agent" appointed pursuant to the terms of this Order or otherwise appearing on any one or more of the DIP Loan Documents executed after the entry of this Order shall bind the Debtors, and no other approval shall be necessary.  The signature of Thomas Rieck or any subsequent "Liquidating Agent" appointed pursuant to the terms of this Order shall bind the Debtors with respect to all matters relating to the shut down and winding up of the Debtors' operations in Tennessee, the proposed sale of the Nonessential Equipment, the proposed sale of the Antioch Property, the proposed sale of the SigmaTron stock and the proposed sale of SVPC and Infovision or all or substantially all of their assets, and no other approval shall be necessary.

21.   <u>Lender's Reservation of Rights; No Waiver</u>. Lender does not waive, and expressly reserves, any and all claims, defenses, rights and remedies it has pursuant to any or all of the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against any Debtor and any officer, director, employee, agent or other representative of any Debtor.  In addition, the rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the Lender arising under this Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors, in their pre-petition capacity, under the Pre-Petition Loan Documents. Without limiting the generally of the foregoing, the Lender may petition this Court for any such

CH_DOCS\258601.16 [W97]

additional protection it may reasonably require with respect to the Pre-Petition Indebtedness, the

DIP Indebtedness or otherwise, and nothing in this Order constitutes a finding with respect to the

adequacy of the protection of the Lender's interests in the Pre-Petition Collateral.

22.     Order Binding on Successors.  The provisions of this Order shall be

binding upon and inure to the benefit of Lender, the Debtors, and their respective successors and

assigns (including any trustee or other estate representative appointed as a representative of any

Debtor's estate or of any estate in any Successor Case).  Except as otherwise explicitly set forth in

this Order, no third parties are intended to be or shall be deemed to be third party beneficiaries of

this Order or the DIP Loan Documents.

23.     Effect of Dismissal, Conversion or Substantive Consolidation.  If any of

the Chapter 11 Cases are dismissed, converted, otherwise superseded or substantively

consolidated, Lender's rights and remedies under this Order and the DIP Loan Documents shall

be and remain in full force and effect as if such Chapter 11 Case had not been dismissed,

converted, superseded or substantively consolidated.  Furthermore, notwithstanding any such

dismissal, conversion, supercission or substantive consolidation, all of the terms and conditions

of this Order, including, without limitation, the liens and the priorities granted hereunder, shall

remain in full force and effect.

24.     Releases and Validation of Pre-Petition Indebtedness and Liens;

Allowance of Secured Claim.  The release, discharge, waivers and agreements set forth in this

ordering paragraph will be deemed effective upon the entry of this Order, subject only to the

right of the Committee and any other party in interest to object on the terms and conditions set

forth in ordering paragraph 26 below.  Each of the Debtors and their estates, hereby:  (a) releases

CH_DOCS\258601.16 [W97]

and discharges Lender, together with its affiliates, agents, attorneys, officers, directors and

employees from any and all claims and causes of action arising out of, based upon or related to,

in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition

relationship between Lender and any Debtor, or any other acts or omissions by Lender in

connection with any of the Pre-Petition Loan Documents or its pre-petition relationship with any

Debtor; (b) waives any and all defenses (including, without limitation, offsets and counterclaims

of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability

(under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of

the Pre-Petition Indebtedness and the security interests in and liens on the Pre-Petition Collateral

in favor of Lender (which liens and security interests are first priority subject only to the Prior

Claims); and (c) agrees, without further Court order and without the need for the filing of any

proof of claim, to the allowance of the pre-petition claims of the Lender pursuant to §§ 502 and

506 of the Bankruptcy Code on account of the Pre-Petition Indebtedness as fully secured claims

according to the Lender's books and records, the principal amount of which is not less than

approximately $20,676,157 as of the Filing Date, plus accrued pre-petition and post-petition

interest, fees, expenses and other amounts chargeable under the Pre-Petition Loan Documents.

     25.    Lender's Relationship with Debtors.  In making decisions to advance any

Loans or other extensions of credit to any Debtor, in taking any other actions or exercising any

discretion set forth in this Order or the DIP Loan Documents (including, without limitation, the

exercise of its approval rights with respect to any budget), Lender shall have no liability to any

third party and shall not be deemed to be in control of the operations of any Debtor, and Lender's

relationship with any Debtor shall not constitute or be deemed to constitute a joint venture or

40

partnership of any kind between Lender and any Debtor with respect to all parties who have

received actual notice of this Order. This paragraph is without prejudice to lender liability causes

of action as may exist with respect to advances or transactions which occured prior to the Filing

Date.

26.    Objections by Parties in Interest. Except as set forth in finding paragraphs

E and F, in ordering paragraph 24 and in this ordering paragraph, all of the provisions of this

Order shall be final and binding on the Debtors and all creditors and other parties in interest. The

Committee and any other party in interest other than the Debtors shall have until November 6,

2000, within which to file, on behalf of the Debtors, and to serve upon counsel for the Lender,

objections or complaints respecting (a) the claims, causes of actions and defenses released by the

Debtors pursuant to ordering paragraph 24 above or (b) the validity, extent, priority, avoidability,

or enforceability of the Pre-Petition Indebtedness or the Lender's pre-petition liens on and pre-

petition security interests in the Pre-Petition Collateral. In the event that no objections or

complaints are filed with this Court and served upon counsel of record for the Lender within the

time period set forth above or no order of this Court granting such objections or the relief

requested in such complaints is entered on or prior to January 8, 2001, the provisions of ordering

paragraph 24 of this Order shall become final and binding on all such parties.

27.    Subordination Agreements. Pursuant to Bankruptcy Code § 510, the

Subordination Agreements remain in full force and effect. Having been properly notified of the

existence of various Events of Default under the Pre-Petition Credit Agreement, as described in

finding paragraph G of this Order, the subordinated parties to the Subordination Agreements may

41

not ask, demand, sue for, accept or receive, and the Borrowers may not pay to such subordinated

parties, any payment of any Subordinated Debt (as defined in the Subordination Agreements).

28.   Effect of Modification of Order. The Debtors shall not, without Lender's

prior written consent, seek to modify, vacate or amend this Order or any DIP Loan Documents.

If any of the provisions of this Order are hereafter modified, vacated or stayed by subsequent

order of this or any other Court, such stay, modification or vacatur shall not affect the validity of

any Indebtedness outstanding immediately prior to the effective time of such stay, modification

or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit

authorized hereby with respect to any such Indebtedness.  Notwithstanding any such stay,

modification or vacatur, any Indebtedness outstanding immediately prior to the effective time of

such modification, stay or vacatur shall be governed in all respects by the original provisions of

this Order, and Lender shall be entitled to all the rights, privileges and benefits, including,

without limitation, the security interests and priorities granted herein, with respect to all such

Indebtedness.

29.   Safe Harbor.  The Court has considered and determined the matters

addressed herein pursuant to its powers under the Bankruptcy Code, including the power to

authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and

Lender have agreed.  Thus, each of such terms and conditions constitutes a part of the

authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections

contained in § 364(e) of the Bankruptcy Code.

30.   Objections Overruled or Withdrawn.  All objections to the entry of this

Order have been withdrawn or overruled.

42

31.     <u>Controlling Effect of Order</u>.  To the extent any provisions in this Order conflict with any provisions of the Motion, any Pre-Petition Loan Documents or any DIP Loan Documents, the provisions of this Order shall control.

32.     <u>Order Effective</u>.  This Order shall be effective as of the date of signature by the Court.

CH_DOCS\258601.16 [W97]

IT IS SO ORDERED.

**2 7 OCT 2000**

DATED this ____ day of _____, 2000.

_Carl A. Dagle_ /KKW

UNITED STATES BANKRUPTCY JUDGE

Presented by:

By: _Nancy A Peterman_

Keith J. Shapiro
Matthew T. Gensburg
Nancy A. Peterman
Greenberg Traurig, LLP
227 West Monroe Street
Suite 3500
Chicago, Illinois 60606
Attorneys for Debtors
(312) 456-8400

Approved as to Form;
Approved for Entry:

By: _____

David S. Heller
Josef S. Athanas
Stephen R. Tetro
Latham & Watkins
Sears Tower, Suite 5800
233 S. Wacker Drive
Chicago, Illinois 60606
(312) 876-7700

Attorneys for LaSalle Bank National Association,
as Lender

44

CH_DOCS\258601.16 [W97]



*ORIGINAL*

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | } | Chapter 11 |
| | } | |
| OUTBOARD MARINE | } | |
| CORPORATION, et al. | } | Case No. 00-37405 |
| | } | |
| | } | |
| Debtors. | } | Jointly Administered |
| | } | |

## FINAL ORDER APPROVING POSTPETITION FINANCING AND GRANTING LIENS AND SUPER ADMINISTRATIVE PRIORITY PURSUANT TO 11 U.S.C. §§ 364(c) AND (d) AND MODIFYING THE AUTOMATIC STAY

OUTBOARD MARINE CORPORATION, a Delaware corporation ("OMC"),

OMC ALUMINUM BOAT GROUP, INC., a Delaware corporation ("OMC Aluminum"), OMC

FISHING BOAT GROUP, INC., a Delaware corporation ("OMC Fishing"), OMC LATIN

AMERICA/CARIBBEAN, INC., a Delaware corporation ("OMC Latin America"), OMC

RECREATIONAL BOAT GROUP, INC., a Delaware corporation ("OMC Boat Group"),

OUTBOARD MARINE TRANSPORTATION CORPORATION, a Delaware corporation

("OMC Transportation"), OMCEMA, Inc., a Delaware corporation ("OMCEMA"), OMC

NEVADA, INC., a Nevada corporation ("OMC Nevada"),  and RECREATIONAL BOAT

GROUP LIMITED PARTNERSHIP, a Delaware limited partnership ("Recreational Boat

336

Group", and with OMC, OMC Aluminum, OMC Fishing, OMC Latin America, OMC Boat

Group, OMC Transportation, OMCEMA, and OMC Nevada, the "Borrowers") each as a debtor

and debtor-in-possession in these cases (each a "Debtor," and collectively the "Debtors"), having

filed with this Court voluntary petitions (each a "Petition," and collectively the "Petitions") for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the

"Code"), on December 22, 2000 (the "Petition Date"); and having filed a Motion on December

22, 2000 pursuant to 11 U.S.C. §§ 364(c) and (d) (the "Motion") for entry of an order, inter alia:

(1)     Authorizing the Borrowers to borrow, on a secured revolving credit basis

from Bank of America, N.A. ("B of A"), and certain other lenders (collectively with B of A, the

"DIP Lenders"), an amount not to exceed $35,000,000 (the "DIP Facility"), pursuant to the terms

of the Interim Order (defined below) and that certain Term Sheet dated as of December 22, 2000

(the "DIP Term Sheet," a true and correct copy of which is attached as Exhibit 1 to the Interim

Order (defined below), by and among the Borrowers, B of A, as agent (in such capacity, the "DIP

Agent") and as a lender, and the DIP Lenders, and any related documents, required to be

delivered by or in connection with the DIP Term Sheet (collectively with the DIP Term Sheet as

amended, the "DIP Loan Documents");

(2)     Authorizing and directing the Debtors to execute and deliver, from time to

time, all such other documents, instruments and agreements and perform all such other acts as

may be required in connection with the DIP Term Sheet;

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-2-

(3)     Authorizing, under Section 364(c)(1), (c)(2), (c)(3) and (d) of the Code,

the Borrowers to obtain postpetition financing under the DIP Facility (all such financing, loans,

extensions of credit, and other indebtedness, including interest and fees in connection therewith,

shall hereinafter be referred to as the "Postpetition Advances"), which financing and indebtedness,

due and owing by the Borrowers to the DIP Lenders, shall (a) pursuant to 11 U.S.C. § 364(c)(1),

have priority over any and all administrative expenses of the kind specified in or created or

awarded pursuant to, inter alia, 11 U.S.C. §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a),

507(b) and 726, subject only to the Carve-Out (as defined below), (b) pursuant to 11 U.S.C. §

364(c)(2) be secured by a first priority fully perfected lien on property of the Debtors not

otherwise subject to a lien  subject only to the Carve-Out (as defined below), (c) pursuant to 11

U.S.C. § 364 (c)(3) be secured by a fully perfected lien in all property of the Debtors other than

the Prepetition Collateral (defined below) (the "Prepetition DIP Junior Collateral") that is subject

to valid and non-avoidable liens as of the Petition Date which security interest shall be junior in

priority to such valid and non-avoidable liens, and (d) pursuant to 11 U.S.C. § 364(d)(1), be

secured by a first priority priming lien on and security interest in all Prepetition Collateral (defined

below), in each case, subject only to the Existing Liens (as defined in paragraph 7 below) other

than Existing Liens in favor of the Prepetition Lenders (as defined below).

(4)     Lifting the automatic stay imposed by section 362 of the Code to the extent

reasonably necessary to permit the DIP Agent, the DIP Lenders and the Debtors to implement the

terms of the Interim Order;

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

(5)   Authorizing the Borrowers, after an interim hearing on the Motion, to

obtain from the DIP Lenders interim financing up to $10,000,000 and to otherwise enable the

Debtors to pay the expenses set forth in the Budget (as defined below) all under the same terms

and conditions as set forth in the DIP Term Sheet pending a final hearing on the Motion (the

"Final Hearing") in accordance with Fed. R. Bankr. P. 4001(b) and (c); and

(6)   Granting the Debtors such other and further relief as the Court deems

necessary, appropriate, equitable, proper, and consistent with the terms of the Interim Order;

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

A.   Pursuant to Sections 1107 and 1108 of the Code, the Debtors have

retained possession of their property and are authorized thereby, as debtors-in-possession, to

continue the operation and management of their businesses.  The Debtors and their non-debtor

affiliates collectively are one of the world's largest designers, manufacturers, and sellers of

outboard marine engines, boats, and marine parts.  The Debtors' products include Johnson and

Evinrude brand outboard engines and Chris*Craft, Four Winns, Seaswirl, Stratos, Javelin, Hydra-

Sports, Lowe, and Princecraft recreational and fishing boats.

B.   The Debtors and the DIP Lenders stipulate that, prior to the Petition Date:

(1)   Certain of the Borrowers, B of A, as agent (in such capacity, the

"Prepetition Agent") and as a lender, and certain other lenders (collectively with B of A, the

"Prepetition Lenders") are parties to that certain Amended and Restated Loan and Security

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-4-

Agreement dated as of January 6, 1998 (such agreement, as amended and modified by that certain

First Amendment to Amended and Restated Loan and Security Agreement dated as of May 21,

1998, that certain Second Amendment to Amended and Restated Loan and Security Agreement

dated as of August 31, 1998, that certain Third Amendment to Amended and Restated Loan and

Security Agreement dated as of December 21, 1998, that certain Fourth Amendment to Amended

and Restated Loan and Security Agreement dated as of February 1, 1999, that certain Fifth

Amendment to Amended and Restated Loan and Security Agreement dated as of February 25,

1999, that certain Sixth Amendment to Amended and Restated Loan and Security Agreement

dated as of July 30, 1999, that certain Seventh Amendment to Amended and Restated Loan and

Security Agreement dated as of October 27, 1999, that certain Eighth Amendment to Amended

and Restated Loan and Security Agreement dated as of January 31, 2000, that certain Ninth

Amendment to Amended and Restated Loan and Security Agreement dated as of August 9, 2000,

and that certain Tenth Amendment to Amended and Restated Loan and Security Agreement dated

as of October 10, 2000, collectively, the "Prepetition Credit Agreement"), pursuant to which the

Prepetition Lenders have made loans to the Borrowers.  As of the Petition Date, the Borrowers

were indebted to the Prepetition Lenders for obligations totaling not less than $125,000,000 in

principal (including approximately $45,000,000 in outstanding letters of credit), plus accrued

interest, fees and costs, including professional fees and costs.  All obligations arising under or

evidenced by the Prepetition Credit Agreement and the instruments and documents executed in

connection with such agreement shall hereinafter be referred to as the "Prepetition Obligations".

(2)     As security for the Prepetition Obligations, the Debtors granted to the Prepetition Agent, for the ratable benefit of the Prepetition Lenders, security interests in and liens upon certain of the Borrowers' then-owned and thereafter acquired property and interests in property as more specifically set forth in the Prepetition Credit Agreement and those Security Agreements, Patent Security Agreements, Trademark Security Agreements, Copyright Security Agreements and other documents executed in connection with the Prepetition Credit Agreement. The Prepetition Lenders assert that they duly perfected the liens and security interests granted to them by the Debtors through the filing and recordation of financing statements and other appropriate documents and instruments in the relevant jurisdictions.  The Prepetition Credit Agreement and the documents executed in connection therewith shall hereinafter be referred to as· the "Prepetition Loan Documents."  The property subject to the liens and security interests described in this paragraph B3 shall hereinafter be referred to as the "Prepetition Collateral."

C.     On December 22, 2000 the Debtors filed a motion seeking interim approval of postpetition financing and granting liens and super administrative expense priority pursuant to 11 U.S.C. §§ 364(c) and (d), modifying the automatic stay and scheduling a final hearing (the "Interim Motion").

D.     After a hearing on December 26, 2000, this Court entered the Interim Order Approving Postpetition Financing And Granting Liens And Super Administrative Priority Pursuant to 11 U.S.C. §§ 364(c) And (d), Modifying The Automatic Stay And Scheduling A Final Hearing (the "Interim Order").

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-6-

E.    On December 28, 2000, the United States Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors Committee").

F.    This Court has jurisdiction over this case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)(2)(D) and 1334. The subject of this Final Order is a "core" proceeding within the meaning of 28 U.S.C. § 157.

G.    The Debtors provided notice of the Interim Order to:  (i) the DIP Agent and the Prepetition Agent, (ii) the DIP Lenders and the Prepetition Lenders, (iii) each Debtor's twenty (20) largest unsecured creditors, (iv) the United States Trustee for the Northern District of Illinois, Eastern Division, (v) the Creditors Committee, and (vi) all parties entitled to notice pursuant to Fed. R. Bankr. P. 4001.

H.    On January 16, 2001, the Creditors Committee filed a Limited Objection Of The Official Committee Of Unsecured Creditors To The Proposed Final Adequate Protection And Financing Orders (the "Objection").

I.    In order to resolve the Objection, the Debtors, the Creditors Committee, and the DIP Lenders have amended the terms of the DIP Term Sheet as set forth in Exhibit 1 attached hereto (the "Amended and Restated DIP Term Sheet") and have agreed to the terms of this Final Order as set forth herein.

J.    A need exists for the Debtors to obtain financing in order to facilitate,

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-7-

among other things, the orderly wind down of their operations and sale of their assets. The

Debtors have no significant source of cash and require cash for the payment of, inter alia, wages,

salaries and certain expenses (including rent and utility deposits), and to meet other expenses

(including the compensation and reimbursement of expenses of such professionals as the Debtors

may, with prior approval of the Court, retain) necessary to preserve their assets and maximize

value during the liquidation process.

       K.     The Debtors are presently unable to obtain, in the ordinary course of

business or otherwise, unsecured credit allowable under Sections 364(a) or 364(b) of the Code, or

secured credit pursuant to Sections 364(c) or 364(d) of the Code, except from the DIP Lenders

on the terms and conditions contained in this Final Order. The DIP Agent and the DIP Lenders

have indicated a willingness to provide the Debtors with certain Postpetition Advances as

contemplated herein, but solely on the terms and conditions set forth in this Final Order and the

Amended and Restated DIP Term Sheet. After considering all of the alternatives, the Debtors

have concluded, in the exercise of their best and reasonable business judgment, that the financing

to be provided by the DIP Lenders under the terms of this Final Order and the Amended and

Restated DIP Term Sheet represents the best financing available to the Debtors.

       L.     Without prejudice to the rights, if any, of any other party in interest to

object to, challenge or dispute the validity and extent of the Prepetition Indebtedness (as defined

below), each of the Debtors admits that it is truly and justly indebted to the Prepetition Lenders

without defense, counterclaim, or offset of any kind, and that as of the Petition Date it was

indebted and liable to the Prepetition Lenders in the aggregate principal amount of not less than

$125,000,000 in respect of loans made by the Prepetition Lenders to the Borrowers and financial

accommodations made by the Prepetition Lenders to the Borrowers pursuant to the Prepetition

Credit Agreement, including letters of credit issued and outstanding under the letter of credit sub-

facility in the Prepetition Credit Agreement in the amount of approximately $45,000,000 plus

approximately $570,000 of accrued and unpaid interest thereon, plus fees, costs and expenses

now owing or hereafter accruing pursuant to the Amended and Restated DIP Term Sheet (the

foregoing amounts of principal, interest, fees, costs, and expenses now owing or hereafter

accruing pursuant to the Prepetition Credit Agreement entered into by the Debtors in connection

therewith are collectively referred to hereinafter as the "Prepetition Indebtedness").

     M.    The security interests and liens granted in this Final Order to the DIP

Agent, for the ratable benefit of the DIP Lenders, including the security interests and liens granted

in paragraph 7 below and in the Amended and Restated DIP Term Sheet, do not impair the valid,

perfected, prepetition security interests and liens, if any, of any holder (other than the Prepetition

Lenders) of such a security interest or lien in the property of the estates created by the filing of the

Petitions.

     N.    Without prejudice to the rights, if any, of any other party in interest to

object to, challenge or dispute the validity, priority, and perfection of the Prepetition Agent's liens

on the Prepetition Collateral, the Debtors agree and acknowledge that the Prepetition

Indebtedness is secured by first-priority, non-avoidable, perfected, valid and enforceable liens on

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

and security interests in all of the Debtors' right, title and interest in and to the Prepetition

Collateral, including, without limitation, the following categories of Prepetition Collateral:

accounts, contract rights, chattel paper, instruments, general intangibles (including without

limitation, trademarks and tradenames, patents and copyrights, and specifically including without

limitation those listed in Schedule 7.1(z) of the Prepetition Credit Agreement), licenses, inventory

(including without limitation, finished goods, work-in-process and raw materials), investment

property (including without limitation, securities, security entitlements and securities accounts,

but excluding capital stock in any subsidiary of OMC or any of its subsidiaries owned by OMC or

any of the other "Loan Parties" under the Prepetition Credit Agreement), books and records, and

deposit accounts and all cash deposited with any clearing bank, the Prepetition Agent or any

Prepetition Lender or any affiliate or subsidiary thereof, respectively, and all proceeds and

products of any of the foregoing as more particularly described in the Prepetition Agreements.

O.     Entry of this Final Order is in the best interest of the Debtors and their

creditors and estates. The terms of the postpetition financing authorized hereby are fair and

reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment

consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.

P.     As set forth in the Motion and based upon the record of this proceeding,

the DIP Agent, the DIP Lenders, the Debtors and the Creditors Committee have negotiated the

terms and conditions of this Final Order and the documents in good faith and at arm's-length, and

any credit extended by the DIP Lenders on or after the Petition Date pursuant to the terms of the

Amended and Restated DIP Term Sheet and this Final Order, shall be and hereby is, deemed to

have been extended in "good faith" for purposes of Section 364(e) of the Code.

**BASED ON THE FOREGOING, IT IS HEREBY ADJUDGED, ORDERED AND
DECREED:**

        1.      The Debtors' Motion shall be, and hereby is, approved, subject to the terms

and conditions set forth in this Final Order.

        2.      Subject to the terms and conditions contained in this Final Order, the

Debtors are hereby expressly authorized and directed to execute and deliver to the DIP Lenders,

as applicable, the Amended and Restated DIP Term Sheet, and such additional documents,

instruments, and agreements as may be reasonably required by the DIP Agent to implement the

terms or effectuate the purposes of this Final Order or the Amended and Restated DIP Term

Sheet including, without limitation, the DIP Loan Agreement as contemplated in the Amended

and Restated DIP Term Sheet in form and substance satisfactory to the DIP Agent, the DIP

Lenders and their counsel.  The terms and conditions of the Amended and Restated DIP Term

Sheet are hereby approved and ratified, and each of the Debtors is authorized and directed to

comply with and perform all of the terms and conditions contained therein.  The failure to

reference or discuss any particular provision of the Amended and Restated DIP Term Sheet in this

Final Order shall not affect the validity or enforceability of any such provision.

        3.      Without limiting the foregoing, the Borrowers are authorized to borrow

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

Postpetition Advances up to the aggregate principal amount, including borrowing capacity

reserved to fund the Employee Retention Amount and Accrued Professional Fees (each as defined

in the Amended and Restated DIP Term Sheet), of $19,500,000 outstanding (or reserved for) at

any one time pursuant to the terms of the Amended and Restated DIP Term Sheet.

4.    In addition, the Debtors are hereby authorized to pay all fees, expenses and

other amounts which may be required or necessary for their performance under the terms of the

Amended and Restated DIP Term Sheet or this Final Order, including, without limitation, the

closing fee (as referenced in the Amended and Restated DIP Term Sheet), the commitment fee (as

referenced in the Amended and Restated DIP Term Sheet), and all reasonable attorneys' fees and

related costs and expenses incurred by the DIP Agent and the DIP Lenders, including those

relating to the negotiation, documentation and administration of the Amended and Restated DIP

Term Sheet and the enforcement of the DIP Agents' and the DIP Lenders' rights under and in

respect of the Amended and Restated DIP Term Sheet.

5.    All loans made to the Borrowers on or after the Petition Date under the

Amended and Restated DIP Term Sheet (collectively, the "Postpetition Advances") and interest

thereon, and all fees, costs, expenses, indebtedness, obligations and other liabilities arising or

incurred on or after the Petition Date and owing by the Debtors to the DIP Lenders under the

Amended and Restated DIP Term Sheet and the Interim Order and this Final Order shall

hereinafter be referred to as the "Postpetition Indebtedness." Postpetition Advances: (i) shall be

evidenced by the books and records of the DIP Agent or the DIP Lenders; (ii) shall bear interest

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-12-

(which shall be payable monthly) at the rate prescribed in the Amended and Restated DIP Term

Sheet; (iii) shall be secured in the manner specified in paragraph 7 below; (iv) shall be payable in

accordance with the terms of the Amended and Restated DIP Term Sheet; and (v) shall comply

with and otherwise be governed by the terms as set forth in the Amended and Restated DIP Term

Sheet.

6.      Subject to the terms and conditions contained in this Final Order, the

Borrowers may use Postpetition Advances to (i) fund expenses incident to the Borrowers' efforts

to preserve and sell assets in accordance with the weekly cumulative amounts set forth in the

Budget (as defined herein) for the then current week, and (ii) to pay all fees as provided under the

DIP Loan Documents, provided that: (1) the aggregate amount of Postpetition Advances

(including Reserve Amounts) which may be used by the Debtors may not exceed $19,500,000;

and (2) the Borrowers may use Postpetition Advances only to the extent and in the amounts

provided for in the Budget (as defined below), unless the Required DIP Lenders (as defined in the

Amended and Restated DIP Term Sheet) consent to a greater or different use of the funds than

that prescribed by the Budget.  Pursuant to the DIP Loan Documents, the Debtors are authorized

and directed to provide the DIP Agent, DIP Lenders and the Creditors Committee with: (i) not

later than the third business day of each week,  (a) a copy of a budget (such budget, with

modifications approved from time to time by the Required DIP Lenders (as defined in the

Amended and Restated DIP Term Sheet), the "Budget", and an initial Budget attached to the

Interim Order as Exhibit "2"), in form and substance satisfactory to the DIP Agent and the

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-13-

Required DIP Lenders, reflecting on a line-item basis anticipated weekly cash receipts and expenditures for the period ending May 31, 2001, and (b) a copy of a variance report (the "Variance Report") reflecting on a line-item basis the actual cash receipts and disbursements for the preceding week and the percentage variance of such actual results from those reflected in the Budget for the preceding week, and a written explanation of such variance; and (ii) such other financial and related reports as required by the Amended and Restated DIP Term Sheet. In the absence of any Event of Default (as defined in the Amended and Restated DIP Term Sheet), the Borrowers shall have continuing authority to borrow Postpetition Advances, but only: (i) on the conditions set forth in this Final Order and the Amended and Restated DIP Term Sheet; and (ii) to the extent and in the amounts provided for in the Budget.

       7.    As security for the full and timely payment of the Postpetition Indebtedness and the timely performance of each of the other obligations owing by the Debtors on or after the Petition Date, the DIP Agent, for the ratable benefit of the DIP Lenders, is hereby granted a valid, perfected, and enforceable security interest in and lien upon all real and personal property of the Debtors and their estates, whether now owned or hereafter acquired or arising, whether tangible or intangible, and wherever located (all such property being referred to collectively as the "DIP Collateral"). The liens and security interests herein granted to the DIP Agent, for the ratable benefit of the DIP Lenders, in that portion of the DIP Collateral (including, without limitation, any such DIP Collateral acquired or generated by the Debtors or their estates after the Petition Date) which is not subject to any other properly perfected, valid, non-avoidable and enforceable liens or

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-14-

security interests as of the Petition Date (the "Postpetition DIP Collateral") shall have first and

paramount priority pursuant to Section 364(c)(2) of the Code, subject only to the Carve-Out (as

defined below).  The liens and security interests herein granted to the DIP Agent, for the ratable

benefit of the DIP Lenders, on all other property owned by the Debtors shall (i) pursuant to

Section 364(d)(1) of the Code, prime the liens and security interests held by the Prepetition Agent

(for the ratable benefit of the Prepetition Lenders) in the Prepetition Collateral, and (ii) pursuant

to Section 364(c)(3) of the Code, be junior in priority only to Existing Liens held by persons other

than the Prepetition Agent.  Existing Liens, as used herein, shall mean liens in property of the

Debtors on the Petition Date that were properly perfected, valid, enforceable and non-avoidable

as of the Petition Date, including the liens granted to the Prepetition Agent for the ratable benefit

of the Prepetition Lenders pursuant to the Prepetition Credit Agreement.

        8.    The security interests and liens herein granted:  (i) shall be subject only to

(x) the Existing Liens (other than those held by the Prepetition Agent) to the extent provided in

clause 7(ii) above, and (y) with respect to the liens granted herein on the Postpetition DIP

Collateral, the "Carve-Out", and shall be prior and senior to all security interests, liens and other

encumbrances in and to the DIP Collateral granted or arising after the Petition Date; (ii) shall not

extend to any avoidance actions by any of the Debtors or their estates, including, without

limitation, those arising under sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy

Code and any retainer paid to Skadden, Arps, Slate, Meagher & Flom as counsel to the Debtors

as agreed by the parties; and (iii) are and shall be valid, perfected, enforceable, non-avoidable and

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

effective by operation of law as of the Petition Date without any further action by the Debtors, the

DIP Agent, or the DIP Lenders and without the execution, filing, or recordation of any financing

statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent

and Trademark Office or other documents.  If the DIP Agent hereafter requests the Debtors to

execute and deliver to the DIP Agent financing statements, security agreements, collateral

assignments, mortgages, or other instruments or documents considered by the DIP Agent to be

reasonably necessary or desirable to further evidence the perfection of the liens and security

interests granted in this Final Order, the Debtors are hereby authorized and directed to execute

and deliver those financing statements, security agreements, mortgages, collateral assignments, in-

struments, and documents, and the DIP Agent is hereby authorized to file or record, in its sole

discretion, such documents; provided that all such documents shall be deemed to have been filed

or recorded at the time and on the date of entry of this Final Order.

       9.     In addition to the liens and security interests granted to the DIP Agent, for

the ratable benefit of the DIP Lenders, pursuant to this Final Order and subject to the last 4

sentences of this paragraph 9, all of the Postpetition Indebtedness (including, without limitation,

all Postpetition Advances) is hereby granted superpriority administrative expense status, in

accordance with Section 364(c)(1) of the Code, over any and all administrative expenses of the

Debtors, whether heretofore or hereafter incurred, of the kind specified in 11 U.S.C. §§ 105, 326,

328, 330, 331, 503(b), 507(a), or 507(b) subject and subordinate only to a carve-out (the "Carve-

Out") for (i) following the termination of the DIP Facility as a consequence of a Default or an

Event of Default upon delivery of a "Termination Notice" (as each such term is defined in the

Amended and Restated DIP Term Sheet), the payment of (A) professional fees and disbursements

incurred by professionals (other than ordinary course professionals) retained, pursuant to Sections

327 or 1103(a) of the Code, by the Debtors and the Creditors Committee (provided that such fees

and disbursements are allowed by the Court) in an aggregate amount not to exceed $750,000

(plus Budgeted professional fees and disbursements incurred prior to such termination to the

extent such fees and expenses are subsequently allowed)  and (B) the expenses (including counsel

fees) of any member of any such committee allowed under Section 503(b)(3)(F) of the Code, and

(ii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to

the Clerk of the Court; provided, however, that neither the Carve-Out nor the Budget shall

include professional fees, disbursements, costs or expenses incurred in connection with asserting

any claims or causes of action against either the Prepetition Lenders, the Prepetition Agent, the

DIP Lenders or the DIP Agent and/or challenging or raising any defense to the Prepetition

Indebtedness or the Postpetition Indebtedness or any lien of the Prepetition Agent, the Prepetition

Lenders, the DIP Agent or the DIP Lenders.  Except as otherwise provided herein, no other

claims, costs or expenses, including, without limitation, any administrative claim granted to any

reclamation claimant, that have been or may be incurred in these proceedings, or in any

conversion of these proceedings pursuant to Section 1112 of the Code, or in any other proceeding

related thereto: (i) shall be granted a priority senior to or pari passu with (x) the claims of the DIP

Lenders against the Debtors or any successor Debtors or trustees, or (y) the security interests and

liens of the DIP Agent, for the ratable benefit of the DIP Lenders, upon the DIP Collateral; or (ii)

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-17-

shall be imposed against the DIP Agent, the DIP Lenders, their claims, or the DIP Collateral,

while any portion of the Postpetition Indebtedness remains outstanding unless first consented to in

writing by the Required DIP Lenders. The Creditors Committee, for itself and any Chapter 7

trustee appointed in this case, expressly reserves the right to challenge the priority, as a matter of

law, of the Section 364(c)(1) priority granted to the DIP Lenders relative to the administrative

priority claims of a Chapter 7 liquidation, and the entry of this Final Order is without prejudice to

such reservation of (and the DIP Lenders' right to challenge) such rights. Moreover, nothing

contained in this paragraph 9 shall (1) impair the rights (if any) of parties-in-interest (with

standing under applicable law) to assert that the priority claims granted to the DIP Lenders

hereunder should be satisfied, in whole or in part, by the imposition against the Prepetition

Lenders of a charge under Section 506(c) or Section 552(b) of the Code against proceeds that are

realized from the disposition of the Prepetition Collateral, or (2) limit in any way the right of the

Prepetition Lenders to contest such assertions. Additionally, nothing contained in this paragraph

9 shall impair the rights (if any) of parties-in-interest (with standing under applicable law) to assert

that charges allowable under Section 506(c) of the Code should be imposed against proceeds of

Postpetition DIP Collateral in respect of the benefits conferred by such parties (other than the

Debtors) upon the DIP Lenders and with respect to the Postpetition DIP Collateral, nor shall

anything contained herein limit the right of the DIP Lenders to contest such assertions. Finally, as

it pertains to proceeds of avoidance actions, including, without limitation, those arising under

sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, the priority accorded the

DIP Lenders hereunder shall be equivalent in priority to a claim allowed under section

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

503(b)(1)(A) of the Bankruptcy Code, or such higher priority as may be awarded to any other entity in respect of such proceeds.

10.    The Debtors agree that no portion of the Postpetition Advances, the DIP Collateral, and/or the Carve-Out may be used to commence or prosecute any action or objection with respect to the claims, liens or security interests of the Prepetition Lenders, the Prepetition Agent, the DIP Lenders or the DIP Agents or raise any defense to the Prepetition or Postpetition Indebtedness.

11.    The DIP Agent is authorized to collect upon, convert to cash, and enforce checks, drafts, instruments, and other forms of payment now or hereafter coming into its possession as collateral or proceeds of collection of the DIP Collateral and to apply all proceeds of collections of collateral now or hereafter coming into the DIP Agent's possession in accordance with the Amended and Restated DIP Term Sheet.  The automatic stay is hereby vacated as against the DIP Agent and the DIP Lenders to permit the DIP Agent and the DIP Lenders to effectuate the provisions of this paragraph 11.

12.    The signature of the Chief Executive Officer or any other persons designated by the Board of Directors or similar governing authority of the respective Debtor, whether by letter to the DIP Agent or appearing on any one or more of the agreements, certificates, instruments, or documents contemplated by or referenced in this Final Order, shall bind the Debtors with respect to documents executed and other actions taken pursuant to this

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

Final Order.

13.      The provisions of this Final Order shall be immediately and fully effective
upon entry by the Court and any actions taken pursuant hereto shall survive entry of, and shall
govern with respect to any conflict with any order (i) which may be entered confirming any plan
of reorganization or (ii) which may be entered converting the Debtors' chapter 11 cases from
chapter 11 to chapter 7. The priority of the liens and security interests granted to the DIP Agent,
for the ratable benefit of the DIP Lenders, in paragraph 7 hereof and the Amended and Restated
DIP Term Sheet, the priority of the superpriority administrative expense granted to the DIP
Lenders in paragraph 9 hereof, and all rights of the DIP Agent and the DIP Lenders and all
obligations of the Debtors created hereunder or arising pursuant hereto or the Amended and
Restated DIP Term Sheet on or after the Petition Date, shall continue in the Debtors' chapter 11
case and in any superseding chapter 7 case under the Bankruptcy Code, and such claims, liens and
security interests shall maintain their priority as provided by this Final Order until satisfied and
discharged in accordance with the terms of the Amended and Restated DIP Term Sheet.

14.   Consistent with Section 364(e) of the Code, if any or all of the provisions of this Final Order are hereafter modified, vacated or stayed: (a) such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability, security interest or lien granted or incurred by the Debtors to the DIP Agent or the DIP Lenders on or after the Petition Date and prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any security interest, lien, priority or right authorized or created hereby pursuant to the Amended and Restated DIP Term Sheet; and (b) any indebtedness, obligation or liability incurred by the Debtors to the DIP Agent or the DIP Lenders on or after the Petition Date and prior to the effective date of such stay, modification or vacation shall be governed in all respects by the provisions of this Final Order, and the DIP Agent and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits, including the priority, security interests and liens granted herein and pursuant to the Amended and Restated DIP Term Sheet, with respect to any such indebtedness, obligation or liability.

15.   Except as otherwise provided for in this Final Order or the Amended and Restated DIP Term Sheet, or to the extent that the Required DIP Lenders may otherwise agree in writing, the Debtors shall not seek, and it shall constitute an Event of Default (as defined below) should there be entered any order: (i) dismissing the chapter 11 case of any of the Debtors under 11 U.S.C. §§ 305 or 1112 or otherwise; (ii) converting the chapter 11 case of any of the Debtors under 11 U.S.C. § 1112 or otherwise; or (iii) confirming a plan of reorganization in the chapter 11 case of any of the Debtors unless such order provides for (x) the payment in full in cash of all

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-21-

Postpetition Indebtedness payable or owing to the DIP Lenders under the Amended and Restated

DIP Term Sheet on or before the effective date of, or substantial consummation of, the plan of

reorganization that is the subject of such order, or (y) such other treatment as may be agreed to in

writing by the Debtors and the Required DIP Lenders (as defined in the Amended and Restated

DIP Term Sheet).

          16.    The automatic stay provisions of 11 U.S.C. § 362 are hereby vacated and

modified to the extent necessary to permit the DIP Agent, and the DIP Lenders to exercise all

rights and remedies provided for in this Final Order, the Amended and Restated DIP Term Sheet,

and applicable law, and to otherwise effectuate the provisions of this Final Order, without the

need for filing further pleadings or application to or order of this Court.  Upon the occurrence and

during the continuance of any Event of Default as defined in the Amended and Restated DIP

Term Sheet and upon the DIP Agent's providing of three (3) business days' written notice (by

facsimile, telecopy or otherwise) to each of the Debtors, to counsel for the Debtors, to the United

States Trustee, and to counsel for the Creditors Committee, the DIP Agent and the DIP Lenders

shall be, and hereby are, authorized to exercise any or all of their rights and remedies and to take

any or all of the following actions without further modification of the automatic stay pursuant to

Section 362 of the Code or further order of or application of this Court:  (a) terminate the Total

DIP Commitments (as defined in the Amended and Restated DIP Term Sheet) and thereafter

cease to make any DIP Loans or Postpetition Advances to the Debtors, (b) declare all principal

of, and accrued interest on, the obligations in respect of the Amended and Restated DIP Term

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

Sheet to be immediately due and payable, (c) set-off immediately, in the DIP Lenders' sole

discretion, any and all amounts in accounts maintained by the Debtors with the DIP Agent or any

of the DIP Lenders, or otherwise enforce rights against any DIP Collateral in the possession of

the DIP Agent or any of the DIP Lenders, and (d) take any other actions or exercise any other

rights or remedies permitted it under this Final Order, the DIP Loan Documents or applicable law.

       17.    In further consideration for the DIP Lenders' agreement to provide the DIP

Loans, the Debtors, on behalf of themselves and their respective estates, agree that (i) the rate of

interest applicable to the Prepetition Obligations from and after the Petition Date shall be the

interest rate prescribed in the Amended and Restated DIP Term Sheet; and (ii) so long as the DIP

Lenders have not terminated or materially restricted the Debtors' right to borrow funds in

accordance with the Amended and Restated DIP Term Sheet, neither the Debtors nor any party

acting on their behalf (including the Creditors Committee) may seek to (a) borrow money from

any person other than the DIP Lenders to the extent that the repayment of such borrowings is to

be secured pursuant to Section 364(d)(1) of the Code by a lien or security interest that is senior or

equal to the liens and security interests held by the Prepetition Agent (for the ratable benefit of the

Prepetition Lenders), or (b) to use cash collateral without the consent of both the Required DIP

Lenders (as defined in the Amended and Restated DIP Term Sheet) and Prepetition Lenders

holdings at least 51% (in dollar amount) of the Prepetition Obligations.

       18.    Each of the Debtors has stipulated and is hereby deemed: (a) to release and

discharge the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders, in their

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-23-

respective capacities as such, together with their respective agents, attorneys, employees, heirs, executors, administrators, officers, directors, successors and assigns, from any and all claims, causes of action and remedies (whether under the Bankruptcy Code or other applicable law) arising out of, based upon or related to the Prepetition Obligations or the Prepetition Collateral securing such obligations; and (b) to waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, amount and nonavoidability (under the Bankruptcy Code or otherwise) of the Prepetition Obligations and the security interests in and liens upon the Prepetition Collateral securing such obligations. The releases and waivers set forth in this paragraph are deemed effective upon the date of entry of this Final Order, but are expressly without prejudice to the rights of the Creditors Committee to challenge the validity of the liens and claims asserted by the Prepetition Lenders, or otherwise seek to prosecute claims held by the Debtors' estates against the Prepetition Lenders. The releases and waivers set forth in this paragraph shall not be deemed to apply to Quantum Industrial Partners, LDC or any assignee or affiliate thereof, nor shall such releases and waivers be construed as a release or waiver of any rights under section 506(c) or 552(b) of the Bankruptcy Code.

19.   The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders and each of the Debtors and their respective successors and assigns (including, without limitation, any chapter 11 trustee, chapter 7 trustee or other fiduciary hereafter appointed for or on behalf of the Debtors or with respect to any of the

Debtors' property in the Debtors' chapter 11 cases or otherwise).

20.    The rights and remedies of the DIP Agent and the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that they may have under the Amended and Restated DIP Term Sheet or otherwise.  The Debtors, the DIP Agent and the DIP Lenders are hereby authorized (i) to implement, in accordance with the terms of the Amended and Restated DIP Term Sheet, any non-material modifications (including, without limitation, any change in the number or composition of the DIP Lenders) to the Amended and Restated DIP Term Sheet without further order of this Court, and (ii) to agree upon and enter into any written amendments or modifications to the Budget without further order of this Court.

21.    This Final Order may be extended by agreement among the Debtors, the DIP Lenders, the DIP Agent, the Creditors Committee and approval by the Court upon two (2) days notice to parties in interest.

Dated: January, 25 2001.

_____
United States Bankruptcy Judge

Consented to:

BANK OF AMERICA, N.A., as DIP Agent

By:_____
     One of its Attorneys

Larry J. Nyhan
Matthew A. Clemente (ARDC # 6255757)
SIDLEY & AUSTIN
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

FINAL ORDER APPROVING SECTION
364 BORROWINGS AND GRANTING LIENS

-26-

**EXHIBIT 1**

**Amended and Restated DIP Term Sheet**

<u>**EXECUTION COPY**</u>

**Amended and Restated DIP Term Sheet**

Outboard Marine Corporation, a Delaware corporation ("OMC"), OMC Aluminum Boat Group, Inc., a Delaware corporation ("OMC Aluminum"), OMC Fishing Boat Group, Inc., a Delaware corporation ("OMC Fishing"), OMC Latin America/Caribbean, Inc., a Delaware corporation ("OMC Latin America"), OMC Recreational Boat Group, Inc., a Delaware corporation ("OMC Boat Group"), Outboard Marine Transportation Corporation, a Delaware corporation ("OMC Transportation"), OMCEMA, Inc., a Delaware corporation ("OMCEMA"), OMC Nevada, Inc., a Nevada corporation ("OMC Nevada") and Recreational Boat Group Limited Partnership, a Delaware limited partnership ("Recreational Boat Group L.P."), and certain of their subsidiaries (collectively, the "Loan Parties") have filed petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). Bank of America, N.A., a national banking association and successor in interest to Bank of America, N.A., formerly NationsBank, N.A., successor in interest to NationsBank of Texas, N.A., in its capacity as agent for the prepetition senior lenders ("BOA"), and certain of the senior lenders hereby agree to extend to the Loan Parties, as debtors and debtors-in-possession, on or before December 31, 2000, a senior secured superpriority debtor-in-possession credit facility in the amount specified below (the "DIP Loans"), subject to the terms and conditions of this term sheet ("Term Sheet"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Amended and Restated Loan and Security Agreement by and among the Borrowers party thereto, OMC Boat Group, BOA as Agent (the "Prepetition Agent") for the lenders specified therein (the "Prepetition Lenders") and the Prepetition Lenders, dated as of January 6, 1998, (as from time to time amended, modified or waived (the "Prepetition Credit Agreement"). The Prepetition Credit Agreement, together with all instruments and documents executed in connection therewith, shall be referred to collectively as the "Prepetition Credit Documents."

**Terms and Conditions for Priming Credit Loan[1]**

Borrowers:                    OMC, OMC Aluminum, OMC Fishing, OMC Latin America, OMC Boat Group, OMC Transportation, OMCEMA, OMC Nevada, and Recreational Boat Group, L.P., as Debtors-In-Possession in cases (the "Cases") pending under Chapter 11 of the Bankruptcy Code (each in such capacity, a "Borrower" or

---

[1]    The terms and conditions for the extension of credit described herein are dependent upon, among other things, authorization and approval by the Bankruptcy Court. The terms and conditions with respect to such commitments are mutually dependent on each other and no lender shall be obligated to extend credit unless agreement with the Debtors and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.

"Debtor" and collectively, the "Borrowers" or the "Debtors"). Each of the Borrowers shall be jointly and severally liable to repay any and all indebtedness incurred under the DIP Loan Agreement (as defined below).

Guarantors:  All subsidiaries of the Borrowers that are non-Debtors, provided that no foreign subsidiary of the Borrowers shall be required to execute a guaranty of the obligations of the Debtors hereunder to the extent that (i) such guaranty would result in adverse tax consequences for any Debtor, (ii) such guaranty would violate applicable local law, (iii) such foreign subsidiary or its directors or officers are advised by legal counsel that the provision of such guaranty could result in personal liability to the directors and officers of such subsidiary or (iv) the DIP Agent shall determine, in the exercise of its reasonable discretion, that the costs involved in procuring a guaranty from such foreign subsidiary exceed the incremental benefits afforded to the DIP Agent and the DIP Lenders through the procurement of such guaranty.

Agent:  BOA (the "DIP Agent").

Lenders:  The financial institutions listed under the column "DIP Lenders" on Schedule I attached hereto (collectively, the "DIP Lenders").

Commitments:  The DIP Loans shall consist of a credit facility (the "DIP Facility") with a maximum commitment of up to $19,500,000 (the "Total DIP Commitment"). The full Retention Program Amount (defined below) together with all Accrued Professional Fees (defined below) shall at all times be reserved against the Total DIP Commitment. The DIP Loans shall be funded by the DIP Lenders in accordance with their respective commitments as reflected in Schedule I attached hereto and pursuant to and solely in accordance with the Budget (as defined herein).

DIP Loans:  The DIP Loans shall be advanced weekly based upon, and solely in accordance with, the Budget (defined below).

Use of Proceeds:  The proceeds of the DIP Facility shall be used by the Debtors, in accordance with the terms of the postpetition financing agreement described herein (the "DIP Loan Agreement") (i) to fund expenses incident to the Debtors' efforts to preserve and sell assets in accordance with, but limited to, the weekly cumulative amounts set forth in the Budget (as defined below) for the then current week, and (ii) to pay all fees as provided under the DIP Loan Agreement (whether incurred before or after the date of the commencement of the Cases (the "Petition Date")).

2

| | |
|---|---|
| Employee Retention Program: | The costs and expenses associated with the Borrowers' employee retention bonus program approved by the Bankruptcy Court, not to exceed $2.5 million in aggregate ("Retention Program Amount") shall, notwithstanding the occurrence of a Default or an Event of Default (and to the extent that such sums have not already been borrowed), be made available to the Debtors upon their request for the sole purpose of funding such Retention Program Amounts. |
| Budget: | Not later than the third business day of each week (and not later than the Closing Date with respect to the Budget to be delivered with respect to the week in which the Closing Date occurs) the Borrower shall provide to the DIP Agent, each DIP Lender and the Official Committee of Unsecured Creditors (the "Committee") (i) a copy of a budget (such budget, with modifications approved from time to time by the Required DIP Lenders (defined below), the "Budget"), in form and substance satisfactory to the DIP Agent and the Required DIP Lenders, reflecting on a line-item basis anticipated weekly cash receipts and expenditures for the succeeding six months, (ii) a copy of a variance report (the "Variance Report") reflecting on a line-item basis the actual cash receipts and disbursements for the preceding week and the percentage variance of such actual results from those reflected in the Budget for the preceding week, and a written explanation of such variance, and (iii) a statement that discloses the cumulative professional fees and expenses that have been accrued, but not paid, since the inception of the cases in accordance with the Budget (such cumulative sum, the "Accrued Professional Fees"). |
| Term: | All DIP Loans shall be repaid in full and the Total DIP Commitment shall terminate at the earliest to occur of (i) May 31, 2001 (the "Maturity Date"), (ii) the Termination Date (as defined below), (iii) the effective date of a plan of reorganization, and (iv) when the Total DIP Commitment has been reduced to zero. |
| Interest Rates and Payment Dates: | The non-default rate of interest with respect to each DIP Loan shall be the Base Rate plus 3.75% (the "Non-Default Rate").

The default rate of interest with respect to each DIP Loan after the occurrence of an Event of Default shall be the Non-Default Rate plus 2%.

Interest on the DIP Loan shall be payable in cash, monthly in arrears. Interest on the Prepetition Revolving Credit Loans shall accrue at the Base Rate plus 3.75% and shall be payable from the proceeds of Prepetition Collateral as provided below. The Prepetition Lenders' entitlement to postpetition interest (but not the |

3

rate at which such interest accrues) will remain subject to determination under Section 506(b) of the Bankruptcy Code.

Closing Fee:          A $1,000,000 closing fee (the "Closing Fee"), fully earned as of the Closing Date, shall be paid on the Closing Date to the DIP Agent for the ratable benefit of the DIP Lenders.

Commitment Fee:      0.375% per annum of the unutilized Total DIP Commitment, payable monthly in arrears, to the DIP Agent for the account of the DIP Lenders.

Nature of Fees:       Non-refundable under all circumstances.

Collateral and Priority:    All obligations of the Debtors to the DIP Lenders and the DIP Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses (collectively, the "DIP Obligations") shall be:

     (a) Secured (subject to the Carve-Out (defined below)), pursuant to section 364(c)(2), of the Bankruptcy Code by a first priority, fully perfected security interest, in all of the existing and after acquired real and personal, tangible and intangible, assets of the Borrowers not subject to a perfected, non-avoidable lien or other encumbrance as of the Petition Date, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable and specifically including the stock of each Debtor's subsidiaries, but limited to 65% of the stock in any foreign subsidiaries of the Debtors), equipment, fixtures, real property interests, franchise rights, patents, tradenames, copyrights, intellectual property, general intangibles, investment property and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, but excluding avoidance actions under the Bankruptcy Code (collectively, the "Postpetition DIP Collateral");

     (b) Secured, pursuant to section 364(d)(1), by a fully perfected security interest senior in priority to all liens of the Prepetition Lenders existing as of the Petition Date in all Collateral existing as of the Petition Date (the "Prepetition DIP Senior Collateral");

     (c) Secured, pursuant to section 364(c)(3), by a fully perfected security interest in all property other than the Collateral (the "Prepetition DIP Junior Collateral") that is subject to valid and

4

non-avoidable liens as of the Petition Date which security interest shall be junior in priority to such valid and non-avoidable liens (the Postpetition DIP Collateral, Prepetition Senior DIP Collateral and the Prepetition DIP Junior Collateral shall be referred to collectively as the "DIP Collateral");

(d) Accorded administrative priority status under section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve-Out; provided, however, that as it pertains to proceeds of avoidance actions, the priority accorded to the DIP Lenders (and to the Prepetition Lenders pursuant to the Adequate Protection provision below) shall be equivalent in priority to a claim allowed under section 503(b)(1)(A) of the Bankruptcy Code, or such higher priority as may be awarded to any other entity in respect of such proceeds.

(e) Joint and several among the Borrowers; and

(f) Guaranteed by all non-Debtor subsidiaries of the Borrowers, subject to the "Guarantors" provisions above.

All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except for (1) those liens granted in favor of the Prepetition Agent and the Prepetition Lenders pursuant to the Prepetition Credit Agreement, and (2) the Permitted Liens.

The foregoing liens on the Postpetition DIP Collateral and the administrative priority claim shall be subject to a carve-out (the "Carve-Out") for (i) following termination of the Total DIP Commitment as provided for herein as the result of a Default or an Event of Default (as each such term will be defined in the DIP Credit Agreement), the payment of allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Debtors and the Committee in an aggregate amount not to exceed $750,000 (plus Accrued Professional Fees incurred prior to such termination to the extent such fees are subsequently allowed) and (ii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, neither the Carve-Out nor the Budget shall include professional fees and disbursements incurred in connection with asserting any claims or causes of action against either the Prepetition Lenders, the Prepetition Agent, the DIP Lenders or the DIP Agent and/or challenging or raising any defense to the obligations under the

5

Prepetition Credit Agreement or the DIP Loans or any lien of the Prepetition Agent, the Prepetition Lenders, the DIP Agent or the DIP Lenders. As long as no Default or Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay Budgeted compensation and reimbursement of expenses, allowed and payable under Bankruptcy Code §§ 330 and 331, as the same may be payable, and the amount so paid shall not reduce the Carve-Out.

Distribution Priorities:    If any Debtor receives cash proceeds from the sale or other disposition of Postpetition DIP Collateral, such proceeds shall be paid to the DIP Agent, when and as received, and shall be applied against the DIP Loans (or released to the Debtors, as the case may be) as follows: first to the payment of all fees and expenses owing to the DIP Agent, second to the payment of accrued interest and fees owing in respect of the DIP Loan, third, released to the Debtors to fund expenses in accordance with the Budget provided that the undrawn portion of the Total DIP Commitment shall be permanently reduced, dollar for dollar, to the extent that such proceeds are released to the Debtors, fourth, after the undrawn portion of the Total DIP Commitment has been eliminated, to the payment of principal and all other amounts owing in respect to the DIP Loan until the DIP Loan has been paid in full and all DIP Commitments have been terminated, and fifth to the payment of any unpaid Adequate Protection Obligations (defined below) until all Adequate Protection Obligations have been paid in full.

If any Debtor receives cash proceeds from the sale or other disposition of Prepetition Senior DIP Collateral (or any net proceeds from the Prepetition Junior DIP Collateral remaining after the senior liens on such collateral are satisfied), such proceeds shall be paid to the DIP Agent, when and as received, and shall be applied against the Prepetition Revolving Credit Loans and the DIP Loan as follows: first to the payment of all fees and expenses owing to the Prepetition Agent in respect of the Prepetition Revolving Credit Loans, second to the Prepetition Agent in respect of the Prepetition Revolving Credit Loans and fees up to an amount equal to all interest accrued in respect of Tranche A Revolving Credit Loans (or to be deposited into a reserve for payment of interest accruing in respect of Tranche A Revolving Credit Loans); third, to the Prepetition Agent in respect of the Prepetition Revolving Credit Loans up to an amount equal to all principal owing in respect of Tranche A Revolving Credit Loans, including all reimbursement obligations in respect of undrawn Letter of Credit Obligations, to be applied by the Prepetition Agent

in a manner consistent with the Prepetition Credit Documents; fourth to the payment of accrued interest and fees owing in respect of the DIP Loan, fifth, released to the Debtors to fund expenses in accordance with the Budget provided that the undrawn portion of Total DIP Commitment shall be permanently reduced, dollar for dollar, to the extent that such proceeds are released to the Debtors, sixth, after the undrawn portion of the Total DIP Commitment has been eliminated, to the payment of principal and all other amounts owing in respect of the DIP Loan until the DIP Loan has been paid in full and all DIP Commitments have been terminated, seventh, to the Prepetition Agent in respect of the Prepetition Revolving Credit Loans to be applied in a manner consistent with the Prepetition Credit Documents.

If and to the extent the DIP Collateral proves to be insufficient to satisfy in full the DIP Loans, the holders of the Revolving Credit Loans shall be obligated to return to the DIP Lenders each such holder's pro rata share of proceeds or payments received by such holders from and after the Petition Date until such time as the DIP Loans have been paid in full.

| | |
|---|---|
| Closing Date: | The date upon which all conditions precedent to the making of the initial extension of credit are satisfied (the "Closing Date"). |
| Fees and Expenses: | The Borrowers shall pay all reasonable costs and expenses of the DIP Agent and DIP Lenders (including fees and expenses of the DIP Agent's legal and financial advisors) relating to the negotiation, documentation and administration of the DIP Loan Agreement and the enforcement of the DIP Agent's and the DIP Lenders' rights under and in respect of the DIP Loan Agreement. The Committee will be afforded an opportunity to review, subject to appropriate redactions for privileged materials, charges of the DIP Lenders' professionals that are reimbursed by the Debtors. |
| Conditions to Each Extension of Credit: | The DIP Loan Agreement shall contain conditions precedent to each extension of credit after the date hereof required by the DIP Agent, including, without limitation: |

(a) The Borrowers shall have executed the DIP Loan Agreement and all other documentation with respect thereto, satisfactory in all respects to the DIP Agent and the DIP Lenders, on the earlier of (i) January 26, 2001, or (ii) such other date which the DIP Agent shall agree to in writing.

(b) No Default or Event of Default shall exist.

7

(c) All representations and warranties shall be true and correct in all material respects as of the date of each extension of credit.

(d) An order of the Bankruptcy Court granting final approval of the DIP Loan Agreement (the "Final Order") shall have been entered in form and substance satisfactory to the DIP Agent and the DIP Lenders, and shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified.

(e) The Debtors are continuing to employ their reasonable best efforts to prosecute the Disposition Plan (as defined in the Interim Order).

(f) Payment of all fees, costs, expenses and other amounts then due and payable to the DIP Agent, including, without limitation, internal fees, costs and expenses.

(g) On or before January 31, 2001, the Debtors shall have directed State Street Bank & Trust, in its capacity as depository agent pursuant to that certain Depository Agreement dated as of May 27, 1998 to remit to the Agent on a provisional basis and subject to Bankruptcy Code § 506(b) the $5.3 million on deposit in accounts FD4426 and FD4427 at State Street Bank & Trust to be applied for the ratable benefit of the Prepetition Lenders.

Representations
and Warranties:
Those representations and warranties as are customary or appropriate in the context of the proposed DIP Loan Agreement and acceptable to the DIP Agent and the DIP Lenders.

Admissions and
Acknowledgments:
In addition to, and without limiting the foregoing, each of the Borrowers shall expressly represent, warrant and acknowledge in the DIP Loan Agreement each of the following, subject to the rights of the Committee:

(a) That each of the prepetition agreements executed and delivered by such Borrower in connection with the Prepetition Credit Agreement, including but not limited to each of the Prepetition Credit Documents to which such Borrower is a party, is valid and enforceable by the Prepetition Agent and the Prepetition Lenders against such Borrower;

(b) That such Borrower shall not dispute the validity or enforceability of any of the Prepetition Credit Documents or

any of its obligations thereunder, or the validity, priority, enforceability, scope or extent of any charge, lien, security interest or any other encumbrance of the Prepetition Agent and the Prepetition Lenders in, on or against any of the Collateral in the Cases or in any other judicial, administrative or other proceeding;

(c) That such Borrower shall not challenge or dispute the validity of any of the obligations under the Prepetition Credit Agreement, and that, as of the Petition Date, the Borrowers were liable to the Prepetition Agent and the Prepetition Lenders in the aggregate principal amount of approximately $125,000,000, inclusive of Letter of Credit Obligations, plus approximately $570,000 in accrued and unpaid interest thereon, plus fees, costs and expenses incurred in connection with the obligations under the Prepetition Credit Agreement as provided in the Prepetition Credit Documents;

(d) That by reason of the Prepetition Credit Documents, the obligations under the Prepetition Credit Agreement are secured by first-priority, non-avoidable, perfected, valid and enforceable liens on and security interests in all of such Borrower's right, title and interest in and to the Collateral.

Affirmative Covenants:    The DIP Loan Agreement shall contain affirmative covenants required by the DIP Agent, including, without limitation: (i) delivery of statement of cash receipts and disbursements which statement shall include separate line items for collections on Collateral, including accounts receivable, and collections from the sale or disposition of Postpetition DIP Collateral, weekly Budgets and Variance Reports, officers certificates, monthly reporting packages and other information requested by the DIP Agent, (ii) delivery weekly of a report on collateral composition, including a breakdown of collateral between Postpetition DIP Collateral and Collateral, (iii) delivery weekly of a status report on sales of collateral, including a breakdown of collateral to be sold between Postpetition DIP Collateral and Collateral, (iv) payment of all postpetition taxes and other obligations, (v) notices of defaults, litigation and other material events, (vi) weekly accounts receivable aging report for the preceding week, (vii) collection of the following percentages (on a cumulative basis) of gross receivables of the Debtors existing as of the Petition Date (1) 2.5% by January 31, 2001, (2) 5% by February 28, 2001, (3) 10% by March 31, 2001, (4) 15% by April 30, 2001, and (5) 35% by May 31, 2001 (the "Receivables Covenant"), and (viii) by no later than February 9, 2001, the Debtors shall provide the DIP Lenders and the Prepetition Lenders with a plan with respect to disposition

9

of the Segregated Funds (defined below). In addition, the Debtors shall provide the Agent by not later than February 2, 2001 all information concerning the Debtors' historical warranty claim experience, as well as warranty insurance information, as the Agent may reasonably request.

Negative Covenants:

The DIP Loan Agreement shall contain negative covenants required by the DIP Agent, including, without limitation, on: (i) liens, (ii) capital expenditures, (iii) payment of certain prepetition claims in accordance with the first day motions filed in the Cases, and (iv) the existence of any claims entitled to a superpriority under § 364(c)(1) of the Bankruptcy Code other than the Superpriority Claims of the DIP Lenders and the Prepetition Lenders. Additionally, OMC will not permit its wholly owned subsidiary, OMC Development Inc., to use, transfer or commingle the $14,064,544.19 plus interest accruing thereon (the "Segregated Funds") held by OMC Development, Inc. at Chase Manhattan Bank in the United States without advance written notice to the Agent and the Committee and, in the absence of the consent of both the Agent and the Committee to any such proposed action, an order from the Bankruptcy Court.

Allocation of Sale Proceeds:

Prior to filing a pleading in the Cases seeking to approve a proposed sale, the Debtors shall provide the DIP Agent and the DIP Lenders a good faith estimate of the allocation of the purchase price consideration among the assets being sold between Postpetition DIP Collateral and Collateral. Any disputes over such allocation shall be resolved by the Bankruptcy Court in the ordinary course of administration of the Cases.

Events of Default:

The DIP Loan Agreement shall contain Events of Default required by the DIP Agent, including, without limitation: (i) the entry of an order dismissing any of the Cases or converting any of the Cases to a Chapter 7 case, (ii) the entry of an order appointing a Chapter 11 trustee in any of the Cases, (iii) the entry of an order granting any other claim superpriority status or a lien equal or superior to that granted to the DIP Agent and the DIP Lenders, (iv) the entry of an order staying, reversing, vacating or otherwise modifying the DIP Loan Agreement, the Interim Order or the Final Order without the prior written consent of the DIP Agent and the DIP Lenders, (v) the entry of an order in any of the Cases appointing an examiner having enlarged powers beyond those set forth under § 1106(a)(3) and (4) of the Bankruptcy Code, (vi) the failure of any of the Borrowers to pay (A) interest or fees when due and such default shall continue for two business days or (B) principal when due, (vii) the failure of any of the Borrowers to comply with any negative covenants, (viii) breach of the Receivables Covenant, (ix)

10

the failure of any of the Borrowers to perform or comply with any other term or covenant and such default shall continue unremedied for a period of 10 days, (x) any representation or warranty by any of the Borrowers shall be incorrect or misleading in any material respect when made; and (xi) an unfavorable variance in the Budget tested on (a) a weekly basis of 15% in total expenses; or (b) a cumulative basis of 10% in total expenses.

Remedies:

Upon the occurrence of an Event of Default other than an Event of Default set forth above in (ii) and (v), the Required DIP Lenders (as defined below) upon three business days written notice to the Debtors, the United States Trustee and the Committee appointed in the Cases may (a) terminate the Total DIP Commitments (the date of any such termination, the "Termination Date", and any notice to the Debtors declaring such a termination, a "Termination Notice"), (b) declare the obligations in respect of the DIP Loan Agreement to be immediately due and payable, (c) enjoin and prohibit each of the Debtors from using any cash collateral (other than to pay any DIP Obligations), (d) set off immediately any and all amounts in any cash collateral account and exercise all rights and remedies under the DIP Loan Agreement and the Interim Order or Final Order, as applicable. With respect to an Event of Default set forth in (ii) and (v) above, the remedies shall be limited to those described in (a) and (c) in the immediately preceding sentence. The DIP Lenders shall have other customary remedies under the DIP Loan Agreement.

Financial and Other
Reporting Requirements:

Each of the Borrowers shall provide all information reasonably requested by the DIP Agent.

Required DIP Lenders:

"Required DIP Lenders" shall mean, as of any date of determination, DIP Lenders who in the aggregate hold at least 61% of the Total DIP Commitment (which, if terminated, shall be deemed outstanding in the amounts outstanding immediately prior to such termination).

100% approval of the DIP Lenders shall be required to do the following: (a) extend the Maturity Date, (b) change the interest rate, or (c) increase the Total DIP Commitment beyond $19,500,000. All other actions relative to the DIP Loans may be accomplished with the consent of the Required DIP Lenders.

Adequate Protection:

To protect the Prepetition Lenders from any diminution in the value of Collateral available to satisfy the Prepetition Lenders' claims resulting from (i) the Debtors' use of such collateral, and (ii) the priming of the liens securing the obligations under the

11

Prepetition Credit Agreement by the liens granted to secure the DIP Loans, the Debtors shall (a) grant to the Prepetition Lenders replacement liens on all DIP Collateral which liens will be subordinate in priority only to (i) the liens granted to secure the DIP Loans and the Carve-Out (with respect to the Postpetition DIP Collateral only), and (ii) valid, non-avoidable liens existing on the Petition Date, (b) grant to the Prepetition Lenders Superpriority Claims subject only to the Carve-Out and the Superpriority Claim granted in favor of the DIP Loans, and (c) reimburse the Prepetition Agent, on a monthly basis, for professional fees and expenses incurred by the Prepetition Agent in connection with the Cases, which reimbursement shall be provisional in nature pending allowance under section 506(b) of the Code. The foregoing replacement liens and Superpriority claim shall secure payment of the Obligations in an amount equal to the diminution in value of the Collateral available to the Prepetition Lenders from and after the Petition Date (such amount, the "Adequate Protection Obligations"), whether such diminution results from (i) the Debtors' use of such collateral, or (ii) the priming of the liens securing the Obligations under the Prepetition Credit Agreement by the liens granted to secure the DIP Loans

Release:

In consideration for the DIP Loans, each of the Borrowers on behalf of itself and each of its successors and assigns (collectively, the "Releasors"), but without prejudice to the rights of the Committee or other party-in-interest to assert claims on behalf of the Debtors' estates, shall forever release, discharge and acquit the DIP Agent, each of the DIP Lenders, the Prepetition Agent, and each of the Prepetition Lenders (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations (collectively, "Claims"), of every type, including, without limitation, any so-called "lender liability" claims or defenses, which occurred on or prior to the date hereof with respect to any of the Borrowers, the Obligations under the Prepetition Credit Agreement, the Prepetition Credit Documents, the DIP Loans or the DIP Loan Agreement.

Counterparts:

This Term Sheet may be executed in one or more counterparts, each of which shall be considered an original counterpart and shall become binding when the DIP Agent and each of the Debtors and DIP Lenders has executed one counterpart. Each of the parties hereto agrees that a signature transmitted via facsimile transmission shall be effective to bind the party so transmitting its signature.

Intended Third Party

12

Beneficiaries:            The parties hereto intend that the Prepetition Agent and the Prepetition Lenders be the beneficiaries of the following provisions of this Term Sheet without prejudice to their rights under the Prepetition Credit Agreement, the Consent Letter, the Final DIP Order, the Agree Final Order Granting Certain Adequate Protection Relief To the Prepetition Lenders or any other order entered in the Cases or any other agreement: (i) subsection (g) of the section titled "Conditions to Each Extension of Credit", (ii) subsection (viii) of the section titled "Affirmative Covenants", (iii) the last sentence of the section titled "Affirmative Covenants", (iv) the last sentence of the section titled "Negative Covenants", (v) the section titled "Distribution Priorities", (vi) the section titled "Adequate Protection", and (vii) the section titled "Release". Furthermore, the provisions identified in (i) through (iv) above cannot be discharged by agreement of the parties hereto or modified in any material manner without the written consent of the Prepetition Agent and the Prepetition Lenders.

Governing Law:            Texas, except as governed by the Bankruptcy Code.

The preceding summary of proposed terms and conditions is not intended to be all-inclusive. Any terms and conditions that are not specifically addressed above would be subject to future negotiations with the Debtors, and comprehensive documentation of the transaction that is acceptable to each DIP Lender will have to be prepared.

IN WITNESS WHEREOF, the DIP Agent, the DIP Lenders and the Borrowers each has caused this Amended and Restated DIP Termsheet to be executed and delivered by their duly authorized officers as of this 24th day of January, 2001.

BORROWERS

OUTBOARD MARINE CORPORATION

By:_____
Name:_____
Title:_____


OMC ALUMINUM BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC FISHING BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC LATIN AMERICA/CARIBBEAN, INC.

By:_____
Name:_____
Title:_____

OMC RECREATIONAL BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

RECREATIONAL BOAT GROUP LIMITED PARTNERSHIP

By:_____
Name:_____
Title:_____


DIP AGENT

BANK OF AMERICA, N.A
in its capacity as DIP Agent

By:_____
Name:_____
Title:_____


DIP LENDERS

BANK OF AMERICA, N.A.
in its capacity as a DIP Lender

By:_____
Name:_____
Title:_____


FLEET CAPITAL CORPORATION

By:_____
Name:_____
Title:_____

THE CIT GROUP/BUSINESS CREDIT, INC.

By:_____
Name:_____
Title:_____

TRANSAMERICA BUSINESS CREDIT CORPORATION

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the DIP Agent, the DIP Lenders and the Borrowers each has caused this ~Amended and Restated DIP Termsheet~ **Term Sheet** to be executed and delivered by their duly authorized officers as of this ~24th~ **25th** day of January, 2001.

<u>BORROWERS</u>

OUTBOARD MARINE CORPORATION

By:_____
Name:_____
Title:_____


OMC ALUMINUM BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC FISHING BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC LATIN AMERICA/CARIBBEAN, INC.

By:_____
Name:_____
Title:_____

OMC RECREATIONAL BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

RECREATIONAL BOAT GROUP LIMITED PARTNERSHIP

By:_____
Name:_____
Title:_____


<u>DIP AGENT</u>

BANK OF AMERICA, N.A
in its capacity as DIP Agent

By:_____
Name:_____
Title:_____


<u>DIP LENDERS</u>

BANK OF AMERICA, N.A.
in its capacity as a DIP Lender

By:_____
Name:_____
Title:_____


FLEET CAPITAL CORPORATION

By: _[signature]_
Name: _Patrick McGannon_
Title: _First Vice President_

THE CIT GROUP/BUSINESS CREDIT, INC.

By:_____
Name:_____
Title:_____

TRANSAMERICA BUSINESS CREDIT CORPORATION

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the DIP Agent, the DIP Lenders and the Borrowers each has caused this Term Sheet to be executed and delivered by their duly authorized officers as of this 25th day of January, 2001.

BORROWERS

OUTBOARD MARINE CORPORATION

By:_____
Name:_____
Title:_____


OMC ALUMINUM BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC FISHING BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC LATIN AMERICA/CARIBBEAN, INC.

By:_____
Name:_____
Title:_____

OMC RECREATIONAL BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

RECREATIONAL BOAT GROUP LIMITED PARTNERSHIP

By:_____
Name:_____
Title:_____


DIP AGENT

BANK OF AMERICA, N.A
in its capacity as DIP Agent

By:_____
Name:_____
Title:_____


DIP LENDERS

BANK OF AMERICA, N.A.
in its capacity as a DIP Lender

By:_____
Name:_____
Title:_____


FLEET CAPITAL CORPORATION

By:_____
Name:_____
Title:_____

THE CIT GROUP/BUSINESS CREDIT, INC.

By: _____
Name: Alan R Schnacke
Title: Assistant Vice President

TRANSAMERICA BUSINESS CREDIT CORPORATION

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the DIP Agent, the DIP Lenders and the Borrowers each has caused this Term Sheet to be executed and delivered by their duly authorized officers as of this 25th day of January, 2001.

BORROWERS

OUTBOARD MARINE CORPORATION

By:_____
Name:_____
Title:_____

OMC ALUMINUM BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC FISHING BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

OMC LATIN AMERICA/CARIBBEAN, INC.

By:_____
Name:_____
Title:_____

OMC RECREATIONAL BOAT GROUP, INC.

By:_____
Name:_____
Title:_____

RECREATIONAL BOAT GROUP LIMITED PARTNERSHIP

By:_____
Name:_____
Title:_____

DIP AGENT

BANK OF AMERICA, N.A.
in its capacity as DIP Agent

By:_____
Name:_____
Title:_____

DIP LENDERS

BANK OF AMERICA, N.A.
in its capacity as a DIP Lender

By:_____
Name:_____
Title:_____

FLEET CAPITAL CORPORATION

By:_____
Name:_____
Title:_____

THE CIT GROUP/BUSINESS CREDIT, INC.

By:_____
Name:_____
Title:_____

TRANSAMERICA BUSINESS CREDIT CORPORATION

By: _Alan Kaplan_
Name: _Mr. Kaplan_
Title: _Vice President_

OUTBOARD MARINE TRANSPORTATION
CORPORATION

By:_____
Name:_____
Title:_____

OMCEMA, INC.

By:_____
Name:_____
Title:_____

OMC NEVADA, INC.

By:_____
Name:_____
Title:_____

## SCHEDULE I

| DIP LENDER | COMMITMENT |
|---|---|
| BANK OF AMERICA, N.A. | 37.07% |
| FLEET CAPITAL CORPORATION | 23.33% |
| THE CIT GROUP/BUSINESS CREDIT, INC. | 19.8% |
| TRANSAMERICA BUSINESS CREDIT CORPORATION | 19.8% |

*January 25, 2001 (10.29AM)*



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - -x
                                :
In re:                          :    Chapter 11
                                :
ICG COMMUNICATIONS, INC.,       :    Case No. 00-4238
     et al.,                    :
                                :    Jointly Administered
               Debtors.         :
                                x
- - - - - - - - - - - - - - -
```

FINAL ORDER AUTHORIZING DEBTORS TO OBTAIN
POST-PETITION FINANCING PURSUANT TO
11 U.S.C. §§ 364(c)(1), 364(c)(2) and 364(c)(3)
AND TO REPAY CERTAIN PRE-PETITION SECURED INDEBTEDNESS

Upon the Motion For Order Authorizing Post-
Petition Financing Pursuant To 11 U.S.C. §§ 364(c) And
105 (the "Motion") of ICG Communications, Inc. and cer-
tain of its direct and indirect subsidiaries identified
on Schedule 1 hereto, each as a debtor and debtor in
possession (hereinafter referred to collectively as the
"Debtors"):

(i) seeking this Court's authorization, pursu-
ant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and
105 of the United States Bankruptcy Code, 11 U.S.C.
§§101, et seq. (the "Code"), and Rules 2002, 4001
and 9014 of the Federal Rules of Bankruptcy Proce-



dure (the "Bankruptcy Rules"), for the Debtors to
obtain post-petition financing as described more
fully below and in the Documents (as defined below)
(the "Financing") up to the aggregate principal
amount of $350,000,000 from The Chase Manhattan Bank
("Chase" or "Agent"), 270 Park Avenue, New York, New
York 10017, with Chase acting as Agent for itself
and a syndicate of banks, financial institutions and
other institutional lenders to be arranged by Chase
(together with Chase, the "Lenders"), (x) with
priority over any and all administrative expenses of
the kind specified in any sections of the Code,
including, without limitation, or arising or ordered
under Sections 503(b), 105, 326, 328, 330, 331,
506(c), 507(a), 507(b), 546(c), 726 (to the extent
permitted by law) and 1112 of the Code (other than
the Carve-Out (as defined below)) pursuant to Sec-
tion 364(c)(1) of the Code, (y) to be secured pursu-
ant to Section 364(c)(2) of the Code by a valid and
perfected first priority security interest in and
Lien (as defined in the Credit Agreement) upon all
pre-petition and post-petition property, wherever
located, of the Debtors, including, without limita-
tion, all cash and cash balances of the Debtors

2

wherever located, not subject to valid and perfected
Liens in existence at the time of the commencement
of the Cases or to valid Liens in existence at the
time of such commencement that are perfected subse-
quent to such commencement as permitted by Section
546(b) of the Code (the "Unencumbered Collateral"),
subject only to the Carve-Out, provided that follow-
ing the Termination Date amounts in the Letter of
Credit Account shall not be subject to the Carve-
Out, and (z) to be secured pursuant to Section
364(c)(3) of the Code by a valid and perfected
junior Lien on all pre-petition and post-petition
property, wherever located, of the Debtors, includ-
ing, without limitation, all cash and cash balances
of the Debtors wherever located, property of the
Debtors, including, without limitation, all cash and
cash balances of the Debtors wherever located, that
is subject to valid and perfected Liens in existence
at the time of the commencement of the Cases or to
valid Liens in existence at the time of such com-
mencement that are perfected subsequent to such
commencement as permitted by Section 546(b) of the
Code, including Liens securing the Indebtedness (as
defined in the Credit Agreement) under the Existing

3

Agreement (as defined in the Credit Agreement)[1] (all of such property referred to in this clause (z) being hereinafter referred to as the "Encumbered Collateral"), junior to such valid and perfected Liens and subject only to the Carve-Out, *provided* that upon repayment in full of all then outstanding Indebtedness under the Existing Agreement, the obligations of the Debtors under the Credit Agreement and under the Documents and in respect of Indebtedness permitted by Section 6.3(v) of the Credit Agreement shall automatically be secured,

---

[1] Existing Agreement is defined in the Credit Agreement to mean: "that certain Credit Agreement dated as of August 12, 1999 among ICG Equipment, Inc. and ICG NetAhead, Inc., as borrowers, ICG Services, Inc., as parent, the several lenders from time to time party thereto, Morgan Stanley Senior Funding, Inc, as sole book-runner and lead arranger, Royal Bank of Canada, as administrative agent and collateral agent, and Bank of America, N.A. and Barclays Bank PLC, as co-documentation agents, and shall include the "Loan Documents" (as defined therein) (each as heretofore amended, amended and restated or otherwise modified)." The Lender Parties (as defined in the Existing Agreement) and the Issuing Bank (as defined in the Existing Agreement) collectively are referred to herein as the "Existing Lenders." Morgan Stanley Senior Funding, Inc., as sole book-runner and lead arranger under the Existing Agreement, Royal Bank of Canada, as administrative agent and collateral agent under the Existing Agreement, and Bank of America, N.A. and Barclays Bank PLC, as co-documentation agents under the Existing Agreement, are collectively referred to herein as the "Existing Agents."

4

pursuant to Section 364(c)(2) of the Bankruptcy
Code, by a valid and perfected first priority senior
security interest and Lien (subject to Liens permit-
ted pursuant to clauses (i) and (ii) of Section 6.1
of the Credit Agreement) upon all pre-petition and
post-petition property, wherever located, of the
Debtors that then secures the Indebtedness under the
Existing Agreement, including, without limitation,
all cash and cash balances of the Debtors wherever
located (subject only to the Carve-Out); and

(ii) seeking this Court's authorization to
repay, in full in accordance with the Credit Agree-
ment and the terms of this Order, the Indebtedness
arising under the Existing Agreement,

and, due notice of the Motion having been given by the
Debtors pursuant to Bankruptcy Rule 4001(c), and upon the
entire record made at the Final Hearing and after due
deliberation and consideration and good and sufficient
cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.  This Court has jurisdiction over these
proceedings and the parties and property affected hereby
pursuant to 28 U.S.C. §§157(b) and 1334. Consideration of

5

the Motion constitutes a core proceeding as defined in 28

U.S.C. §157(b)(2).

2.   The Debtors have a need to obtain financing

in order to permit, among other things, the orderly

continuation of the operation of their businesses, to

maintain business relationships with vendors and suppli-

ers, to make certain strategic capital expenditures, to

repay all Indebtedness under the Existing Agreement and

to satisfy other working capital needs.  The ability of

the Debtors to obtain sufficient working capital and

liquidity through the incurrence of new Indebtedness for

borrowed money and other financial accommodations is

vital to the Debtors.  The preservation and maintenance

of the going concern values of the Debtors is integral to

a successful Chapter 11 proceeding of the Debtors pursu-

ant to the provisions of Chapter 11 of the Code.  The

Debtors are unable to obtain for these necessary purposes

adequate unsecured credit allowable under Section

503(b)(1) of the Code as an administrative expense.  A

facility in the amount provided by the Financing is

unavailable to the Debtors without the Debtors granting

to the Agent and the Lenders (x) pursuant to Section

364(c)(1) of the Code, allowed superpriority claims, with

respect to all Indebtedness and obligations of the Debt-

6

ors under the Credit Agreement (and with respect to all
Indebtedness and obligations in respect of overdrafts and
related liabilities referred to in Section 6.3(v) of the
Credit Agreement), having priority over any and all
administrative expenses of the kind specified in any
sections of the Code, including, without limitation, or
arising or ordered under Sections 503(b), 105, 326, 328,
330, 331, 506(c), 507(a), 507(b), 546(c), 726 (to the
extent permitted by law) and 1112 of the Code (other than
the Carve-Out), (y) pursuant to Section 364(c)(2) of the
Code, security for such Indebtedness and obligations by
the granting of a valid and perfected first priority
senior security interest in and Lien upon all Unencum-
bered Collateral (subject only to the Carve-Out), pro-
vided that following the Termination Date, amounts in the
Letter of Credit Account shall not be subject to the
Carve-Out; and (z) pursuant to Section 364(c)(3) of the
Code, security for such Indebtedness and obligations by
the granting of a valid and perfected junior security
interest in and Lien upon Encumbered Collateral (subject
only to the Carve-Out), provided that upon repayment in
full of all Indebtedness then outstanding under the
Existing Agreement, the obligations of the Debtors under
the Credit Agreement and under the Documents and in

7

respect of Indebtedness permitted by Section 6.3(v) of the Credit Agreement shall automatically and additionally be secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid and perfected first priority senior security interest and Lien (subject to Liens permitted by clauses (i) and (ii) of Section 6.1 of the Credit Agreement) upon all pre-petition and post-petition property, wherever located, of the Debtors that then secures the Indebtedness under the Existing Agreement, including, without limitation, all cash and cash balances of the Debtors wherever located (subject only to the Carve-Out).

  3.  The terms of the Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration. The Financing has been negotiated in good faith and at arm's-length between the Debtors and the Agent and any credit extended, letters of credit issued for the account of and loans made to the Debtors by the Lenders pursuant to, and any credit extended in respect of overdrafts referred to in, the Revolving Credit Agreement dated as of December 1, 2000, among the Debtors, the Lenders and the Agent (the "Credit Agreement"), the

8

Credit Agreement, shall be deemed to have been extended
by the Lenders in "good faith," as that term is used in
Section 364(e) of the Code.

       4.  The Documents are hereby approved and the
Debtors are immediately authorized and empowered to
borrow or to obtain standby or import documentary letters
of credit (up to a maximum sublimit of $10,000,000 for
such standby letters of credit) pursuant to and in accor-
dance with the Credit Agreement up to an aggregate of
$350,000,000, which shall be used for the purposes set
forth in the Credit Agreement. In addition, the Debtors
are immediately authorized to the extent permitted in the
Credit Agreement to incur overdrafts and related liabili-
ties arising from treasury, depository and cash manage-
ment services or in connection with any automated clear-
ing house fund transfers provided to or for the benefit
of the Debtors by Chase or any of its affiliates. Not-
withstanding anything herein to the contrary, no Loans
(as defined in the Credit Agreement), Letters of Credit
(as defined in the Credit Agreement), or related cash or
any portion of the Carve-Out amount provided for herein
may be used to object to or contest in any manner, or
raise any defenses to, the validity, priority or
enforceability of the Indebtedness owing to the Agent or

Lenders, or the claims or rights in favor of the Agent or
Lenders securing such Indebtedness, or to assert any
claims or causes of action against the Agent or Lenders
in their capacity as Lenders or Agents under the Financ-
ing.

5.   The Debtors are expressly authorized,
empowered and directed to execute and deliver to the
Lenders, among other documents, the Credit Agreement and
the Security and Pledge Agreement (as defined in the
Credit Agreement) to which the Debtors are parties (col-
lectively, and together with the letter agreement re-
ferred to in paragraph 13(iii) hereof, the "Documents").
The Debtors are hereby authorized, obligated and directed
to perform and do all acts that may be required in con-
nection with the Documents. Upon execution and delivery
of the Documents, the Documents shall constitute valid
and binding obligations of the Debtors that are parties
thereto, enforceable against each Debtor that is a party
thereto in accordance with their terms.

6. As security for all of the Debtors' obliga-
tions and Indebtedness arising under the Financing and
the Documents (and in respect of the overdrafts and
related liabilities entered into with the Lenders re-
ferred to above), the Agent and the Lenders are granted,

10

pursuant to Section 364(c)(1) of the Code, an allowed
superpriority claim having priority over any and all
administrative expenses of the kind specified in Sections
503(b), 105, 326, 328, 330, 331, 506(c), 507(a), 507(b),
546(c), 726 (to the extent permitted by law) and 1112 of
the Code, subject only to (x) in the event of the occur-
rence of an Event of Default (as defined in the Credit
Agreement) or an event that would constitute an Event of
Default with the giving of notice or lapse of time or
both, the payment of allowed and unpaid professional fees
and disbursements incurred by the Debtors and any statu-
tory committee (each, a "Committee") appointed in the
Debtors' Chapter 11 cases (the "Cases") in an amount not
in excess of $3,000,000 (plus all professional fees and
disbursements incurred prior to the occurrence of an
Event of Default to the extent allowed at any time by the
Bankruptcy Court), and (y) the payment of fees pursuant
to 28 U.S.C. §1930 to the Clerk of the Court (collec-
tively, the "Carve-Out"). No claim (other than claims or
Liens granted prior to the date hereof) having a priority
superior or pari passu with that granted by this Order to
the Agent and the Lenders shall arise or be granted while
any portion of the Financing (or refinancing thereof by

11

the Lenders during the pendency of these cases) or the
commitment thereunder remains outstanding.

7.  So long as no Event of Default or an event
which with the giving of notice or lapse of time or both
would constitute an Event of Default shall have occurred
and be continuing, the Debtors shall be permitted to pay
compensation and reimbursement of expenses allowed and
payable under Sections 330 and 331 of the Code, as the
same may be due and payable. Any such compensation and
expenses previously paid, or accrued but unpaid, prior to
the occurrence of such Event of Default may also be paid
and shall not be applied against the Carve-Out. Except to
the extent of the Carve-Out, no expenses of the adminis-
tration of the Cases or any future proceeding or case
which may result therefrom, including liquidation in
bankruptcy or other proceedings under the Code, shall be
charged against the Agent, the Lenders, the Encumbered
Collateral or Unencumbered Collateral, pursuant to Sec-
tion 506(c) of the Code or otherwise, without the prior
written consent of the Agent, and no such consent shall
be implied from any other action, inaction, or acquies-
cence by the Agent or the Lenders.

8.  As security for all of the Debtors' obliga-
tions and Indebtedness arising under the Financing and

12

the Documents (and in respect of overdrafts and related
liabilities arising from cash management services pro-
vided by Chase or any of its affiliates referred to
above), the Agent, on behalf of the Lenders, is hereby
granted (effective upon the date of this Order and with-
out the necessity of the execution by the Debtors of
mortgages, security agreements or otherwise), pursuant to
Section 364(c)(2) of the Code, a valid and perfected
first priority senior security interest in and Lien upon
all Unencumbered Collateral (subject only to the Carve-
Out), provided that following the Termination Date,
amounts in the Letter of Credit Account shall not be
subject to the Carve-Out. The security interests and
Liens granted to the Agent on behalf of the Lenders
hereunder shall not (i) be subject to any Lien or secu-
rity interest which is avoided and preserved for the
benefit of the Debtors' estates under Section 551 of the
Code, (ii) be subordinated to or made pari passu with any
other Lien or security interest under Section 364(d) of
the Code, or otherwise, or (iii) include Debtors' avoid-
ance powers under Sections 544-549 of the Code, includ-
ing, without limitation, any avoidance power exercisable
against one Debtor for the benefit of another Debtor's
estate, subject to the Liens in connection with the

13

Financing, which Liens shall be unaffected by the outcome of any such avoidance action.

9. As security for all of the Debtors' obligations and Indebtedness arising under the Financing and the Documents (and in respect of overdrafts and related liabilities arising from cash management services provided by Chase or any of its affiliates referred to above), the Agent, on behalf of the Lenders, is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements or otherwise), pursuant to Section 364(c)(3) of the Code, a valid and perfected junior security interest in and Lien upon all Encumbered Collateral (subject only to the Carve-Out), provided that upon repayment in full in cash of all Indebtedness then outstanding under the Existing Agreement (the date of such repayment being the "Repayment Date"), including all Indemnity Claims (as defined below) asserted as of the Repayment Date, pursuant to Paragraph 11 hereof, the obligations of the Debtors under the Credit Agreement and under the Documents and in respect of Indebtedness permitted by Section 6.3(v) of the Credit Agreement shall automatically and additionally be secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a valid and

14

perfected first priority senior security interest and
Lien (subject to Liens permitted pursuant to clauses (i)
and (ii) of Section 6.1 of the Credit Agreement) upon all
pre-petition and post-petition property, wherever lo-
cated, of the Debtors that then secures the Existing
Agreement, including, without limitation, all cash and
cash balances of the Debtors wherever located (subject
only to the Carve-Out). The security interests and Liens
granted to the Agent on behalf of the Lenders hereunder,
including the resulting first priority security interests
and Liens arising upon payment of the Indebtedness under
the Existing Agreement and of the Indemnity Claims as-
serted as of the Repayment Date pursuant to Paragraph 11
below shall not be (i) subject to any Lien or security
interest which is avoided and preserved for the benefit
of the Debtors' estates under Section 551 of the Code or
(ii) subordinated to or made pari passu with any Lien or
security interest under Section 364(d) of the Code, or
otherwise.  Following repayment in full of all Indebted-
ness then outstanding under the Existing Agreement, the
Liens and security interests of the Existing Lenders and
the Existing Agents shall remain in full force and ef-
fect, subject in all respects, however, to the Liens and
Indebtedness under the Credit Agreement, to secure and as

15

collateral for (A) any claim of any Existing Lender or
Existing Agent as an indemnitee of any Debtor under the
Existing Agreement or any document or agreement executed
in connection therewith, and (B) to the extent provided
by the Existing Agreement, or any document or agreement
executed in connection therewith, the reasonable fees,
costs and expenses, including reasonable attorneys' fees,
incurred by the Existing Lenders or any Existing Agent in
connection with matters relating to the Existing Agree-
ment, including, without limitation, the enforcement of
any rights and remedies in connection therewith and in
connection with any investigation, litigation or proceed-
ing (or preparation of a defense or negotiation of a
resolution or settlement in connection therewith) brought
against the Existing Lenders or any Existing Agent (all
such fees, costs and expenses of the type described in
this clause (B) are collectively referred to herein as
the "Indemnity Claims", it being understood and ordered
that the term Indemnity Claims and the payments to be
made to the Existing Agents and Existing Lenders pursuant
to this Order shall not include any claims described in
clause (A) above), provided that the Liens and all obli-
gations of any Debtor under the Existing Agreement shall
be subject to and subordinate to all Liens in connection

16

with the Financing, all Indebtedness under the Credit
Agreement, and the Carve-Out.  In particular, following
repayment in full in cash of all Indebtedness then out-
standing under the Existing Agreement and all Indemnity
Claims asserted as of the Repayment Date pursuant to
Paragraph 11 below, and until the Credit Agreement is
terminated and all Indebtedness, liabilities and obliga-
tions of the Debtors to the Agents and the Lenders under
the Documents and all other Indebtedness otherwise owing
by the Debtors to the Agent and the Lenders, howsoever
evidenced, whether now or hereafter existing, whether for
principal, interest, fees, expenses or otherwise are paid
in full and satisfied, then (a) the Liens and all obliga-
tions of any Debtor under the Existing Agreement (and any
agreements and documents executed in connection there-
with) shall be expressly subordinate and subject in all
respects in right of payment and priority to the prior
payment in full of and satisfaction of all Indebtedness,
liabilities and obligations of the Debtors to the Agent
and the Lenders under the Documents and all other Indebt-
edness otherwise owing by the Debtors to the Agent and
the Lenders, howsoever evidenced, whether now or hereaf-
ter existing, whether for principal, interest, fees,
expenses or otherwise, (b) no payment shall be made (nor

17

any additional security given therefor) by the Debtors,
directly or indirectly, in respect of the obligations of
any Debtor under the Existing Agreement (and any agree-
ments and documents executed in connection therewith),
and the Existing Lenders and the Existing Agent will not
ask, demand, sue for, take any action to enforce, take or
receive, directly or indirectly, in cash or other prop-
erty, by sale, set-off or in any other manner whatsoever,
any monies which may be owing with respect to the obliga-
tions of any Debtor under the Existing Agreement (and any
agreements and documents executed in connection there-
with), except that, so long as no Event of Default under
the Credit Agreement shall have occurred and be continu-
ing, the Debtors shall pay Indemnity Claims of the Exist-
ing Agents and the Existing Lenders, and (c) the Existing
Lenders and the Existing Agents shall not assert or
enforce any rights or remedies available to any of them
under the Existing Agreement (and agreements and docu-
ments executed in connection therewith) against any
Debtor in respect of the Collateral securing the Indebt-
edness under the Credit Agreement.

10.   The Agent and the Lenders shall not be
required to file or to record financing statements,
mortgages, notices of Lien or similar instruments in any

18

jurisdiction or take any other action in order to vali-
date and perfect the security interests and Liens granted
to them pursuant to this Order. If the Agent, on behalf
of the Lenders, shall, in its sole discretion, choose to
file such financing statements, mortgages, notices of
Lien or similar instruments or otherwise confirm perfec-
tion of such security interests and Liens, the Debtors
shall execute such documents as requested by the Agent,
and all such documents shall be deemed to have been filed
or recorded at the time and on the date of entry of this
Order.

11.    Each of the Debtors is authorized and
empowered to use proceeds of the Financing in accordance
with the terms of the Credit Agreement. The Debtors are
hereby authorized and directed in accordance with the
Credit Agreement to pay in full in cash (and not in part)
simultaneously with the making of the first Loan or the
issuance of the first Letter of Credit (as defined in the
Credit Agreement) all of the Indebtedness then outstand-
ing under the Existing Agreement and all Indemnity Claims
asserted as of the Repayment Date, provided, however,
that prior to the payment in full in cash (and not in
part) of such Indebtedness under the Existing Agreement
and such Indemnity Claims, the Debtors may request one or

19

more Letters of Credit in support of obligations of the
Debtors to Governmental Authorities (as defined in the
Credit Agreement) or that are otherwise acceptable to
Agent.  No Letters of Credit shall be issued to the
Debtors prior to the payment in full (and not in part) of
the Indebtedness under the Existing Agreement if after
giving effect to such issuance the aggregate outstanding
Letters of Credit would exceed $2,000,000.  Notwithstand-
ing any provision of this Order or the Credit Agreement
to the contrary, the Debtors agree to provide the Admin-
istrative Agent under the Existing Agreement for the
benefit of the Existing Lenders not less than two Busi-
ness Days' notice of Debtors' payment in full of all
Indebtedness under the Existing Agreement.  The foregoing
notice to the Administrative Agent under the Existing
Agreement for the benefit of the Existing Lenders shall
be a courtesy only, such that notwithstanding any failure
by the Debtors to provide such notice to the Administra-
tive Agent under the Existing Agreement, the Indebtedness
under the Existing Agreement and all Indemnity Claims
asserted as of the Repayment Date shall be deemed repaid
in full in cash and the Liens in respect thereof subordi-
nated to the Liens on the Debtors' assets created in
connection with the Financing only upon payment by the

20

Debtors of the amount set forth in the payoff letter or
comparable document provided by the Administrative Agent
under the Existing Agreement to the Debtors and consis-
tent with the terms of this Order, which payoff letter or
comparable document the Administrative Agent under the
Existing Agreement shall have a reasonable time to pro-
vide to the Debtors if such two Business Days' notice is
not provided.

       12.    Nothing in this Order shall prejudice
the right of any Committee or party in interest in these
proceedings to seek, within ninety days from the date
hereof, to (i) disallow the claims of the Existing Lend-
ers, (ii) avoid any security or collateral interests
claimed by the Existing Lenders in the assets of the
Debtors, (iii) otherwise challenge the validity, priority
or extent of the Liens and/or claims of the Existing
Lenders, (iv) disgorge all or any part of the payment by
the Debtors to the Existing Lenders pursuant to Paragraph
11 above to the extent that said payment (or portion
thereof) was in excess of the final amount of the allowed
secured claim of the Existing Lenders, or (v) obtain any
other relief of any type or nature whatsoever, legal or
equitable, against the Existing Lenders or any Existing
Agent on account of their relationship with the Debtors

21

prior to the commencement of these chapter 11 cases, as
determined (if an objection is filed) by final order of
this Court. In the event that the Existing Lenders are
required to disgorge any such amount in excess of their
allowed secured claim, (i) the Debtors shall immediately
cause said amount to be paid to the Agent for application
against the then outstanding Indebtedness under the
Financing; and (ii) the Commitment shall be reduced in an
equal amount. Accordingly, in the event that the Existing
Lenders are required to disgorge all or any part of said
payment by the Debtors, the resulting unsecured claims of
the Existing Lenders shall in all respects be subject to
the rights and Liens of the Agent and the Lenders under
this Order and the Credit Agreement.  Any such objection
or action shall set forth in reasonable detail the basis
therefor and the grounds on which it is asserted that the
Indebtedness under the Existing Agreement should not be
paid in full in cash.  After ninety days from the date
hereof, any and all challenges and actions by any Commit-
tee or party in interest or other person or entity of a
type described in clauses (i) through (v) of this para-
graph shall be forever barred.  Until such time as the
Indebtedness under the Existing Agreement and the Indem-
nity Claims are paid in full in cash as provided herein,

22

the Debtors shall provide the Existing Lenders and Exist-
ing Agents with such adequate protection of their inter-
ests under the Existing Agreement as the Court has autho-
rized or may authorize pursuant to separate order of the
Court. Upon payment in full pursuant to Paragraph 11
above of all of the Indebtedness then outstanding under
the Existing Agreement and Indemnity Claims, the obliga-
tions of the Debtors under the Credit Agreement and under
the Documents and in respect of Indebtedness permitted by
Section 6.3(v) of the Credit Agreement shall automati-
cally and in addition to the other Liens and claims
authorized by this Order be secured, pursuant to Section
364(c)(2) of the Bankruptcy Code, by a valid and per-
fected first priority senior security interest and Lien
(subject to Liens permitted pursuant to clauses (i) and
(ii) of Section 6.1 of the Credit Agreement) upon all
pre-petition and post-petition property of the Debtors,
including, without limitation, all cash and cash balance
of the Debtors wherever located, that then secures the
Existing Agreement (subject only to the Carve-Out).

   13.  Each of the Debtors is authorized and
directed to do and perform all acts, to make, execute and
deliver all instruments and documents (including, without
limitation, the execution of security agreements, mort-

23

gages and financing statements), and to pay fees, which
may be reasonably required or necessary for the Debtors'
performance under the Financing, including, without
limitation: (i) the execution of the Documents, (ii) the
execution of one or more amendments to the Credit Agree-
ment for, among other things, the purpose of adding
additional banks, financial institutions or other insti-
tutional lenders as Lenders and reallocating the commit-
ments for the Financing among the Lenders, and modifying
the affirmative and negative covenants set forth in the
Credit Agreement, in each case in such form as the Debt-
ors, the Agent and the Lenders may agree, and (iii) the
non-refundable payment to Chase or the Lenders, as the
case may be, of the Fees referred to in the Credit Agree-
ment (and in the separate letter agreement dated November
13, 2000, between the Debtors and Chase referred to in
the Credit Agreement) and such Letter of Credit Fees (as
defined in the Credit Agreement), Commitment Fees (as
defined in the Credit Agreement) and reasonable costs and
expenses as may be due from time to time without duplica-
tion including, without limitation, reasonable attorneys'
fees and disbursements as provided in the Documents, all
as such terms are defined in the Documents.  To the
extent that, prior to the entry of this Order, the Debt-

24

ors did or performed any acts, made, executed or deliv-
ered any instruments or documents or paid any fees,
reasonably required or necessary for the Debtors' perfor-
mance under the Financing, the same are hereby ratified.
As among themselves, and not in limitation of their joint
and several obligations to the Agent or the Lenders, as
the case may be, or with respect to the Liens in connec-
tion with the Financing, for payment of the Fees, Letter
of Credit Fees, Commitment Fees and other costs and
expenses, including, without limitation, attorneys' fees
and disbursements and indemnification obligations pro-
vided for in the Documents, the Debtors shall allocate
all such obligations pro rata based upon the projected
usage of or benefit from the proceeds of the Financing by
each Debtor; provided, however, that upon final satisfac-
tion and repayment in full of all obligations and Indebt-
edness to the Agent and Lenders under the Credit Agree-
ment, the Debtors shall reallocate liability as between
themselves for such Fees, Letter of Credit fees, Commit-
ment Fees and other costs, expenses and obligations pro
rata based upon the actual usage of or benefit from the
proceeds of the Financing consistent with the determina-
tion to be made pursuant to paragraph 18 hereof.

25

14.    The Debtors, the Agent and the Lenders
may amend, modify, supplement or waive any provision of
the Documents if such amendment, modification, supplement
or waiver is permitted under the terms of the Documents
and is not material (in the good faith judgment of the
Debtors and the Agent), without the need to apply to, or
receive further approval from, the Court, provided,
however, that the Debtors shall give notice to any Com-
mittee and the Office of the United States Trustee of any
non-material amendments, waivers, supplements or modifi-
cations.

15.    Subject only to the provisions of the
Credit Agreement, the automatic stay provisions of Sec-
tion 362 of the Code are vacated and modified to the
extent necessary so as to permit the Agent and the Lend-
ers to exercise, upon the occurrence of an Event of
Default and upon five (5) Business Days' (as that term is
defined in the Credit Agreement) written notice to the
Debtors, the Office of the United States Trustee and
counsel to any Committee, all rights and remedies pro-
vided for in the Documents (including, without limita-
tion, the right to setoff monies of the Debtors in ac-
counts maintained with the Agent or any Lender).

26

16.    The Documents and the provisions of this
Order shall be binding upon the Agent, the Lenders and
the Debtors and their respective successors and assigns
(including any Chapter 7 or Chapter 11 trustee hereinaf-
ter appointed or elected for the estate of any of the
Debtors) and inure to the benefit of the Agent, the
Lenders and the Debtors and (except with respect to any
trustee hereinafter appointed or elected for the estate
of any of the Debtors) their respective successors and
assigns.

17.    Notwithstanding the joint and several
nature of their obligations under the Credit Agreement,
the Debtors are directed to keep current and accurate
books and records so that each of the following, among
other matters, is readily ascertainable: (a) the amount
of Loans made to or for the benefit of, and Letters of
Credit opened for, each Debtor; (b) the proceeds of any
Loans transferred or retransferred from one Debtor to
another Debtor; (c) the amount of all payments made by
each Debtor in respect of the Indebtedness and other
obligations owed to the Agent or the Lenders under the
Credit Agreement, whether for principal, interest, fees,
costs, expenses or other amounts; (d) the amount of any
setoffs against a Debtor by the Agent or the Lenders; and

27

(e) details concerning the realization upon any collateral belonging to any Debtor or the proceeds thereof on account of Indebtedness or other obligations owed to the Agent or the Lenders. Notwithstanding the foregoing, the failure of any Debtor to perform any such actions shall not affect the Debtors' obligations to the Agent or the Lenders.

18.   Upon (i) final satisfaction and repayment in full of all obligations and Indebtedness to the Agent and the Lenders under the Credit Agreement, and (ii) termination of the Commitment, then each of the Debtors shall thereafter, automatically and without further act or deed, be subrogated to the rights of the Agent and the Lenders under the Credit Agreement as against the other Debtors based upon each respective Debtor's actual (i) usage of or benefit from the proceeds of the Financing and (ii) repayment or satisfaction thereof. Such rights of subrogation shall include, without limitation, all of the Liens, collateral, priorities, superpriorities and other rights, remedies and claims granted to the Agent or the Lenders, as the case may be, under the Documents or otherwise. Final determination of the respective usage of or benefit from the proceeds of the Financing by each Debtor and its liabil-

28

ity therefor, as well as the amount of any claims arising
by way of subrogation in favor of the other Debtors,
shall be made by this Court after notice and a hearing.

19.   Unless all obligations and Indebtedness
owing to the Agent and the Lenders under the Credit
Agreement shall theretofore have been indefeasibly paid
in full (and, with respect to outstanding Letters of
Credit issued pursuant to the Credit Agreement, the
Debtors shall be in compliance with the provisions of
Section 2.3(b) the Credit Agreement), the Debtors shall
not seek, and it shall constitute an Event of Default if
any of the Debtors seek, or if there is entered, an order
dismissing or converting any of the Cases, or a plan (or
confirmation of such plan) that does not provide for the
indefeasible payment in full in cash of the Indebtedness
(including cash collateralization of all Letters of
Credit or the deposit of standby Letters of Credit with
the Agent as provided in the Credit Agreement) on the
effective date of such plan. If an order dismissing or
converting any of the Cases under Section 1112 of the
Code or otherwise is at any time entered, such order
shall provide (in accordance with Sections 105 and 349(b)
of the Code) that (x) the superpriority claims, Liens and
security interests granted to the Agent and the Lenders

29

pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such superpriority claims, Liens and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, Liens and security interests referred to in (x) above.

20.    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (x) the validity of any obligation, Indebtedness or liability incurred by the Debtors to the Lenders prior to written notice to the Agent of the effective date of such reversal, stay, modification or vacation, or (y) the validity and enforceability of any Lien or priority authorized or created hereby or pursuant to the Credit Agreement with respect to any such obligations, Indebtedness or liability. Notwithstanding any such reversal, stay, modification or vacation, any Indebtedness, obligation or liability incurred by the Debtors to the Lenders prior to written notice to the

30

Agent of the effective date of such reversal, stay,
modification or vacation shall be governed in all re-
spects by the original provisions of this Order, and the
Lenders shall be entitled to all the rights, remedies,
privileges and benefits, granted herein and/or pursuant
to the Credit Agreement with respect to such Indebted-
ness, obligation or liability. The obligations of the
Debtors under this Order and the Financing shall not be
discharged by the entry of an order confirming a plan of
reorganization in any of the Cases and, pursuant to
Section 1141(d)(4) of the Code, the Debtors have waived
such discharge.

21.   The notice given by the Debtors of the
Motion and of the Final Hearing constitutes due and
sufficient notice of the Motion and of the Final Hearing.

Dated: Wilmington, Delaware
December __19__, 2000

_____
UNITED STATES DISTRICT JUDGE

31

**SCHEDULE 1 TO FINAL ORDER**

**Subsidiaries**

Bay Area Teleport, Inc.
Communications Buying Group, Inc.
DownNorth, Inc.
ICG Access Services - Southeast, Inc.
ICG Canadian Acquisition, Inc.
ICG ChoiceCom, L.P.
ICG ChoiceCom Management, LLC
ICG DataChoice Network Services, LLC
ICG Enhanced Services, Inc.
ICG Equipment, Inc.
ICG Funding LLC
ICG Holdings (Canada) Co.
ICG Holdings, Inc.
ICG Mountain View, Inc.
ICG NetAhead, Inc.
ICG Ohio LINX, Inc.
ICG Services, Inc.
ICG Telecom Group, Inc.
ICG Telecom Group of Virginia, Inc.
ICG Telecom of San Diego, L.P.
ICG Tevis, Inc.
NikoNet, LLC
PTI Harbor Bay, Inc.
Trans American Cable, Inc.
Western Plains Finance, LLC

# Attachment 8

ORIGINAL

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
                                          :
In re:                                    :    Chapter 11
                                          :
STONE & WEBSTER, INCORPORATED, et al.,    :    Case Nos. 00-2142 (RRM)
                                          :
        Debtors.                          :    Jointly Administered
                                          :
------------------------------------------------------------- x
```

## FINAL ORDER (1) AUTHORIZING THE DEBTORS AND DEBTORS-IN-POSSESSION TO INCUR POSTPETITION SECURED INDEBTEDNESS, (2) GRANTING SECURITY INTERESTS AND PRIORITY PURSUANT TO 11 U.S.C. SECTION 364, (3) PROVIDING ADEQUATE PROTECTION; AND (4) MODIFYING AUTOMATIC STAY

Upon the motion, dated June 5, 2000 (the "Motion"), of Stone & Webster,

Incorporated ("S&W") and its direct and indirect subsidiaries, debtors and debtors-

in-possession (collectively, "Stone & Webster" or the "Debtors") for the entry of an

order (the "Order") in the above-captioned chapter 11 cases (the "Cases"):

(1) authorizing the Debtors to enter into the Debtor-in-Possession Credit Agreement

dated as of June 2, 2000 (the "DIP Credit Agreement") with Jacobs Engineering

Group, Inc. (the "Lender"), a prepetition secured creditor (all capitalized terms in

this Order not otherwise defined shall have the meanings given to those terms in the

DIP Credit Agreement); (2) granting security interests and liens to the Lender as

additional protection of its Lien on Prepetition Collateral and to secure the Debtors'

obligations under the DIP Credit Agreement and granting the Lender priority claims

*153*

pursuant to sections 364(c)(1), 364(c)(2) and 364(d) of title 11 of the United States

Code (the "Bankruptcy Code") with respect to the Postpetition Indebtedness;

(3) modifying the automatic stay; and (4) setting a further hearing on the Motion, if

necessary; and upon the Affidavit of Thomas L. Langford in Support of Chapter 11

Petition and First-Day Orders sworn to on June 5, 2000; and it appearing that,

pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bank-

ruptcy Rules"), proper and adequate notice has been given and that, under the

circumstances, no other or further notice is necessary and hearings having been held

before this Court on June 5, and June 23, 2000 (the "Hearings"); and upon the record

of the Hearings; and after due deliberation thereon; and good and sufficient cause

appearing therefor:

   BASED ON THE FOLLOWING STIPULATIONS BETWEEN THE

DEBTORS AND THE LENDER AND THE EVIDENCE PRESENTED IN THE

MOTION AND AT THE HEARINGS, THE COURT MAKES THE FOLLOWING

FINDINGS OF FACT AND CONCLUSIONS OF LAW:

   A.    Filing of Petitions.  On June 2, 2000 (the "Petition Date"), the Debtors

filed with this Court their petitions for relief under Chapter 11 of the Bankruptcy

Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors have

retained possession of their assets and are authorized to continue the operation and

management of their businesses as debtors-in-possession.

2

B.    <u>The Motion; Notice</u>. The Motion was filed on June 5, 2000. The Debtors served by telecopy or hand delivery on or before June 5, 2000, notice of the Motion on, among others:  (i) each Debtor's forty largest creditors on a consolidated basis, and (ii) all of their known secured creditors, and a copy of the Motion and a proposed form of the Interim Order with respect to the Motion (the "Interim DIP Order") on the United States Trustee.  Additionally, copies of the Interim DIP Order approved by the Court were served in accordance with the terms thereof, and copies of the DIP Credit Agreement and the other DIP Credit Documents (as defined herein) were made available to the parties-in-interest at the offices of the Debtors' counsel and filed with the Court.  Such notice is appropriate and adequate under the circumstances set forth herein and presented to this Court in accordance with Bankruptcy Rule 4001(c) and section 102(1) of the Bankruptcy Code, as required by sections 364(c) and 364(d) of the Bankruptcy Code.

C.    <u>Jurisdiction; Core Proceeding</u>.  Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157.  This Order is subject to, and the Lender is entitled to the benefits of, the provisions of section 364(e) of the Bankruptcy Code.  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

D.    <u>No Creditors' Committee</u>.  A creditors' committee (the "Committee") was appointed in the Cases on or about June 13, 2000 pursuant to section 1102 of the

3

Bankruptcy Code, which Committee was provided with a copy of the Motion, the

Interim DIP Order, the DIP Credit Agreement and the other DIP Credit Documents.

       E.      Nature and History of Business.  Stone & Webster is principally

engaged in providing professional engineering, construction and consulting services.

Additionally, certain Debtor subsidiaries own and operate fourteen cold storage

warehousing facilities located primarily in the southeastern United States and others

own and operate Stone & Webster office buildings in Houston, Texas and

Schenectady, New York.  As of December 31, 1999, Stone & Webster employed

approximately 5,300 regular employees.

       F.      Prepetition Indebtedness to the Lender and Security Therefor;

Prepetition Credit Facility.  On the Petition Date, S&W was indebted to the Lender

as described below:

       (i)      S&W and the Lender are parties to a Revolving Credit

Agreement dated May 9, 2000 (the "Prepetition Credit Agreement") and various

other Loan Documents (as defined in the Prepetition Credit Agreement and, together

with the Prepetition Credit Agreement and all other agreements and documents

relating thereto and executed prior to the Petition Date, the "Prepetition Loan

Documents").  The Prepetition Credit Agreement provides for Loans (defined

therein) to be made by the Lender to S&W in an aggregate amount not to exceed

$50,000,000, subject to certain conditions and restrictions.

4

(ii)    As of the Petition Date, the principal amount of the Prepetition Indebtedness (as defined below) owed to the Lender, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than $22,000,000.

(iii)    Pursuant to the Prepetition Credit Documents, S&W granted to the Lender a continuing lien and security interest to secure the Prepetition Indebtedness (as defined below) in the Prepetition Collateral (as defined below), whether then-owned or thereafter acquired or existing, wherever located. Pursuant to the Prepetition Credit Documents, various Subsidiary Pledgors (as defined in the Prepetition Credit Agreement) also granted the Lender security interests in their right and title to the Prepetition Collateral to secure the Prepetition Indebtedness.

(iv)    For purposes of this Order, all of the indebtedness and obligations of S&W or any of the others Debtors to the Lender arising out of or relating to the Prepetition Credit Documents, together with all prepetition and postpetition interest and expenses now or hereafter accrued on such indebtedness and obligations, shall hereinafter collectively be referred to as the "Prepetition Indebtedness." All collateral (as defined and described in the Prepetition Credit Documents) that existed as of the Petition Date and all proceeds thereof (including postpetition proceeds thereof) shall hereafter be referred to as the "Prepetition Collateral."

G.    Perfection of the Lender's Security Interests. The Lender has asserted and the Debtors hereby waive their right to contest that the Lender's security interests are perfected in the Prepetition Collateral by the filing of a series of UCC-1

5

financing statements (the "Prepetition Financing Statements") with the proper state

and county offices for the perfection of such security interests.

     H.    <u>Validity and Allowance of Prepetition Indebtedness</u>. As of the

Petition Date, (i) the Prepetition Credit Documents are valid and binding agreements

pursuant to their terms and obligations of the Debtors, and each of them, (ii) the

amount of the Prepetition Indebtedness is due and payable to the Lender as a fully

secured claim in an amount not less than the amount set forth above plus the

amounts set forth in clause (iii) of this paragraph, (iii) pursuant to section 506(b) of

the Bankruptcy Code, the Lender is entitled to be paid postpetition interest on the

Prepetition Indebtedness, as well as reasonable fees, costs and charges related to the

Prepetition Indebtedness, all as provided in the Prepetition Credit Documents,

(iv) except as provided in the Prepetition Intercreditor Agreement, the Lender's liens

on and security interests in the Prepetition Collateral are valid, perfected, enforce-

able, non-avoidable and first priority liens and security interests and the Lenders

prepetition claim against the Debtors and the estates created by the filing of the

petitions (the "Estates") is allowed and is valid, enforceable and non-avoidable in the

amount of the Prepetition Indebtedness, (v) the Debtors may not assert any claim,

counterclaim, setoff, or defense of any kind or nature which would in any way affect

the validity, enforceability and non-avoidability of the Prepetition Indebtedness or

the Lender's security interests in and liens on the Prepetition Collateral or reduce or

affect the obligation to pay the Prepetition Indebtedness unless otherwise agreed to

6

by the Lender, and (vi) the Lender and its agents and employees are released and

discharged from all claims and causes of action of any of the Debtors arising out of

the Prepetition Credit Documents or the Debtor's relationship with the Debtors prior

to the Petition Date.

      I.      Need for Funding.  In the ordinary course of their business, the

Debtors have substantial cash needs and their ability to timely meet those needs is

critical.  In the event that the Debtors failed to have sufficient liquidity, they would

not be able to pay service providers, suppliers and vendors or to provide their clients

with the services they demand.  Under the circumstances, the DIP Financing (as

defined below) is therefore necessary to avoid any immediate and irreparable harm

to the Debtors and the Estates that may be occasioned by the commencement of

these Cases and any resulting material changes in credit terms or unexpected cash

flow issues that might arise.

      J.      The Lender's Willingness To Extend DIP Financing.  The Lender was

willing to advance postpetition funds (the "DIP Financing") in the form of revolving

loans (the "Loans") to the Debtor during the period from the Petition Date until the

earlier of (a) the entry of a final order approving the DIP Financing, or (b) July 2,

2000 (the "Interim Financing Period") on substantially the same terms and condi-

tions as applied prior to the Petition Date, all as more fully set forth in the DIP Credit

Agreement.  In addition to all of the conditions set forth in the DIP Credit Agree-

ment, the Lender's willingness to provide DIP Financing was conditioned upon the

7

entry of the Interim DIP Order and this Order. Furthermore, the Lender's willingness to advance DIP Financing beyond the Interim Financing Period was conditioned upon (i) the entry of a final order acceptable to the Lender in its sole and absolute discretion and (ii) the entry of a bidding procedures order acceptable to the Lender in its sole and absolute discretion.

K.   Cash Collateral. For purposes of this Order, "Cash Collateral" shall consist of all property of the Debtors that constitutes cash collateral in which the Lender has an interest as provided in section 363(a) of the Bankruptcy Code and shall include, without limitation, all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any property upon which the Lender holds a lien or a replacement lien, whether as part of the Prepetition Collateral or other DIP Collateral (as defined below) or pursuant to an order of the court or applicable law or otherwise.

L.   No Other Sources of Funds. Prior to the Petition Date, the Debtors investigated the possibility of obtaining alternative sources of cash or credit on an unsecured basis or secured basis on more favorable terms than the Lender. The Debtors have been unable to find any entity willing to provide financing other than the Lender, and believe, based on that investigation, their historical experience with potential lenders, and their knowledge of the lending terms provided to engineering firms that, under the circumstances, no financing on terms more favorable than those proposed by the Lender is available.

8

M.    Good Faith. The Lender has acted in good faith in agreeing to extend credit to the Debtors in accordance with the DIP Credit Agreement, the Interim DIP Order and this Order. The terms of the DIP Financing authorized by this order set forth below are for reasonably equivalent value and fair consideration. The agreements and arrangements authorized in this Order have been negotiated at arms' length with all parties represented by experienced counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their terms and have been entered into in good faith. Any credit extended and loans made to Stone & Webster by the Lender pursuant to the DIP Credit Agreement shall be deemed to have been extended in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

N.    Events of Default. Upon the occurrence of any Event of Default, the Lender shall be entitled to the rights and remedies provided in the DIP Credit Agreement; provided, however, that the Lender shall provide the Debtors, their counsel, counsel to and any statutory committee of unsecured creditors appointed in these Cases, three (3) days notice prior to taking any actions to enforce its rights under the DIP Credit Agreement.

O.    Cause Shown. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the Debtors' businesses as going concerns, will increase the possibility of maximizing the value of the Debtors' assets, which will, in turn, maximize the prospects for

9

generating a dividend to unsecured creditors, and will avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, their creditors and the Estates. Therefore, it is hereby,

ORDERED, ADJUDGED AND DECREED THAT:

1.    <u>Authorization to Borrow; DIP Credit Documents</u>. The Motion is granted and the Debtors are authorized to enter into and be bound by the following documents and to borrow money after the Petition Date and to perform its obligations thereunder in accordance with the terms thereof:

  (a)    the DIP Credit Agreement;

  (b)    the Debtor-in-Possession Security and Pledge Agreement dated June 5, 2000 between the Debtors and the Lender;

  (c)    all such financing statements, notices, schedules, other security agreements, deeds of trust, mortgages, instruments, guaranties, subordination agreements, acceptance agreements and documents as may be necessary or required to evidence its obligations to the Lender, to consummate the terms and provisions of the Motion and this Order and to evidence perfection of the liens and security interests to be given to the Lender pursuant hereto and thereto; and

  (d)    such other agreements and documents as set forth in the foregoing documents as a condition to the Lender's willingness to make loans or other extensions of credit pursuant thereto or as the Lender shall reasonably require in connection with or to evidence the DIP Financing, whether now or hereafter executed by or on behalf of the Debtors and delivered to the Lender.

For purposes of the Motion and this Order, the documents listed in subparagraphs (a) through (d) above shall hereinafter collectively be referred to as the "DIP Credit

10

Documents," and each of the terms and conditions of the DIP Credit Documents is

incorporated herein by this reference. The DIP Credit Documents shall be and

become obligations of the Debtors and the Estates upon entry of this Order. All

indebtedness and obligations incurred on or after the Petition Date by the Debtor to

the Lender pursuant to the DIP Credit Documents (including principal, accrued and

unpaid interest, and costs and expenses, including reasonable attorneys' fees and

expenses) are referred to herein as the "DIP Indebtedness," and together with the

Prepetition Indebtedness as the "Indebtedness."

2.    Maximum Amount of Borrowing. The maximum aggregate outstand-

ing principal amount of DIP Indebtedness shall be as set forth in the DIP Credit

Documents.

3.    Interest. The rate of interest to be charged for loans and other

extensions of credit to the Debtors under the DIP Credit Agreement shall be the rates

set forth in the DIP Credit Agreement (which are the same rates that were charged

prior to the Petition Date under the Prepetition Credit Agreement).

4.    Termination of Loans; Term of DIP Credit Agreement. The DIP

Credit Agreement, and the Lender's willingness to make Loans thereunder, shall

immediately and automatically terminate (except as the Lender may otherwise agree

in writing), and all DIP Indebtedness shall be immediately due and payable (except

as the Lender may otherwise agree in writing) upon the earliest to occur of: (i) the

ninetieth (90th) day after the Closing Date; or (ii) entry of an Order of the Court

11

approving sale of the Debtor's assets to any entity other than the Lender, other than

as expressly contemplated in the Asset Acquisition Agreement; or (iii) the Lender's

election, in its sole and absolute discretion (subject to the terms of the DIP Credit

Agreement), to terminate such DIP Revolving Loans upon the occurrence of any

Event of Default; or (iv) as otherwise provided in the DIP Credit Agreement.

5.    <u>Security for DIP Indebtedness</u>.  The Indebtedness shall be secured by,

and the Lender is hereby granted, pursuant to sections 364(c)(1), 364(c)(2) and

364(d) of the Bankruptcy Code, a first lien on all Collateral, of any kind or nature

whatsoever, and all proceeds or profits thereof including any and all of the

Prepetition Collateral, but excluding any claims or causes of action under Chapter 5

of the Bankruptcy Code and the proceeds and profits thereof (collectively, the "DIP

Collateral"), which Lien shall at all times be senior to the rights of the Debtors, any

successor trustee(s) in these or any subsequent proceedings under the Bankruptcy

Code, and any other Person, subject only to the following exceptions:

a.    except as expressly provided in the Prepetition Intercreditor

Agreement; and

b.    except to the extent of the Carve Out set forth in the DIP

Credit Agreement, <u>provided, however</u>, that the dollar amount of the Carve Out shall

not exceed $1,000,000 in the aggregate, which amount may be used by the Borrow-

ers after the occurrence and during the continuance of a Default or an Event of

Default, notwithstanding the Lender's security interests in the Collateral and the

Lender's rights hereunder, to pay fees or expenses incurred by the Borrower consti-

tuting (i) allowances of compensation for services rendered or reimbursement of

expenses awarded by the Bankruptcy Court under sections 330 and 331 of the

Bankruptcy Code or otherwise, to Borrower's professionals, (ii) allowances of

compensation for services rendered or reimbursement of expenses awarded by the

Bankruptcy Court under section 105(a), 330 or 331 of the Bankruptcy Code, to

accountants, attorneys and other professionals retained in the Cases by any unse-

cured creditors' committee appointed in accordance with section 1102 of the Bank-

ruptcy Code or any examiner appointed in accordance with section 1104 of the

Bankruptcy Code, (iii) fees required to be paid to the Office of the United States

Trustee under section 1930(a), Title 28, United States Code, and (iv) the actual,

necessary expenses, other than compensation, and reimbursement pursuant to section

503(b)(4) of the Bankruptcy Code, incurred by a member of a committee appointed

under section 1102 of the Bankruptcy Code, if such expenses are incurred in the

performance of the duties of such committee and are allowed by the Bankruptcy

Court; provided, however, that the dollar limitation on such fees, expenses and

disbursements shall not include (a) compensation for services performed prior to the

occurrence of a Default or Event of Default, whether or not paid, provided that no

portion of the Carve Out shall be available for challenges to the prepetition secured

position of Lender, and no more than $50,000 of the Carve Out shall be available for

pre-challenge investigative work with respect to the prepetition secured position of

Lender by any parties other than the Borrower or (b) any fees, expenses, indemnities or other amounts paid to the Lender or its attorneys and agents under this Agreement or otherwise.

6.      <u>Limited Cross-Collateralization</u>. Notwithstanding anything in the DIP Credit Documents or this Order, the postpetition Liens and security interests granted thereunder and hereunder shall secure the Prepetition Indebtedness only to the extent of the diminution in value of the Prepetition Collateral occurring from and after the Petition Date.

7.      <u>Perfection of Liens on DIP Collateral</u>. The Lender shall not be required to file financing statements, mortgages, deeds of trust, or other documents in any jurisdiction or take any other action in order to validate or perfect the security interests and liens granted to it by this Order or by any of the DIP Credit Documents. If the Lender shall, in its sole and absolute discretion, choose to file such financing statements, mortgages, deeds of trust or other documents or otherwise confirm perfection of such security interests and liens, the Lender is authorized to effect such filings and recordation, and all such financing statements, deeds of trust or similar documents shall be deemed to have been filed or recorded as of the Petition Date.

8.      <u>Waiver of DIP Rights</u>. This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lender's liens upon the DIP Collateral to secure all obligations under the DIP Credit Documents. In consideration of the financing made available pursuant hereto, the Debtors hereby irrevoca-

bly waive any right, (a) without the Lender's prior written consent, or (b) without prior indefeasible payment in full of the Indebtedness: (i) to grant or impose, or request that the Court grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Collateral or Prepetition Collateral, equal or superior to the Lender's liens on and security interests in such DIP Collateral or Prepetition Collateral; or (ii) to modify or affect any of the Lender's rights under this Order, or the DIP Credit Documents by any plan of reorganization confirmed in these Cases or any subsequent order entered in this Case. If this interim Order does not become final pursuant to the terms of paragraph 26 and no final order is entered, all of the Lender's rights under Bankruptcy Rule 4001 are expressly reserved.

9.    Modification of Automatic Stay.

a.    The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary (i) to enable the Lender to file any financing statements, deeds of trust, mortgages or other instruments and documents, if any, evidencing its security interests in and liens on the DIP Collateral and (ii) to allow the Lender to give the Debtors any notice provided for in any of the DIP Credit Documents or this Order.

b.    The automatic stay pursuant to section 362 of the Bankruptcy Code shall be lifted to allow the Lender to take any and all actions permitted

15

by the DIP Credit Documents in the event of an Event of Default; provided, however, notwithstanding anything to the contrary in this Order or the DIP Credit Agreement, the Lender shall be required to give the Debtors, the United States Trustee, and counsel for any statutory committee, advance written notice of at least three (3) business days prior to taking any action to enforce the Lender's liens and security interests except for the giving of notices to the Debtor.

10.     Priority Claims; No Section 506(c) Charges.  In addition to the Liens granted to the Lender hereunder, the DIP Indebtedness shall constitute an administrative priority equivalent in priority to a claim under section 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of the kinds specified in, or ordered pursuant to, section 105, 326, 503(b), 507(a), or 507(b) of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor or any successor trustee in this or any subsequent proceeding under the Bankruptcy Code.  No costs or expenses of administration of any person or entity which have been or may be incurred in these Cases, any conversion of these Cases, or any of them, pursuant to section 1112 of the Bankruptcy Code, or in any other proceedings related hereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Debtors arising out of loans and extensions of credit made by the Lender to the Debtors or with the security interests in and liens of the Lender upon the DIP Collateral, and no costs or expenses of

16

administration shall be imposed against the Lender, its claims, or the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, postpetition claims against the Debtors for statutory fees due the United States Trustee and professional fees subject to the Carve Out under the circumstances specified in the DIP Credit Agreement shall be prior to the liens and administrative priority of the Lender.

11.    Use of Proceeds of DIP Financing. Funds borrowed under the DIP Credit Agreement shall be used by the Debtors solely in the ordinary course of their business unless otherwise ordered by the Court; provided, however, that the foregoing shall not be construed to prohibit the Debtors from using funds advanced by the Lender under the DIP Credit Agreement to pay expenses as otherwise authorized in this Order. It is understood that the Lender may assume that the Debtors will comply with this requirement, and the Lender shall have no duty to monitor such compliance.

12.    Application of Collateral Proceeds; Interest on Prepetition Indebtedness; Fees.

a.    The Debtor shall immediately pay to the Lender all the proceeds of any disposition of any DIP Collateral pursuant to the terms of the DIP Credit Agreement and the priorities established in the Prepetition Intercreditor Agreement.

17

b.     All interest and fees with respect to the Prepetition Indebted-

ness shall continue to accrue and be payable at the rate and times set forth in

the Prepetition Credit Documents.

c.     The Lender shall be promptly reimbursed by the Debtors

without order of the Court for all costs and expenses (including, without

limitation, all filing and recording fees, reasonable attorneys' and paralegals'

fees and expenses and out-of-pocket audit expenses) incurred by the Lender

in connection with (i) the preparation of this Order, the DIP Credit Docu-

ments and related instruments, documents and agreements; (ii) the preserva-

tion and protection of the Lender's rights hereunder and thereunder; and

(iii) the collection of all DIP Indebtedness.  Fees and expenses incurred by

the Lender in connection with the DIP Credit Documents shall be charged to

the DIP Indebtedness.  Nothing herein shall be construed to limit the Lender's

right to otherwise seek reimbursement under the Prepetition Credit Docu-

ments of its prepetition fees, costs or expenses.  Nothing contained herein

shall preclude the Debtors or any party-in-interest from challenging the

reasonableness of any fees or expenses incurred by the Lender after the

Petition Date.

13.     Sale of Assets.  All sales, leases or disposition of DIP Collateral

outside of the ordinary course of business may be done only with prior Court

approval and with notice to the Lender.  The Lender expressly reserves its right to

18

(a) contest any proposed sale or disposition of any DIP Collateral except as provided

herein, or (b) credit bid any portion of the Indebtedness in conjunction with any such

sale. In the event that a combined sale of DIP Collateral and Prepetition Collateral is

conducted, if the source of funds generated by such sale is not clearly identifiable,

such funds will first be deemed to be proceeds of DIP Collateral.

14.     No Liability to Third Parties.  In making decisions to advance loans

or other extensions of credit to Stone & Webster, in administering any loans or other

extensions of credit, or in taking any other actions reasonably related to this Order or

the DIP Credit Documents, the Lender shall have no liability to any third party

(including creditors of the Debtors) and shall not be deemed to be in control of the

operations of the Debtors or to be acting as a "responsible person" or "owner or

operator" with respect to the operation or management of the Debtors.

15.     Effect of Plan.  The liens, security interests, rights and remedies

granted to the Lender pursuant to this Order and the DIP Credit Documents shall not

be modified, altered or impaired in any manner by any plan of reorganization for any

of the Debtors, unless otherwise agreed to by the Lender.

16.     Authorized Signatories.  The signature of any officer of any of the

Debtors appearing any one or more of the DIP Credit Documents to be executed

after the entry of this Order shall bind the Debtors, and each of them.  No board of

director or other approval shall be necessary.

19

17.    <u>Additional Rights of the Lender</u>.  The Lender may petition this Court for any such additional protection as it may reasonably require with respect to the Prepetition Indebtedness, the DIP Indebtedness, or otherwise.  The Lender does not waive any rights it has pursuant to the Prepetition Credit Documents and the Lender shall retain all rights available pursuant to the Bankruptcy Code or any other applicable law.

18.    <u>No Waiver</u>.  The rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the Debtors arising under this Order are in addition to, and not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors under the Prepetition Credit Documents.

19.    <u>Service of Pleadings</u>.  The Debtors shall deliver to the Lender, its counsel of record, and any other persons reasonably requested by the Lender from time to time, as soon as is practicable, copies of any pleading, notice or other document filed by the Debtors in the Cases.

20.    <u>Use of Cash Collateral</u>.  The Debtors may use Cash Collateral in the ordinary course of business to the extent permitted in the DIP Loan Documents and the Asset Acquisition Agreement.

21.    <u>Adequate Protection of the Lender's Prepetition Security Interest</u>.  As adequate protection for the Debtors' use of Cash Collateral and other Collateral:

20

a. The Debtors hereby grant the Lender replacement liens on all present and future assets of the Estates, which replacement liens shall have priority over all subsequent liens and encumbrances on such property, subject to the provision of the Prepetition Intercreditor Agreement. Such replacement liens shall secure the Indebtedness to the extent of any postpetition diminution in value of the Prepetition Collateral.

b. The Debtors will maintain and insure the Prepetition Collateral and the property encumbered by the replacement liens granted to the Lender in accordance with the requirements of the Prepetition Credit Agreement.

c. The Lenders are entitled to all other protections under the DIP Credit Agreement.

d. Administrative Priority Claim. To the extent that the adequate protection provided herein fails to protect the Lender against any postpetition diminution in the value of the Prepetition Collateral, the Lender shall be entitled to an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code with priority over any and all other administrative expenses of any kind payable or allowed pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 503(b), 507(a), and 507(b) of the Bankruptcy Code; provided, however, the Lender's allowed administrative claim shall be subordinate to any allowed administrative

21

expense claim that the Lender holds under the section 364(c) of the Bank-

ruptcy Code in connection with DIP Credit Agreement and pari passu with

any allowed administrative expense claim for adequate protection that Bank

of America, N.A., as Collateral Agent (the "Collateral Agent") under that

certain Collateral Agency and Intercreditor Agreement dated as of July 30,

1999 (the "Bank Intercreditor Agreement") holds on account of the Cash

Collateral Stipulation.

Notwithstanding the foregoing, the Lender shall have the right to petition the

Bankruptcy Court for additional adequate protection with respect to any Collateral

and to retain all rights under the Prepetition Loan Documents, the Bankruptcy Code,

or otherwise. Additionally, to the extent that the Lender seeks to exercise any

remedies with respect to the security provided pursuant to this paragraph 21, the

Lender shall provide the Debtors and the Committee with three (3) business days'

advance notice.

     22.   No Dismissal. If any of the Cases are dismissed, converted, other-

wise superseded or substantively consolidated, to the extent permitted by applicable

law, the Lender's rights and remedies under this order and the DIP Credit Documents

shall be and remain in full force and effect as if the Case or Cases had not been filed

or the Case or Cases had not been dismissed, converted or superseded. Furthermore,

notwithstanding any such dismissal, conversion, supersession or consolidation, all of

the terms and conditions of this Order, including, without limitation, the liens

granted hereunder, shall remain in full force and effect, to the extent permitted by applicable law.

23.    Effect of and Limitation on Challenges to the Lender's Claims or Liens.  Notwithstanding anything to the contrary contained in this Order or in any of the DIP Credit Documents, the Lender may, in its sole discretion, immediately and unilaterally discontinue, any further extensions of credit under the DIP Credit Agreement, upon the institution by any person or entity of any action seeking to challenge the validity or priority of, or to subordinate, any of the Indebtedness or the Lender's Liens on any of the Prepetition Collateral or the DIP Collateral.  The Debtors acknowledge and agree that the security interests held by the Lender are valid, enforceable, duly perfected and non-avoidable.  The Debtors waive their rights to challenge or avoid the Lender's liens on any of the Collateral.  Moreover, except as expressly provided in this Order, no other party shall attempt to challenge the validity or priority of, or to subordinate, any of the Indebtedness or the Lender's Liens on any of the Collateral.

24.    Committee Rights.  Notwithstanding anything to the contrary contained herein, in any Order of this Court or in any other agreement between the Debtors and Lender, no later than sixty (60) days after the entry of this Order, the Committee (or if no such Committee is appointed, any creditor or equity holder) may object, challenge, or seek to avoid the amount, validity, enforceability and priority of the Indebtedness or the Lender's Liens on the Collateral.  If no such action is

23

commenced within such sixty (60) day period, the Indebtedness shall be conclu-
sively deemed valid and enforceable and the security interests of the Lender in the
Collateral shall be deemed valid, enforceable and perfected liens in such property.

25.    Effect of Modification of Order.

a.    If, for any reason, any of the provisions of this Order are
hereafter stayed, modified, terminated, or vacated, on any material matter without
the Lender's written consent, including, without limitation, by subsequent order of
this or any other Court, then in such event:  (i) the Lender shall be entitled, but not
obligated, to discontinue any further loans, extensions of credit or financial accom-
modations hereunder or under the DIP Credit Documents; and (ii) the DIP Indebted-
ness, together with all interest, fees, cost, expenses and charges of any nature that
may have accrued in connection therewith, shall upon notice to the Debtors from the
Lender, become due and payable upon delivery of such notice, without further notice
or order of the Court.

b.    The Debtor shall not, without the Lender's prior written
consent, seek to modify, vacate or amend this Order or any DIP Credit Documents.
Notwithstanding anything to the contrary in this Order, if any of the provisions of
this Order are hereafter modified, vacated or stayed by subsequent order of this or
any other court, such stay, modification or vacation shall not affect the validity of
any Indebtedness incurred prior to the effective date of such stay, modification or
vacation, or the validity and enforceability of any lien or priority authorized hereby

24

with respect to any such Indebtedness.  Notwithstanding any such stay, modification

or vacation, any Indebtedness incurred by Stone & Webster prior to the effective

date of such modification, stay or vacation shall be governed in all respects by the

original provisions of this Order, and the Lender shall be entitled to all the rights,

privileges and benefits, including, without limitation, the security interests and

priorities granted herein, with respect to all such Indebtedness.

     26.     <u>Objections Overruled</u>.  Except to the extent specifically set forth

herein, all objections to the entry of this Order are hereby overruled.

     27.     <u>Order Effective</u>.  This Order shall be effective as of the date of

signature by the Court.


Dated: Wilmington, Delaware
     June 23, 2000



                             *Roderick R. McKelvie*
                             Honorable Roderick R. McKelvie
                             UNITED STATES DISTRICT COURT JUDGE

Exhibit 1

RECYCLED

ALL-STATE® LEGAL   800-222-0510   E3901

# Attachment 9

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - x

In re                              :

BRAZOS SPORTSWEAR, INC., *et al.*,  :

                    Debtors.   :

- - - - - - - - - - - - - - - - x

|   |   |
|---|---|
| | Chapter 11 |
| | Case Nos. 99-142(PJW) through 99-145(PJW) |
| | (Jointly Administered) |

### FINAL ORDER (I) AUTHORIZING SECURED POSTPETITION FINANCING ON A SUPERPRIORITY BASIS, AND (II) GRANTING LIENS, SUPERPRIORITY ADMINISTRATIVE CLAIMS AND RELATED RELIEF

Upon the motion, dated January 21, 1999 (the "Motion"),[1] of Brazos Sportswear, L.L.C., Brazos Embroidery, Inc., and Morning Sun, Inc., debtors and debtors-in-possession (collectively, the "Borrowing Debtors"), for interim and final orders under 11 U.S.C. §§ 105, 362 and 364, and Fed. R. Bankr. P. 2002 and 4001:

1. authorizing the Borrowing Debtors to obtain, on an interim and final basis, postpetition secured financing and other financial accommodations, up to an aggregate principal amount not to exceed $62,500,000, under 11 U.S.C. § 364(c) on the terms set

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion.

240168.03-New YorkS3A

forth in (i) that certain Post-Petition Loan and Secu-
rity Agreement, dated January 21, 1999 (the "Credit
Agreement"), a copy of which is attached to the Motion
as Exhibit A, and as shall be amended or otherwise sup-
plemented in accordance with the provisions of the "Mod-
ifications to DIP Financing Arrangement Between Fleet
Capital Corporation and BankBoston, N.A., as Lenders,
and Brazos Sportswear, L.L.C., Morning Sun, Inc., and
Brazos Embroidery, Inc., as Borrowers" annexed hereto as
Exhibit 1 (the "Modifications"), and (ii) other related
loan documents (with the Credit Agreement, and as de-
fined therein, the "Loan Documents");

2.   authorizing the Borrowing Debtors under 11
U.S.C. § 364(c) to borrow money and seek other financial
accommodations from the Lenders on an interim basis in
an amount equal to (i) the Borrowing Debtors' total
outstanding Prepetition Obligations under the
Prepetition Loan Documents plus (ii) an amount up to
$5,000,000 (exclusive of contingent liabilities under
outstanding letters of credit issued under the
Prepetition Credit Agreement) over and above the amount
of the Prepetition Obligations on the Petition Date, on
the terms and conditions of the Loan Documents and on
the basis of the security and priority provided therein;

240168.03-New YorkS3A                    2

3.   authorizing the Borrowing Debtors (i) to use the proceeds of the Postpetition Financing for the purposes set forth in the Credit Agreement, including, without limitation, working capital and general corporate purposes, and (ii) to utilize the first borrowing under the Credit Agreement to retire and pay in full the Borrowing Debtors' Prepetition Obligations under the Prepetition Credit Agreement, consisting of unpaid principal, accrued and unpaid interest, and unpaid fees and expenses (including attorneys fees) for which the Borrowing Debtors are responsible in accordance with the Credit Agreement;

4.   authorizing the Borrowing Debtors under 11 U.S.C. § 364(c) to grant to the Agent for the ratable benefit of the Lenders, and as security for the repayment of the borrowings and all other obligations arising under the Credit Agreement and other Loan Documents (the "Obligations"), security interests in and liens upon all of each Borrowing Debtor's existing and after-acquired property, wherever located (as more fully described in the Loan Documents and in paragraph 6 below, (the "Collateral") on the terms set forth in the Credit Agreement;

5.  granting "super-priority" claim status to Lenders with respect to the Obligations pursuant to 11 U.S.C. § 364(c)(1); and

6.  modifying the automatic stay of 11 U.S.C. § 362 in certain respects in connection with the Post-petition Financing.

Due and sufficient notice of the Motion having been given; and a Preliminary Hearing on the Motion having been held before this Court on January 21, 1999 pursuant to Bankruptcy Rule 4001(c)(2); and upon the record presented to the Court by the Borrowing Debtors at the Preliminary Hearing; and upon the order of this Court dated January 21, 1999, authorizing the Postpeti-tion Financing on an interim basis (the "Interim Or-der"); and only the objection of the official committee of unsecured creditors (the "Creditors' Committee") having been filed; and such objection having been re-solved by the terms of the Modifications and this Final Order; and upon the record of the final hearing held before this Court on April 13, 1999 (the "Final Hear-ing"); and this Court having found good and sufficient cause appearing therefor,

IT IS HEREBY FOUND that:

A.   This Court has jurisdiction over the Chap-
ter 11 Cases and the Motion pursuant to 28 U.S.C.
§§ 157(b) and 1334.   Consideration of the Motion consti-
tutes a core proceeding as defined in 28 U.S.C.
§ 157(b)(2).

B.   Notice of the Preliminary Hearing, the
Final Hearing, and the relief requested in the Motion
was given to (1) the United States Trustee; (2) the
Borrowing Debtors' 20 largest creditors, (3) the Agent,
(4) the Prepetition Agent, (5) each of the Prepetition
Lenders, (6) the indenture trustee for the 10.5% Notes
due 2007 issued by Brazos Sportswear, Inc, (7) counsel
for the Creditors' Committee, and (8) all entities re-
quired to be served under Bankruptcy Rule 2002.   Under
the circumstances, notice of the Preliminary Hearing,
the Final Hearing, and the Motion complied with the
requirements of Bankruptcy Code sections 102(1), 364(c),
and 364(d) and Bankruptcy Rules 2002 and 4001(c), was
adequate and sufficient, and no other or further notice
is or shall be required.

C.   On or about February 16, 1999, the Credi-
tors' Committee filed its "Objection of Official Commit-
tee of Unsecured Creditors to Final Order Approving

240168.03-New YorkS3A                         5

Postpetition Financing Facility" (the "Creditors' Com-
mittee Objection"). The Creditors' Committee Objection
has been resolved, as stated on the record by counsel
for the Creditors' Committee at the Final Hearing. No
other objections have been filed.

   D. Without prejudice to the rights of any
other party in interest (but subject to the limitations
thereon described in decretal paragraphs 3 and 15), the
Borrowing Debtors admit that, in accordance with the
terms of the Prepetition Loan Documents, the Borrowing
Debtors were truly and justly indebted to the Prepeti-
tion Lenders, without defense, counterclaim or offset of
any kind, and that as of the Petition Date (i) the Bor-
rowing Debtors were liable to the Prepetition Agent and
the Prepetition Lenders in the aggregate amount of ap-
proximately $42,000,000 (such amount, exclusive of con-
tingent liabilities under any outstanding letters of
credit issued under the Prepetition Credit Agreement (as
defined in decretal paragraph 10 below, "Prepetition
LC's"), being the "Prepetition Obligations" as of the
Petition Date) in respect of loans made by the
Prepetition Lenders to Brazos Sportswear, L.L.C. and
Morning Sun, Inc. pursuant to the Prepetition Credit
Agreement, and (ii) each Debtor party to a guarantee

executed and delivered in respect of the Prepetition

Obligations was liable to the Prepetition Lenders pursu-

ant to such guarantee.

E.   Without prejudice to the rights of any

other party (but subject to the limitations thereon

described in decretal paragraphs 3 and 15), the Borrow-

ing Debtors further admit that the Prepetition Obliga-

tions were secured by valid and enforceable liens and

security interests granted under the Prepetition Loan

Documents by the applicable Borrowing Debtors to the

Prepetition Agent, for the ratable benefit of the

Prepetition Lenders, upon and in all of the Borrowing

Debtors' inventory and accounts receivable, and all

accessions to, substitutions for and all replacements,

products and cash and non-cash proceeds thereof, as well

as all books and records of the Borrowing Debtors per-

taining to the foregoing (collectively, as set forth

more particularly in Section 4 of the Prepetition Credit

Agreement, the "Prepetition Collateral").

F.   The Lenders' willingness to make Loans (as

defined below) under the Credit Agreement was contingent

upon the repayment in full on the Closing Date (as de-

fined in the Credit Agreement) of the Prepetition Obli-

gations under the Prepetition Credit Agreement.   Effec-

240168.03-New YorkS3A                    7

tive as of the Closing Date, (i) an amount equal to the
Prepetition Obligations was borrowed and paid to the
Prepetition Agent, for the benefit of the Prepetition
Lenders, as the first borrowing and revolving credit
advance under the Credit Agreement to retire and pay in
full the Borrowing Debtors' Prepetition Obligations
under the Prepetition Credit Agreement and became Obli-
gations under the Credit Agreement and (ii) the
Prepetition Obligations then were reduced by an equal
amount; provided, however, that such first borrowing and
payment under the Credit Agreement was without prejudice
to the right of any party in interest (including the
Creditors' Committee, but excluding the Borrowing Debt-
ors) to, not later than April 19, 1999, (1) seek to
avoid any security or collateral interest in the assets
of the Borrowing Debtors claimed by the Prepetition
Agent or Prepetition Lenders, (2) seek disgorgement of
all or any part of any payment made by the Borrowing
Debtors to the Prepetition Agent or Prepetition Lenders,
or (3) otherwise seek recovery from the Prepetition
Agent or Prepetition Lenders on account of their rela-
tionship with the Borrowing Debtors.

G.   Pursuant to the Interim Order, the Borrow-
ing Debtors were expressly authorized and empowered to

240168.03-New YorkS3A                    8

execute and deliver to the Lenders the Credit Agreement
and any other Loan Document to be executed and delivered
in connection therewith; the Borrowing Debtors executed
and delivered the Credit Agreement and related Loan
Documents to the Lenders; the Borrowing Debtors entered
into and substantially complied with the terms and con-
ditions of the Loan Documents, including, but not lim-
ited to, repayment of the amounts borrowed thereunder,
together with interest, fees, costs, and reasonable
expenses in accordance with and subject to the terms and
conditions of the Loan Documents and the Interim Order;
and the Borrowing Debtors paid all facility, commitment,
and other fees and expenses, including, but not limited
to, all reasonable fees and expenses of professionals
engaged by the Agent and the Lenders, in accordance with
the terms of the Credit Agreement and the Interim Order.

H.   The Borrowing Debtors do not have suffi-
cient available sources of working capital and financing
to carry on the operation of their businesses without
the financing provided by the Postpetition Financing.
The Borrowing Debtors' ability to maintain business
relationships and otherwise finance their operations is
essential to the Borrowing Debtors' continued viability.
In addition, the Borrowing Debtors' need for financing

240168.03-New YorkS3A                9

is immediate and critical, and the preservation, mainte-
nance and enhancement of the going concern value of the
Borrowing Debtors are of the utmost significance and
importance to a successful reorganization of the Borrow-
ing Debtors under Chapter 11 of the Bankruptcy Code.

I.   Given the Borrowing Debtors' current fi-
nancial condition, financing arrangements and capital
structure, the Borrowing Debtors are unable to obtain
unsecured credit allowable under Bankruptcy Code section
503(b)(1) as an administrative expense.  Financing on a
postpetition basis is not otherwise available without
the Borrowing Debtors granting, pursuant to Bankruptcy
Code section 364(c)(1), claims having priority over any
and all administrative expenses of the kinds specified
in Bankruptcy Code sections 503(b) and 507(b), other
than as described below, and securing such financing
indebtedness and obligations with security interests in
and the liens upon the property described below pursuant
to Bankruptcy Code sections 364(c) and (d).

J.   Based on the record presented to the Court
by the Borrowing Debtors at the Preliminary Hearing and
the Final Hearing, the Credit Agreement and the Loan
Documents have been negotiated in good faith and at
arm's length between the Borrowing Debtors and the Lend-

240168.03-New YorkS3A                    10

ers, and any credit extended and advances made to the
Borrowing Debtors pursuant to the Credit Agreement and
the Loan Documents is and shall be deemed to have been
extended, issued or made, as the case may be, in good
faith, as required by and within the meaning of Bank-
ruptcy Code section 364(e).

K.   Based on the record presented to the Court
by the Borrowing Debtors at the Preliminary Hearing and
the Final Hearing, the Court finds that the terms of the
Postpetition Financing are fair and reasonable, reflect
the Borrowing Debtors' exercise of prudent business
judgment consistent with their fiduciary duties, and are
supported by reasonably equivalent value and fair con-
sideration.

L.   The relief requested in the Motion is
necessary, essential and appropriate for the continued
operation of the Borrowing Debtors' business and the
management of their assets and properties.  The Court
concludes that entry of this Final Order is in the best
interest of the Borrowing Debtors' respective estates
and creditors as its implementation will, among other
things, sustain the operation and value of the Borrowing
Debtors' existing businesses and enhance the Borrowing
Debtors' prospects for a successful reorganization.

240168.03-New YorkS3A                    11

M.   The Credit Agreement and Loan Documents, as amended by the Modifications and this Final Order, shall constitute all of the terms and conditions of the postpetition financing between the Borrowing Debtors and the Lenders.   In the event of any inconsistency between the terms of this Final Order and the terms of the Credit Agreement and other Loan Documents, the terms of this Final Order shall be deemed to control.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary and Final Hearings, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.   The Motion is granted, subject to the terms and conditions set forth in this Final Order.

2.   The Borrowing Debtors are expressly authorized and empowered to execute and deliver the Credit Agreement and any other Loan Document to be executed and delivered in connection therewith.   The Borrowing Debtors are authorized to enter into and comply with and directed to perform all of the terms and conditions of the Loan Documents, including repayment of amounts borrowed thereunder, with interest, fees, costs and reasonable expenses, in accordance with and subject to the

240168.03-New YorkS3A                    12

terms and conditions set forth in the Loan Documents and
this Final Order.  The Borrowing Debtors are further
authorized to pay all facility, commitment and other
fees and expenses, including, without limitation, all
reasonable fees and expenses of professionals engaged by
the Agent and the Lenders, in accordance with the terms
of the Credit Agreement.  All loans and other extensions
of credit made under the Credit Agreement (the "Loans")
and interest thereon and all fees, costs, expenses,
indebtedness, obligations and liabilities of the Borrow-
ing Debtors to the Agent or the Lenders at any time
arising under the Loan Documents and this Final Order
are hereinafter referred to as the "Obligations."

        3.  The Borrowing Debtors are authorized to
continue to borrow from the Lenders, on the terms and
subject to the conditions set forth in the Loan Docu-
ments and this Final Order an amount up to (a) the sum
of (i) the Borrowing Debtors' total outstanding Obliga-
tions under the Prepetition Loan Documents plus (ii) the
balance of the amount of the credit facility provided by
the Lenders under Section 2 of the Credit Agreement
(exclusive of contingent liabilities under the
Prepetition Credit Agreement) over and above the aggre-
gate amount of the Prepetition Obligations on the Peti-

240168.03-New YorkS3A                    13

tion Date, or (b) $62,500,000.  The Borrowing Debtors

are authorized to use the proceeds of the Loans to oper-

ate the Borrowing Debtors' businesses (and otherwise use

the proceeds of the Postpetition Financing for the uses

permitted in the Credit Agreement), subject to the pro-

visions of the Credit Agreement and the Loan Documents.

Satisfaction of the Prepetition Obligations pursuant to

the Interim Order (a) shall be adjusted finally within

twenty (20) days after the Final Hearing by a final

accounting agreed upon by the Borrowing Debtors and the

Prepetition Agent in respect of all outstanding and

previously unaccounted for costs, fees and charges pay-

able in reimbursement to the Prepetition Lenders as

Prepetition Obligations, and (b) shall be without preju-

dice to the right of any party in interest (including

the Creditors' Committee, but excluding the Borrowing

Debtors) to, not later than April 19, 1999, (x) seek to

avoid any security or collateral interest in the assets

of the Borrowing Debtors claimed by the Prepetition

Agent or Prepetition Lenders, (y) seek disgorgement of

all or any part of any payment made by the Borrowing

Debtors to the Prepetition Agent or Prepetition Lenders,

or (z) otherwise seek recovery from the Prepetition

Agent or Prepetition Lenders on account of their rela-

tionship with the Borrowing Debtors.   In the event that,
on or prior to April 19, 1999, any party in interest
(including, without limitation, the Creditors' Committee
or any other statutory committee(s) in these cases) (i)
appeals from or seeks review or rehearing of the Interim
Order or this Final Order, or (ii) files an adversary
proceeding or contested matter or otherwise commences
litigation either (x) challenging the validity,
enforceability or priority of the Prepetition Obliga-
tions and the Prepetition Agent's and Prepetition Lend-
ers' liens on the Prepetition Collateral or (y) seeking
disgorgement of all or any part of any payment made by
the Borrowing Debtors to the Prepetition Agent or
Prepetition Lenders, or otherwise seeking recovery from
the Prepetition Agent or Prepetition Lenders on account
of their relationship with the Borrowing Debtors, then
the liens of the Prepetition Agent and Prepetition Lend-
ers under the Prepetition Credit Agreement, as well as
any of their liens on assets of the Borrowing Debtors
securing the Prepetition Obligations, shall be rein-
stated pending final adjudication of any such appeal,
rehearing, reconsideration, adversary proceeding, con-
tested matter or other litigation.

240168.03-New YorkS3A                    15

4.   If an Event of Default (as defined in the Credit Agreement) occurs, then the Agent and Lenders shall be authorized to terminate the Postpetition Financing (the date of any such termination, the "Termination Date"), and subject to the requirement contained in the Credit Agreement with respect to specified remedies to provide five business days' prior written notice to the Company, the United States Trustee and any statutory committees appointed in the Chapter 11 Cases, the Agent, acting at the direction of the Lenders, may exercise rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code section 362 (which is hereby modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court:   (a) declare the principal of and accrued interest, fees and other liabilities constituting the Obligations to be due and payable;  (b) set off amounts in bank accounts maintained with a Lender, or otherwise enforce rights against any other Collateral in the possession of the Agent or any Lender; and/or (c) take any other action or exercise any other right or remedy permitted to the Lenders under the Loan Docu-

ments, this Final Order or by operation of law; pro-
vided, however, that the Agent and the Lenders may take
the actions described above only after providing five
business days prior written notice in accordance with,
and to the extent required by, the Credit Agreement.
Without limiting the generality of the remedies and the
provision of any of the Loan Documents or this Final
Order, in no event shall any of the Borrowing Debtors be
authorized to use any of the Collateral (including any
cash proceeds of any Collateral) from and after, and
during the continuance of, any Event of Default until
all of the Obligations are paid in full.

5. In accordance with Bankruptcy Code
section 364(c)(1), subject to paragraph 7 below, the
Obligations shall constitute claims (the "Superpriority
Claims") with priority in payment over any and all ad-
ministrative expenses of the kinds specified or ordered
pursuant to any provision of the Bankruptcy Code, in-
cluding, but not limited to, Bankruptcy Code sections
105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b)
and 726, and shall at all times be senior to the rights
of the Borrowing Debtors, and any successor trustee or
any creditor, in the Chapter 11 Cases or any subsequent
proceedings under the Bankruptcy Code. Subject only to

240168.03-New YorkS3A                    17

the Carve-Out (as defined below), no cost or expense of

administration under Bankruptcy Code sections 105,

364(c)(1), 503(b), 506(c), 507(b) or otherwise, includ-

ing those resulting from the conversion of any of the

Chapter 11 Cases pursuant to Bankruptcy Code

section 1112, shall be senior to, or pari passu with,

the Superpriority Claims of the Agent and the Lenders

arising out of the Obligations, and the Borrowing Debt-

ors shall not surcharge any Collateral of the Agent or

the Lenders under 11 U.S.C. § 506(c).

6.   As security for the Obligations, the Agent

and the Lenders have been granted (effective upon the

date of the Interim Order and without the necessity of

the execution by the Borrowing Debtors of mortgages,

security agreements, pledge agreements, financing state-

ments or otherwise, and notwithstanding any provision of

any pre-Petition Date instrument purporting to restrict

the grant of liens on any of the Collateral), valid and

perfected security interests in, and liens upon (the

"Liens"), all present and after-acquired property of

each of the Borrowing Debtors of any nature whatsoever,

including, without limitation, all Accounts, Inventory,

Equipment, General Intangibles, Investment Property,

Chattel Paper, Documents, and all monies and other Prop-

erty of any kind (as each of the foregoing capitalized

terms is defined in the Credit Agreement) now or at any

time or times hereafter, and all cash contained in any

account maintained by the Borrowing Debtors and the

proceeds of all causes of action (other than causes of

action arising under the Bankruptcy Code) (collectively

with all proceeds and products of any or all of the

foregoing, the "Collateral"), such Liens to have the

following priorities:

> (a)   pursuant to Bankruptcy Code section
> 364(c)(2), a first priority, perfected Lien
> upon all of the Borrowing Debtors' right, ti-
> tle and interest in, to and under all Collat-
> eral that is not otherwise encumbered by a
> validly perfected security interest or lien on
> the Petition Date or after giving effect to
> the repayment of the Prepetition Obligations;

> (b)   pursuant to Bankruptcy Code section
> 364(c)(3), a junior, perfected Lien upon all
> of the Borrowing Debtors' right, title and
> interest in, to and under all Collateral that
> is encumbered by a validly perfected security
> interest or lien of any party (other than a
> Prepetition Lender) in existence as of the
> Petition Date, or a valid lien perfected (but
> not granted) after the Petition Date to the
> extent such perfection in respect of a pre-
> Petition Date claim is expressly permitted
> under the Bankruptcy Code.

The Liens granted pursuant to the Interim Order are

hereby ratified and reaffirmed.

7.   Any provision of this Order or the Credit

Agreement to the contrary notwithstanding, the Liens and

Superpriority Claims granted to the Agent and the Lend-
ers pursuant to the Credit Agreement, the Interim Order,
and this Final Order shall be subject and subordinate to
a carve-out (the "Carve-Out") for:   (a) the payment of
allowed professional fees and disbursements incurred by
the professionals retained, pursuant to Bankruptcy Code
sections 327 or 1103(a), by the Borrowing Debtors and
the Creditors' Committee in an amount not to exceed
$250,000 (the "Post-Termination Carve-Out Amount") on
account of such professional fees and disbursements
incurred after the "Facility Termination Date" (as de-
fined below), and the aggregate amount (the "Pre-Termi-
nation Carve-Out Amount") of all unpaid professional
fees and disbursements incurred, accrued or invoiced
from the Petition Date until the Facility Termination
Date; and (b) quarterly fees required to be paid pursu-
ant to 28 U.S.C. § 1930(a)(6) and any fees payable to
the Clerk of the Bankruptcy Court, to the extent that
such fees are payable after the Facility Termination
Date and there are not funds on hand in the
Borrowing Debtors' Chapter 11 estates with which to
satisfy such fees and other administrative expenses;
provided, however, that the Carve-Out shall not include
professional fees and disbursements incurred

240168.03-New YorkS3A                20

in connection with any claims or causes of action

against either the Prepetition Lenders or

the Prepetition Agent and/or challenging or raising

any defense to the Prepetition Obligations or any Lien

of the Prepetition Agent or the Prepetition Lenders.

Until the Facility Termination Date, the Borrowing Debt-

ors shall be permitted to pay compensation and reim-

bursement of expenses, allowed and payable under Bank-

ruptcy Code sections 330 and 331, as the same may be

payable, and the amount so paid shall be free and clear

of the Liens and the Superpriority Claims.  As used

herein, the term "Facility Termination Date" means the

earliest of (x) the date on which Agent and Lenders

cease making advances to the Borrowing Debtors under the

Loan Documents as a consequence of an Event of Default,

(y) the Maturity Date (as defined in the Credit Agree-

ment) or (z) the date on which all of the Obligations

have been satisfied.  If the Facility Termination Date

occurs as a consequence of an Event of Default, then,

whether or not demand for payment of the Carve-Out has

been made by a Borrowing Debtor or any other interested

party or professional person and irrespective of Lend-

ers' termination of their commitments under the Credit

Agreement, Lenders may, in their discretion at any time,

240168.03-New YorkS3A                    21

advance to Borrowing Debtors pursuant to the Credit

Agreement an amount equal to the Carve-Out (or the Lend-

ers' estimate of such amount), to be held by Borrowing

Debtors in a separate account, in escrow, for

the benefit of professional persons entitled to be paid

from the Carve-Out (the "Professional Fee Escrow").   If

the Facility Termination Date occurs in connection with

a proposed sale of assets of one or more Borrowing Debt-

ors, with the result that the Obligations will be sub-

stantially satisfied or paid in full therefrom, then,

from the proceeds of such sale, Agent and Lenders may

satisfy the Obligations after setting aside an amount

(the "Reserve Amount") equal to the greater of

$4,000,000 or the amount that the sale proceeds exceeds

the amount of the Obligations.   The Agent and Lenders

shall hold the Reserve Amount pending Agent's receipt of

a final accounting from professional persons in accor-

dance with the next sentence hereof.   Each professional

person who may be entitled to participate in the Carve-

Out shall, after the sooner to occur of (i) ten (10)

days after the date of consummation of a sale of assets

of the Borrowing Debtors for an amount sufficient to

substantially satisfy or pay in full the Obligations or

(ii) fifteen (15) days from receipt of a written request

for an accounting from Agent after the Facility Termina-
tion Date, submit to Agent and Lenders an accounting for
the amount of their fees and expenses that such profes-
sional person claims constitutes a part of the Pre-Ter-
mination Carve-Out Amount.  If and to the extent that
the Reserve Amount exceeds the aggregate amount of such
accountings plus the Post-Termination Carve-Out Amount,
then Lenders shall promptly return such excess to the
Borrowing Debtors and shall deposit into the Profes-
sional Fee Escrow an amount derived from the sale pro-
ceeds that equals the aggregate amount of such
accountings plus the Post-Termination Carve-Out Amount.
Upon deposit of funds into the Professional Fee Escrow
in accordance with the foregoing provisions of
this paragraph, neither Agent nor Lenders, nor any of
the Collateral, shall be subject to any further liabil-
ity for the Carve-Out or the payment of any other pro-
fessional fees or expenses.  The funds on hand in the
Professional Fee Escrow shall be free and clear of
Agent's Liens except to the extent that the balance
thereof exceeds the amount of accrued fees and expenses
comprising the Carve-Out.  The foregoing provisions
shall supersede the provisions of paragraph 7 of the
Interim Order with respect to the Carve-Out.

240168.03-New YorkS3A                    23

8.   Subject to the other terms of this Final
Order, the Liens shall be prior and senior to all liens
and encumbrances of all other secured creditors in and
to such Collateral granted, or arising, after the Peti-
tion Date (including, without limitation, liens and
security interests, if any, granted in favor of any
federal, state, municipal or other governmental unit,
commission, board or court for any liability of the
Borrowing Debtors).   The Liens shall constitute valid
and duly perfected security.interests and liens, and the
Agent and the Lenders shall not be required to file or
serve financing statements, notices of lien or similar
instruments which otherwise may be required under fed-
eral or state law in any jurisdiction, or take any ac-
tion, including taking possession, to validate and per-
fect such financing statements and liens; and the fail-
ure by the Borrowing Debtors to execute any documenta-
tion relating to the Liens shall in no way affect the
validity, perfection or priority of such Liens.   If,
however, the Agent, in its reasonable discretion, shall
determine to file any such financing statements, notices
of lien or similar instruments, or to otherwise confirm
perfection of such Liens, the Borrowing Debtors are
directed to cooperate with and assist in such process,

240168.03-New YorkS3A                    24

the automatic stay imposed by Bankruptcy Code
section 362(a) is hereby lifted to allow the filing and
recording of a certified copy of this Final Order or any
such financing statements, notices of lien or similar
instruments, and all such documents shall be deemed to
have been filed or recorded at the time of and on the
date of the Interim Order.

9. As long as any portion of the Obligations
remains unpaid, or any Loan Document remains in effect,
the Borrowing Debtors shall not seek, and it shall con-
stitute an Event of Default (and automatic occurrence of
the Termination Date) if (a) there shall be entered any
order dismissing any of the Chapter 11 Cases or (b)
except as otherwise expressly permitted under the Credit
Agreement, there shall be entered in any of the Chapter
11 Cases or any subsequent Chapter 7 case any order
which authorizes under any section of the Bankruptcy
Code, including Bankruptcy Code sections 105 and 364,
(i) the granting of any lien or security interest in any
property of the Borrowing Debtors in favor of any party
other than the Agent and the Lenders or (ii) the obtain-
ing of credit or the incurring of indebtedness that is
entitled to superpriority administrative status equal or
superior to that granted to the Agent and the Lenders

240168.03-New YorkS3A                        25

pursuant to this Final Order; unless, in connection with
any transaction cited in clause (i) or (ii) of this
paragraph 9; such order requires that the Obligations
shall first be indefeasibly paid in full to the Lenders.

10.   Effective as of entry of the Interim
Order, any outstanding letters of credit issued under
the Prepetition Credit Agreement ("Prepetition LC's")
shall be deemed to be, and treated as, Letters of Credit
and Obligations under the Credit Agreement as if such
Prepetition LC's had been issued in the first instance
under the terms of the Loan Documents.  Such Obligations
associated with such Prepetition LC's shall be paid by
disbursements directly to Lenders from the proceeds of
Loans under the Credit Agreement.

11.   Subject to the Carve-Out terms of para-
graph 7 above, as long as any portion of the Obligations
remains unpaid, all proceeds of dispositions of Collat-
eral, including, but not limited to, all proceeds from
the sales of Collateral in the ordinary course of busi-
ness or outside the ordinary course of business, shall
be paid promptly to the Lenders in reduction of the
Borrowers' Obligations under the Loan Documents to the
extent of Lenders' interest and priority in such Collat-
eral.  To the extent that the Agent or the Lenders actu-

ally receive payment of proceeds of their Collateral,
they shall receive such proceeds subject to the Carve-
Out and be obligated (to the extent of the Pre-Termina-
tion Carve-Out Amount and Post-Termination Carve-Out
Amount, as applicable) to pay promptly accrued fees,
expenses and disbursements of the Borrowing Debtors'
professionals, when and to the extent such fees, ex-
penses and disbursements are payable but are not paid by
the Borrowing Debtors under any order of the Court pro-
viding for and authorizing payment of compensation to
such professionals.

12.   The Borrowing Debtors are authorized and
directed to perform all acts, and execute and comply
with the terms of such other documents, instruments and
agreements in addition to the Loan Documents, as the
Agent or the Lenders may reasonably require, as evidence
of and for the protection of the Obligations, or which
otherwise may be deemed reasonably necessary by the
Agent or the Lenders to effectuate the terms and condi-
tions of this Final Order and the Loan Documents.   The
Borrowing Debtors, the Agent and the Lenders are hereby
authorized to implement, in accordance with the terms of
the Credit Agreement, any modifications of the Credit
Agreement without further order of the Court on the

240168.03-New York53A                    27

following conditions:   (i) the modifications must not
materially change the terms of the Credit Agreement
("material terms," as used herein, means interest rate,
fees, maturity date, events of default and remedies) and
(ii) copies of the modifications must be served upon
counsel for any statutory committees appointed.   Any
modification of material terms, to be effective, must be
approved by the Court.

13.   Having been found to be extending credit
and making Loans to the Borrowing Debtors in good faith,
the Agent and the Lenders shall be entitled to the full
protection of Bankruptcy Code section 364(e) with re-
spect to the Obligations and the Liens created or autho-
rized by this Final Order in the event that this Final
Order or any authorization contained herein is stayed,
vacated, reversed or modified on appeal.   Any stay,
modification, reversal or vacation of this Final Order
shall not affect the validity of any obligation of the
Borrowing Debtors to the Agent or the Lenders incurred
pursuant to this Final Order.   Notwithstanding any such
stay, modification, reversal or vacation, all Loans made
pursuant to this Final Order and the Credit Agreement,
and all Obligations incurred by the Borrowing Debtors
pursuant hereto or the Loan Documents prior to the ef-

fective date of such stay, modification, reversal or
vacation, shall be governed in all respects by the orig-
inal provisions hereof and the Agent, the Lenders, the
Prepetition Agent and the Prepetition Lenders, shall be
entitled to all the rights, privileges and benefits,
including without limitation, the Liens and
Superpriority Claims granted herein.

14.   The provisions of this Final Order and
any actions taken pursuant hereto shall survive entry of
any order which may be entered (a) confirming any plan
of reorganization in any of the Chapter 11 Cases (and
the Obligations shall not be discharged by the entry of
any such order or pursuant to Bankruptcy Code section
1141(d)(4), the Borrowing Debtors having hereby waived
such discharge); (b) converting any of the Chapter 11
Cases to a Chapter 7 case; or (c) dismissing any of the
Chapter 11 Cases, and the terms and provisions of this
Final Order as well as the Superpriority Claims and
Liens granted pursuant to this Final Order and the Loan
Documents shall continue in full force and effect not-
withstanding the entry of such order, and such
Superpriority Claims and Liens shall maintain their
priority as provided by this Final Order until all of

the Obligations are indefeasibly paid in full and dis-
charged.

15.   The findings contained in paragraphs D
and E hereof shall be binding upon all parties in inter-
est, including but not limited to, the Borrowing Debt-
ors, the Creditors' Committee, and any additional statu-
tory committee(s) appointed in these cases, unless (a) a
party in interest (including the Creditors' Committee,
but excluding the Debtors) has properly filed an adver-
sary proceeding or contested matter (subject to the
limitation set forth in the proviso of decretal para-
graph 7) challenging the validity, enforceability or
priority of the Prepetition Obligations, the Prepetition
Agent's and the Prepetition Lenders' liens on the
Prepetition Collateral in respect thereof on or before
April 19, 1999, and (b) the Court rules in favor of the
plaintiff in any such timely and properly filed adver-
sary proceeding or contested matter.  If no such adver-
sary proceeding or contested matter is properly com-
menced as of such date, (i) the Prepetition Obligations
shall, if not previously satisfied, constitute allowed
claims for all purposes in the Chapter 11 Cases and any
subsequent Chapter 7 cases, (ii) the Prepetition Agent's
and the Prepetition Lenders' liens on the Prepetition

Collateral shall be deemed to be or have been legal,
valid, binding, perfected, not subject to subordination
and otherwise unavoidable, (iii) the Prepetition Obliga-
tions, the Prepetition Agent's and the Prepetition Lend-
ers' liens on the Prepetition Collateral shall not be
subject to any other or further challenge by any party
in interest seeking to exercise the rights of the Bor-
rowing Debtors' estate, including, without limitation,
any successor thereto, and (iv) the retirement and re-
payment of Prepetition Obligations made pursuant to
paragraph 3 hereof shall be final and binding on all
parties in interest.  Nothing in this Final Order is
intended to diminish any rights of the Creditors' Com-
mittee or any other statutory committee(s) that are
otherwise conferred upon them under the Bankruptcy Code
or to confer upon them any rights not otherwise con-
ferred upon them under the Bankruptcy Code.

     16.  Entry of this Final Order shall be with-
out prejudice to any and all rights, remedies, claims
and causes of action which the Prepetition Agent or the
Prepetition Lenders may have against the Borrowing Debt-
ors or third parties, and without prejudice to the right
of the Prepetition Agent and the Prepetition Lenders to
seek relief from the automatic stay in effect pursuant

to Bankruptcy Code section 362, or any other relief in
the Chapter 11 Cases, and the right of the Borrowing
Debtors to oppose any such relief. The provisions of
this Final Order shall be binding upon and inure to the
benefit of the Agent, the Lenders, the Prepetition
Agent, the Prepetition Lenders, the Borrowing Debtors,
and their respective successors and assigns, including
any trustee or other fiduciary hereafter appointed in
the Chapter 11 Cases as a legal representative of the
Borrowing Debtors or the Borrowing Debtors' estates.

17.   The terms of this Final Order shall be
deemed to control over terms of the Credit Agreement and
other Loan Documents that are inconsistent with the
terms of this Final Order.

18.   On or before the tenth (10th) day follow-
ing entry of this Final Order, the Borrowing Debtors
shall execute and deliver an amended Credit Agreement
(the "Amended Credit Agreement") embodying in substance
the terms and conditions set forth in the Modifications
annexed hereto as Exhibit 1.   The Borrowing Debtors
shall file with the Court a copy of the Amended Credit
Agreement as soon as practicable after such execution
and delivery.

240168.03-New YorkS3A                    32

19. Except as specifically amended, modified, or supplemented by this Final Order, all of the provisions of the Interim Order, the Credit Agreement, and the Loan Documents shall remain in full force and effect and are hereby ratified and made final by this Final Order.

Dated:  Wilmington, Delaware
        April 14, 1999

_____
Honorable Peter J. Walsh
Chief United States Bankruptcy Judge

## MODIFICATIONS TO DIP FINANCING ARRANGEMENT
### BETWEEN FLEET CAPITAL CORPORATION AND BANKBOSTON, N.A., AS LENDERS ("LENDERS"), AND BRAZOS SPORTSWEAR, L.L.C., MORNING SUN, INC., AND BRAZOS EMBROIDERY, INC., AS BORROWERS ("BORROWERS")

I.   AMENDMENTS TO POST-PETITION LOAN AND SECURITY AGREEMENT ("Credit Agreement")

    A.   The definition of "Borrowing Base" on pages 4 through 6 of the Credit Agreement will be amended to incorporate the following concepts:

        1.   Effective as of March 18, 1999, the advance rate on eligible Cincinnati Facility Inventory consisting of "blank" finished goods for which there is a committed purchase order (in form and substance satisfactory to the Lenders in their sole discretion) will be temporarily increased to 100% of cost, but not to exceed $4,000,000 of total loans outstanding at any time until April 30, 1999, not to exceed $500,000 of total loans outstanding at any time from May 1, 1999 through May 31, 1999, and not to exceed $0 of total loans outstanding at any time on and after May 31, 1999. All sales of such inventory will reduce the $4,000,000 initial cap by an amount equal to the cost of the inventory sold. For purposes hereof, the cost of inventory means book cost without deducting any inventory-related reserves reflected on the balance sheet.

        2.   The advance rate on all other eligible Cincinnati Facility Inventory consisting of "blank" finished goods (including, without limitation, the "blank" finished goods inventory in excess of the $4,000,000 limit through April 30, 1999, and the $500,000 limit to May 31, 1999, as described in paragraph I.A.1 above), will be 35% except as otherwise provided in paragraph 3 below; and

        3.   The advance rate on all eligible blank Crable inventory will remain at 65% of cost.

    B.   The ineligible calculation pertaining to the obsolete inventory at the Cincinnati Facility in the amount of $1,615,000 referenced in the last sentence of the definition of "Eligible Inventory" on page 12 of the Credit Agreement will be deleted.

    C.   The definition of "DIP Facility Limit" on page 8 of the Credit Agreement will be amended as follows:

        1.   For the period from May 1, 1999 through May 30, 1999, the Lenders will provide an overadvance facility of up to $2,500,000, inclusive of any other overadvances created. The overadvance amount must be reduced to $1,000,000 by the earlier of the sale of Gulf Coast or by May 31, 1999 and must be paid in full by July 30, 1999.

---

\*   *Capitalized terms used herein, unless otherwise defined, shall have the meanings ascribed to them in that certain Post-Petition Loan and Security Agreement dated January 21, 1999, between Lenders and Borrowers.*

240390.04-New YorkS3A

2.    The conditions precedent to the funding of the overadvance will be (a) Lenders satisfactory confirmation of approval of commercial financing for the offer to purchase Gulf Coast by G.C. Sportswear, L.L.C. or other affiliate of S. T. McKnight or a higher and/or better bidder; (b) approval of the sale of Gulf Coast by the Creditors' Committee; (c) receipt by the Lenders and Committee of the Borrowers' good faith revised projections (prepared by Borrowers after consultation with the Creditors' Committee's financial advisor, and reasonably acceptable to the Creditors' Committee) reflecting the Borrowers' new financing structure and most recent business forecast (collectively, the "Business Plan"); (d) establishment of financial covenants based upon the Borrowers' Business Plan that set a monthly minimum Morning Sun EBITDA test and a monthly Morning Sun cumulative orders or bookings test, with such tests to be applied first as of the end of May 1999 and thereafter at the end of each following month; provided, however, that, in any event, (i) such tests will not require actual performance exceeding 90% of the Borrowers' projected performance levels set forth in the Business Plan, and (ii) will terminate in the event of the sale of Morning Sun; (e) the advance rate for the first tranche on eligible Cincinnati Facility Inventory set forth in paragraph I.A.1 above (with the exception of $500,000 from May 1, 1999 through May 31, 1999) is reduced to 35%; and (f) absence of any Event of Default including, without limitation, an Event of Default resulting from any overadvance existing on May 1, 1999.

D.    The definition of "Carve-Out Reserve" on page 7 of the Credit Agreement will be amended (i) by deleting the word "allowed" in subsection (iii); (ii) by deleting the reference to $250,000 and by inserting $375,000 in its place; and (iii) by changing the phrase "Post Default Carve Out Amount" to "Post-Termination Carve-Out Amount".

E.    Section 3.1(A) of the Credit Agreement will be amended to provide LIBOR rate pricing option for Loans to bear interest at an adjusted LIBOR rate *plus* 3.50%. The maximum amount of LIBOR-priced borrowings that may be outstanding at any time will be $25,000,000, with minimum incremental strips of $5,000,000 and with a maximum of 3 strips. Each LIBOR-priced Loan will have an interest period of 30 days. This provision is in addition to, and not in lieu of, the Base Rate option and does not modify the terms of the Credit Agreement dealing with the Default Rate. The Credit Agreement will be appropriately supplemented with Lenders' customary language dealing with LIBOR-priced Loans, including provisions dealing with breakage fees and borrowing mechanics.

F.    Section 3.1(H) will be amended to provide that , if on or before July 1, 1999, all of the Obligations are paid in full and the Credit Agreement is terminated as a result of financing provided to Borrowers by a third party, then Lenders will provide a rebate of a portion of the closing fee, calculated by prorating $425,000 over the original term that the Credit Agreement was in effect.

G.    Section 3.1 of the Credit Agreement will be amended by adding a new paragraph (J), to read as follows:

        "(J)    Credit Against Exit Fee.    If and only if Lenders provide post-confirmation exit financing to Borrowers, then Borrowers shall receive

a credit against any closing fee charged by Lenders in connection with the exit financing up to the amount of $150,000. Nothing herein shall obligate Lenders to provide any post-confirmation exit financing to any Borrower or constitute the consent of Lenders to provide any such financing."

H.   Section 9.1(X) of the Credit Agreement regarding the Plan of Liquidation of Cincinnati Facility Inventory will be deleted in its entirety and the following provision inserted in its place:

"Promptly complete in a commercially reasonable manner the sale pending of the Cincinnati Facility Inventory (except for the Crable inventory) by June 11, 1999."

I.   Sections 9.1(T) and 9.2(O) of the Credit Agreement will be amended to provide that Lenders will (a) give their consent to a sale of assets of the Gulf Coast division if the net cash proceeds from the sale are at least equal to the sum of (i) the portion of the outstanding Loans at closing that are margined against the assets of the Gulf Coast division assets *plus* (ii) $1,500,000; and (b) agree to apply the proceeds from the sale, first, to repay the portion of the Loans that were margined at closing against the assets sold, then to permanently reduce any overadvance outstanding, and then to permanently reduce the Borrowing Base and the DIP Facility Limit as provided in the last paragraph of the definition of "Borrowing Base" and as provided in the definition of "DIP Facility Limit Reduction Amount." Sections 9.1(T) and 9.2(O) of the Credit Agreement will also be amended to provide that Lenders will give their consent to sale of Morning Sun and/or Plymouth Mills, a division of Brazos Sportswear, L.L.C., to a qualified buyer for cash if the net cash proceeds from the sale are at least equal to the outstanding amount of all of the Obligations (including contingent claims for Letters of Credit) and are remitted to Lenders at Closing.

J.   Section 9.1(W) of the Credit Agreement (Business Plan) will be deleted and the following substituted in lieu thereof:

"Furnish Lenders with a copy to Houlihan Lokey Howard & Zukin (a) on a weekly basis with (i) a weekly report concerning each Borrower's customer orders received by such Borrower during the immediately preceding week for the purchase of goods from such Borrower in the ordinary course of business compared to Borrowers' business plan; (ii) a weekly report of each Borrower's backlog of orders compared to Borrowers' business plan; (iii) a weekly report of each Borrower's total shipments of goods during the immediately preceding week compared to Borrowers' business plan and (iv) Borrowers' projection of availability; (b) by the fifteenth day following the end of the fiscal month, a copy of the estimated monthly financial statements of Borrowers by business unit in the form currently provided to the Borrowers' boards of directors."

K.   Section 11.1(L) of the Credit Agreement (Change in Control) will be deleted.

L.   Section 11.1(H) of the Credit Agreement (Plan of Reorganization) will be amended by changing the date of July 31, 1999 to August 31, 1999.

M.     Borrower is in default under certain provisions of the Credit Agreement, including, but not limited to, Sections 9.1(X) (Plan of Liquidation of Cincinnati Facility Inventory) and 10.2(F) (Permanent Financing Order within thirty (30) days), and as a result thereof, one or more Events of Default have occurred and continue to exist under the Credit Agreement (the "Existing Events of Default"). Lenders and Agent will waive only the Existing Events of Default that are in existence on the date hereof and delete them in the amendment to be made to the Credit Agreement.

N.     Section 9.1(Y) (Average Excess Availability) of the Credit Agreement will be revised so that the requirements are suspended from April 1, 1999 through and including June 29, 1999. On June 30, 1999, the Borrowing Base must exceed the Obligations by at least $1,000,000 and for each rolling period of two (2) weeks thereafter the Average Excess Availability shall be at least $1,000,000.

II.     FINAL DIP FINANCING ORDER

The final DIP financing order will be substantially the same, in form, scope and content, as the interim financing order as modified, with appropriate adjustments to reflect that it is the final financing order and with the following changes.

A.     The Credit Agreement, as amended by the terms outlined above, will be approved.

B.     The provisions in paragraph 3, on page 12, of the interim order that limit the dollar amount of Loans that may be outstanding at any time under the Credit Agreement will be deleted.

C.     Paragraph 4 on page 16 will be amended to delete the last proviso and insert the following in lieu thereof:

"provided , however, that the Agent and the Lenders may take the actions described above only after providing five business days prior written notice in accordance with, and to the extent required by, the Credit Agreement. Without limiting the generality of the remedies and the provision of any of the Loan Documents or this Order, in no event shall any of the Borrowing Debtors be authorized to use any of the Collateral (including any cash proceeds of any Collateral) from and after, and during the continuance of, any Event of Default until all of the Obligations are paid in full."

D.     Paragraph 7, beginning on page 18, will be deleted and the following substituted in lieu thereof:

"Any provision of this Order or the Credit Agreement to the contrary notwithstanding, the Liens and Superpriority Claims granted to the Agent and the Lenders pursuant to the Credit Agreement and this Order shall be subject and subordinate to a carve-out (the "Carve-Out") for: (a) the payment of allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Borrowing Debtors and any statutory committee of unsecured creditors appointed in the Chapter 11 Cases in an amount not to exceed $250,000

(the "Post-Termination Carve-Out Amount") on account of such profes-
sional fees and disbursements incurred after the "Termination Date" (as
defined below), and the aggregate amount (the "Pre-Termination Carve-Out
Amount") of all unpaid professional fees and disbursements incurred,
accrued or invoiced from the Petition Date until the Termination Date; and
(b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6)
and any fees payable to the Clerk of the Bankruptcy Court, to the extent that
such fees are payable after the Termination Date and there are not funds on
hand in the Borrowing Debtors' Chapter 11 estates with which to satisfy
such fees and other administrative expenses; provided, however, that
the Carve-Out shall not include professional fees and disbursements
incurred in connection with any claims or causes of action against either the
Pre-Petition Lenders or the Pre-Petition Agent and/or challenging or raising
any defense to the Pre-Petition Obligations or any Lien of the Pre-Petition
Agent or the Pre-Petition Lenders.   Until the Termination Date, the
Borrowing Debtors shall be permitted to pay compensation and reimburse-
ment of expenses, allowed and payable under Bankruptcy Code §§ 330 and
331, as the same may be payable, and the amount so paid shall be free and
clear of the Liens and the Superpriority Claims.   As used herein,
the term "Termination Date" means the earliest of (x) the date on which
Agent and Lenders cease making advances to the Borrowing Debtors under
the Loan Documents as a consequence of an Event of Default, (y) the
Maturity Date (as defined in the Credit Agreement) or (z) the date on which
all of the Obligations have been satisfied.   If the Termination Date occurs
as a consequence of an Event of Default, then, whether or not demand for
payment of the Carve-Out has been made by a Borrowing Debtor or any
other interested party or professional person and irrespective of Lenders'
termination of their commitments under the Credit Agreement, Lenders
may, in their discretion at any time, advance to Borrowing Debtors pursuant
to the Credit Agreement an amount equal to the Carve-Out (or Lender's
estimate of such amount), to be held by Borrowing Debtors in a separate
account, in escrow, for the benefit of professional persons entitled to be
paid from the Carve-Out (the "Professional Fee Escrow"). If the Termina-
tion Date occurs in connection with a proposed sale of assets of one or more
Borrowing Debtors, with the result that the Obligations will be substantially
satisfied or paid in full therefrom, then, from the proceeds of such sale,
Agent and Lenders may first satisfy the Obligations after setting aside an
amount (the "Reserve Amount") equal to the greater of $4,000,000 or the
amount that the sale proceeds exceeds the amount of the Obligations. The
Agent and Lenders shall hold the Reserve Amount pending Agent's receipt
of a final accounting from professional persons in accordance with the next
sentence hereof.   Each professional person who may be entitled to
participate in the Carve-Out shall, after the sooner to occur of (i) ten (10)
days after the date of consummation of a sale of assets of the Borrowing
Debtors for an amount sufficient to substantially  satisfy or pay in full the
Obligations or (ii) fifteen (15) days from receipt of a written request for an
accounting from Agent after the Termination Date, submit to Agent and
Lenders an accounting for the amount of their fees and expenses that such

5

professional person claims constitute a part of the Pre-Termination Carve-Out Amount. If and to the extent that the Reserve Amount exceeds the aggregate amount of such accountings plus the Post-Termination Carve-Out Amount, then Lenders shall promptly return such excess to the Borrowing Debtors and shall deposit into the Professional Fee Escrow an amount derived from the sale proceeds that equals the aggregate amount of such accountings plus the Post-Termination Carve-Out Amount. Upon deposit of funds to the Professional Fee Escrow in accordance with the foregoing provisions of this paragraph, neither Agent nor Lenders, nor any of the Collateral, shall be subject to any further liability for the Carve-Out or the payment of any other professional fees or expenses. The funds on hand in the Professional Fee Escrow shall be free and clear of Agent's liens except to the extent that the balance thereof exceeds the amount of accrued fees and expenses comprising the Carve-Out. The foregoing provisions shall supersede the provisions of paragraph 7 of the Interim Order with respect to the Carve-Out."

E.   Paragraph 12 on page 24 will be amended so that clause (iii) thereof will be eliminated, a period placed in lieu of the semicolon after clause (ii), the word "and" inserted after the semicolon at the end of clause (i) and the following added at the end of the paragraph:

"Any modification of material terms, to be effective, must be approved by the Court."

F.   The parties shall endeavor to finalize the amendment of the Credit Agreement promptly after (and, in any event within ten days after) the entry of the final order.

# Attachment 10

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONXUS COMMUNICATIONS, INC., | ) | Case No. 99-1147 (MFW) |
| CONXUS FINANCIAL CORP., | ) | |
| CONXUS NETWORK, INC., | ) | |
| CONXUS SPECTRUM, INC., | ) | Jointly Administered |
| CONXUS PROPERTIES, INC., | ) | |
| | ) | |
| Debtors. | ) | |

### FINAL ORDER (I) AUTHORIZING (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 363 AND 364

Upon the motion (the "Motion") dated May 19, 1999 of Conxus Financial Corp. (the "Borrower"), Conxus Communications, Inc. (the "Parent") and the following direct and indirect subsidiaries of the Borrower (together with the Parent, the "Guarantors"): Conxus Network, Inc., Conxus Spectrum, Inc. and Conxus Properties, Inc., debtors and debtors-in-possession (collectively, the "Debtors"), (a) seeking this Court's authorization pursuant to Sections 363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Borrower, inter alia, (i) to obtain post-petition financing (the "Post-Petition Financing"), and for the Guarantors to guarantee the payment of such obligations up to an aggregate amount not to exceed $17,000,000 including principal and interest (the "Commitment") (subject to the staging of the availability of the Commitment described in the Credit Agreement and Paragraph 3 of this Final Order) from Motorola, Inc.,

by and through its Messaging Systems Products Group (the "Lender"), and for the Borrower

and the Guarantors to execute a Credit and Guarantee Agreement with respect to the Post-

Petition Financing substantially in the form attached as an Exhibit to the Motion (as

amended, supplemented or otherwise modified from time to time, including the

modifications set forth in this Final Order, the "Credit Agreement"); and for the Borrower to

execute a credit Note (the "Note"); and for each Guarantor to guarantee the Note and all

obligations of the Borrower and each other Guarantor under the Credit Agreement (the

Credit Agreement, the Note, and all ancillary documents at any time executed in connection

therewith, collectively, the "Loan Documents"); (ii) to grant the Lender, pursuant to

Bankruptcy Code §§ 364(c) and 364(d), security interests in all of the Debtors' currently

owned and after acquired property to secure the Debtors' obligations under the Loan

Documents and (iii) to grant the Lender priority in payment with respect to such obligations

over any and all administrative expenses of the kinds specified in Bankruptcy Code §§

503(b) and 507(b), other than as described below; (b) seeking this Court's authorization to

use Cash Collateral (as defined below) pursuant to Bankruptcy Code § 363(c) and to provide

adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(d) to the secured

lenders (the "Pre-Petition Lenders") pursuant to that Second Amended and Restated Credit

Agreement, dated as of May 28, 1998 (as amended, supplemented or otherwise modified

prior to the commencement of these Chapter 11 Cases, the "Pre-Petition Credit Agreement"),

among the Borrower, the Lender, The Chase Manhattan Bank ("Chase"), Glenayre

Electronics Inc. ("Glenayre") and Chase, as administrative agent for the Pre-Petition Lenders

(in such capacity, the "Pre-Petition Agent"), on account of their pre-petition debt (the "Pre-

Petition Obligations") under the Pre-Petition Credit Agreement and all collateral and

ancillary documents executed in connection therewith (the "Pre-Petition Loan Documents")

2

with respect to (x) the priming liens and security interests to be granted pursuant hereto

under Bankruptcy Code § 364(d) to secure the Post-Petition Financing and (y) any

diminution in the value of the Pre-Petition Lenders' interests in the Pre-Petition Collateral (as

defined below) resulting from the use of Cash Collateral, the use, sale or lease of the Pre-

Petition Collateral (other than Cash Collateral) or the imposition of the automatic stay

pursuant to Bankruptcy Code § 362; and (c) seeking a preliminary hearing (the "Preliminary

Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule

4001 (the "Interim Order") authorizing the Borrower to borrow from the Lender under the

Post-Petition Financing up to an aggregate of $8,050,000 plus accrued interest on the

aggregate principal amount upon the terms and conditions set forth in the Loan Documents

and the Interim Order pending the Final Hearing referred to below (including, without

limitation, the staging of the availability of the Commitment described in the Credit

Agreement and Paragraph 3 of the Interim Order), at which time the Borrower will seek

authority to borrow an additional $8,950,000, for a total aggregate of $17,000,000; and due

and sufficient notice of the Motion under the circumstances having been given and the Court

having entered the Interim Order on May 19, 1999 which authorized the Borrower to borrow

$4,000,000 from the Lender pending the Final Hearing; and (d) requesting that a final

hearing (the "Final Hearing") be scheduled by this Court to consider entry of a final order

(the "Final Order"; together with the Interim Order, the "Orders") authorizing on a final

basis, inter alia, the Post-Petition Financing; the Final Hearing on the Motion having been

held before this Court on June 9, 1999; and a continued Final Hearing on the Motion having

been held before this Court on July 1, 1999; upon the entire record made at the Preliminary

Hearing and the Final Hearing including the continued Final Hearing, and this Court having

found good and sufficient cause appearing therefor;

3

The Court hereby makes the following FINDINGS:

A.    On May 18, 1999 (the "Filing Date"), the Borrower and the
Guarantors filed voluntary petitions for relief with this Court under Chapter 11 of the
Bankruptcy Code (the "Chapter 11 Cases").   The Debtors are continuing in possession of
their property, and operating and managing their businesses, as debtors-in-possession
pursuant to Bankruptcy Code §§ 1107 and 1108.  The Final Hearing and continued Final
Hearing have been held pursuant to the provisions of Bankruptcy Rule 4001(c).  A
Preliminary Hearing was held on May 19, 1999, at which time this Court entered the Interim
Order authorizing debtor-in-possession financing.

B.    This Court has jurisdiction over the Chapter 11 Cases and the Motion
pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core
proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    Without prejudice to the rights of any other party (but subject to the
limitations described in Paragraph 15 below), the Debtors admit that, in accordance with the
terms of the Pre-Petition Loan Documents, the Debtors are truly and justly indebted to the
Pre-Petition Lenders, without defense, counterclaim or offset of any kind, and that as of the
Filing Date (i) the Borrower was liable to the Pre-Petition Lenders in the aggregate principal
amount of approximately $71,815,746 in respect of loans made by the Pre-Petition Lenders
to the Borrower pursuant to the Pre-Petition Credit Agreement (together with interest accrued
and unpaid thereon and fees and expenses payable under the Pre-Petition Credit Agreement),
(ii) each Debtor party to the guarantees executed and delivered in respect of the Pre-Petition
Obligations was contingently liable to the Pre-Petition Lenders in respect of such guarantees:
and (iii) as of the Filing Date, the Borrower and the Guarantors, in consideration of the Loans
to be made under the Commitment and the consent of the Pre-Petition Lenders to the priming

4

of their liens and use of Cash Collateral, waive and release any and all causes of action and

claims whatsoever against the Lender, the Pre-Petition Lenders, the Pre-Petition Agent and

their respective agents, representatives, assigns and successors.

   D.   Without prejudice to the rights of any other party (but subject to the

limitations described in Paragraph 15 below), the Debtors further admit that, by reason of the

Pre-Petition Loan Documents, the Pre-Petition Obligations are secured by enforceable liens

and security interests granted by the applicable Debtors to the Pre-Petition Agent, for the

ratable benefit of the Pre-Petition Lenders, upon and in substantially all of the Borrower's

and the other applicable Debtors' assets and property (including the setoff rights described

below, the "Pre-Petition Collateral"), including without limitation, equipment, inventory,

accounts receivable, instruments, chattel paper, general intangibles, contracts, documents of

title, to the full extent permitted by applicable law, all FCC Licenses (as such term is defined

in the Pre-Petition Credit Agreement) and the proceeds of any FCC Licenses, the capital

stock of each of the Credit Parties, and all other tangible and intangible personal property and

the proceeds and products thereof, provided, however, that this Court is not, by this Final

Order, ruling upon the enforceability of the lien, under applicable non-bankruptcy law, of the

Pre-Petition Agent and the Pre-Petition Lenders in the FCC Licenses themselves.  The Pre-

Petition Lenders are entitled, pursuant to Bankruptcy Code §§ 361 and 363(e), to adequate

protection of their interest in the Pre-Petition Collateral, including cash collateral within the

meaning of Bankruptcy Code § 363(a) ("Cash Collateral"), for the use of the Cash Collateral,

the use, sale or lease of the Pre-Petition Collateral other than the Cash Collateral and the

imposition of the automatic stay.

   E.   The Debtors do not have sufficient available sources of working

capital and financing to carry on the operation of their businesses without the Post-Petition

5

Financing and the use of Cash Collateral. The ability of the Debtors to maintain business relationships with their vendors and suppliers, to purchase new inventory and otherwise finance their operations, is essential to the Debtors' continued viability. In addition, the Debtors' critical need for financing is immediate. In the absence of the Post-Petition Financing and such use of the Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur. The preservation, maintenance and enhancement of the going concern value of the Borrower and the other Debtors are of the utmost significance and importance to a successful reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.

F.    Given the Debtors' current financial condition and capital structure, the Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense. Financing on a post-petition basis is not otherwise available without the Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code §364(c) and (d).

G.    The Lender has informed the Debtors that the Lender is unwilling to extend the Post-Petition Financing unless the Debtors agree to use funding from the Initial Commitment Amount to repay in full the <u>Bridge Loans</u> (as defined in the Credit Agreement), up to a principal amount of $2,000,000. Although the Bridge Loans are unsecured, payment of the Bridge Loans is appropriate under the Doctrine of Necessity. As set forth in Paragraph E, the Post-Petition Financing is essential to the continuing operation of the Debtor and there is a real and immediate threat that, without the Post-Petition Financing, the Debtors will be

6

unable to pay critical suppliers and employees, and continuing operation of the Debtors'

estates would not be possible, thereby causing serious and immediate harm to the Debtors

and their estates. Accordingly, the Interim Order authorized and directed repayment by the

Debtors of the Bridge Loans, but without prejudice to the right of the Official Committee of

Unsecured Creditors (the "Committee") to challenge repayment of the Bridge Loans, such

challenge to be lodged and heard at the Final Hearing. This Court finds no basis to modify

its ruling under the Interim Order authorizing and directing repayment by the Debtors of the

Bridge Loans.

        H.      Notice of the Final Hearing and the relief requested in the Motion has

been given to (i) the Office of the United States Trustee; (ii) the creditors holding the 20

largest unsecured claims against the Borrower; (iii) the Pre-Petition Lenders and the Pre-

Petition Agent; (iv) the Escrow Agent for the Convertible Notes; (v) counsel for the

Committee; and (vi) the Indenture Trustee for the Convertible Notes. Due and sufficient

notice of the Final Hearing and the relief requested in the Motion was properly given to all

interested parties in accordance with the requirements of Bankruptcy Code §§ 102(1), 364(c)

and 364(d) and Bankruptcy Rules 2002 and 4001(c). The Committee has been formed in the

case and was represented at the Final Hearing.

        I.      Based on the record presented to this Court by the Debtors, it appears

(and the Debtors, Lender and Pre-Petition Lenders have stipulated) that the Post-Petition

Financing has been negotiated in good faith and at arm's-length between the Debtors and the

Lender, and any credit extended and loans made to the Debtors pursuant to the Credit

Agreement shall be deemed to have been extended, issued or made, as the case may be, in

good faith as required by. and within the meaning of, Bankruptcy Code § 364(e).

J.    Based on the record before this Court, it appears (and the Debtors,
Lender and Pre-Petition Lenders have stipulated) that the terms of the Post-Petition
Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment
consistent with their fiduciary duties, and are supported by reasonably equivalent value and
fair consideration. The Debtors have taken all actions under applicable non-bankruptcy law,
including obtaining any required ratification of the Debtors' Board of Directors or Executive
Committee, to authorize execution by Mark Moore of the Loan Documents.

K.    The Pre-Petition Lenders and Pre-Petition Agent have consented to the
terms of the Post-Petition Financing and the provisions of this Final Order, subject to and
contingent upon receipt of adequate protection for (i) the priming of the Pre-Petition Agent's
and the Pre-Petition Lenders' liens by the liens in favor of the Agent and the Lenders granted
in the Orders and the Loan Documents pursuant to Bankruptcy Code § 364(d), (ii) the use of
Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use sale or lease of the Pre-
Petition Collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c) and
(iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362, provided to the
Pre-Petition Lenders and Pre-Petition Agent under Paragraph 9 of this Final Order.

L.    The Debtors have requested entry of this Final Order pursuant to
Bankruptcy Rule 4001(c)(2). The permission granted herein to enter into the Post-Petition
Financing as modified hereby, and obtain funds thereunder, and to use the Cash Collateral, is
necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes
that entry of this Final Order is in the best interests of the Debtors' respective estates and
creditors as its implementation will, among other things, allow for the flow of merchandise
and services to the Company necessary to sustain the operation of the Debtors' existing
businesses and enhance the Debtors' prospects for successful reorganization.

8

Based upon the foregoing findings, stipulations, and conclusions, and upon

the record made before this Court at the Preliminary Hearing and the Final Hearing, and

good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED that:

1.    The Motion is granted, subject to the terms and conditions set forth in

this Final Order.

2.    The Debtors are expressly authorized and empowered to execute and

deliver the Credit Agreement, the Note and any other Loan Document to be executed and

delivered in connection therewith. The Debtors' Chief Financial Officer, Mark Moore, is

hereby authorized to execute all such documents, and upon their execution by Mark Moore,

the Loan Documents shall be binding upon the Debtors and Debtors-in-Possession without

the requirement of ratification or any other action by the Debtors' Board of Directors. The

Borrower and the Guarantors are authorized to comply with and perform all of the terms and

conditions contained therein, and the Borrower is directed to pay amounts borrowed, and

each Guarantor is further directed to pay amounts guaranteed, with interest to the Lender in

accordance with and subject to the terms and conditions set forth in the Loan Documents and

the Orders. The Debtors are further authorized and directed to pay all facility, commitment

and other fees and expenses, including, without limitation, all reasonable fees and expenses

of professionals engaged by the Lender, in accordance with the terms of the Credit

Agreement. All loans made under the Credit Agreement (the "Loans") and interest thereon

and all fees, costs, expenses, indebtedness, obligations and liabilities of the Borrower and

each Guarantor to the Lender under or in respect of the Loan Documents and the Orders, are

hereinafter referred to as the "Obligations."

9

3.    The Borrower is expressly authorized to borrow from the Lender, on the terms and subject to the conditions set forth in the Loan Documents and the Orders (including, without limitation, the staging of the availability of the Commitment set forth in the Credit Agreement and the next succeeding proviso), a total of $17,000,000, of which $2,000,000 has been previously earmarked and authorized by the Bankruptcy Court to be used for repayment of the Bridge Loans in full. So long as no Lender or Pre-Petition Lender has delivered to the Debtors a Contingent Commitment Notice (as defined in the Credit Agreement), on or before August 6, 1999, the Contingent Commitment shall be made available from August 14, 1999 to the Termination Date (as defined below). The Guarantors are expressly authorized to guarantee all Obligations in respect of such Loans. The Borrower is authorized to use the proceeds of the Loans, and to use the Cash Collateral, in the operation of the Debtors' businesses, provided that (a) the proposed Loan or use of Cash Collateral is consistent with the terms of the Credit Agreement and this Final Order and will be used to pay when due expenses of the types and in the amounts (subject to the terms of the Credit Agreement) as are generally set forth in the Budget (as defined in the Credit Agreement), and (b) the requested Loan is necessary after the Borrower's use of all available Cash Collateral.

4.    Upon the occurrence of and during the continuance of an Event of Default (as defined in the Credit Agreement), the Lender may exercise rights and remedies and take all or any of the following actions without further modification of the automatic stay pursuant to Bankruptcy Code § 362 (which is hereby deemed modified and vacated to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate the Commitment and thereafter cease to make Loans to the Debtor (the date of such termination, the "Termination

10

Date"), provided, however, that notwithstanding an Event of Default, the Lender shall be

required to fund the Severance Commitment (as defined in the Credit Agreement); (b)

declare the principal of and accrued interest, fees and other liabilities constituting the

Obligations to be due and payable; (c) set-off amounts in any accounts maintained with the

Lender or otherwise enforce rights against any other Collateral in the possession of the

Lender; and/or (d) take any other action or exercise any other right or remedy permitted to

the Lender under the Loan Documents, the Orders or by operation of law; provided, further,

that the Lender may take the actions described in clauses (c) or (d) above and may exercise

any other right of set-off granted in the Loan Documents, including section 9.7 of the Credit

Agreement, only after providing five business days' prior written notice to the Borrower, the

United States Trustee, the Pre-Petition Lenders, the FCC, and the Committee; and provided, further,

that no order prohibiting such actions described in clauses (c) or (d) shall have been entered

by this Court during such five business day period. The Debtors waive any right to seek

relief under the Bankruptcy Code, including without limitation, under Bankruptcy Code §

105, to the extent any such relief would in any way restrict or impair the rights and remedies

of the Lender set forth in the Orders and in the Loan Documents. In addition, the Borrower's

right to use Cash Collateral shall terminate automatically on the Termination Date or, upon

the occurrence and during the continuance of an Event of Default, on the fifth business day

after the Lender provides written notice to the Borrower, the United States Trustee, the Pre-

Petition Lenders, the FCC, and the Committee of the occurrence and continuance of an Event of

Default and that such use of Cash Collateral shall terminate as a result thereof.

     5.    Notwithstanding anything herein to the contrary, no Loans, Cash

Collateral or any portion of the Carve-Out (as defined in Paragraph 8 below) may be used (a)

to object to or contest in any manner, or raise any defenses to, the validity, perfection,

priority or enforceability of the Obligations or the Pre-Petition Obligations, or the liens and

security interests securing the Obligations or the Pre-Petition Obligations, (b) to assert any

claims or causes of action against the Lender, the Pre-Petition Lenders or the Pre-Petition

Agent, except to enforce the provisions of the Interim Order, this Final Order and the Credit

Agreement, or (c) for formal discovery proceedings against the Lender, the Pre-Petition

Lenders, the Pre-Petition Agent, or third parties in connection with potential claims against

the foregoing lender parties; provided, that none of the Committee Fees may be used to

compensate for formal discovery proceedings as set forth in subparagraph (c) of this

Paragraph unless, prior to the commencement of such proceedings, the Committee has

attempted to obtain the information it is seeking by informal means and has been

unsuccessful in obtaining such information on a timely basis, and the Committee

demonstrates to the Court, in connection with obtaining Court approval for such formal

discovery proceedings, that the Committee attempted to obtain the information sought by

such proceedings by informal means and was unsuccessful and that the Committee has

demonstrated to the Court that the information sought is reasonably calculated to lead to the

discovery of admissible evidence relevant to a colorable claim that the Committee, in good

faith, believed it could bring; and provided, further, that, in any event, no more than $50,000

of the Committee Fees may be used to compensate Committee counsel for such formal

discovery proceedings.

6.    In accordance with Bankruptcy Code § 364(c)(1), subject to Paragraph

8 below, the Obligations shall constitute claims (the "Super-priority Claims") with priority in

payment over any and all administrative expenses of the kinds specified or ordered pursuant

to any provision of the Bankruptcy Code, including, but not limited to. Bankruptcy Code §§

105, 326. 328, 330, 331, 503(b), 506(c), 507(a) and 507(b) and shall at all times be senior to

the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. No cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from and incurred subsequent to the conversion of any of the Chapter 11 Cases to Chapter 7 pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Super-priority Claims of the Lender arising out of the Obligations, subject only to the Carve-Out (as defined in Paragraph 8). Notwithstanding the foregoing, the waiver of third party rights under § 506(c) shall only apply to claims of third parties who have received notice of the provisions of this Paragraph 6. The Debtors shall serve notice of this Paragraph on all parties in interest. The Borrower and the Guarantors shall, subject to the Budget, be permitted to pay compensation and reimbursement of expenses allowed and payable under §§ 330 and 331 of the Bankruptcy Code, as the same may be payable, which amounts shall reduce the Carve-Out as set forth in Paragraph 8 below.

7.      As security for the Obligations, the Lender shall have and is hereby granted  valid and perfected, security interests in, and liens upon (the "Liens"), all present and after-acquired personal and real property of the Debtors of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtors, all causes of action existing as of the Filing Date and the proceeds thereof (but excluding from the Collateral avoidance actions under §§ 544 through 553 of the Bankruptcy Code and all proceeds thereof), all claims for relief arising under Bankruptcy Code § 506 and proceeds thereof, all FCC Licenses (as such term is defined in the Credit Agreement) and the proceeds of any FCC Licenses; provided, however, that such security interest does not include at any time the FCC Licenses to the extent (but only the extent) that at such time any Debtor is prohibited from granting a security interest therein pursuant to the Communications Act of

13

1934, as amended, but such security interest does include, to the maximum extent permitted by law, all rights incident or appurtenant to the FCC Licenses and the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of the FCC Licenses; the capital stock of each Debtor and all real property, the title to which is held by the Borrower or any Guarantor, or possession of which is held by the Borrower or any Guarantor pursuant to leasehold interest, (collectively, with all proceeds and products of any or all of the foregoing, the "Collateral"). The Liens on the Collateral granted to the Lender shall have the following priority:

(a)   Pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected lien or security interest;

(b)   Pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior, priming, perfected Lien upon all of the Debtors' right, title and interest in, to and under the Pre-Petition Collateral;

(c)   Pursuant to Bankruptcy Code § 364(c)(3), a second priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral which is subject to the Permitted Liens (as defined in the Credit Agreement), which shall be junior to such Permitted Lien to the extent the Permitted Lien is a validly perfected security interest or lien in existence as of the Filing Date; and

(d)   In the event the Liens are junior to a lien in favor of a third party (the "Third Party Lien") pursuant to the terms of this Final Order, and the Third Party Lien is avoided pursuant to an avoidance power under §§544 through 553 of the Bankruptcy Code, the Third Party Lien shall be preserved for the benefit of this Estate but shall be junior and subordinate to the Liens.

8.   Any provision of the Orders or the Credit Agreement to the contrary notwithstanding, the Liens and Super-priority Claims granted to the Lender pursuant to the Credit Agreement and the Orders shall, whether or not there has been the occurrence of an Event of Default, be subject and subordinate only to (in addition to the retainers for Debtors' counsel that are included in the Permitted Liens) (a) the payment of allowed professional fees

14

and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§

327 or 1103(a), by the Debtors and by the Committee in the Chapter 11 Cases (the

"Professionals"), in an aggregate amount allocated to that Professional under the Budget (as

amended by this Final Order), prorated and accrued up to, and incurred prior to, the

Termination Date (the "Accrued Amount"), less any portion of the Accrued Amount paid

from the Loans or Cash Collateral prior to the Termination Date, but without reduction from

the Accrued Amount for any fees paid from retainers included in the Permitted Liens; plus

(b) the payment of allowed professional fees and disbursements incurred by attorneys

retained by the Debtors in the additional aggregate sum of $400,000, less the amount of

professional fees and disbursements paid to attorneys retained by the Committee pursuant to

subparagraph (c); (c) the payment of allowed professional fees and disbursements incurred

by attorneys retained by the Committee in the additional aggregate sum of $100,000; and (d)

quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to

the Clerk of the Bankruptcy Court (collectively, the "Carve-Out"); provided, however, the

Carve-Out shall not include professional fees and disbursements incurred in connection with

(i) asserting any claims or causes of action against the Lender, the Pre-Petition Lenders or the

Pre-Petition Agent, including formal discovery proceedings in anticipation thereof, except to

the extent permitted pursuant to Paragraph 5 of this Final Order, and/or (ii) challenging any

lien of the Lender, the Pre-Petition Agent or the Pre-Petition Lenders.  In no event (i) shall

the Lender be required to advance any funds for, or subordinate its Liens and Super-priority

Claims to, or (ii) shall the Pre-Petition Agent and Pre-Petition Lenders be required to

subordinate their Super-priority Claims, Replacement Liens and other liens and security

interests, to payments to Professionals employed on behalf of the Committee in excess of the

Accrued Amount for such Professionals plus the amount set forth in clause (c) above.  The

15

Pre-Petition Agent and Pre-Petition Lenders further agree that the liens and security interests

and Replacement Liens securing the Pre-Petition Obligations shall be subject to and

subordinate to the fees and expenses described in clauses (a) and (b) of the Carve-Out,

provided, however, that such consent by the Pre-Petition Lenders shall in no way be

construed to increase the aggregate amount of the Carve-Out as set forth above.

9.    (a)    Immediately upon the entry of the Interim Order, the Debtors

were authorized, and are hereby authorized to continue to use all Cash Collateral of the Pre-

Petition Lenders; provided, that the Pre-Petition Lenders are granted adequate protection as

hereinafter set forth.

(b)    As adequate protection to the Pre-Petition Agent and the Pre-

Petition Lenders for (i) the priming of the Pre-Petition Agent's and Pre-Petition Lenders'

liens by the Liens in favor of the Lender granted in the Orders and the Loan Documents

pursuant to Bankruptcy Code § 364(d), (ii) the use of the Cash Collateral pursuant to

Bankruptcy Code § 363(c), (iii) the use, sale or lease of the Pre-Petition Collateral (other

than the Cash Collateral) pursuant to Bankruptcy Code § 363(c) and (iv) the imposition of

the automatic stay pursuant to Bankruptcy Code § 362:

(A)    the Pre-Petition Agent and the Pre-Petition Lenders shall be
and they hereby are granted effective as of the date of entry of the Interim
Order (limited in amount to the aggregate diminution, if any, after the Filing
Date in the value of the interests of the Pre-Petition Lenders in the Cash
Collateral and Pre-Petition Collateral resulting from the matters referenced in
clauses (i) through (iv) above), valid and perfected, replacement security
interests in, and liens upon (the "Replacement Liens"), all of the Debtors'
right, title and interest in, to and under the Collateral, subject only to (x) the
Carve-Out, (y) the Liens granted pursuant to the Orders and the Loan
Documents to secure the Obligations and (z) any validly perfected liens in
existence on the Filing Date which remain senior (after giving effect to the
Orders) to the Liens granted to the Lender pursuant to the Orders and the
Loan Documents;

16

(B)    if the Pre-Petition Lenders retain a financial advisor and/or valuation expert to advise the Pre-Petition Lenders regarding the value and marketability of the Debtors, the Debtors are hereby authorized and required to pay all reasonable fees and expenses incurred by the Pre-Petition Lenders in connection with the retention of such financial advisor and/or valuation expert, subject to a cap of $100,000;

(C)    the Debtors are hereby authorized and directed to reimburse the Pre-Petition Lenders for all reasonable pre-petition out-of-pocket fees and expenses payable under the Pre-Petition Credit Agreement, to the extent such fees and expenses are not otherwise paid to the Lender under Paragraph 2 of this Final Order or the Interim Order;

(D)    in the event that, during the pendency of the Chapter 11 Cases, there is a sale or other disposition of any Pre-Petition Collateral or any Collateral subject to a Replacement Lien (other than sales of inventory in the ordinary course of business and as otherwise permitted under the Credit Agreement), the Pre-Petition Agent, for the ratable benefit of the Pre-Petition Lenders, shall immediately receive payment of any net proceeds remaining after satisfaction of the Obligations;

(E)    pursuant to Bankruptcy Code § 364(c)(i), the Pre-Petition Agent and the Pre-Petition Lenders shall have and they are hereby granted Super-priority Claims (limited in amount to the aggregate diminution, if any, after the Filing Date in the value of the interests of the Pre-Petition Lenders in the Cash Collateral and the Pre-Petition Collateral resulting from the matters referenced in clauses (i) through (iv) above junior only to (a) the Super-priority Claims granted to the Lender in respect of the Obligations pursuant to the Orders and (b) the Carve-Out; and

(F)    the Replacement Liens and Super-priority Claims granted to the Pre-Petition Lenders under this Paragraph 9 shall be valid, perfected, enforceable and not subject to avoidance to the extent, but only to the extent, that the Pre-Petition Agent's and Pre-Petition Lenders' liens are valid, perfected, enforceable and not subject to avoidance.

10.    Under the circumstances, and based upon the consent of the Pre-Petition Agent and the Pre-Petition Lenders, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Agent and Pre-Petition Lenders. Notwithstanding anything in the Orders or the Loan Documents to the contrary, any Replacement Liens and Super-priority Claims granted to the Lender in its capacity as a Pre-Petition Lender, as adequate protection on account of (i) the priming of its liens arising

17

under the Pre-Petition Credit Agreement, (ii) the use of Cash Collateral, (iii) the use, sale or

lease of Pre-Petition Collateral (other than Cash Collateral), and (iv) the imposition of the

automatic stay shall share pari passu with the Replacement Liens and Super-priority Claims

granted to the Pre-Petition Agent and other Pre-Petition Lenders.

           11.    Except as set forth in Paragraphs 6 through 9 above, and Paragraphs

17 through 19 below, the Liens and Replacement Liens shall be prior and senior to all liens

and encumbrances of all other secured creditors in and to such Collateral or Pre-Petition

Collateral granted, or arising, after the Filing Date.  Other than the Carve-Out, the Debtors

shall not assert a claim under Bankruptcy Code § 506(c) for any costs and expenses incurred

in connection with the preservation, protection or enhancement of, or realization by the

Lender, the Pre-Petition Agent or the Pre-Petition Lenders upon the Collateral or the

Pre-Petition Collateral.  The Liens and Replacement Liens granted pursuant to the Orders

shall constitute valid and duly perfected security interests and liens, and the Pre-Petition

Agent and the Pre-Petition Lenders shall not be required to execute, file, or serve security

agreements, pledge agreements, mortgages, financing statements, notices of lien or similar

instruments which otherwise may be required under federal or state law in any jurisdiction,

or take any action, including taking possession, to validate and perfect such security interests

and liens; and the failure by the Debtors to execute any documentation relating to the Liens

or Replacement Liens shall in no way affect the validity, perfection or priority of such Liens

or Replacement Liens.  If, however, the Lender, any Pre-Petition Lenders or the Pre-Petition

Agent, in their sole discretion, shall determine to file any such financing statements, notices

of lien or similar instruments, or to otherwise confirm perfection of such Liens or

Replacement Liens. the Debtors are directed to cooperate with and assist in such process.

The stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and

recording of a certified copy of the Orders or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of the Interim Order.

12.     As long as any portion of the Obligations remains unpaid, or any Loan Document remains in effect, the Debtors shall not seek, and it shall constitute an Event of Default (and automatic occurrence of the Termination Date) if (a) there shall be entered any order dismissing any of the Chapter 11 cases; (b) except as otherwise provided in Paragraphs 8 and 9 hereof or as permitted under the Credit Agreement, there shall be entered in any of the Chapter 11 Cases or any subsequent Chapter 7 case any order which authorizes under any section of the Bankruptcy Code, including Bankruptcy Code §§ 105 or 364, (i) the granting of any lien or security interest in any property of the Debtors in favor of any party other than the Lender or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status equal or superior to that granted to the Lender and the Pre-Petition Lenders pursuant to the Orders; unless, in connection with any transaction cited in clause (i) or (ii) of this Paragraph 12, such order requires that the Obligations shall first be indefeasibly paid in full; or (c) the Debtors shall file a plan of reorganization that does not propose to pay the Loans in full on or before the effective date of such plan of reorganization.

13.     The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Loan Documents, as Lender may reasonably require, as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of the Orders and the Loan Documents. The Debtors and the Lender are hereby authorized to implement, in accordance with the

terms of the Credit Agreement, any non-material modifications of the Credit Agreement

without further order of this Court, including but not limited to modification of the Budget

under the Credit Agreement and related modifications to the financial covenants and Section

6.1 of the Credit Agreement.

14.    Having been found to be extending credit and making Loans to the

Debtors in good faith, based on the record before this Court, the Lender shall be entitled to

the full protection of Bankruptcy Code § 364(e) with respect to the Obligations and the Liens

created or authorized by the Orders in the event that either of the Orders or any authorization

contained herein is stayed, vacated, reversed or modified on appeal. Any stay, modification,

reversal or vacation of either of the Orders shall not affect the validity of any Obligation of

the Debtors to the Lender incurred pursuant to either of the Orders. Notwithstanding any

such stay, modification, reversal or vacation, all Loans made pursuant to the Orders and the

Credit Agreement and all uses of Cash Collateral and Obligations incurred by the Debtors

pursuant thereto prior to the effective date of such stay, modification, reversal or vacation

shall be governed in all respects by the original provisions hereof, and the Lender, the

Pre-Petition Agent and the Pre-Petition Lenders shall be entitled to all the rights, privileges

and benefits, including without limitation, the security interests and priorities granted herein

with respect to all such Obligations and uses of Cash Collateral. The provisions of the

Orders and any actions taken pursuant to the Orders shall survive entry of any order which

may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases

(and, to the extent not satisfied in full, the Obligations shall not be discharged by the entry of

any such order or pursuant to Bankruptcy Code § 1141(d)(4), the Debtors having hereby

waived such discharge); (b) converting any of the Chapter 11 Cases to a Chapter 7 case; or

(c) dismissing any of the Chapter 11 Cases, and the terms and provisions of the Orders as

well as the Super-priority Claims, Liens and Replacement Liens granted pursuant to the

Orders and the Loan Documents shall continue in full force and effect notwithstanding the

entry of such order, and such Super-priority Claims, Liens and Replacement Liens shall

maintain their priority as provided by this Final Order until all of the Obligations and all

obligations in respect of the matters set forth in clauses (a) through (c) of Paragraph 9 hereof

are indefeasibly paid in full and discharged.

15.    The findings contained in Paragraphs C and D shall be binding upon

all parties in interest as findings of the Court, including but not limited to, the Debtors and

any statutorily appointed committee(s) unless (i) a party in interest (including any statutorily

appointed committee(s)) has properly filed an adversary proceeding or contested matter

(except to enforce the provisions of the Interim Order, this Final Order or the Credit

Agreement) challenging the validity, enforceability or priority of the Pre-Petition Obligations

or the Pre-Petition Lenders' liens in respect thereof by no later than the date that is ninety

(90) days after the entry of the Interim Order and (ii) the Court rules in favor of the plaintiff

in any such adversary proceeding. If no such adversary proceeding or contested matter is

properly commenced as of such date or the Court does not rule in favor of the plaintiff in any

such proceeding, the Pre-Petition Obligations shall constitute allowed claims for all purposes

of the Chapter 11 Cases, and any subsequent Chapter 7 cases, the Pre-Petition Lenders' liens

in respect of the Pre-Petition Obligations shall be deemed legal, valid, binding, perfected, not

subject to subordination and otherwise unavoidable, and the Pre-Petition Obligations and the

Pre-Petition Lenders' liens in respect thereof shall not be subject to any other or further

challenge by any party in interest seeking to exercise the rights of the Debtors' estates

including, without limitation, any successor thereto.

21

16.    Entry of this Final Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Pre-Petition Agent or the Pre-Petition Lenders may have against the Debtors or third parties, and without prejudice to the right of the Pre-Petition Agent and the Pre-Petition Lenders to seek relief from the automatic stay in effect pursuant to Bankruptcy Code § 362, or any other relief in the Chapter 11 Cases, and the right of the Debtors to oppose any such relief. The provisions of this Final Order shall be binding upon and inure to the benefit of the Lender, the Pre-Petition Agent, the Pre-Petition Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases or upon conversion of the Cases to Chapter 7 under Bankruptcy Code §1112, as a legal representative of the Debtors or the Debtors' estate.

17.    Nothing contained in this Final Order shall affect the extent, validity or priority of the security interest of Charter Financial, Inc. ("Charter") in certain personal property granted pursuant to the Master Loan and Security Agreement No. 3519 between Charter and Conxus Network, Inc., the Schedules thereto, and the December 31, 1997 letter agreement in connection therewith between Charter, Chase, Glenayre and Lender.

18.    Notwithstanding any other provisions of this Final Order, including, but not limited to Paragraphs 7 and 9 hereof, this Final Order shall not be deemed to grant Lender or the Pre-Petition Lenders a lien or right in the Pre-Petition Collateral encumbered by the Permitted Liens (as defined in the Credit Agreement), or the proceeds thereof, which is superior to the Permitted Liens or the rights of the holders thereof.

19.    Nothing contained in this Final Order shall

(a)    constitue a finding that the Debtors have any interest in the funds contained in the Escrow Account the (the "Funds" and the "Escrow") created for the

22

benefit of The Bank of New York ("BNY") as Indenture Trustee under the indenture dated as

of May 28, 1998 for the benefit of the holders of the 9.0% Convertible Senior Subordinated

Notes due 2001 (the "Noteholders") pursuant to an Escrow Agreement dated May 28, 1998

entered into between the Parent and BNY as Escrow Agent except that the Lender, the

Debtors, and BNY stipulate and agree that the Funds are not property of the estate without

prejudice to the right of the Committee to investigate and give notice in writing to the Pre-

Petition Lender, Debtors, and U.S. Trustee by August 17, 1999 of an intent to claim that the

Funds are property of the estate or that the Debtors' estates have claims against the Funds, and

if so the Committee will promptly file an action concerning the Funds; provided however that

(i) if the Bankruptcy Court, upon timely objection by the Committee, rules that the Funds

constitute property of this estate, then the Lender shall be granted a lien on the Debtors'

residual interest in the Funds, junior to any lien of the Indenture Trustee and senior to all

other liens; (ii) BNY's lien for the ratable benefit of the Noteholders shall constitute a

Permitted Lien under the Credit Agreement;

        (b)     impose any further duties upon BNY as Escrow Agent; and

        (c)     otherwise affect the prior rights of the BNY and the

Noteholders to the Funds.

        20.   The waiver of all rights to demand marshaling of collateral upon any

sale in Section 9.16 of the Credit Agreement or in any other Loan Document shall not be

effective or binding upon the Committee.

        21.   The Debtors shall provide the Committee with copies of all financial

reports, information and notices delivered to the Lender pursuant to Sections 5.1, 5.2 and 5.6

of the Credit Agreement and any notice received from the Lender or any Pre-Petition

hereunder pursuant to Section 2.1 or 7.2 of the Credit Agreement.

23

22.    In the event of any inconsistency between the provisions of the Interim

Order and the provisions of this Final Order, the provisions of this Final Order shall

supersede and govern over the provisions of the Interim Order.  Except as specifically

amended, modified or supplemented hereby, all of the provisions of the Interim Order shall

remain in full force and effect and are hereby ratified by this Final Order.

23.    In the event of any inconsistency between the provisions of the Credit

Agreement or any other Loan Document and the provisions of this Final Order, the

provisions of this Final Order shall supersede and govern over the provisions of the Credit

Agreement and other Loan Documents.  Except as specifically amended, modified or

supplemented hereby, all of the provisions of the Credit Agreement and other Loan

Documents shall remain in full force and effect and are hereby ratified by this Final Order.

24.    Section 4.3(c) of the Credit Agreement is hereby modified such that

the "pitch books" of the Financial Advisor required thereunder shall be in final form and

ready for distribution by July 21, 1999, and the funding date under the Credit Agreement for

July 1999 shall be July 22, 1999.

Dated: Wilmington, Delaware
        July 1, 1999

_____
UNITED STATES BANKRUPTCY JUDGE

Movant to send copies to all
parties and file certificate
of service with the court.                    24

# Attachment 11

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - x
In re                       :
                            :    Chapter 11
     Jitney-Jungle Stores   :
          of America, Inc., :    Case No. 99-3602 (MFW)
          et al.            :
                            :    Jointly Administered
                 Debtors.   :
- - - - - - - - - - - - - - x
```

## FINAL ORDER (I) AUTHORIZING SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 362, 363, 364 AND 105, AND (II) AUTHORIZING SECURED TRADE CREDITOR FINANCING ON A JUNIOR LIEN BASIS PURSUANT TO 11 U.S.C. §§ 364 AND 105

Upon the motion (the "Senior DIP Financing
Motion") dated October 12, 1999 of the above-captioned
debtors and debtors in possession (collectively, the
"Debtors") seeking this Court's authorization pursuant to
sections 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1) and 105 of Title 11 of the United States Code,
11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code")
and Rules 2002, 4001(c) and 9014 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules"), for
Jitney-Jungle Stores of America, Inc. (the "Company") and
each other Debtor (collectively, with the Company, the
"Borrowers"), to inter alia, (a) obtain post-petition

259

financing (the "Senior DIP Financing"), up to an aggre-
gate principal amount not to exceed $260,799,675, less·
aggregate outstanding Pre-Petition Senior Obligations and
Pre-Petition Junior Obligations (each as defined below)
(inclusive of a $25 million sublimit for the issuance of
letters of credit) (the "Commitment") from a syndicate of
financial institutions including, without limitation, BT
Commercial Corporation (the "Lenders") arranged by BT
Commercial Corporation ("BTCC") as agent (in its capacity
as agent for the Lenders, the "Agent"), and for the
Borrowers to execute a Credit Agreement with respect to
the Senior DIP Financing (as amended, supplemented or
otherwise modified from time to time, the "Senior Credit
Agreement"); and for the Borrowers to execute certain
notes (the "Notes," and the Senior Credit Agreement, the
Notes, and all ancillary documents at any time executed
in connection therewith, collectively, the "Senior Loan
Documents"); (b) grant the Lenders, pursuant to Bank-
ruptcy Code §§ 364(c) and 364(d), security interests in
all of the Borrowers' currently owned and after acquired
property to secure the Borrowers' obligations under the
Senior Loan Documents; and (c) grant the Lenders priority
in payment with respect to such obligations over any and
all administrative expenses of the kinds specified in

2

Bankruptcy Code §§ 503(b) and 507(b) other than as de-
scribed below; and due and sufficient notice of the
Senior DIP Financing Motion having been given; and the
final hearing (the "Final Hearing") on the Senior DIP
Financing Motion having been held before this Court on
November 18, 1999; and upon the entire record made at the
Final Hearing, and this Court having found good and
sufficient cause appearing therefor;

        **IT IS HEREBY FOUND** that:

        A.   On October 12, 1999 (the "Filing Date"),
the Debtors filed voluntary petitions for relief with
this Court under Chapter 11 of the Bankruptcy Code (the
"Chapter 11 Cases"). The Debtors are continuing in
possession of their property, and operating and managing
their businesses, as debtors-in-possession pursuant to
Bankruptcy Code §§ 1107 and 1108.

        B.   This Court has jurisdiction over the
Chapter 11 Cases and the Senior DIP Financing Motion
pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration
of the Senior DIP Financing Motion constitutes a core
proceeding as defined in 28 U.S.C. § 157(b)(2).

        C.   Prior to the Filing Date, the Borrowers
entered into an Amended and Restated Revolving Credit
Agreement, dated as of September 15, 1997 (as amended,

3

supplemented or otherwise modified prior to the Filing

Date, the "Fleet Pre-Petition Credit Agreement" and,

together with collateral and ancillary documents executed

in connection therewith, the "Fleet Pre-Petition Loan

Documents") with Fleet Capital Corporation as agent

("Fleet") and with the lenders pursuant thereto (such

lenders, and any successors thereto by assignment or

otherwise, collectively, the "Pre-Petition Senior Lend-

ers"). The Fleet Pre-Petition Loan Documents provided

for loans to the Borrowers in the aggregate principal

amount of up to $150 million which included the aggregate

amount of outstanding letters of credit (together with

all interest, fees, expenses, and other amounts owing

under the Fleet Pre-Petition Loan Documents, the "Pre-

Petition Senior Obligations").

   D. Prior to the Filing Date, the Borrowers

entered into a Term Loan Agreement dated as of July 26,

1999 (as amended, supplemented or otherwise modified

prior to the Filing Date, the "Silver Oak Pre-Petition

Credit Agreement" and, together with collateral and

ancillary documents executed in connection therewith, the

"Silver Oak Pre-Petition Loan Documents") with Silver Oak

Capital, L.L.C. as agent ("Silver Oak") and with the

lenders pursuant thereto (such lenders, and any succes-

4

sors thereto by assignment or otherwise, collectively,
the "Pre-Petition Junior Lenders"). The Silver Oak Pre-
Petition Loan Documents provided for loans to the Borrow-
ers in the aggregate principal amount of up to $50 mil-
lion (together with all interest, fees, expenses, "Make-
Whole Premium" as defined below, and other amounts owing
under the respective Silver Oak Pre-Petition Loan Docu-
ments, the "Pre-Petition Junior Obligations").

   E. Without prejudice to the rights of any
other party (but subject to the limitations described in
decretal Paragraph 6), the Debtors admit that, in accor-
dance with the terms of the Fleet Pre-Petition Loan
Documents and the Silver Oak Pre-Petition Loan Documents,
the Borrowers are truly and justly indebted to the Pre-
Petition Senior Lenders and the Pre-Petition Junior
Lenders, respectively, without defense, counterclaim or
offset of any kind, and that as of the Filing Date
(i) the Borrowers were liable to the Pre-Petition Senior
Lenders in the aggregate principal amount of approxi-
mately $126 million in respect of loans made by the Pre-
Petition Senior Lenders to the Borrowers pursuant to the
Fleet Pre-Petition Credit Agreement (together with inter-
est accrued and unpaid thereon and fees and professional
expenses), (ii) the Borrowers were contingently liable to

5

the Pre-Petition Senior Lenders in the aggregate princi-

pal amount of approximately $11 million in respect of .

letters of credit issued pursuant to the Fleet Pre-Peti-

tion Credit Agreement and which remained outstanding as

of the Filing Date and (iii) the Borrowers were liable to

the Pre-Petition Junior Lenders in the aggregate amount

of approximately $50 million in respect of loans made by

the Pre-Petition Junior Lenders to the Borrowers pursuant

to the Silver Oak Pre-Petition Credit Agreement.

       F.    Without prejudice to the rights of any

other party (but subject to the limitations described in

decretal Paragraph 6), the Debtors further admit that the

Pre-Petition Senior Obligations and Pre-Petition Junior

Obligations are secured by valid, perfected, enforceable

and unavoidable liens and security interests granted by

the applicable Borrowers to the respective agents under

the Fleet Pre-Petition Credit Agreement and Silver Oak

Pre-Petition Credit Agreement, for the ratable benefit of

the Pre-Petition Senior Lenders and Pre-Petition Junior

Lenders, respectively, upon and in substantially all of

the Borrowers' assets and property (including the setoff

rights described below, the "Pre-Petition Collateral"),

including without limitation, equipment, inventory,

accounts receivable, real property, instruments, chattel

6

paper, general intangibles, contracts, documents of
title, the capital stock of each Borrower that is a
subsidiary of Jitney-Jungle Stores of America, Inc., as
well as the capital stock of all subsidiaries of each
Borrower and all other tangible and intangible personal
property and the proceeds and products thereof, and that
the value of the Pre-Petition Collateral on a liquidation
basis exceeds the aggregate amount of the sum of the Pre-
Petition Senior Obligations and the Pre-Petition Junior
Obligations.  The Debtors further admit that, pursuant to
an Intercreditor Agreement, dated as of July 26, 1999
(the "Pre-Petition Intercreditor Agreement"), the liens
and security interests of Fleet on the Pre-Petition
Collateral have priority over, and are senior in all
respects to, the liens and security interests of Silver
Oak on the Pre-Petition Collateral, to the extent pro-
vided in the Pre-Petition Intercreditor Agreement.
Substantially all cash of the Debtors now in existence or
hereafter acquired constitutes the cash collateral of the
Pre-Petition Senior Lenders and the Pre-Petition Junior
Lenders within the meaning of Bankruptcy Code § 363(a)
("Cash Collateral").

   G. On October 12, 1999, the Court entered an
order (the "Interim Order") approving the Senior DIP

7

Financing and authorizing the Debtors to borrow a portion
of the funds available under the Senior DIP Financing
pending the Final Hearing.  Pursuant to the Interim
Order, the Debtors were authorized to borrow, and did
borrow, under the Senior DIP Financing (a) approximately
$137 million to repay the Pre-Petition Senior Obligations
(including cash collateralization of outstanding letters
of credit) and (b) approximately $50 million to repay the
Pre-Petition Junior Obligations (other than the "Make-
Whole Premium," as defined in the Silver Oak Pre-Petition
Credit Agreement), in each case subject to the reserva-
tion of rights contained in decretal paragraph 6 of the
Interim Order.

H.    Subsequent to the entry of the Interim
Order, the Debtors obtained expressions of interest from
two different parties for alternative financing for the
portion of the Senior DIP Financing that was to be pro-
vided by Silver Oak on a subordinated basis under the
Senior Credit Agreement (the "Silver Oak DIP Loans").
Accordingly, on November 12, 1999, the Debtors filed a
Motion (the "Junior DIP Financing Motion"), seeking
authority to (i) amend the Senior DIP Financing to elim-
inate the Silver Oak DIP Loans, reducing the amount of
financing available under the Senior DIP Financing from

8

$260,799,675 to $200,000,000, and (ii) obtain additional
post-petition financing, in the alternative, from either
of the two prospective new lenders.  The Debtors' obli-
gations under either of the two potential alternative
financing options would be secured by liens on substan-
tially all of the Debtors' assets, junior in priority to
the liens granted in favor of the Agent and the Lenders
under the Senior DIP Financing, and would be contractu-
ally subordinate to the Debtors' obligations to the
Agent and the Lenders.  Because the Senior Credit Agree-
ment prohibits the Debtors from incurring indebtedness
and granting liens on their assets without the consent
of the Lenders under the Senior DIP Financing, such
Lenders have the right to approve the form and substance
of the terms, conditions and documentation with respect
to any such prospective financing.

I.   As a result of negotiations between the
Debtors, the Agent, Silver Oak, the Official Committee
of Unsecured Creditors of the Debtors (the "Committee")
and the proposed alternative lenders, at the Final Hear-
ing the Debtors requested that the Court approve alter-
native financing in the original principal amount of
$63,750,000, committed to by PPM America, Inc. (the "PPM
Junior DIP Financing").  The Debtors requested that, if

9

the PPM Junior DIP Financing is authorized and approved,
the Debtors be authorized to borrow the full amount
available thereunder to repay in full all obligations on
account of the Silver Oak DIP Loans and reduce outstand-
ing borrowings under the Senior DIP Financing.

J.  The Debtors do not have sufficient avail-
able sources of working capital and financing to carry
on the operation of their businesses without the Senior
DIP Financing.  The ability of the Debtors to pay em-
ployees, maintain business relationships with their
vendors and suppliers, to purchase new inventory and
otherwise finance their operations, is essential to the
Debtors' continued viability.  In the absence of the
Senior DIP Financing, the continued operation of the
Debtors' businesses would not be possible and serious
and irreparable harm to the Debtors and their estates
would occur.  The preservation, maintenance and enhance-
ment of the going concern value of the Debtors are of
the utmost significance and importance to a successful
reorganization of the Debtors under Chapter 11 of the
Bankruptcy Code.

K.  Given the Debtors' current financial
condition and capital structure, the Debtors are unable
to sustain their operations with the use of Cash Collat-

10

eral and are unable to obtain unsecured credit allowable
under Bankruptcy Code § 503(b)(1) as an administrative
expense.  Financing on a post-petition basis is not
otherwise available without the Borrowers granting,
pursuant to Bankruptcy Code § 364(c)(1), claims having
priority over any and all administrative expenses of the
kinds specified in Bankruptcy Code §§ 503(b) and 507(b),
other than as described below, and securing such indebt-
edness and obligations with the security interests in
and the liens upon the property described below pursuant
to Bankruptcy Code §§ 364(c) and (d).

      L.   Notice of the Final Hearing and the re-
lief requested in the Senior DIP Financing Motion has
been given to (i) the Office of the United States
Trustee; (ii) the creditors holding the 20 largest unse-
cured claims against the Debtors; (iii) the agents for
the Pre-Petition Senior Lenders and the Pre-Petition
Junior Lenders; (iv) the Indenture Trustee for the 12%
Senior Notes due 2006 and the 10.38% Senior Subordinated
Notes due 2007, each issued by the Debtors; and (v)
counsel for the Committee. Sufficient and adequate no-
tice of the Final Hearing and the relief requested in
the Senior DIP Financing Motion has been given pursuant

11

to Bankruptcy Code §§ 102(1), 364(c) and 364(d) and
Bankruptcy Rules 2002 and 4001(c).

    M.  The Senior DIP Financing has been negoti-
ated in good faith and at arms-length between the Debt-
ors and the Lenders, and any credit extended, letters of
credit issued and loans made to the Borrowers pursuant
to the Senior Credit Agreement shall be deemed to have
been extended, issued or made, as the case may be, in
good faith as required by, and within the meaning of,
Bankruptcy Code § 364(e).

    N.  The terms of the Senior DIP Financing are
fair and reasonable, reflect the Debtors' exercise of
prudent business judgment consistent with their fidu-
ciary duties, and are supported by reasonably equivalent
value and fair consideration.

    O.  The Debtors have requested immediate
entry of this Order pursuant to Bankruptcy Rule
4001(c)(2).  This Court concludes that entry of this
Order is in the best interests of the Debtors' respec-
tive estates and creditors as its implementation will,
among other things, allow the Debtors to sustain the
operation of their existing businesses and enhance the
Debtors' prospects for successful reorganization.

12

Based upon the foregoing findings and conclu-
sions, and upon the record made before this Court at the
Final Hearing, and good and sufficient cause appearing
therefor;

**IT IS HEREBY ORDERED** that:

1.   The Senior DIP Financing Motion is
granted, subject to the terms and conditions set forth
in this Order.

2.   The Debtors are expressly authorized and
empowered to execute and deliver the Senior Credit
Agreement, the Notes and any other Senior Loan Document
to be executed and delivered in connection therewith,
including, concurrent with the Debtors' execution of the
PPM Junior DIP Financing after entry by this Court of an
order authorizing them to do so, any amendments neces-
sary to eliminate the Silver Oak DIP Loans from the
Senior DIP Financing and all provisions in the Senior
Loan Documents related thereto.  The Debtors are autho-
rized to comply with and perform all of the terms and
conditions contained therein, and the Debtors are di-
rected to repay amounts borrowed, with interest, to the
Lenders in accordance with and subject to the terms and
conditions set forth in the Senior Loan Documents and
this Order.  The Debtors are further authorized and

13

directed to pay all facility, commitment and other fees
and expenses, including, without limitation, all reason-
able fees and expenses of professionals engaged by the
Agent or any Lender, in accordance with the terms of the
Senior Credit Agreement.  All loans made under the Se-
nior Credit Agreement (the "Loans") and interest
thereon, together with all reimbursement and other obli-
gations in respect of letters of credit issued under the
Senior Credit Agreement ("Letters of Credit"), and all
fees, costs, expenses, indebtedness, obligations and
liabilities of the Borrowers to the Agent and the Lend-
ers under or in respect of the Senior Loan Documents and
this Order, together with any obligations of the Debtors
to BTCC in its capacity as a bank in the Debtors' cash
management system, are hereinafter referred to as the
"Senior Postpetition Obligations."

        3.   The Borrowers are expressly authorized to
borrow from the Lenders, on the terms and subject to the
conditions set forth in the Senior Loan Documents and
this Order, all funds available thereunder.  The Debtors
are authorized to use the proceeds of the Loans and to
request the issuance of Letters of Credit, in the opera-
tion of the Debtors' businesses, provided that the pro-

14

posed Loan or Letter of Credit is consistent with the
terms of the Senior Credit Agreement and this Order.

   4. The Borrowers' utilization of the pro-
ceeds of the first borrowing under the Senior DIP Fi-
nancing to retire the Debtor's obligations to the Pre-
Petition Senior Lenders under the Fleet Pre-Petition
Loan Documents and the Pre-Petition Junior Lenders under
the Silver Oak Pre-Petition Loan Documents, consisting
of unpaid principal, accrued and unpaid interest, and
unpaid fees and expenses for which the Debtors are re-
sponsible (other than (i) the "Make-Whole Premium" pay-
able under Section 2.04(b) of the Silver Oak Pre-Peti-
tion Credit Agreement, which shall be deemed assumed by
the Borrowers jointly and severally as a "Senior
Postpetition Obligation" (defined in Paragraph 2, above)
payable to the Term Lenders under the Senior Credit
Agreement at maturity of the DIP Financing and (ii)
obligations with respect to undrawn letters of credit
under the Fleet Pre-Petition Credit Agreement), as au-
thorized under the Interim Order, is hereby reconfirmed
subject to the provisions of Paragraph 6 below.

   5. Upon receipt by the Pre-Petition Senior
Lenders and the Pre-Petition Junior Lenders of all
amounts owed to the Pre-Petition Senior Lenders and the

15

Pre-Petition Junior Lenders and the receipt by Fleet of
the cash collateral for the outstanding letters of
credit and fees thereon:  (a) any lien or security in-
terest of the Pre-Petition Senior Lenders or Pre-Peti-
tion Junior Lenders on any asset of the Debtors was
terminated and extinguished and of no force or effect
whatsoever (other than (i) for reasonable expenses,
including reasonable attorneys' fees, incurred by the
Pre-Petition Senior Lenders or Pre-Petition Junior Lend-
ers in the defense of any action brought against them
that is resolved in their favor, respectively, (ii) any
reinstatement of such liens by this Court in connection
with any remedy that may be fashioned in accordance with
Paragraph 6, below, which liens when reinstated shall be
subject and subordinate to the Liens granted to secure
the Senior DIP Financing and the Carve Out, and (iii)
the lien of Fleet on the cash collateral for the out-
standing letters of credit); (b) all claims of the Pre-
Petition Senior Lenders and Pre-Petition Junior Lenders
against the Debtors were terminated, extinguished, and
of no force or effect whatsoever (other than for (i)
reasonable expenses, including reasonable attorney's
fees, incurred by the Pre-Petition Senior Lenders or
Pre-Petition Junior Lenders in the defense of any action

16

brought against them that is resolved in their favor,
respectively, (ii) any reinstatement of such claims by
this Court in connection with any remedy that may be
fashioned in accordance with Paragraph 6 below, (iii)
the "Make-Whole Premium" payable under Section 2.04(b)
of the Pre-Petition Term Loan Agreement with Silver Oak,
which shall be deemed assumed by the Borrowers jointly
and severally as a "Postpetition Obligation" (defined in
Paragraph 2, above) payable to the Term Lenders at matu-
rity of the Post-Petition Financing, and (iv) claims of
Fleet in respect of outstanding letters of credit and
fees thereon); and (c) the Pre-Petition Senior Lenders
and Pre-Petition Junior Lenders delivered (and to the
extent they have not already done so, are under a con-
tinuing obligation to deliver) to the Agent any and all
property of the Debtors that is in their respective
possession or control (other than the cash collateral
for the outstanding letters of credit and fees thereon).
Nothing contained in this Order shall affect the rights
or obligations of the parties to the Pre-Petition
Intercreditor Agreement.

6.    Nothing in this Order or in the Senior
Loan Documents shall prejudice the right of the Commit-
tee to seek to (a) disallow the Pre-Petition Senior

17

Lenders' or Pre-Petition Junior Lenders' claims, (b)
avoid any security or collateral interest in the assets
of the Debtors claimed by the Pre-Petition Senior Lend-
ers or Pre-Petition Junior Lenders in Pre-Petition Col-
lateral, (c) otherwise challenge the validity, priority
or extent of the Pre-Petition Senior Lenders' or Pre-
Petition Junior Lenders' liens and/or claims, (d) dis-
gorge all or any part of any payment or transfer made by
the Debtors under the Fleet Pre-Petition Credit Agree-
ment or Silver Oak Pre-Petition Credit Agreement or as
authorized pursuant to Paragraph 4, above, or (e) obtain
any other relief, legal or equitable, against the Pre-
Petition Senior Lenders or Pre-Petition Junior Lenders
or otherwise recover from the Pre-Petition Senior Lend-
ers or Pre-Petition Junior Lenders on account of their
relationship with the Debtors prior to the commencement
of these Chapter 11 Cases, provided that the Committee
shall have ninety (90) days from the date of appointment
of counsel to the Committee within which to file an
objection or commence an action with respect to the Pre-
Petition Senior Lenders' or Pre-Petition Junior Lenders'
claims or liens.  Any such objection or action shall set
forth with reasonable particularity the basis for the
objection or action and the reason why the Pre-Petition

18

Senior Lenders' or Pre-Petition Junior Lenders' claims
should not have been paid in full in accordance with the
Senior DIP Financing and this Order.  If no such objec-
tion or action is filed on or before ninety (90) days
after the date of appointment of counsel to the Commit-
tee, any and all challenges (including, but not limited
to, those under 11 U.S.C. §§ 544, 547 and/or 548) by any
party (including, without limitation, the Committee and
any subsequently appointed trustee), to the validity,
sufficiency, extent, perfection, refinancing or avoid-
ance of the Pre-Petition Senior Lenders' or Pre-Petition
Junior Lenders' liens in the Pre-Petition Collateral or
the Pre-Petition Senior Lenders' or Pre-Petition Junior
Lenders' claims, shall be forever barred.

       7.   If an Event of Default (as defined in the
Senior Credit Agreement) occurs, the Agent may, and
acting at the direction of the Majority Lenders (as
defined in the Senior Credit Agreement) shall, terminate
the Senior DIP Financing (the date of any such termina-
tion, the "Termination Date"), and the automatic stay
pursuant to Bankruptcy Code § 362(a) shall be deemed
automatically lifted and modified without further order
of this Court (subject to the provisions of Paragraph 19
below), to permit the Agent and the Lenders to exercise

any and all of their rights and remedies under the Se-

nior Credit Agreement, the other Senior Loan Documents

and this Order.

        8.   Pursuant to Section 8.18 of the Credit

Agreement, until all Postpetition Obligations are paid

in full in cash, without first obtaining the written

consent of the Agent (as defined in the Credit Agree-

ment), (i) the Debtors shall not reject any unexpired

lease or executory contract, and (ii) the Debtors shall

not assume or apply to the Court to assume any executory

contract or unexpired lease unless the order (in a form

acceptable to the Agent in its reasonable discretion)

authorizing such assumption specifically provides that,

notwithstanding such assumption, the Debtors may later

assign the relevant lease or contract under Bankruptcy

Code § 365(f) without, among other things, obtaining the

consent of the relevant landlord or other party thereto

(but after complying with the other requirements of

Bankruptcy Code § 365).

        9.   If any Event of Default shall have oc-

curred and be continuing, the Agent shall have the right

to direct the Debtors how and when to exercise all

rights of the Debtors under Bankruptcy Code § 365.

Without in any manner limiting any right or remedy of

20

the Agent or any Lender under any section or provision
of the Senior Loan Documents, and unless the Debtors and
the Committee agree otherwise, no such direction shall
require any Debtor to assign any unexpired lease or
executory contract earlier that the earlier of (i) the
expiration of twenty (20) days from the date of such
direction and (ii) five (5) business days prior to (x)
the day upon which the relevant lease or contract may be
deemed rejected under Bankruptcy Code § 365 (whether by
expiration of any relevant time period for assumption or
rejection or otherwise), (y) a scheduled hearing date on
which the relevant executory contract or unexpired lease
may be assumed or rejected or (z) the earliest day on
which, in the good faith judgment of the Agent, a de-
fault not subject to cure could occur with respect to
that lease or contract.  Unless the Debtors and the
Committee agree otherwise, any such assignment pursuant
to an Agent's direction described above shall be to the
highest and best bidder at a public auction held before
the Court or as the Court shall otherwise direct.  Not-
withstanding anything to the contrary contained herein,
if the Debtors do not fully honor and take all actions
requested in any such direction within three (3) busi-
ness days of the delivery of such direction, the Agent

21

may, on five (5) days' notice to the Debtors, the Com-
mittee and any landlord or other counterparty to the
relevant lease or contract, move the Court on behalf of
the Debtors for the relief specified in the direction
and such notice shall be due and sufficient notice of
such request under the circumstances.

      10.  Paragraphs 8 and 9 shall not apply to any
lease that has an appraised value of less than zero or
to any contract whose assumption or rejection will not
affect the value of any Collateral.

      11.  In accordance with Bankruptcy Code
§ 364(c)(1), subject to Paragraph 13 below, the Senior
Postpetition Obligations shall constitute claims (the
"Super-priority Claims") with priority in payment over
any and all administrative expenses of the kinds speci-
fied or ordered pursuant to any provision of the Bank-
ruptcy Code, including, but not limited to, Bankruptcy
Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a)
and 507(b) and shall at all times be senior to the
rights of the Debtors, and any successor trustee or any
creditor, in the Chapter 11 Cases or any subsequent
proceedings under the Bankruptcy Code.  No cost or ex-
pense of administration under Bankruptcy Code § 105,
364(c)(1), 503(b), 506(c), 507(b) or otherwise, shall be

senior to, or *pari passu* with, the Super-priority Claims
of the Lenders arising out of the Senior Postpetition
Obligations, subject only to the Carve-Out (as hereinaf-
ter defined).  As long as no unwaived Default or Event
of Default (as each such term is defined in the Senior
Credit Agreement) shall have occurred and be continuing,
the Debtors shall be permitted to pay compensation and
reimbursement of expenses allowed and payable under
§§ 330 and 331 of the Bankruptcy Code.

      12.  As security for the Senior Postpetition
Obligations, and as provided in the Senior Loan Docu-
ments, the Agent and the Lenders shall have and are
hereby granted (effective upon the date of this Order
and without the necessity of the execution by the Bor-
rowers of mortgages, security agreements, pledge agree-
ments, financing statements or otherwise), valid and
perfected, security interests in, and liens upon (the
"Liens"), all present and after-acquired personal and
real property of the Debtors of any nature whatsoever,
wherever located, including, without limitation, all
cash contained in any account maintained by the Borrow-
ers, the proceeds of all causes of action existing as of
the Filing Date and causes of action arising under the
Bankruptcy Code, and all real property the title to

23

which is held by the Borrowers, or possession of which is held by the Borrowers pursuant to a leasehold interest (collectively with all proceeds and products of any or all of the foregoing, whether or not the underlying Liens are valid, the "Collateral"), as follows:

(a) pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Borrowers' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected lien or security interest, including without limitation, all personal and real property;

(b) pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior, priming, perfected Lien upon all of the Borrowers' right, title and interest in, to and under the Pre-Petition Collateral; and

(c) pursuant to Bankruptcy Code § 364(c)(3), a second priority, perfected Lien upon all of the Borrowers' right, title and interest in, to and under all Collateral which is subject to a validly perfected security interest or lien in existence as of the Filing Date (other than the Pre-Petition Collateral, which is covered by clause (b) above) junior to such validity perfected liens or security interests.

13.  Any provision of this Order or the Senior Credit Agreement to the contrary notwithstanding, the Liens and Super-priority Claims granted to the Agent and

24

the Lenders pursuant to the Senior Credit Agreement and
this Order shall be subject and subordinate only to:
(a) following the occurrence and during the pendency of
a Default or an Event of Default, the payment of allowed
professional fees and disbursements incurred by the
professionals retained, pursuant to Bankruptcy Code
§ 327 or 1103(a), by the Borrowers and any statutory
committees appointed in the Chapter 11 Cases, in an
aggregate amount not to exceed $2.0 million and
(b) quarterly fees required to be paid pursuant to
28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk
of the Bankruptcy Court and any agent thereof (collec-
tively, the "Carve-Out"); provided, however, that the
Carve-Out shall not include professional fees and dis-
bursements incurred in connection with asserting any
claims or causes of action against the Lenders or the
Agent.  The Borrowers' availability under the Senior
Credit Agreement shall be reduced by the professional
fees in the Carve-Out.

14.  The post-petition claims of vendors and
suppliers who execute agreements in form and substance
satisfactory to the Debtors pursuant to which such ven-
dor or supplier agrees to provide trade terms, practices
and programs (including, but not limited to, credit

25

lines, pricing, cash discounts, timing of payments,
allowances, rebates, coupon reconciliation, normal prod-
uct mix and availability and other applicable terms and
programs) to the Debtors during and after these chapter
11 cases as extended to credit worthy companies (each
such vendor or supplier, a "Secured Trade Creditor")
shall be (subject to the provisions of Paragraph 15
below) granted a security interest (collectively, the
"Secured Trade Creditor Liens") in all Inventory of the
Debtors securing the Secured Trade Claims of such Se-
cured Trade Creditor.  A "Secured Trade Claim" shall
mean the claims (net of all allowances, rebates and
other credits) held by such Secured Trade Creditor on
account of goods shipped by such Secured Trade Creditor
and received by the Debtors from and after the date that
such vendor or supplier became a Secured Trade Creditor.
All Secured Trade Creditor Liens shall be fully subordi-
nate and junior to the Liens granted hereunder and pur-
suant to the Senior Loan Documents to the Agent, Collat-
eral Agent and the Lenders, the Carve-Out and any other
liens granted to the Pre-Petition Senior Lenders and
Pre-Petition Junior Lenders in accordance with the pro-
visions of Paragraph 6, and no Secured Trade Creditor
may enforce, and each Secured Trade Creditor is hereby

26

enjoined from enforcing, any rights or remedies whatso-
ever against the Collateral unless and until all Senior
Postpetition Obligations are indefeasibly paid in full
and all Commitments have been terminated.

15. As a condition precedent to the effec-
tiveness of the grant of any Secured Trade Creditor
Lien, the Debtors shall appoint a collateral trustee,
acceptable to the Agent in the Agent's sole discretion,
pursuant to a collateral agency agreement to be entered
into among the Debtors and a trustee (the "Vendor
Trustee"), which collateral agency agreement must be in
form and substance acceptable to the Agent in the
Agent's sole discretion, which Vendor Trustee will act
on behalf of the Secured Trade Creditors. Upon appoint-
ment of the Vendor Trustee, the Secured Trade Creditor
Liens granted hereunder shall transfer to and shall be
deemed to have been granted to the Vendor Trustee.
Notwithstanding anything in this Order to the contrary,
it shall be a condition precedent to the effectiveness
of the grant of the Secured Trade Creditor Liens that
the Collateral Agent under the Senior Loan Documents and
the Vendor Trustee enter into an intercreditor and sub-
ordination agreement in form and substance satisfactory
to the Agent in its sole and absolute discretion.

27

16. The Debtors shall not assert a claim
under Bankruptcy Code § 506(c) for any costs and ex-
penses incurred in connection with the preservation,
protection or enhancement of, or realization by the
Agent or the Lenders upon the Collateral. In no event
shall the Lenders be subject to the equitable doctrine
of "marshaling" or any other similar doctrine with re-
spect to any Collateral. This Order shall be sufficient
and conclusive evidence of the validity, perfection, and
priority of the Agent's Liens upon the Collateral to
secure all Senior Postpetition Obligations under the
Senior Loan Documents. Neither the Agent nor the Lend-
ers shall be required to file or serve financing state-
ments, notices of lien or similar instruments which
otherwise may be required under federal or state law in
any jurisdiction, or take any action, including taking
possession, to validate and perfect the Liens. If,
however, the Agent or any Lender, in their sole discre-
tion, shall determine to file any such financing state-
ments, notices of lien or similar instruments, or to
otherwise confirm perfection of such Liens, the Debtors
are directed to cooperate with and assist in such pro-
cess, the stay imposed by Bankruptcy Code § 362(a) is
hereby lifted to allow the filing and recording of a

28

certified copy of this Order or any such financing

statements, notices of lien or similar instruments, and

all such documents shall be deemed to have been filed or

recorded at the time of and on the date of this Order.

17.   The Debtors are authorized and directed

to pay immediately to the Agent all (a) Cash Collateral

and (b) proceeds received from the disposition or col-

lection of the Pre-Petition Collateral or Collateral.

All amounts so received by the Agent shall be applied in

the priorities set forth in Section 4.11 of the Senior

Credit Agreement.

18.   As long as any portion of the Senior

Postpetition Obligations remains unpaid, or any Senior

Loan Document remains in effect it shall constitute an

Event of Default (not exclusive of Events of Default set

forth in the Senior Credit Agreement) if (a) there shall

be entered any order dismissing any of the Chapter 11

Cases or (b) there shall be entered in any of the Chap-

ter 11 Cases or any subsequent Chapter 7 case any order

which authorizes under any section of the Bankruptcy

Code, including Bankruptcy Code § 105 or 364, (i) the

granting of any lien or security interest in any prop-

erty of the Debtors in favor of any party other than the

Agent and the Lenders, other than as permitted under the

29

Senior Loan Documents, (ii) the obtaining of credit or
the incurring of indebtedness that is entitled to super-
priority administrative status equal or superior to that
granted to the Agent and the Lenders pursuant to this
Order, (iii) authorizing the use by the Debtor of Cash
Collateral, other than as permitted under the Senior
Loan Documents, or the Debtors seek any of the foregoing
relief or (iv) the Debtors' return of goods constituting
Collateral pursuant to section 546(g)* of the Bankruptcy
Code other than as permitted under the Senior Loan Docu-
ments; unless, in connection with any transaction cited
in clause (i), (ii), (iii) or (iv) of this Paragraph 18,
such order requires that the Senior Postpetition Obliga-
tions shall first be indefeasibly paid in full (includ-
ing cash collateralization of all Letters of Credit).

19.   Upon the occurrence of and during the
continuance of an Event of Default, the Agent may, or
acting at the direction of the Majority Lenders shall,
exercise rights and remedies and take all or any of the
following actions without further modification of the
automatic stay pursuant to Bankruptcy Code § 362 (which
is hereby deemed modified and vacated to the extent
necessary to permit such exercise of rights and remedies
and the taking of such actions) or further order of or

30

application to this Court:  (a) terminate the Commitment
and thereafter cease to issue Letters of Credit or make
Loans to the Borrowers; (b) declare the principal of and
accrued interest, fees and other liabilities constitut-
ing the Senior Postpetition Obligations to be due and
payable; (c) set-off amounts in any of the Debtors'
accounts, maintained with a Lender or otherwise enforce
rights against any other Collateral or Pre-Petition
Collateral in the possession of the Agent or the Lend-
ers; and/or (d) take any other action or exercise any
other right or remedy permitted to the Agent or Lenders
under the Senior Loan Documents, this Order or by opera-
tion of law; provided, however, that the Agent and the
Lenders may take the actions described in clauses (c) or
(d) above only after providing three (3) business days
prior written notice to the Debtors, the United States
Trustee and any statutory committee of unsecured credi-
tors appointed in the Chapter 11 Cases.  The Debtors
waive any right to seek relief under the Bankruptcy
Code, including without limitation, under Bankruptcy
Code § 105, to the extent any such relief would in any
way restrict or impair the rights and remedies of the
Agent or the Lenders set forth in this Order and in the
Senior Loan Documents.

20.   The Debtors are authorized to perform all
acts, and execute and comply with the terms of such
other documents, instruments and agreements in addition
to the Senior Loan Documents, as the Agent or the Lend-
ers may reasonably require, as evidence of and for the
protection of the Senior Postpetition Obligations, or
which otherwise may be deemed reasonably necessary by
the Agent or the Lenders to effectuate the terms and
conditions of this Order and the Senior Loan Documents.
The Debtors, the Agent and the Lenders are hereby autho-
rized to implement, in accordance with the terms of the
Senior Credit Agreement, any non-material modifications
(including without limitation, any change in the number
or composition of the Lenders) of the Senior Credit
Agreement without further order of this Court.

21.   Without limiting the rights of access and
information afforded the Agent and the Lenders under the
Senior Loan Documents, each of the Debtors shall be
required to afford representatives, agents and/or em-
ployees of the Agent and the Lenders access to such
entity's premises and its records in accordance with the
Senior Loan Documents and shall cooperate, consult with,
and provide to such persons all such non-privileged
information and information not subject to a binding

32

confidentiality agreement, as they may reasonably re-
quest.

22. The Borrowers shall be jointly and sever-
ally liable for all Senior Postpetition Obligations.

23. Having been found to be extending credit,
issuing Letters of Credit and making Loans to the Bor-
rowers in good faith, based on the record before this
Court, the Agent and the Lenders shall be entitled to
the full protection of Bankruptcy Code § 364(e) with
respect to the Senior Postpetition Obligations and the
Liens created or authorized by this Order in the event
that this Order or any authorization contained herein is
stayed, vacated, reversed or modified on appeal. Any
stay modification, reversal or vacation of this Order
shall not affect the validity of any Senior Postpetition
Obligation of the Debtors to the Agent or the Lenders
incurred pursuant to this Order. Notwithstanding any
such stay, modification, reversal or vacation, all Loans
made and all Letters of Credit issued pursuant to this
Order and the Senior Credit Agreement and all Senior
Postpetition Obligations incurred by the Borrowers pur-
suant hereto prior to the effective date of such stay,
modification, reversal or vacation shall be governed in
all respects by the original provisions hereof and the

33

Agent or the Lenders shall be entitled to all the
rights, privileges and benefits, including without limi-
tation, the security interests and priorities granted
herein with respect to all such Senior Postpetition
Obligations.

24.   The Debtors may not (and no other order
entered by this Court shall be construed to allow the
Debtors to) enter into any documentation with respect to
the PPM Junior DIP Financing unless all such documenta-
tion is in form and substance acceptable to BTCC as
Agent under the Senior DIP Financing and unless an
intercreditor agreement in form and substance acceptable
to BTCC as Agent under the Senior DIP Financing is exe-
cuted.

25.   The provisions of this Order and any
actions taken pursuant hereto shall survive entry of any
order which may be entered (a) confirming any plan of
reorganization in any of the Chapter 11 Cases (and, to
the extent not satisfied in full, the Obligations shall
not be discharged by the entry of any such order, or,
pursuant to Bankruptcy Code § 1141(d)(4), the Borrowers
having hereby waived such discharge); (b) converting any
of the Chapter 11 Cases to a Chapter 7 case; or
(c) dismissing any of the Chapter 11 Cases, and the

34

terms and provisions of this Order as well as the Super-priority Claims and Liens granted pursuant to this Order and the Senior Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and such Super-priority Claims and Liens shall maintain their priority as provided by this Order until all of the Senior Postpetition Obligations hereof are indefeasibly paid in full and discharged.

26.   The provisions of this Order shall be binding upon and inure to the benefit of the Agent, Fleet, Silver Oak, the Lenders, the Pre-Petition Senior Lenders, the Pre-Petition Junior Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases as a legal representative of the Debtors or their estates.


Dated:      November 19, 1999
            Wilmington, Delaware


                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

cc: B. Shannon, Esq.  11/19/99

# Attachment 12

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - x
                        :
In re                   :  Chapter 11
                        :
FPA MEDICAL MANAGEMENT,  :  Case Nos. 98-1596 (PJW)
INC., et al.,           :  through 98-1685 (PJW)
                        :
              Debtors.  :  Jointly Administered
                        :
- - - - - - - - - - - - x
```

INTERIM ORDER (I) AUTHORIZING SECURED POSTPETITION
FINANCING ON A SUPERPRIORITY BASIS PURSUANT TO
11 U.S.C. § 364, (II) AUTHORIZING USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364, AND
(IV) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULE 4001(C)

Upon the joint motion (the "Motion") dated
July 20, 1998 of FPA Medical Management, Inc., a debtor
and debtor-in-possession (the "Company"), and the direct
and indirect subsidiaries of the Company that are debtors
and debtors-in-possession (the "Guarantors";
collectively, with the Company, the "Debtors"), (a)
seeking this Court's authorization pursuant to Sections
363(c), 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of
Title 11 of the United States Code, 11 U.S.C. §§ 101, et
seq. (as amended, the "Bankruptcy Code") and Rules 2002,

4001(c) and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "Bankruptcy Rules"), for the

Company, inter alia, (i) to obtain secured postpetition

financing (the "Postpetition Financing") in an aggregate

principal amount not to exceed $50,000,000 (the

"Commitment") from BankBoston, N.A. ("BankBoston"), as

agent (in its capacity as agent for the Lenders referred

to below, the "DIP Agent"), and a syndicate of other

financial institutions (including BankBoston, the

"Lenders"), and for the Company and the Guarantors to

execute a Revolving Credit and Guarantee Agreement with

respect to the Postpetition Financing (as amended,

supplemented or otherwise modified from time to time, the

"Credit Agreement"); and for the Company to execute

revolving credit notes (the "Notes"); and for each

Guarantor to guarantee the Notes and all obligations of

the Company and each other Guarantor under the Credit

Agreement (the Credit Agreement, the Notes, and all

ancillary documents at any time executed in connection

therewith, collectively, the "Loan Documents"), (ii) to

grant the Lenders, pursuant to Bankruptcy Code §§ 364(c)

and 364(d), security interests in all of the Debtors'

presently owned and after-acquired property to secure the

Debtors' obligations under the Loan Documents, and (iii)

2

to grant the Lenders, pursuant to Bankruptcy Code
§ 364(c)(i), priority in payment with respect to such
obligations over any and all administrative expenses of
the kinds specified in Bankruptcy Code §§ 503(b) and
507(b), other than as described below; (b) seeking this
Court's authorization, pursuant to Bankruptcy Code
§ 363(c), to use the Cash Collateral (as defined below)
and, pursuant to Bankruptcy Code §§ 361, 363(e) and
364(d), to provide adequate protection to the secured
lenders (the "Prepetition Lenders") to the Company under
the Credit Agreement dated as of June 30, 1997 (as
amended, supplemented or otherwise modified prior to the
commencement of these Chapter 11 cases, the "Prepetition
Credit Agreement"), among the Company, the Prepetition
Lenders, BankBoston as agent (in such capacity, the
"Prepetition Agent") for the Prepetition Lenders and
Lehman Commercial Paper, Inc. as syndication agent and
arranger, on account of their prepetition debt (the
"Prepetition Obligations") under the Prepetition Credit
Agreement and all collateral and ancillary documents
executed in connection therewith (the "Prepetition Loan
Documents") with respect to any diminution in the value
of the Prepetition Lenders' interests in the Prepetition
Collateral (as defined below) resulting from (i) the

3

priming liens and security interests to be granted herein
pursuant to Bankruptcy Code § 364(d) to secure the
Postpetition Financing, (ii) the use of the Cash
Collateral, (iii) the use, sale or lease of the
Prepetition Collateral (other than the Cash Collateral)
or (iv) the imposition of the automatic stay pursuant to
Bankruptcy Code § 362(a); (c) seeking a preliminary
hearing (the "Preliminary Hearing") on the Motion to
consider entry of an interim order pursuant to Bankruptcy
Rule 4001 (this "Order") authorizing the Company, inter
alia, to borrow from the Lenders under the Credit
Agreement up to an aggregate of $34,000,000 (inclusive of
amounts necessary to repay the Sterling Obligations (as
defined below)), all upon the terms and conditions set
forth in the Loan Documents and this Order pending the
Final Hearing referred to below; and (d) requesting that
a final hearing (the "Final Hearing") be scheduled, and
that notice procedures in respect of the Final Hearing be
established, by this Court to consider entry of a final
order (the "Final Order") authorizing on a final basis,
inter alia, the Postpetition Financing; and due and
sufficient notice of the Motion and the Preliminary
Hearing under the circumstances having been given; and
the Preliminary Hearing on the Motion having been held

4

before this Court on July 20, 1998; and upon the entire
record made at the Preliminary Hearing, and this Court
having found good and sufficient cause appearing
therefor,

   **IT IS HEREBY FOUND** that:

   A.   On July 19, 1998, (the "<u>Filing Date</u>"), the
Debtors filed voluntary petitions for relief with this
Court under Chapter 11 of the Bankruptcy Code (the
"<u>Chapter 11 Cases</u>").  The Debtors are continuing in
possession of their property, and operating and managing
their businesses, as debtors in possession pursuant to
Bankruptcy Code §§ 1107 and 1108.

   B.   This Court has jurisdiction over the
Chapter 11 Cases and the Motion pursuant to 28 U.S.C.
§§ 157(b) and 1334.  Consideration of the Motion
constitutes a core proceeding as defined in 28 U.S.C.
§ 157(b)(2).

   C.   Without prejudice to the rights of any
other party (but subject to the limitations thereon
described below in decretal paragraph 16), the Debtors
admit that, in accordance with the terms of the
Prepetition Loan Documents, the Debtors are truly and
justly indebted to the Prepetition Lenders, without
defense, counterclaim or offset of any kind, and that as

5

of the Filing Date (i) the Company was liable to the
Prepetition Lenders in the aggregate principal amount of
approximately $285,000,000 in respect of loans made by
the Prepetition Lenders to the Company pursuant to the
Prepetition Credit Agreement, (ii) the Company was
contingently liable to the Prepetition Lenders in the
aggregate principal amount of approximately $30,000,000
in respect of a letter of credit issued pursuant to the
Prepetition Credit Agreement and which remained
outstanding as of the Filing Date and (iii) each Debtor
party to a guarantee executed and delivered in respect of
the Prepetition Obligations was contingently liable to
the Prepetition Lenders pursuant to such guarantee.

D.    Without prejudice to the rights of any
other party (but subject to the limitations thereon
described below in decretal paragraph 16), the Debtors
further admit that the Prepetition Obligations are
secured by valid and enforceable liens and security
interests granted by the applicable Debtors to the
Prepetition Agent, for the ratable benefit of the
Prepetition Lenders, upon and in substantially all of the
Company's and the other applicable Debtors' assets and
property (including the setoff rights described in the
Prepetition Loan Documents and arising by operation of

6

law, collectively the "<u>Prepetition Collateral</u>"),
including without limitation, inventory, accounts
receivable, equipment, general intangibles, and other
tangible and intangible personal property and the
proceeds thereof.  All of the Debtors' cash constitutes
proceeds of the Prepetition Collateral and, therefore, is
cash collateral of the Prepetition Lenders within the
meaning of Bankruptcy Code § 363(a) (the "<u>Cash
Collateral</u>").  The Prepetition Lenders are entitled,
pursuant to Bankruptcy Code §§ 361 and 363(e), to
adequate protection of their interest in the Prepetition
Collateral, including for the use of the Cash Collateral,
the use, sale or lease of the Prepetition Collateral
other than the Cash Collateral and the imposition of the
automatic stay.

      E.   The Lenders' willingness to provide the
Commitments and to make Loans under the Credit Agreement
is contingent upon the repayment in full of the Sterling
Obligations on the Closing Date (as defined in the Credit
Agreement).

      F.   The Debtors do not have sufficient
available sources of working capital and financing to
carry on the operation of their businesses without the
Postpetition Financing and the use of the Cash

Collateral.  The Debtors' ability to maintain business
relationships with their payors and suppliers, to pay
their thousands of employees and otherwise finance their
operations, is essential to the Debtors' continued
viability.  In addition, the Debtors' critical need for
financing is immediate.  In the absence of the
Postpetition Financing and the use of the Cash
Collateral, the continued operation of the Debtors'
businesses would not be possible, and serious and
irreparable harm to the Debtors and their estates would
occur.  The preservation, maintenance and enhancement of
the going concern value of the Company and the other
Debtors are of the utmost significance and importance to
a successful reorganization of the Debtors under Chapter
11 of the Bankruptcy Code.

        G.   Given the Debtors' current financial
condition, financing arrangements and capital structure,
the Debtors cannot obtain unsecured credit allowable
under Bankruptcy Code § 503(b)(1) as an administrative
expense.  Financing on a postpetition basis is not
otherwise available without the Debtors (i) granting,
pursuant to Bankruptcy Code § 364(c)(1), claims having
priority over any and all administrative expenses of the
kinds specified in Bankruptcy Code §§ 503(b) and 507(b),

8

other than as described below, (ii) securing, pursuant to
Bankruptcy Code §§ 364(c) and (d), such indebtedness and
obligations with security interests in and liens upon the
property, and with the priority, described below and
(iii) providing for adequate protection of the
Prepetition Lenders' interests as described below.

      H.    Notice of the Preliminary Hearing and the
relief requested in the Motion has been given to (i) the
Office of the United States Trustee, (ii) the Prepetition
Lenders and the Prepetition Agent and (iii) the creditors
holding the 20 largest unsecured claims against the
Debtors.  No creditors' committee has been appointed in
any of the Chapter 11 Cases.  Under the circumstances,
such notice of the Preliminary Hearing and the relief
requested in the Motion complies with the requirements of
Bankruptcy Code §§ 102(1), 364(c) and 364(d) and
Bankruptcy Rules 2002 and 4001(c).

      I.    Based on the record presented to the Court
by the Debtors at the Preliminary Hearing, the
Postpetition Financing has been negotiated in good faith
and at arm's length between the Debtors and the Lenders,
and any credit extended and loans made to the Debtors
pursuant to the Credit Agreement shall be deemed to have
been extended or made, as the case may be, in good faith

9

as required by, and within the meaning of, Bankruptcy
Code § 364(e).

J.   Based on the record presented to the Court
by the Debtors at the Preliminary Hearing, the terms of
the Postpetition Financing are fair and reasonable,
reflect the Debtors' exercise of prudent business
judgment consistent with their fiduciary duties, and are
supported by reasonably equivalent value and fair
consideration.

K.   The Debtors have requested immediate entry
of this Order pursuant to Bankruptcy Rule 4001(c)(2).
The permission granted herein to enter into the
Postpetition Financing and obtain funds thereunder, and
to use the Cash Collateral, is necessary to avoid
immediate and irreparable harm to the Debtors.  This
Court concludes that entry of this Order is in the best
interest of the Debtors' respective estates and creditors
as its implementation will, among other things, provide
working capital necessary to sustain the operation of the
Debtors' existing businesses and enhance the Debtors'
prospects for successful reorganization.

Based upon the foregoing findings and
conclusions, and upon the record made before this Court

10

at the Preliminary Hearing, and good and sufficient cause
appearing therefor;

     **IT IS HEREBY ORDERED** that:

     1.    The Motion is granted, subject to the
terms and conditions set forth in this Order.

     2.    The Debtors are expressly authorized and
empowered to execute and deliver the Credit Agreement,
the Notes and any other Loan Document to be executed and
delivered in connection therewith.  The Company and the
Guarantors are authorized to comply with and perform all
of the terms and conditions of the Loan Documents
including repayment of amounts borrowed thereunder, with
interest, in accordance with and subject to the terms and
conditions set forth in the Loan Documents and this
Order.  The Debtors are further authorized (a) to pay all
facility, commitment and other fees and expenses,
including, without limitation, all reasonable fees and
expenses of professionals engaged by the DIP Agent and
the Lenders, in accordance with the terms of the Credit
Agreement.  All loans made under the Credit Agreement
(the "Loans") and interest thereon and all fees, costs,
expenses, indebtedness, obligations and liabilities of
the Company and each Guarantor to the Agent and the

11

Lenders under the Loan Documents and this Order are
hereinafter referred to as the "<u>Obligations</u>."

        3.    The Company is expressly authorized to
borrow from the Lenders, on the terms and subject to the
conditions set forth in the Loan Documents and this
Order, a total of $34,000,000 under the Credit Agreement
pending the Final Hearing, and the Guarantors are
expressly authorized to guarantee all Obligations in
respect of such Loans.  The Company is authorized to use
the proceeds of the Loans and to use the Cash Collateral
in the operation of the Debtors' businesses, <u>provided</u>,
that (a) the proposed Loan or use of the Cash Collateral
is consistent with the terms of the Credit Agreement and
this Order and will be used to pay when due expenses of
the types (and in the amounts, subject to permitted
variances) as are set forth in the Budget (as defined in
the Credit Agreement) and (b) any requested Loan is
necessary after the Company's use of all available Cash
Collateral.  Upon entry of this Order, the Debtors are
hereby authorized and directed to use the proceeds of the
initial Loans to repay the Sterling Obligations.

        4.    If an Event of Default (as defined in the
Credit Agreement) occurs, subject to the requirement
contained in the Credit Agreement with respect to

12

specified remedies to provide five business days' prior
written notice to the Company, the United States Trustee
and any statutory committees appointed in the Chapter 11
Cases, the DIP Agent, acting at the direction of the
Required Lenders (as defined in the Credit Agreement),
may terminate the Postpetition Financing (the date of any
such termination, the "Termination Date") and declare the
Loans to be due and payable, and the automatic stay
pursuant to Bankruptcy Code § 362(a) shall be deemed
lifted and modified, without further order of this Court,
to permit the DIP Agent and the Lenders to exercise any
and all of their rights and remedies under the Credit
Agreement, the other Loan Documents and this Order.  In
addition, the Company's right to use Cash Collateral
shall terminate automatically on the Termination Date or
on the third business day after the DIP Agent, acting at
the direction of the Required Lenders, provides written
notice to the Company, the United States Trustee and any
statutory committees appointed in the Chapter 11 Cases of
the occurrence of an Event of Default and that such use
of Cash Collateral shall terminate as a result thereof.
Notwithstanding anything herein to the contrary, no
Loans, Cash Collateral or any portion of the Carve-Out
(as defined below) may be used to object to or contest in

13

any manner, or raise any defenses to (a) the validity,
perfection, priority or enforceability of (i) the
Prepetition Obligations or the liens securing the
Prepetition Obligations or (ii) the obligations (the
"Sterling Obligations") under the Credit Agreement, dated
as of June 30, 1998 (as amended, supplemented or
otherwise modified, the "Sterling Credit Agreement"),
among Sterling Healthcare Group, Inc. ("Sterling"), the
several lenders from time to time parties thereto (the
"Sterling Lenders") and BankBoston, N.A., as
administrative agent for the Sterling Lenders (in such
capacity, the "Sterling Agent"), or to assert any claims
or causes of action against the Prepetition Lenders, the
Prepetition Agent, the Sterling Lenders or the Sterling
Agent.

      5.    In accordance with Bankruptcy Code
§ 364(c)(1), subject to Paragraph 7 below, the
Obligations shall constitute claims (the "Superpriority
Claims") with priority in payment over any and all
administrative expenses of the kinds specified or ordered
pursuant to any provision of the Bankruptcy Code,
including, but not limited to, Bankruptcy Code §§ 105,
326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and
726, and shall at all times be senior to the rights of

14

the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code. Subject only to the Carve-Out, no cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Superpriority Claims of the DIP Agent and the Lenders arising out of the Obligations.

6. As security for the Obligations, the DIP Agent and the Lenders shall have and are hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected security interests in, and liens upon (the "Liens"), all present and after-acquired property of the Debtors of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtors and the proceeds of all causes of action (other than causes of action arising under the Bankruptcy Code) existing as of the Filing Date (collectively with all proceeds and

15

products of any or all of the foregoing, the

"Collateral"):

      (a)  pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Filing Date;

      (b)  pursuant to Bankruptcy Code § 364(d)(1), a first priority, senior, priming, perfected Lien upon all of the Debtors' right, title and interest in, to and under the Prepetition Collateral; and

      (c)  pursuant to Bankruptcy Code § 364(c)(3), a second priority, junior, perfected Lien upon all of the Debtors' right, title and interest in, to and under all Collateral (other than the Prepetition Collateral) which is subject to a Permitted Lien, including, without limitation, a validly perfected security interest or lien in existence as of the Filing Date, or a valid lien perfected (but not granted) after the Filing Date to the extent such perfection in respect of a pre-Filing Date claim is expressly permitted under the Bankruptcy Code, provided, that the Liens granted in favor of the DIP Agent and the Lenders shall be senior to any Permitted Lien which is expressly stated in the Credit Agreement to be junior to the Liens in favor of the DIP Agent and the Lenders.

      7.  Any provision of this Order or the Credit Agreement to the contrary notwithstanding, the Liens and Superpriority Claims granted to the DIP Agent and the Lenders pursuant to the Credit Agreement and this Order shall be subject and subordinate to a carve-out (the "Carve-Out") for (a) following the occurrence and during the pendency of a Default or an Event of Default (as each

16

such term is defined in the Credit Agreement), the payment of allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by the Debtors and any statutory committee of unsecured creditors appointed in the Chapter 11 Cases in an aggregate amount not to exceed $3,000,000 (plus professional fees and disbursements previously incurred, accrued or invoiced prior to such Default or Event of Default to the extent subsequently allowed) and (b) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, the Carve-Out shall not include professional fees and disbursements incurred in connection with asserting any claims or causes of action against the Prepetition Lenders, the Prepetition Agent, the Sterling Lenders or the Sterling Agent and/or challenging or raising any defense to the Prepetition Obligations, the Sterling Obligations or any lien of the Prepetition Agent, the Prepetition Lenders, the Sterling Agent or the Sterling Lenders. As long as no Default or Event of Default shall have occurred and be continuing, the Company and the Guarantors shall be permitted to pay compensation and reimbursement of expenses, allowed and payable under

17

Bankruptcy Code §§ 330 and 331, as the same may be payable, and the amount so paid shall not reduce the Carve-Out.

8.   (a)   Immediately upon entry of this Order, the Debtors are hereby authorized to use Cash Collateral for the items and in the amounts (subject to variances permitted by the Credit Agreement) set forth in the Budget, _provided_ that the Prepetition Lenders are granted adequate protection as hereinafter set forth.

(b)   As adequate protection to the Prepetition Agent and the Prepetition Lenders for any diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral, and only to the extent of such diminution, resulting from (i) the priming of the Prepetition Agent's and the Prepetition Lenders' liens by the Liens in favor of the DIP Agent and the Lenders granted in this Order and the Loan Documents pursuant to Bankruptcy Code § 364(d), (ii) the use of the Cash Collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale or lease of the Prepetition Collateral (other than the Cash Collateral) pursuant to Bankruptcy Code § 363(c), and (iv) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a):

18

(i)   the Prepetition Agent and the Prepetition Lenders shall be and they hereby are granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens upon (the "Replacement Liens"), all of the Debtors' right, title and interest in, to and under the Collateral, subject only to (x) the Carve-Out, (y) the Liens granted pursuant to this Order and the Loan Documents to the DIP Agent and the Lenders to secure the Obligations and (z) any validly perfected liens which remain senior (after giving effect to this Order) to the Liens granted to the DIP Agent and the Lenders pursuant to this Order and the Loan Documents;

(ii)   the Prepetition Agent and the Prepetition Lenders shall be and they hereby are granted, pursuant to Bankruptcy Code § 364(c)(1), Superpriority Claims, junior only to (x) the Superpriority Claims granted to the DIP Agent and the Lenders in respect of the Obligations pursuant to this Order and (y) the Carve-Out; and

(iii)   the Debtors shall deliver to the Prepetition Agent and the Prepetition Lenders (without duplication) copies of all financial and other reporting, and at the same time, required to be delivered to the DIP Agent and the Lenders under the Credit Agreement.

9.   Under the circumstances, and based upon the Prepetition Lenders' consent, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Lenders. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Agent and the Prepetition Lenders pursuant hereto is without prejudice

19

to the right of the Prepetition Agent and the Prepetition
Lenders to seek modification of the grant of adequate
protection provided hereby so as to provide different or
additional adequate protection, and without prejudice to
the right of the Debtors or any other party in interest
to contest any such modification.

10. Except as set forth in paragraphs 6, 7 and
8 above, the Liens and Replacement Liens shall be prior
and senior to all liens and encumbrances of all other
secured creditors in and to such Collateral granted, or
arising, after the Filing Date (including, without
limitation, liens and security interests, if any, granted
in favor of any federal, state, municipal or other
governmental unit, commission, board or court for any
liability of the Debtors). Other than the Carve-Out, the
Debtors shall not assert a claim under Bankruptcy
Code § 506(c) for any costs and expenses incurred in
connection with the preservation, protection or
enhancement of, or realization by the DIP Agent, the
Lenders, the Prepetition Agent or the Prepetition Lenders
upon the Collateral or the Prepetition Collateral. The
Liens and Replacement Liens granted pursuant to this
Order shall constitute valid and duly perfected security
interests and liens, and the DIP Agent, the Lenders, the

20

Prepetition Agent and the Prepetition Lenders shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such Liens or Replacement Liens. If, however, the DIP Agent or the Prepetition Agent, in its reasonable discretion, shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Liens or Replacement Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

11. As long as any portion of the Obligations remains unpaid, or any Loan Document remains in effect,

21

the Debtors shall not seek, and it shall constitute an
Event of Default (and automatic occurrence of the
Termination Date) if (a) there shall be entered any order
dismissing any of the Chapter 11 Cases or (b) except as
otherwise provided in paragraph 8 hereof or as expressly
permitted under the Credit Agreement, there shall be
entered in any of the Chapter 11 Cases or any subsequent
Chapter 7 case any order which authorizes under any
section of the Bankruptcy Code, including Bankruptcy Code
§§ 105 or 364, (i) the granting of any lien or security
interest in any property of the Debtors in favor of any
party other than the DIP Agent and the Lenders or (ii)
the obtaining of credit or the incurring of indebtedness
that is entitled to superpriority administrative status
equal or superior to that granted to the DIP Agent and
the Lenders pursuant to this Order; unless, in connection
with any transaction cited in clause (i) or (ii) of this
paragraph 11, such order requires that the Obligations
shall first be indefeasibly paid in full.

12.  Upon the occurrence and during the
continuance of an Event of Default, the DIP Agent, acting
at the direction of the Required Lenders, may exercise
rights and remedies and take all or any of the following
actions without further modification of the automatic

22

stay pursuant to Bankruptcy Code § 362 (which is hereby.

deemed modified and vacated to the extent necessary to

permit such exercise of rights and remedies and the

taking of such actions) or further order of or

application to this Court:  (a) terminate the Commitments

and thereafter cease to make Loans to the Company; (b)

declare the principal of and accrued interest, fees and

other liabilities constituting the Obligations to be due

and payable; (c) setoff amounts in bank accounts

maintained with a Lender, or otherwise enforce rights

against any other Collateral in the possession of the DIP

Agent or any Lender; and/or (d) take any other action or

exercise any other right or remedy permitted to the

Lenders under the Loan Documents, this Order or by

operation of law; provided, however, the DIP Agent and

the Lenders may take the actions described in clauses (c)

or (d) above only after providing five business days'

prior written notice to the Company, the United States

Trustee and any statutory committees appointed in the

Chapter 11 Cases and provided further that no order

prohibiting such actions is entered by this Court during

such five business day period.  The Debtors waive any

right to seek relief under the Bankruptcy Code, including

without limitation, under Bankruptcy Code § 105, to the

23

extent any such relief would in any way restrict or impair the rights and remedies of the DIP Agent and the Lenders set forth in this Order and in the Loan Documents, provided that such waiver shall not preclude the Debtors from contesting whether a Default or Event of Default has occurred and is then continuing.

13.   The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Loan Documents, as the DIP Agent or the Lenders may reasonably require, as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the DIP Agent or the Lenders to effectuate the terms and conditions of this Order and the Loan Documents.   The Debtors, the DIP Agent and the Lenders are hereby authorized to implement, in accordance with the terms of the Credit Agreement, any non-material modifications (including without limitation, any change in the number or composition of the Lenders) of the Credit Agreement without further Order of this Court.

14.   Having been found to be extending credit and making Loans to the Debtors in good faith, the DIP Agent and the Lenders shall be entitled to the full protection of Bankruptcy Code § 364(e) with respect to

24

the Obligations and the Liens created or authorized by
this Order in the event that this Order or any
authorization contained herein is stayed, vacated,
reversed or modified on appeal.  Any stay, modification,
reversal or vacation of this Order shall not affect the
validity of any obligation of the Debtors to the DIP
Agent or the Lenders incurred pursuant to this Order.
Notwithstanding any such stay, modification, reversal or
vacation, all Loans made pursuant to this Order and the
Credit Agreement, all uses of Cash Collateral and all
Obligations incurred by the Debtors pursuant hereto or
the Loan Documents prior to the effective date of such
stay, modification, reversal or vacation, shall be
governed in all respects by the original provisions
hereof and the DIP Agent, the Lenders, the Prepetition
Agent and the Prepetition Lenders, shall be entitled to
all the rights, privileges and benefits, including
without limitation, the Liens, Replacement Liens and
Superpriority Claims granted herein.

15.  The provisions of this Order and any
actions taken pursuant hereto shall survive entry of any
order which may be entered (a) confirming any plan of
reorganization in any of the Chapter 11 Cases (and the
Obligations shall not be discharged by the entry of any

such order or pursuant to Bankruptcy Code § 1141(d)(4),
the Debtors having hereby waived such discharge); (b)
converting any of the Chapter 11 Cases to a Chapter 7
case; or (c) dismissing any of the Chapter 11 Cases, and
the terms and provisions of this Order as well as the
Superpriority Claims, Liens and Replacement Liens granted
pursuant to this Order and the Loan Documents shall
continue in full force and effect notwithstanding the
entry of such order, and such Superpriority Claims, Liens
and Replacement Liens shall maintain their priority as
provided by this Order until all of the Obligations and
all obligations in respect of the matters set forth in
clauses (i) through (iii) of paragraph 8(b) are
indefeasibly paid in full and discharged.

    16.  The findings contained in paragraphs C and
D shall be binding upon all parties in interest,
including but not limited to, the Debtors and any
statutory committee of unsecured creditors, unless (a) a
party in interest (including any statutory committee of
unsecured creditors) has properly filed an adversary
proceeding or contested matter (subject to the limitation
set forth in the last sentence of decretal paragraph 4)
challenging the validity, enforceability or priority of
the Prepetition Obligations or the Sterling Obligations,

the Prepetition Agent's and the Prepetition Lenders'
liens on the Prepetition Collateral or the Sterling
Agent's or the Sterling Lenders' liens on the property
securing the Sterling Obligations in respect thereof no
later than the date that is sixty (60) days after the
date of appointment of a statutory committee of unsecured
creditors and (b) the Court rules in favor of the
plaintiff in any such timely and properly filed adversary
proceeding or contested matter.  If no such adversary
proceeding or contested matter is properly commenced as
of such date, the Prepetition Obligations and the
Sterling Obligations, as the case may be, shall
constitute allowed claims for all purposes in the Chapter
11 Cases and any subsequent Chapter 7 cases, the
Prepetition Agent's and the Prepetition Lenders' liens on
the Prepetition Collateral and the Sterling Agent's or
the Sterling Lenders' liens on the property securing the
Sterling Obligations shall be deemed legal, valid,
binding, perfected, not subject to subordination and
otherwise unavoidable, and the Prepetition Obligations,
the Sterling Obligations, the Prepetition Agent's and the
Prepetition Lenders' liens on the Prepetition Collateral
and the Sterling Agent's or the Sterling Lenders' liens
on the property securing the Sterling Obligations shall

27

not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estate, including, without limitation, any successor thereto.

17.  Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Prepetition Agent or the Prepetition Lenders may have against the Debtors or third parties, and without prejudice to the right of the Prepetition Agent and the Prepetition Lenders to seek relief from the automatic stay in effect pursuant to Bankruptcy Code § 362, or any other relief in the Chapter 11 Cases, and the right of the Debtors to oppose any such relief.  The provisions of this Order shall be binding upon and inure to the benefit of the DIP Agent, the Lenders, the Prepetition Agent, the Prepetition Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

18.  The Debtors shall, on or before July 22, 1998, mail copies of a notice of the entry of this Order, together with a copy of this Order and a copy of the Motion, to the parties having been given notice of the

28

Preliminary Hearing, to any party which has filed prior
to such date a request for notices with this Court and to
counsel for any statutory committee of unsecured
creditors appointed pursuant to Bankruptcy Code § 1102.
The notice of entry of this Order shall state that any
party in interest objecting to the Postpetition Financing
shall file written objections with the United States
Bankruptcy Court Clerk for the District of Delaware no
later than 4:00 p.m. on August 6, 1998, which objections
shall be served so that the same are received on or
before such date by:  (a) Skadden, Arps, Slate, Meagher &
Flom, 333 W. Wacker Drive, Chicago, Illinois 60606,
Attention: John Wm. Butler, Jr., Esq. and J. Eric
Ivester, Esq., and One Rodney Square, Wilmington,
Delaware 19801, Attention:  Gregg Galardi, Esq.,
Attorneys for the Debtors; (b) Simpson Thacher &
Bartlett, 425 Lexington Avenue, New York, New York 10017,
Attention:  Lillian E. Kraemer, Esq. and Kenneth S.
Ziman, Esq., and Duane, Morris & Heckscher LLP,
1201 Market Street, Suite 1500, Wilmington, Delaware
19801, Attention:  Teresa K.D. Currier, Esq., Attorneys
for the DIP Agent and the Prepetition Agent; and (c) the
Office of the United States Trustee.

19.  The Final Hearing will be held on August 10, 1998 at 10:00 a.m.

Dated:    Wilmington, Delaware
          July 2/, 1998


          The Honorable Peter J. Walsh
          Chief United States Bankruptcy Judge