u'i 11 2011

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No 01 B 31751 |
| | ) | Chapter 11 |
| GOSS HOLDINGS, INC ., et al., | ) | Hon. Carol A. Doyle |
| | ) | (Jointly Administered) |
| Debtors. | ) | Hearing Date:  10/10/01 |
| | ) | Hearing Time:  1:30 p.m. |

### FINAL ORDER (A) (i) AUTHORIZING POST PETITION FINANCING AND (ii) GRANTING SUPER ADMINISTRATIVE PRIORITY EXPENSE CLAIM STATUS, AND (B) APPROVING STIPULATION REGARDING USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

Goss Graphic Systems, Inc. ("Goss") and Goss Holdings, Inc. ("Holdings," successor to GGS Holdings, Inc. ("Old Holdings")), as debtors and debtors in possession (collectively, the "Debtors"), filed their motion on September 10, 2001 (the "Motion") (A) for authority, pursuant to Sections 105, 362, 363 and 364(c) and (d) of the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code") and Bankruptcy Rule 4001(c), inter alia, (i) for Goss to borrow funds and receive letter of credit financing (the "DIP Financing") pursuant to that certain debtor-in-possession credit agreement (the "DIP Credit Agreement")[1] by and among Goss, as Borrower, Bankers Trust Company, as agent (the "DIP Agent"), the lenders from time to time signatory thereto, (including the Gap Lenders (as hereinafter defined), the "DIP Lenders") and certain other parties, (ii) for Holdings to guarantee those borrowings and for the Debtors to guarantee postpetition borrowings by Goss's foreign subsidiaries pursuant to those certain debtor-in-possession guarantees dated September 10, 2001 in substantially the form annexed to the Motion (the "DIP Guaranties") (the DIP Credit

---

[1]  Unless otherwise defined herein, terms used in this Order have the meanings ascribed to them in the DIP Credit Agreement.



Agreement, the DIP Guaranties and the related agreements, instruments and documents are herein collectively referred to as the "DIP Financing Documents"), (iii) for the Debtors to grant liens securing such loans, advances and obligations and (iv) for the Debtors to grant super priority administrative claim status in respect of such loans, advances and obligations and (B) for approval, pursuant to Bankruptcy Code sections 361, 363 and 364(d) and Bankruptcy Rule 4001(d), of the Stipulation Regarding Use of Cash Collateral and Adequate Protection (the "Adequate Protection Stipulation") by and among Goss, Holdings and Bankers Trust Company, as administrative agent (the "Prepetition Agent") on behalf of itself and the Lenders under the hereinafter described Prepetition Credit Agreement (the "Prepetition Lenders").

Upon the record of the interim hearing made by the Debtors before this Court with respect to the Motion at the interim hearing on September 13, 2001, and the final hearing on October 10, 2001, it appears that:

A.    On September 10, 2001 (the "Petition Date"), the Debtors filed voluntary chapter 11 petitions under the Bankruptcy Code. No trustee or examiner has been appointed. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are authorized to operate their business as debtors-in-possession.

B.    Prior to the commencement of the Chapter 11 cases, (i) the Debtors and certain of the Prepetition Lenders executed an agreement (the "Lender Lock-up Agreement") and (ii) the Debtors and certain holders of Holding's $112,500,000 principal amount of Subordinated Notes due 2005 (the "Noteholders") executed an agreement (the "Noteholder Lock-up Agreement"), pursuant to which the parties to each such agreement agreed, inter alia, to support

the confirmation of a plan of reorganization containing the essential terms set forth therein (the "Plan").

C.      Goss and Old Holdings previously filed Chapter 11 cases in the District of Delaware on July 30, 1999 (the "Old Chapter 11 Cases"). At that time, Goss, Goss Graphic Systems Limited ("Goss UK"), Goss Systemes Graphiques Nantes S.A. ("Goss France") and Goss Graphic Systems Japan Corporation ("Goss Japan"), (Goss UK, Goss France and Goss Japan, the "Foreign Borrowers"), as borrowers (the "Borrowers"), the lenders party thereto and Bankers Trust Company, as agent, were parties to that certain $200,000,000 Amended and Restated Multicurrency Credit Agreement dated as of January 28, 1998, as amended (as so amended, the "1998 Credit Agreement"). In connection with the Old Chapter 11 Cases, certain of the lenders under the 1998 Credit Agreement provided $50,000,000 of debtor-in-possession financing to Goss and its subsidiaries (the "1998 DIP Financing"), which financing was secured by priming liens on the assets of Goss and Old Holdings. As part of a joint plan of reorganization of Goss and Old Holdings, Goss and the Foreign Borrowers, as Borrowers, the Prepetition Lenders and the Prepetition Agent entered into that certain $250,000,000 Second Amended and Restated Multicurrency Credit Agreement dated as of November 19, 1999 (as amended, the "Prepetition Credit Agreement").

D.      The Prepetition Credit Agreement originally provided for the following commitments: Domestic Tranche A Revolving Loan Commitments in a maximum amount of $50,000,000, available solely to Goss; Domestic Tranche B Revolving Loan Commitments in a maximum amount of $50,000,000, available solely to Goss; UK Tranche B Revolving Loan Commitments in a maximum amount of $50,000,000 (with an initial suballocation of

$35,000,000) available solely to Goss UK under the conditions set forth in the Prepetition Credit Agreement, utilization of which reduces the availability of the Domestic Tranche B Revolving Loan Commitments; Domestic Term Loans in the amount of $131,243,580; and UK Term Loans in the amount of $18,756,420. On August 30, 2000, the Prepetition Credit Agreement was amended to add an additional facility (the "Domestic Tranche A Overline") in the amount of $15,000,000, available only to Goss. The Domestic Tranche A Overline was to be repaid by May 31, 2001, which date was extended to September 30, 2001.

E.    As of the Petition Date, the aggregate principal amounts outstanding under the Prepetition Credit Agreement were approximately: $15,000,000 outstanding to Goss under the Domestic Tranche A Overline; $50,000,000 outstanding to Goss under the Domestic Tranche A Revolving Loan Commitment; $50,000,000 outstanding to Goss and Goss UK under the Tranche B Revolving Loan Commitment; and $150,000,000 outstanding to Goss and Goss UK under the Term Loans.

F.    Under the Prepetition Credit Agreement, the Prepetition Lenders have made advances to Goss UK, which advances are secured by a first priority lien on certain assets of Goss UK and guaranteed by Goss and Holdings. Because of the Debtors' bankruptcies, no further advances to any Foreign Borrowers are available under the Prepetition Credit Agreement.

G.    The Domestic Tranche A Revolving Loans refinanced the 1998 DIP Financing. The Domestic Tranche A Revolving Loans and the Tranche A Overline Loans are hereinafter referred to collectively as the "Tranche A Loans." The Tranche A Loans are secured pari passu by a first priority lien on substantially all assets of Goss and Holdings (except for 34% of the stock of the Foreign Borrowers). The Domestic Tranche B Revolving Loans and

4

Domestic Term Loans (collectively, the "Tranche B Loans") are secured pari passu by a second priority lien on substantially all the assets of Goss and Holdings (except for 34% of the stock of the Foreign Borrowers). The UK Tranche B Revolving Loans and the UK Term Loans are secured pari passu by liens on substantially all the assets of Goss UK and are guaranteed by Goss, which guaranty is secured by a second priority lien on substantially all the assets of Goss and Holdings (except for 34% of the stock of the Foreign Borrowers), which lien is pari passu with the liens securing the Tranche B Loans.

H.     The obligations of the Debtors to the Prepetition Lenders participating in the Tranche A Loans (such Lenders, the "Prepetition Tranche A Lenders") under the Prepetition Loan Documents (as hereinafter defined) are referred to herein as the "Tranche A Secured Obligations." The obligations of the Debtors to the Prepetition Lenders participating in the Tranche B Loans (such Lenders, the "Prepetition Tranche B Lenders") under the Prepetition Loan Documents are referred to herein as the "Tranche B Secured Obligations."

I.     The Tranche A Security Agreements and the Tranche B Security Agreements (each as defined in the Adequate Protection Stipulation), the Intercreditor Agreement and any other document, instrument or agreement executed by any person in favor of the Prepetition Lenders or the Prepetition Agent granting a lien on any assets of the Debtors to secure the Tranche A Secured Obligations and/or the Tranche B Secured Obligations (collectively, the "Prepetition Secured Obligations"), any and all financing statements and amendments and continuation statements filed in connection therewith, any and all other filings and recordings and any and all amendments thereto are referred to herein collectively as the "Prepetition Domestic Collateral Documents," and all property of the Debtors pledged,

mortgaged or encumbered thereby for the benefit of the Prepetition Lenders is referred to herein collectively as the "Prepetition Domestic Collateral."

J.      Pursuant to that certain Intercreditor Agreement dated as of November 19, 1999, the Tranche B Lenders subordinated their liens securing the Tranche B Secured Obligations in the Prepetition Domestic Collateral (as defined below) to the liens securing the Tranche A Secured Obligations in the Prepetition Domestic Collateral.

K.      With respect to Goss, the Prepetition Domestic Collateral includes: (i) 100% of the shares of capital stock of its domestic subsidiaries, 66% of the shares of the capital stock of the Foreign Borrowers and 100% of that Intercompany Note dated as of November 19, 1999 by and among the Borrowers; (ii) substantially all of its tangible and intangible personal property, including without limitation membership interests in uncertificated subsidiaries, trademarks and patents; and (iii) liens on its real property in Iowa.

L.      With respect to Holdings, the Prepetition Domestic Collateral includes: (i) 100% of the shares of capital stock of Goss and (ii) substantially all of its tangible and intangible personal property.

M.      The Debtors agree that the Prepetition Agent, for the benefit of the Prepetition Lenders, possesses valid, properly perfected and non-avoidable first and second priority security interests in the Prepetition Domestic Collateral pursuant to the Prepetition Domestic Collateral Documents, subject only to Permitted Encumbrances (as defined in the Prepetition Credit Agreement) existing on the Petition Date.

N.      As of the Petition Date, the Debtors were indebted to the Prepetition Lenders on account of the Prepetition Secured Obligations in an aggregate principal amount,

including letter of credit usage, of approximately $265 million, plus unpaid fees, expenses and

accrued interest as of the Petition Date, all of which the Debtors agree is not subject to any offset,

counterclaim, defense or claim for recoupment, except as the amount of letter of credit usage is

reduced by the expiration and non-renewal of undrawn letters of credit issued pursuant to the

Prepetition Credit Agreement (the "Prepetition Letters of Credit").

O.    Prior to the Petition Date, the Debtors and certain of the Prepetition

Lenders entered into that certain Forbearance, Lock-Up and Voting Agreement dated as of

September 7, 2001, pursuant to which the Prepetition Lenders party thereto agreed to support a

plan of reorganization described therein (the "Proposed Plan").

P.    Absent authorization to use cash collateral under Bankruptcy Code

sections 363(c)(2) and (e), the Debtors will have no cash funds available for use in their business

operations and for the maintenance and preservation of the property and assets of the Debtors'

estates because the Prepetition Lenders have liens on or security interests in substantially all of

their assets and property, including their prepetition accounts receivable and the proceeds thereof

(which constitute cash collateral as the latter term is defined in Bankruptcy Code section 363(a)).

Because the commencement of the Chapter 11 Cases constitutes an Event of Default under the

Prepetition Credit Agreement, and Goss UK intends to cease making payments to the Prepetition

Lenders, permitting the Prepetition Lenders to cease making advances to the Foreign Borrowers

and permitting the Lenders to exercise their remedies against the Foreign Borrowers, the ability

of the Foreign Borrowers to generate cash may be severely impaired.  Moreover, any cash

generated by the Foreign Borrowers may become unavailable to the Debtors because cash

advanced from the Foreign Borrowers to the Debtors would also constitute the Prepetition

Lenders' Cash Collateral.

Q.      Without the use of its cash funds, the cash funds of the Foreign Borrowers

and the DIP Financing, the Debtors and Foreign Borrowers will be unable to operate during the

pendency of the Chapter 11 Cases.

R.      In order to operate their business the Debtors have requested that the

Prepetition Lenders consent to the use of their cash collateral and provide the Debtors with

$90,000,000 in debtor-in-possession financing. Each of the Tranche A Lenders was requested to

participate in the DIP Financing on pro rata basis. To the extent the Tranche A Lenders' failure

to subscribe to the DIP Financing resulted in a shortfall in the DIP Financing (the "Gap

Amount"), the Tranche B Lenders were invited to participate by providing commitments for the

Gap Amount under the DIP Tranche 1A Facility of the DIP Financing (in such capacity, the

"Gap Lenders"). Certain of the Tranche A Lenders and certain of the Tranche B Lenders, in their

capacity as DIP Lenders, have agreed to provide up to $90,000,000 in DIP Financing in

accordance with the terms of the DIP Credit Agreement. The DIP Credit Agreement provides for

the following facilities: (i) the DIP Tranche 1A Facility with a $25 million maximum revolving

commitment available solely to Goss, $10 million of which shall be available initially, $15

million more of which may be made available, in two increments of $5 million and $10 million,

respectively, upon the discretionary approval of 92% of the DIP Lenders participating in the DIP

Tranche 1A Facility (the "DIP Tranche 1A Lenders."); (ii) the DIP Tranche 1B Facility with a

$17 million maximum revolving commitment available solely to Goss, becoming available if and

as letters of credit currently outstanding under the Domestic Tranche A Revolving Loan

Commitment expire without draw thereon prior to September 30, 2001 in principal amounts

equal to the face amounts of such letters of credit; (iii) the DIP Tranche 2 Facility with a $15

million maximum revolving commitment available solely to Goss; and (iv) the DIP Tranche 3

Facility with a $50 million maximum revolving commitment available solely to Goss, reducing

dollar for dollar as expiring letters of credit under the Domestic Tranche A Revolving Loan

Commitment create availability under the DIP Tranche 1B Facility.  Each of the DIP Tranche 1A

Facility, the DIP Tranche 1B Facility, the DIP Tranche 2 Facility and the DIP Tranche 3 Facility

are referred to herein as a "DIP Facility" and collectively as the "DIP Facilities."

      S.    The DIP Credit Agreement also provides for the Foreign Facility with a

$25 million maximum revolving commitment to the Foreign Borrowers.  The Foreign Facility

commitment shall operate as a sublimit under the DIP Facilities, such that it shall not exceed the

available DIP Facility commitments at any time, and Borrowings and Letter of Credit Usage

under the Foreign Facility shall reduce the maximum commitment amount of the DIP Facilities.

      T.    Under the terms of the DIP Credit Agreement, (i) the proceeds of the DIP

Tranche 1A Facility and the DIP Tranche 1B Facility are to be used to (a) fund working capital

requirements and bankruptcy costs of Goss and (b) provide standby letters of credit for the

benefit of Goss; (ii) the proceeds of the DIP Tranche 2 Facility are to be used to refinance the

Tranche A Overline held by the DIP Lenders participating in the DIP Tranche 2 Facility (the

"DIP Tranche 2 Lenders"), with any further availability to be used to (i) fund working capital

requirements and bankruptcy costs of Goss and (ii) provide standby letters of credit for the

benefit of Goss; and (iii) the proceeds of the DIP Tranche 3 Facility are to be used to refinance

the balance of the Domestic Tranche A Revolving Loans (other than Tranche A Overline) held

by the DIP Lenders participating in the DIP Tranche 3 Facility (the "DIP Tranche 3 Lenders"),

with any further availability to be used to (i) fund working capital requirements and bankruptcy

costs of Goss and (ii) provide standby letters of credit for the benefit of Goss.

U.     The DIP Credit Agreement provides that available DIP Tranche 3 Facility

commitments shall be exhausted before any funding of the DIP Tranche 2 Facility, and available

DIP Tranche 2 Facility commitments shall be exhausted before any funding either of the DIP

Tranche 1A Facility or the DIP Tranche 1B Facility.  A portion of the proceeds of the DIP

Facilities (approximately $42 million) will be used to refinance the Tranche A Loans, and the

balance shall be used to replace letters of credit outstanding under the Tranche A Loan facilities

or to fund new loans to Goss or to issue new letters of credit for the benefit of Goss.

V.     In order to induce the DIP Lenders to provide the DIP Financing, the DIP

Credit Agreement also provides for a $5 million fee for the DIP Tranche 1A Lenders (the "Back

End Fee") and a $500,000 fee for the Gap Lenders (the "Gap Back End Fee"), each to be paid on

the Maturity Date (as hereinafter defined).  The Back End Fee and the Gap Back End Lending

Fee shall be prorated on the basis of the actual amount of the DIP Tranche 1A Facility made

available by order of this Court and by the election of the DIP Lenders participating in the DIP

Tranche 1A Facility.

W.     Borrowings under the DIP Credit Agreement are to be repaid on the date

(the "Maturity Date") which is the earlier of (i) 6 months from the date of entry of this Order,

(ii) the effective date of a plan of reorganization of the Debtors and (iii) the date of termination in

whole of the Commitments (as defined therein) under the DIP Credit Agreement pursuant to

Section 8 thereof.  Item (i) of the preceding sentence may be extended by up to 90 days by

majority in amount of the maximum commitment of the DIP Lenders for all facilities under the DIP Credit Agreement combined.   The DIP Credit Agreement also provides that the liens securing the DIP Tranche 1A Facility and DIP Tranche 1B Facility shall be pari passu with one another in lien priority and shall be first priority obligations; the Back End Fee and the Gap Back End Fee shall be pari passu with one another in lien priority and shall be second priority obligations; the DIP Tranche 2 Facility and the DIP Tranche 3 Facility shall be pari passu with one another in lien priority and shall be third priority obligations; and all of the foregoing shall be senior in priority to all other liens on the DIP Collateral (as hereinafter defined) but subject to the Carve-Out (as hereinafter defined) in accordance with the terms thereof.

    X.  The Debtors are unable to obtain debtor-in-possession financing under Bankruptcy Code section 364(b) or (c) or on any basis other than the arrangement under the DIP Credit Agreement, which provides the DIP Lenders with (i) priming liens senior to the Prepetition Lenders' liens on the Prepetition Domestic Collateral pursuant to Bankruptcy Code section 364(d) (the "Priming Liens") as well as the Debtors' postpetition assets (other than avoidance actions), (ii) liens on the unencumbered 34% of the capital stock of the Foreign Borrowers (the "New Stock Liens") and (iii) guaranties from the Debtors senior to the guaranties granted to the Prepetition Lenders pursuant to the Prepetition Loan Documents (the "Priming Guaranties"), all in accordance with the terms and conditions of the DIP Credit Agreement and the Prepetition Lenders' Consent (as defined herein).

    Y.  The DIP Lenders have agreed to provide the DIP Financing on the terms and conditions in the DIP Financing Documents and in reliance thereon and provided that the Court enters an order satisfactory to the DIP Lenders approving the DIP Financing Documents

and granting such liens, security interests and priorities to or for the benefit of the DIP Lenders as are set forth herein and in the DIP Credit Agreement with respect to all obligations of the Debtors to the DIP Lenders under the DIP Financing Documents (the "DIP Obligations"), including granting the Priming Liens, the New Stock Liens and the Priming Guaranties.

Z.      The Debtors will receive and benefit from the credit provided under the DIP Financing Documents authorized herein.   The credit provided under the DIP Financing Documents is necessary to fund the business of the Debtors and will contribute to payment of the actual and necessary costs and expenses of preserving their estates.

AA.      Without providing the Prepetition Lenders adequate protection, the Debtors cannot grant the Priming Guaranties and the Priming Liens on the Prepetition Domestic Collateral, and accordingly would be unable to obtain the DIP Financing and would not have sufficient cash to operate.   The Prepetition Lenders have agreed to consent to the use of their cash collateral and the granting of the Priming Liens and Priming Guaranties pursuant to that certain Consent and Limited Waiver to Credit Agreement (the "Prepetition Lenders' Consent"), provided the Prepetition Lenders receive the adequate protection set forth in the Adequate Protection Stipulation.

BB.      Based on the record made by the Debtors before the Court, the financing arrangement contemplated by the Motion and approved herein pursuant to which the DIP Financing will be made available to the Debtors is the product of arms' length negotiation and is entered into by the DIP Lenders in good faith, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code.

CC.   The ability of the Debtors to continue in business so they can attempt to reorganize under the Bankruptcy Code depends on obtaining the relief sought in the Motion.

DD.   Notice of the relief requested in the Motion, including a sufficient description of the terms of the DIP Financing Documents, has been given, inter alia, to the United States Trustee, counsel to the DIP Agent and the Prepetition Agent, the creditors scheduled on the Debtors' lists filed pursuant to Bankruptcy Rule 1007(d) and the indenture trustee for the Noteholders. No additional parties need be given notice pursuant to Bankruptcy Rule 4001(c). The DIP Credit Agreement annexed to the Motion constitutes an "agreement" as used in Bankruptcy Rule 4001(c).

EE.   No further notice of or hearing on the relief sought in the Motion is required. The Court has jurisdiction over this case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b)(2)(D) and 1334.

FF.   Good, adequate and sufficient cause has been shown to justify the granting of the relief requested in the Motion.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.   The Motion is granted and the DIP Financing Documents are hereby approved subject to the terms and conditions hereinafter set forth.

2.   If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed by subsequent order of this Court or any other court, such reversal, stay, modification or vacatur shall not affect the validity and enforceability of any DIP Obligation, debt or claim incurred or any priority that is or was incurred or granted pursuant to the DIP Financing Documents, the Adequate Protection Stipulation or this Order, and

notwithstanding any stay, reversal, modification or vacatur of this Order, any DIP Obligations

owing to the DIP Lenders or any obligation under the Adequate Protection Stipulation arising

prior to the effective date of such stay, reversal, modification or vacatur, shall be governed in all

respects by the original provisions of this Order, the DIP Financing Documents and the Adequate

Protection Stipulation, as the case may be.   The DIP Lenders shall be entitled to all of their

respective rights, privileges and benefits hereunder and under the DIP Financing Documents

including, without limitation, the priorities, rights and remedies granted herein and therein to or

for their benefit with respect to all DIP Obligations owing to the DIP Lenders, and the priority

granted therefor as set forth herein under Bankruptcy Code section 364(c)(1).

## DIP FINANCING

3.     Goss is authorized to obtain loans and request the issuance of letters of

credit and guarantee loans and letters of credit obtained by the Foreign Borrowers pursuant to the

terms of the DIP Financing Documents and this Order, and Holdings is authorized to guarantee

loans and letters of credit obtained by Goss and the Foreign Borrowers pursuant to the DIP

Financing Documents.

4.     The Debtors are hereby (i) authorized and directed to execute and deliver

the DIP Financing Documents and all other documents necessary or desirable to implement the

DIP Financing (through one or more officers designated by them), (ii) authorized and directed to

grant the security interests and liens granted in the DIP Financing Documents, (iii) authorized

and directed to effect all transactions and take any actions provided for in the DIP Financing

Documents or deemed necessary by the DIP Lenders to effectuate the terms and conditions of the

DIP Financing Documents and this Order, including, without limitation, the payment of any and

all fees, costs, charges, commissions and expenses, including reasonable counsel fees, payable

under the DIP Financing Documents or this Order, and (iv) authorized and directed to comply

with all provisions of the DIP Financing Documents, including, without limitation, the payment

and satisfaction in full of all DIP Obligations when due in accordance with the terms of the DIP

Financing Documents.

        5.     The DIP Obligations shall be entitled to the following protections, liens

and priorities:

        (a)     pursuant to Bankruptcy Code Sections 364(c) and 364(d), the Lender

Consent and the Adequate Protection Stipulation, the DIP Obligations shall be secured by valid

and perfected liens on all property of the estates of the Debtors, whether real or personal, tangible

or intangible, now existing or hereafter acquired or created, and wherever located, and the

respective proceeds of such property (the "DIP Collateral") (other than avoiding powers

established under the Bankruptcy Code and proceeds thereof), which liens shall be senior to liens

of the Prepetition Lenders in the Prepetition Domestic Collateral and to the replacement liens

granted to the Prepetition Lenders pursuant to this Order.

        (b)     all DIP Obligations (including, but not limited to, the obligation to pay

principal, interest, professional fees, costs, charges, commissions and expenses) shall be paid as

provided in the DIP Financing Documents when due, without defense, offset, reduction or

counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors

arising under Bankruptcy Code section 364(c)(1), with priority for such claims over any and all

administrative expenses (other than the Carve-Out (as defined below)) of the kind specified or

ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to,

Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a) and 507(b) .

        (c)     the liens and super administrative expense priority claims granted in (a)

and (b) of this section 5 shall be subject to (i) professional fees and expenses incurred in the

cases and allowed under Sections 328, 330 and 331 of the Bankruptcy Code of professional

persons retained pursuant to an order or orders of the Court by the Debtors (collectively, the

"Debtors' Professionals") and the Committee's professionals (the "Committee's Professionals"),

(A) which fees and expenses for all professionals other than the Blackstone Group prior to the

occurrence of an Event of Default (I) do not exceed the amount for such fees and expenses

provided for in the Approved Budget prior to the date of the occurrence of such Event of Default

and (II) (a) have been paid, (b) have been billed (including bills provided for information

purposes only) if copies of any such bills have been provided to the DIP Lenders, (c) are the

subject of a filed interim or final fee application, or (d) have been accrued, (B) which fees and

expenses from and after the occurrence of an Event of Default do not exceed $1,000,000 for all

such professionals other than the Blackstone Group ($350,000 of which shall be reserved for the

Committee's professionals) and (C) which fees and expenses for the Blackstone Group shall not

exceed the sum of (I) the aggregate monthly fees (at a rate not in excess of $200,000 per month)

of Blackstone from the Petition Date until three months after the date, if any, that Blackstone

shall have been directed to pursue a sale of all or substantially all the assets of the Debtors; (II) in

the event of a sale of all or substantially all the assets of the Debtors, if such sale occurs more

than three months after the date Blackstone is so directed, monthly fees after such three month

period of not more than $150,000 per month until consummation of such sale; and (III) either (x)

in the event of a sale of all or substantially all the assets of the Debtors, a one-time transaction fee in an amount not to exceed 3.5% of the net proceeds from such sale available for distribution to creditors but not less than $1,250,000 or (y) in the event the Debtors confirm a Chapter 11 plan of reorganization that does not include a sale of all or substantially all of the assets of the Debtors and such plan becomes effective, the Restructuring Fee provided in Blackstone's engagement lette, provided, however, that, notwithstanding anything in clause (C) hereof to the contrary, in the event that the Debtors are liquidated in a fashion other than through one or more sales as going concerns, there shall be no carve-out for the Blackstone Group with respect to the transaction fee referred to in sub-clause (III)(x) or clause (C), and (ii) fees payable to the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a) ((i) and (ii) collectively the "Carve-Out").

(d)     Notwithstanding the preceding clause (c) of this section 5, in no event shall the proceeds of the DIP Facilities be used to finance in any way any adversary action, suit, arbitration, proceeding or other litigation of any type relating to or in connection with the Prepetition Credit Agreement or any of the loan documents or instruments entered in connection therewith (the "Prepetition Loan Documents"), including, without limitation, any challenges to claims of the Prepetition Lenders or the validity, perfection, priority or enforceability of any of the liens securing such claims or any payment made thereunder, except that prior to the conclusion of the 60 day period referred to in Paragraph 23, such proceeds may be used for compensation, to the extent approved by the Court, of the Unsecured Creditors' Committee (the "Committee") for its analysis of such liens and claims. The DIP Obligations shall at all times be senior, in this and any subsequent case under the Bankruptcy Code, to the rights of the Debtors,

any successor trustee and (except to the extent of the Carve-Out) any unsecured claims of any

creditor or other entity.

(e)     No cost or expense of administration or any claims in this case, including

those resulting from or incurred after any conversion of this case pursuant to Bankruptcy Code

section 1112 shall (except to the extent of the Carve-Out) rank prior to, or on parity with, the DIP

Obligations. The security interests and liens granted to the DIP Lenders shall not now or at any

time hereafter be subject to any lien or security interest that is avoided and preserved for the

benefit of the Debtors' estates under Bankruptcy Code section 551.

(f)     The liens on the DIP Collateral granted hereunder securing: (i) the DIP

Tranche 1A Facility and DIP Tranche 1B Facility shall be pari passu with one another in lien

priority and shall be first priority obligations, (ii) the Back End Fee and the Gap Back End Fee

shall be pari passu with one another in lien priority and shall be second priority obligations and

(iii) the DIP Tranche 2 Facility and the DIP Tranche 3 Facility shall be pari passu with one

another in lien priority and shall be third priority obligations; and all of the foregoing shall be

senior in priority to all other liens on the DIP Collateral. Proceeds received from foreclosure or

other realization on DIP Collateral that is also part of the Prepetition Domestic Collateral shall be

applied toward repayment of the DIP Tranche 1A Facility and DIP Tranche 1B Facility obligations under the DIP Credit Agreement only after all

available proceeds from foreclosure or other realization on DIP Collateral not part of the

Prepetition Domestic Collateral has been applied thereto.

6.     Other than (i) liens granted pursuant to this Order, (ii) liens permitted

under the terms of the DIP Financing Documents, (iii) liens existing on the Petition Date and

liens that relate back to the Petition Date that may be perfected pursuant to Bankruptcy Code

section 362(b)(3), no liens or security interests shall attach to any property of the Debtors' estates

in this or any subsequent case under the Bankruptcy Code unless either (a) the DIP Lenders give

their express written consent, or (b) the DIP Financing has been terminated and all DIP

Obligations (other than unmatured rights to indemnification) have been paid in full ("Discharge

of the DIP Financing").

7.      Other than (i) Indebtedness (as defined in the DIP Credit Agreement)

permitted by the DIP Financing Documents and this Order or (ii) Indebtedness the proceeds of

which are used first to satisfy in full all DIP Obligations in accordance with the terms of the DIP

Financing Documents, no Indebtedness shall be incurred by the Debtors in this or any subsequent

case under the Bankruptcy Code unless or until (a) the DIP Lenders give their express written

consent, or (b) the Discharge of the DIP Financing.

8.      Prior to Discharge of the DIP Financing, no cost or expense, including, but

not limited to, any cost or expense of administration of the Chapter 11 Cases or any future

proceeding that may develop out of such cases, including liquidation in chapter 7 or other case

under the Bankruptcy Code, but excluding the Carve-Out, shall be charged by the Debtors

against their  property pursuant to Bankruptcy Code section 506(c) or otherwise, without the

prior written consent of the DIP Lenders, and no such consent shall be implied from any action,

inaction or acquiescence by the DIP Lenders *provided, however, that this section 8 shall be applicable only to the Debtors'*

9.      Subject to the terms  and conditions of the DIP Financing Documents, the *Professionals and the Committee's*

DIP Financing shall terminate on the earlier of (i) the date that is 6 months after the Petition

Date, (ii) the date a plan of reorganization in the Chapter 11 Cases becomes effective, (iii) the *Professionals)*

Discharge of the DIP Financing or (iv) the date on which an event occurs that otherwise causes

*and provided further that this section 8 shall not apply to post-petition suppliers of goods and services to the Debtors.*

the termination of the DIP Financing as provided in the DIP Financing Documents (the date of any such termination in this Paragraph 9, the "Termination Date").

10. The security interests and liens in the DIP Collateral granted to the DIP Lenders herein are valid and fully perfected by entry of this Order, and the DIP Lenders shall not be required to file any financing statement, mortgage, notice of lien or similar instrument in any jurisdiction or take any other action in order to validate, perfect or otherwise enforce the security interests or liens created hereunder. If the DIP Agent chooses, in its sole discretion, to file financing statements or other documents or otherwise confirm perfection of such security interests and liens in the DIP Collateral, the automatic stay of Bankruptcy Code section 362 is hereby modified to allow such actions, and all such documents shall be deemed to have been filed or recorded on the date of entry of this Order. The DIP Agent is hereby authorized to file this Order as evidence of its security interests and liens in lieu of a financing statement or similar filing.

11. The DIP Lenders, having been found to be acting in good faith, shall be entitled to the full protection of Bankruptcy Code section 364(e) and the claims, liens and priorities created or authorized in this Order and the DIP Financing Documents are so created and authorized pursuant to Bankruptcy Code sections 364(c) and (d) and are entitled to the benefits and protections of Bankruptcy Code section 364(e).

12. The DIP Lenders and the DIP Agent are entitled to all of the rights, benefits, privileges and remedies set forth or provided herein or in the DIP Financing Documents, including, but not limited to all of the rights, benefits, privileges and remedies available to the DIP Lenders and the DIP Agent upon the occurrence and during the continuance

*[handwritten: provided, however, that this subsection is without prejudice to the rights of the Debtors or the Committee to seek injunctive relief, under Section 105(a))]*

of an Event of Default. Without limiting the generality of the foregoing, upon the occurrence of

an Event of Default (A) the automatic stay of Bankruptcy Code section 362 (to the extent

applicable) is vacated and modified to permit the DIP Agent to exercise, enjoy or enforce any

and all rights, benefits, privileges and remedies under the DIP Credit Agreement or in law or at

equity after ten (10) days written notice to the Debtors, the Committee and the United States

Trustee including, but not limited to (a) the termination by the DIP Lenders of their obligation to

make advances under the DIP Financing Documents, (b) the declaration of all DIP Obligations to

be immediately due and payable in full, (c) exercise of remedies against the DIP Collateral,

including, without limitation, foreclosing on such DIP Collateral under applicable state law *[handwritten: (and]*

*[handwritten: or]* (d) sale of the DIP Collateral pursuant to Section 363 of the Bankruptcy Code) and (B) the

Prepetition Agent, on behalf of the Prepetition Lenders, may file and seek approval of a plan of

reorganization for the Debtors (or either of them), notwithstanding anything to the contrary in

Section 1121 of the Bankruptcy Code; *[handwritten: provided, however, that the DIP Lenders and Prepetition Lenders may request that the DIP Collateral be]*

13.     The provisions of this Order, including the priority and validity of all *[handwritten: such]*

claims and liens in favor of the DIP Lenders, and any actions taken pursuant hereto shall survive

entry of any other order which may be entered in this case, including any order (i) confirming

any plan of reorganization, (ii) converting these cases from chapter 11 to chapter 7, (iii)

appointing a trustee or examiner, or (iv) dismissing this case, and the terms and provisions of this

Order, as well as the priorities in payment granted pursuant to this Order, and the DIP Financing

Documents shall continue in full force and effect notwithstanding the entry of any such other

order, until all of the DIP Obligations are satisfied and discharged in accordance with their terms.

*[handwritten in right margin: pursuant to Section 363 of the Bankruptcy Code.]*

## ADEQUATE PROTECTION STIPULATION

14.     The Debtors are hereby authorized and directed to (i) enter into the
Adequate Protection Stipulation; (ii) grant the security interests and liens provided therein; and
(iii) perform any and all obligations thereunder.

15.     The Prepetition Lenders shall be provided the following adequate
protection for the use of the Prepetition Lenders' Cash Collateral (as defined in the Adequate
Protection Stipulation) and the granting of the Priming Liens and Priming Guaranties:

(a)     To the extent of any diminution in value of the Prepetition
Lenders' Cash Collateral and other Prepetition Domestic Collateral resulting from the Debtors'
use of the Prepetition Lenders' Cash Collateral or otherwise, as further partial adequate
protection, the Prepetition Lenders shall be granted by the Debtors an administrative expense
claim pursuant to Bankruptcy Code section 507(b) with priority over any and all other
administrative expenses of the kind specified or ordered pursuant to any provision of the
Bankruptcy Code, including, but not limited to Bankruptcy Code sections 105, 326, 328, 503(b),
506(c), 507(a) and 507(b); provided that the Prepetition Lenders' claims pursuant to this
paragraph shall be subject and subordinate to the claims and liens of the DIP Lenders and the
claims and liens to which the DIP Lenders' claims and liens are subject and subordinate under
the circumstances specifically referred to in Paragraph 6 of this Order (collectively, the "DIP
Superpriority Claims").

(b)     As further partial adequate protection against any diminution in the
value of the Prepetition Lenders' Cash Collateral and other Prepetition Domestic Collateral
resulting from the Debtors' use thereby or otherwise, to the extent such property does not

otherwise constitute Prepetition Lenders' Cash Collateral, the Prepetition Lenders shall be granted a postpetition security interest and lien (the "Replacement Lien") on all property of the estates of Goss and Holdings, whether real or personal, tangible or intangible, now existing or hereafter acquired or created, and wherever located, including, without limitation, all debtor in possession accounts, the unencumbered 34% of the capital stock of the Foreign Borrowers and all other property of the types or kinds described in Paragraphs G and H of the Adequate Protection Stipulation and the respective proceeds of such property, (other than avoiding powers established in the Bankruptcy Code and proceeds thereof). All proceeds of and collections on the postpetition collateral shall, for purposes of this Order, be included in the definition of "Prepetition Lenders' Cash Collateral." The Replacement Lien shall be subject and subordinate to the Liens in favor of the DIP Lenders and the DIP Superpriority Claims. The security interests and liens granted to the Prepetition Lenders as partial adequate protection pursuant to this Order shall not now or at any time hereafter be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code section 551.

(c)    As further partial adequate protection against any diminution in the value of the Prepetition Lenders' Cash Collateral and other Prepetition Domestic Collateral resulting from Debtors' use thereby or otherwise, unless otherwise agreed by the Prepetition Lenders, proceeds received by the DIP Agent from foreclosure or other realization on DIP Collateral that is also part of the Prepetition Domestic Collateral shall be applied toward repayment of the obligations under the DIP Credit Agreement only after all available proceeds from foreclosure or other realization on DIP Collateral not part of the Prepetition Domestic Collateral has been applied thereto.

(d)     The security interests and liens granted to the Prepetition Lenders

as partial adequate protection pursuant to this Order shall be (i) in addition to all other security

interests and liens securing the Prepetition Secured Obligations in existence on the Petition Date

and (ii) valid, perfected and enforceable from and after the entry of this Order.

17.     No party (including the Prepetition Agent or the Prepetition Lenders) shall

be required to file any financing statement, mortgage, notice of lien or similar instrument in any

jurisdiction or take any other action in order to validate and perfect the security interests, or liens

created hereunder. If the Prepetition Agent chooses, in its sole discretion, to file such financing

statements or other documents or otherwise confirm perfection of such security interests, or liens,

the automatic stay of Bankruptcy Code section 362 is hereby deemed vacated and modified to

allow such actions and such documents shall be deemed to have been filed or recorded at the

time and on the date of entry of this Order. The Prepetition Agent is hereby authorized to file

this Order as evidence of their security interests and liens in lieu of a financing statement or

similar filing.

18.     No portion of the Prepetition Lenders' Cash Collateral shall be used to

finance in any way any adversary action, suit, arbitration, proceeding or other litigation of any

type relating to or in connection with the Prepetition Credit Agreement or any of the loan

documents or instruments entered in connection therewith, including, without limitation, any

challenges to claims of the Prepetition Lenders or the validity, perfection, priority or

enforceability of any of the liens securing such claims or any payment made thereunder, provided

that prior to the conclusion of the 60 day period referred to paragraph 23, such proceeds may be

used for compensation, to the extent approved by the Court, of a Creditors' Committee for its

analysis of such liens and claims.

19.     This Order shall constitute authorization, ratification and approval of any

action taken or to be taken by the Debtors, the Prepetition Agent or the Prepetition Lenders

authorized under the Adequate Protection Stipulation.

20.     The priority and validity of all claims and liens in favor of the Prepetition

Lenders created pursuant to the Adequate Protection Stipulation and this Order shall survive the

appointment of any trustee in any of the Chapter 11 Cases or the conversion of any of the

Chapter 11 Cases to a case under chapter 7, and the priority and validity of all such liens shall

additionally survive the dismissal of any of the Chapter 11 Cases unless the Prepetition Secured

Obligations have been indefeasibly paid in full in cash prior to such dismissal. Neither the

termination of the Debtors' right to use the Prepetition Lenders' Cash Collateral (through

termination of the Adequate Protection Stipulation or otherwise) nor any unstayed reversal,

modification, vacation, amendment, invalidity, ineffectiveness, or supersedence of any or all of

the provisions of the Adequate Protection Stipulation by an order of any court, shall affect the

validity or enforceability of the Replacement Lien, security interests or claims granted pursuant

to the Adequate Protection Stipulation or any of the rights granted to Prepetition Lenders

pursuant to the Adequate Protection Stipulation.

21.     Upon the occurrence of an Event of Default under the Adequate Protection

Stipulation, the Debtors shall immediately notify the Prepetition Agent. Upon the occurrence of

any Event of Default, irrespective of whether notice is given or received pursuant to the

preceding sentence, then (i) without further order of the Court, (a) the Debtors' authority to use

the Prepetition Lenders' Cash Collateral shall immediately terminate, provided that Debtors shall

be authorized and directed to use the Prepetition Lenders' Cash Collateral only for the repayment

of the Prepetition Secured Obligations, and (b) the Debtors shall not use the Prepetition Lenders'

Cash Collateral for any other purpose without the prior written consent of the Prepetition

Lenders; and (ii) without in any way limiting the foregoing and notwithstanding any other notice

requirements contained in the Bankruptcy Code or applicable rules, the Prepetition Lenders may

seek an order of the Court on not less than three business days' written notice to the Debtors, the

Committee and the United States Trustee, for additional adequate protection of the Prepetition

Lenders' interests in the Prepetition Lenders' Cash Collateral and the Prepetition Domestic

Collateral and such other relief as the Prepetition Lenders may request.

22.     The Debtors' authorization to use the Prepetition Lenders' Cash Collateral

pursuant to the Adequate Protection Stipulation shall terminate upon the earlier of (a) upon the

occurrence of an Event of Default under the Adequate Protection Stipulation, (b) if a final order

approving the Adequate Protection Stipulation is not entered within thirty (30) days after entry of

the Interim Order, and (c) in any event, on the Commitment Termination Date under the DIP

Credit Agreement, as such date may be extended or modified in accordance with the terms of the

DIP Credit Agreement.

23.     Notwithstanding anything to the contrary contained in the Adequate

Protection Stipulation, in any order of the Court or in any other agreement between the Debtors

or the Prepetition Lenders, no later than sixty (60) days after the entry of this Order, any

committee appointed in the Chapter 11 Cases (or if no such committee is appointed, any creditor

or equity holder) may object, challenge, or seek to avoid the amount, validity, enforceability and

priority of the Prepetition Secured Obligations of the Debtors and the security interests of the

Prepetition Agent or any of the Prepetition Lenders in the Prepetition Domestic Collateral, and if

no such action is commenced within such 60 day period, the Prepetition Secured Obligations

shall be deemed valid and enforceable and the security interests of the Prepetition Agent and any

of the Prepetition Lender in the Prepetition Domestic Collateral shall be deemed valid,

enforceable and perfected liens in such property.

24 *25*. This Court retains and reserves jurisdiction to enforce all provisions of this

Order.

Dated: Chicago, Illinois
      October 10, 2001

                                        _____
                                        Hon. Carol A. Doyle
                                        United States Bankruptcy Judge

Submitted by:

SUZZANNE S. UHLAND
AUSTIN K. BARRON
O'MELVENY & MYERS LLP

*24. The reference in the DIP Credit Agreement in Section 8.19 (iii) to sixty (60) days is hereby changed to ninety (90) days, and such Section shall only require that a hearing be conducted concluded by such date.*

By _____
    Suzzanne S. Uhland
Attorneys for Bankers Trust Company,
    as DIP Agent and Prepetition Agent

MARK MCDERMOT
SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)

By _____
    Mark McDermott
Attorneys for the Debtors