## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.: 01 B 31751 |
| | ) | 01 B 31747 |
| GGSI Liquidation, Inc. et al., | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| GUS A. PALOIAN, not individually but solely in | ) | |
| his capacity as the Chapter 7 Trustee of the above | ) | |
| captioned Bankruptcy Estates, | ) | The Honorable Jack B. Schmetterer |
| Plaintiff, | ) | |
| | ) | Adversary No.: 03 A 03888 |
| v. | ) | |
| Grupo Serla S.A. de C.V. a/k/a Grupo Empresarial | ) | |
| Serla, S.A. de C.V.; Editorial Comercial, S.A. de | ) | |
| C.V.; Sergio Edwardo Guarneros Trujillo; Bank One | ) | |
| individually and as successor-in-interest to First | ) | |
| National Bank of Chicago, a national banking | ) | |
| Association, and Union Industrial Mexicana, S.A. | ) | |
| de C.V., | ) | |
| Defendants. | ) | |

### NOTICE OF FILING

TO:     See Service List Attached.

PLEASE TAKE NOTICE that on April 27, 2006, we caused to be filed with the Clerk of the above Court, The Trustee's Amended Final Argument And Proposed Findings Of Fact And Conclusions Of Law, copies of which are attached hereto and hereby served on you.

### CERTIFICATE OF SERVICE

I, the undersigned, certify that I served a copy of this notice and attached documents to the individual(s) listed via electronic filing, facsimile transmission and U.S. Mail at 200 West Adams Street, Chicago, Illinois on April 27, 2006 with proper postage paid.

Subscribed and Sworn to me
this 27th day of April 2006.

/Notary Public/

"OFFICIAL SEAL"
PEGGY D. MOFFITT
Notary Public, State of Illinois
My Commission Expires 6/6/09

Daniel P. Dawson
Donald C. Shine
Nisen & Elliott, LLC
200 W. Adams St., Suite 2500
Chicago, IL 60606
(312) 346-7800

## SERVICE LIST

Mr. Gus A. Paloian
Seyfarth Shaw
55 E. Monroe St., 42nd Floor
Chicago, IL 60603
(via e-filing)

David E. Bennett
Vedder, Price Kaufman & Kammholz, PC
222 N. LaSalle St., Suite 2600
Chicago, IL 60601
(via e-filing)

Joseph M. Russell
JP Morgan Chase Bank, N.A.
Law Dept., Mail Code IL1-02816
10 S. Dearborn St., Floor 11
Chicago, IL 60670
(312) 732-3596

Vaughn A. White
Maria Ramirez Strohmeier
Montes & Associates
831 N. Ashland Ave.
Chicago, IL 60622
(312) 850-9879
(E-filing & facsimile)

Grupo Empresarial Serla, S.A. de C.V.
AV Patriostimo
No. 711C
Col. San Juan Mixcoac
Mexico, D.F. 03730
(U.S. Mail)

Editorial Comercial, S.A. de C.V.
Moliere No. 48,
Co. Polancio C.P. 11560
Mexico, D.F. Conm. 281-0381
(U.S. Mail)

Union Industrial Mexicana, S.A. de C.V.
Attn:  Lic. Oscar Sosa Guiterrez, DC
Santisisimia 38 Col. Santa Cruz Atoyac
Mexico, D.F. 03310
(U.S. Mail)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: GGSI Liquidation Inc., et al., | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |
| GUS A. PALOIAN, not individually but solely | ) | |
| in his capacity as the Chapter 7 trustee of the | ) | |
| above captioned bankruptcy estates, | ) | Case No. 01 B 31751 |
| | ) | (Jointly Administered) |
| Plaintiff, | ) | |
| | ) | |
| | ) | Adv. No. 03 A 03888 |
| v. | ) | |
| | ) | Hon. Jack B. Schmetterer |
| Grupo Serla S.A. de C.V. a/k/a Grupo | ) | |
| Empresarial Serla, S.A. de C.V.; Editorial | ) | |
| Comercial, S.A. de C.V.; Sergio Eduardo | ) | |
| Guarneros Trujillo; Bank One, individually | ) | |
| and as successor-in-interest to First National | ) | |
| Bank of Chicago, a national banking | ) | |
| association, and Union Industrial Mexicana, | ) | |
| S.A. de C.V., | ) | |
| | ) | |
| Defendants. | ) | |

**THE TRUSTEE'S AMENDED FINAL ARGUMENT AND PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, Gus A. Paloian, not individually but solely in his capacity as Chapter 7 Trustee

(the "Plaintiff" or "Trustee") of the above captioned Bankruptcy Estates, by his attorneys, Nisen

& Elliott, LLC, as his final argument and proposed findings of fact and conclusions of law,

states as follows:

**INTRODUCTION**

1.      The facts relevant to this case are simple.  In 1997, Goss sold a printing press to

a purchaser located in Mexico for the price of $5,948,860.00.  The sale was financed by a

promissory note purchased by a Bank (i.e. the "Bank" or "Bank One").  After the purchaser

failed to pay the amounts due under the promissory note, Bank One demanded and Goss agreed

to repurchase the note. Goss actually paid Bank One $5,175,728.17 in connection with the

repurchase. In spite of this, after Goss filed for bankruptcy protection, Bank One (who was still

holding the original promissory note) sold the promissory note to another entity connected to

the makers of the promissory note for a fraction of its face amount and kept all of the sale

proceeds. Moreover, Bank One did this without giving notice to the creditors much less

obtaining modification of the automatic stay. The Trustee now seeks to rescind Goss'

repurchase of the promissory note and require Bank One to return the $5,175,728.17.

      2.      In lieu of that, the Trustee seeks damages caused by Bank One's post-petition

actions. For example, Bank One caused significant damage to Goss by: 1) interfering with a

contract between Goss and Grupo Serla wherein Goss expected to receive $2,700,000.00;

2) preventing Goss from collecting $1,800,000.00 in checks actually endorsed by Grupo Serla

to Goss; 3) preventing Goss from enforcing its security interest in the printing press; and

4) preventing Goss from receiving $5,000,000.00 withheld in connection with the re-sale of the

printing press. As a remedy for these acts, the Trustee seeks to impose a trust on all of the

money received by Bank One post-petition as well as obtain a money judgment for the resulting

damages, including punitive damages and the attorneys fees caused by Bank One's knowing

and willful violation of the automatic stay. Alternatively, the Trustee seeks to recover the full

amount due and owing on the promissory note through a joint and several judgment against all

of the Defendants. The amount due and owing on the promissory note when the trial began

equaled $9,724,858.50 plus attorneys' fees.

2

## PROPOSED FINDINGS OF FACT

### I.    Goss Sold A Printing Press.

3.    In December of 1996, Grupo Serla, S.A. de C.V. ("Grupo Serla") issued a letter

of intent to purchase a Goss "Universal 45" printing press from Goss Graphic Systems, Inc.

("Goss"). (Tr. Ex. 1; citations to Trustee's Trial Exhibits will hereinafter be referred to as "Tr.

Ex. __") In the letter of intent Grupo Serla acknowledged it "thoroughly reviewed" the

printing press and found its "capability to meet our requirements". (Tr. Ex. 1)

### A.    The Sale And Purchase Agreement.

4.    On March 19, 1997, Editorial Comercial, S.A. de C.V. ("Editorial Comercial" or

"Purchaser") and Goss entered into a Sale and Purchase Agreement (the "Contract To Sell The

Press") in which Goss agreed to sell and Editorial Comercial agreed to purchase a Goss

Universal 45 and related equipment (the "Printing Press") at a price of $5,948,860.00, as

amended.  (Tr. Ex. 2, ST 1074)

### 1.    The Purchaser Granted Goss A Security Interest In The Printing Press In Order To Secure Payment Of The Purchase Price.

5.    In order to secure payment of the purchase price, the Purchaser granted Goss a

security interest in the Printing Press. (Tr. Ex. 2, ST 1057)  The security interest attached to all

proceeds of any sale, assignment or conveyance.  (Tr. Ex. 2, ST 1057, par. 15) The Purchaser

also agreed not to "sell, assign or convey or in any manner, cause or permit a transfer, of any

present or future interest in the Secured Collateral [i.e. the Printing Press]".  (Tr. Ex. 2, ST

1057, par. 15a)

3

**2.**     **The Purchaser Pledged To Hold The Printing Press In Safekeeping For Goss.**

6.     As part of the Contract To Sell The Press, the Purchaser also executed a

"Pledge" on the Printing Press. (Tr. Ex. 2, ST 1070). The object of the Pledge was to guarantee

payment to Goss of the purchase price of the Printing Press. (Tr. Ex. 2, ST 1070) In the Pledge,

Sergio Edwardo Guarneros Trujillo ("Mr. Guarneros"), the 97% owner of the Purchaser,

admitted receiving the Printing Press and agreed to hold it per the Pledge in safekeeping. (Tr.

Ex. 2, ST 1070) Editorial Comercial and Mr. Guarneros further agreed in the Pledge that if the

Purchaser did not pay the purchase price, Goss could request a Judge to authorize the sale of the

Printing Press. (Tr. Ex. 2, ST 1070)

**B.**     **Bank One Financed The Sale.**

7.     The Contract To Sell The Press was subject to securing suitable financing. (Tr.

Ex. 2, ST 1068) The First National Bank of Chicago, later purchased by Bank One and

thereafter by JP Morgan Chase, its successors in interest (hereinafter "Bank One" or the

"Bank") agreed to finance the transaction. (Tr. Ex. 3) In connection with the financing of the

sale, Grupo Serla (another company owned by Mr. Guarneros) and Editorial Comercial

executed a promissory note (the "Grupo Serla Note") on September 4, 1997 in the amount of

$5,370,000.00 for the financed portion of the purchase price. (Tr. Ex.4) Mr. Guarneros signed

the Grupo Serla Note "por aval", personally guaranteeing the same. (Tr. Ex. 4) Mr. Guarneros

understood he was responsible for the payments on the Grupo Serla Note (Guarneros, 10/5/05,

p. 51 and 52; citations to trial testimony will hereinafter be referred to by the name of the

witness followed by the date of testimony and the page of the transcript). (Mr. Guarneros, when

referred to collectively with Grupo Serla and Editorial Comercial, shall hereinafter be referred

4

to as Mr. Guarneros and His Companies).  Bank One then financed the sale by purchasing the

Grupo Serla Note from Goss pursuant to a Note Purchase Agreement. (Tr. Ex. 3)

### C.   Mr. Guarneros And His Companies Failed To Pay For The Printing Press.

8.      After taking possession of the Printing Press and signing the Grupo Serla Note,

Mr. Guarneros and His Companies failed to pay as agreed. (Tr. Exs. 6 , 14 + 118 )  In fact, they

made only one payment of $75,000.00 on the Grupo Serla Note.  (Tr. Ex. 14; Guarneros,

10/5/05, p. 45)   This payment was applied by Bank One solely to unpaid interest. (Tr. Ex. 14)

### 1.   Bank One, While Purported Owner Of The Grupo Serla Note, Sent Numerous Notices To Mr. Guarneros And His Companies Demanding Payment.

9.      As a result of the failure to pay the amounts due under the Grupo Serla Note,

Bank One formally notified Mr. Guarneros and His Companies of the default on July 30, 1998.

(Tr. Ex. 6)  In addition, Bank One, purportedly as the owner of the Grupo Serla Note, sent at

least *seventeen (17) demand notices* for past due installments to Mr. Guarneros and His

Companies from the year 1997 through 2000. (Tr. Exs. 5, 6, 7 and 118)  Despite all of the

above, Mr. Guarneros and His Companies failed to make any principal payments due under the

Grupo Serla Note.  (Guarneros, 10/5/05,  p. 45)

### 2.   Bank One And Goss Jointly Filed Suit Against Mr. Guarneros And His Companies To Collect On The Grupo Serla Note.

10.      Due to the continued failure of Mr. Guarneros and His Companies to pay the

amounts due under the Grupo Serla Note, Bank One and Goss collectively sued Mr. Guarneros

and His Companies in the Circuit Court For The Eighteenth Judicial Circuit in DuPage County,

5

Illinois (the "DuPage Litigation").  (Tr. Exs. 9 + 15)  The same attorney, Joe Krasovec at Schiff,

Hardin & Waite, represented both Bank One and Goss in the DuPage Litigation.

(Tr. Ex. 15; SH&W 00358)

      11.      In the DuPage Litigation, Bank One and Goss pleaded alternatively that Bank

One and/or Goss were entitled to recover the amounts due and owing on the Grupo Serla Note.

(Tr. Ex. 15)  The DuPage Litigation was still pending when Goss ultimately filed for

bankruptcy protection. (Tr. Ex. 77)

**II.**      **Goss Repurchased The Grupo Serla Note.**

      12.      While the DuPage Litigation was pending, Bank One demanded that Goss

unwind the financing transaction between Bank One and Goss by causing Goss to repurchase

the Grupo Serla Note. (Tr. Exs. 21 + 3; Bank Ex. 66)  Goss agreed to do so. (Tr. Ex. 21)  Goss

actually paid Bank One $5,175,728.17 to repurchase the Grupo Serla Note prior to filing for

bankruptcy protection. (Tr. Ex. 14 for the $925,728.17 prior to 12/15/00; Page, 9/30/05,  p. 44

and Tr. Ex. 21, for the $4,250.000 after 12/15/00)

      **A.**      **Step One:  Goss Initially Repurchased 15% Of The Grupo Serla Note.**

      13.      When Mr. Guarneros and His Companies failed to make the first payment due on

the Grupo Serla Note, Bank One demanded that Goss repurchase 15% of the Grupo Serla Note.

(Tr. Ex. 21; Bank Ex. 66)  In connection therewith, Goss paid Bank One $805,500.00 plus

accrued interest, for a total of $925,728.17, in exchange for 15% of the Grupo Serla Note. (Tr.

Exs. 14 + 21)

      14.      After Mr. Guarneros and His Companies failed to make subsequent payments,

Bank One demanded that Goss repurchase the remaining 85% of the Grupo Serla Note.  (Bank

Ex. 66; Tr. Ex. 21; Kaplan, 9/26/05, p. 48 + 49) Specifically, Ronnie Kaplan, a First Vice

President of Bank One, called Joseph Gaynor, the Chief Financial Officer of Goss, on or about

October 24, 2000 and demanded that Goss repurchase the Grupo Serla Note. (Bank Ex. 66;

Kaplan, 9/26/05, p. 48) Mr. Gaynor memorialized this demand in writing. (Bank Ex. 66) Mr.

Gaynor's letter is clear. It states: ". . . in light of your demand that Goss repurchase the Grupo

Serla Note . . . we propose that Goss repurchase the Grupo Serla Note . . .". (Bank Ex. 66)

### B.   Step Two:  On December 15, 2000 Goss Repurchased The Remainder Of The Grupo Serla Note.

15.   After a series of negotiations regarding the repurchase of the remainder of the

Grupo Serla Note (Kaplan, 9/26/05, p. 49), on December 15, 2000 Goss and Bank One executed

an Agreement (hereinafter the "Note Repurchase Agreement") wherein Goss agreed to re-

purchase the remaining 85% of the Grupo Serla Note from Bank One through the delivery of a

Promissory Note payable to Bank One  (the "Repurchase Note") in the amount of

$5,675,495.12 (collectively the "Note Repurchase Transaction"). (Tr. Ex. 21)

### 1.   Bank One Admitted Goss Had Already Repurchased A Portion Of The Grupo Serla Note.

16.   In the Note Repurchase Agreement, Bank One admitted that Goss had already

"repurchased 15% of the Grupo Serla Note from Bank One by paying Bank One the principal

amount of $805,000.00 plus accrued interest". (Tr. Ex. 21) Likewise, in the Note Repurchase

Agreement, Bank One admitted that it demanded that Goss "repurchase the remaining 85% of

the Grupo Serla Note by paying Bank One the principal amount of $4,564,500.00 plus interest

through December 15, 2000 in the amount of $1,110,995.12." (Tr. Ex. 21)

### a.    The Testimony Of Mark Page.

17.    At trial, Bank One realized that the clear, unambiguous language of the Note Repurchase Agreement defeated its defenses.  Therefore, certain witnesses from Bank One attempted to evade or distort the actual wording of the Note Repurchase Agreement. (Page, 9/30/05, p. 40-42) Perhaps no attempt was more confusing than that of Mark Page. (Page, 9/30/05, p. 40-42) Mr. Page was a First Vice President of Bank One and the lawyer who actually worked with Mr. Kaplan in negotiating the Note Repurchase Agreement.  (Page, 9/30/05, p. 36 + 41)  Nevertheless, Mr. Page actually attempted to deny the fact that Goss had already repurchased 15% of the Grupo Serla Note despite the fact the Note Repurchase Agreement, approved by him, stated just that. (Page, 9/30/05, p. 40-42)  For example, when Mr. Page was asked whether it was true that Goss had repurchased 15 percent of the Grupo Serla Note from Bank One by paying Bank One the principal amount of $805,000.00 plus accrued interest as of December 15, 2000, he responded:

> "It's true but it's incomplete.  I mean, that statement was just
> convenient shorthand that the parties used to describe the
> transaction.  It wasn't intended to connote that they had actually
> become an owner of 15 percent of the note." (Page, 9/30/05, p. 40)

18.    The court, finding Mr. Page's statement unclear (i.e. that what was written was *true* but that the Note Repurchase Agreement was not intended to connote what it actually *said*) then asked:

> "THE COURT:  It was intended to connote that?
> THE WITNESS:  It was not intended to connote that...
> THE COURT:  And who drafted it, that document?
> THE WITNESS:  Goss' I guess deputy general counsel at the time,
> Mary Ann Spiegel.
> THE COURT:  And you were representing Bank One?
> THE WITNESS:  I was.

8

THE COURT:  Who signed it on behalf of Bank One?

THE WITNESS:  Mr. Kaplan.

THE COURT:  Did you advise him on that subject?  I mean, did you - - were you still working on the project when it was handed to Mr. Kaplan to sign?

THE WITNESS:  I was still working on it, yes.

THE COURT:  Was there any other lawyer working on it at that time?

THE WITNESS:  No other lawyer.

THE COURT:  So we can deduce from that you approved the language of this document that an officer of the bank signed?

THE WITNESS:  I did approve the language.  I advised Mr. Kaplan it was okay to sign the agreement." (Page, 9/30/05, p. 40-42)

Unfortunately for Bank One, the Note Repurchase Agreement which Mr. Page approved  and Mr. Kaplan signed on behalf of Bank One is clear and unambiguous. ( Tr. Ex. 21)

## 2.    The Note Repurchase Agreement Became Effective Within One Week Of December 15, 2000.

19.    The Note Repurchase Agreement, by its own terms "became effective upon the later to occur of (i) the execution of the counterparts by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the Company [Goss]."  (Tr. Ex. 21)

20.    The Note Repurchase Agreement was executed and the Repurchase Note was delivered to Bank One within one week of December 15, 2000. (Page, 9/30/05, p. 44)  Thus, the repurchase became effective in December of 2001.  (Tr. Ex. 21; Page, 9/30/05, p. 44)  However, while the repurchase became effective on that date, the Note Repurchase Agreement allowed Bank One to retain physical possession of the original Grupo Serla Note pending payment in full of all amounts due under the Repurchase Note or as a court of competent jurisdiction should otherwise direct. (Tr. Ex. 21)

9

### 3.    Bank One Understood Goss Repurchased The Grupo Serla Note On December 15, 2000.

21.    As noted above, the fact that Goss repurchased the Grupo Serla Note through the Note Repurchase Agreement is clear and unambiguous. (Tr. Ex. 21)  However, if there could be any further doubt about the meaning of the Note Repurchase Agreement, Ronnie Kaplan removed it at trial. (Kaplan, 9/26/05, p. 56 + 57)

22.    Mr. Kaplan, a First Vice President of Bank One, actually signed the Note Repurchase Agreement on behalf of Bank One after a series of negotiations with Joe Gaynor of Goss. (Kaplan, 9/26/05, p. 53 + 54)  It was Mr. Kaplan's custom and practice to review documents before he signed them and not sign them if they were false. (Kaplan, 9/26/05,  p. 53)  After evading the question and actually requiring the Court to ask whether he heard the question and understood it, Mr. Kaplan ultimately admitted  that "yeah" he understood the Note Repurchase Agreement was in fact an agreement for Goss' repurchase of the Grupo Serla Note. (Kaplan, 9/26/05, p. 56 + 57)

### 4.    The Repurchase Was Not A Mere Continuance Of Goss' Obligations Under The Note Purchase Agreement.

23.    At trial, Bank One further attempted to evade the clear meaning of the Note Repurchase Agreement by presenting "evidence" that the Note Repurchase Agreement and the Repurchase Note were merely extensions of the original "Obligations" of Goss as defined under the Note Purchase Agreement and that Bank One received no additional consideration for entering into the Note Repurchase Transaction.  However, the documents and testimony proved otherwise.  (See, Tr. Exs. 3, 4, 21, 118 + 121; Kaplan, 9/26/05, p. 69-72; Salas, 10/18/05, p. 41-43)

10

### a.    The Repurchase Note Interest Rate Differs From Goss'
### Obligations Under The Note Purchase Agreement.

24.    Bank One clearly received consideration for the Note Repurchase Transaction.

(Tr. Ex. 21)  The most obvious consideration was the Repurchase Note itself. (Tr. Ex. 21,  BO

02667)  The Repurchase Note given by Goss to Bank One changed the "Obligations" Goss

might have owed Bank One under the Note Purchase Agreement. (Tr. Exs. 3 + 21)  Thus, for

example, the interest rate contained  in the Repurchase Note differs from the interest rate

contained in the original Grupo Serla Note (which evidenced the "Obligations" under the Note

Purchase Agreement).   (Tr. Exs. 4 + 21; Kaplan, 9/26/05, p. 69–72)  The interest rate contained

in the Repurchase Note equaled the Eurodollar Rate plus 1.5% per annum.  (Tr. Ex. 21)  The

interest rate contained in the Grupo Serla Note equaled LIBOR plus 1%.  (Tr. Ex. 4)  Ms. Salas

testified that LIBOR and Eurodollar are the same. (Salas, 10/18/05, p. 42)  Therefore, simply

because 1% does not equal 1.5%, Bank One received additional consideration through the

interest in the Repurchase Note. (See, above)

25.    Similarly, the default interest rate contained in the Repurchase Note initially

equaled the Eurodollar rate plus 4% and then converted to the prime rate plus 2% per annum.

(Tr. Ex. 21)  In comparison, the default interest rate contained in the Grupo Serla Note equaled

LIBOR plus 4% and did not convert.  (Tr. Ex. 4).  Once again, this constitutes consideration for

the Note Purchase Transaction.

### b.    The Repurchase Note Was Not Freely Assignable.

26.    In addition, the Repurchase Note was not generally assignable except to another

financial institution. (Tr. Ex. 21)  Specifically, the Repurchase Note provided that:

> The Bank may at any time assign this Note [i.e. the "Repurchase
> Note"] and its rights hereunder to any affiliate, and the Bank or
> any subsequent holder of this Note may at any time assign this
> Note and its rights hereunder to a financial institution or, with the
> consent of the Company which consent shall not be unreasonably
> withheld or delayed, to any other person or entity, provided,
> however, that such consent shall not be required if any of the
> events in the first sentence of the immediately preceding
> paragraph has occurred and is continuing. (Tr. Ex. 21)

In other words, the Repurchase Note was not generally assignable to any entity *other than* a

*financial institution* without the consent of the Company. (Tr. Ex. 21)  Despite this fact, Bank

One sold the Repurchase Note to Union Industrial without Goss' consent after it filed for

bankruptcy protection. (Tr. Ex. 88)  This was a clear violation of the automatic stay.

### 5.    After December 15, 2000, The Bank Stopped Demanding Payment For The Amounts Due Under The Grupo Serla Note.

27.    As noted above, prior to Goss repurchasing the Grupo Serla Note on December

15, 2000, Bank One, purportedly as owner of the note, sent numerous demands to Mr.

Guarneros and His Companies to pay the amounts due under the Grupo Serla Note.  In fact,

Bank One sent *at least* seventeen (17) Demand Notices to Mr. Guarneros and His Companies

over a period of several years, seeking payment of the amounts due pursuant to the Grupo Serla

Note. (Tr. Ex. 118)  However, *after Bank One sold the Grupo Serla Note to Goss on December

15, 2000 and Bank One received the Repurchase Note*, Bank One completely stopped sending

demand notices to Mr. Guarneros and His Companies.  (Salas, 10/18/05, p. 34-36; Tr. Exs. 118

+121)  The reason is obvious.  Bank One stopped sending demand notices to Mr. Guarneros and

His Companies after December 15, 2000 because the note was now between Bank One and

Goss. (Salas, 10/18/05, p. 36)  Therefore, Bank One billed Goss on the new Repurchase Note.

(Salas, 10/18/05, p. 36)

**6.** **Instead of Demanding Payment From Grupo Serla, After December
15, 2000 The Bank Demanded Payment From Goss.**

28.    After Goss repurchased the Grupo Serla Note, beginning on December 26, 2000,

Bank One billed *Goss* for the amounts due under the *Repurchase Note*. (Tr. Ex. 121, pages

3712-3709, 3708, 3703, 3701, 3698, 3693, 3691, 3688, 3686, 3683, 3682, 3679, 3678, 3674,

3673, 3670, 3669, 3665, 3664; Salas, 10/18/05 p. 36)  These invoices to Goss do not reference

the Grupo Serla Note previously owned by Bank One as the prior demand notices to the Mr.

Guarneros and His Companies did.  (Tr. Exs. 118 + 4)  Instead, they reference the Note

Purchase Agreement between *Goss* and Bank One.  (Tr. Exs. 121 + 21)

29.    These invoices to Goss are once again consistent with an understanding that

Bank One actually sold the Grupo Serla Note to Goss as stated in the Note Repurchase

Agreement.  (Tr. Exs. 21 + 121)  Even the specific dollar amounts claimed by Bank One in the

invoices to Goss correspond to the Repurchase Note *not* the Grupo Serla Note. (Tr. Ex. 121)

For example, the default notices sent by Bank One to Mr. Guarneros and His Companies sought

default interest of LIBOR plus 4% because that was the default interest rate contained in the

Grupo Serla Note owned by the Bank at that time. (Tr Ex. 118; Kaplan, 9/26/05, p. 68-70;

Salas, 10/18/05, p. 41-43)  However, the default notices sent to Goss (and even the subsequent

proof of claim filed by the Bank in this matter) were based on the interest rates contained in the

Repurchase Note. (Salas, 10/18/05, p. 41-43; Tr. Exs. 33, 34, 51, 64 (BO 03626), 74, 79 + 121)

**7.** **Even Bank One's Internal Computer System Revealed Bank One
Understood It Sold The Grupo Serla Note To Goss On December 15,
2000.**

30.    Even the internal documents kept by Bank One in December of 2000 show Bank

One understood Goss repurchased the Grupo Serla Note on December 15, 2000. (Tr. Ex. 119)

Thus, at trial, it was revealed that Bank One maintains a computer system which keeps track of historical events. (Tr. Ex. 119) They call it an LS2 System. (Salas, 10/18/05, p. 53) The LS2 System reflects that on December 15, 2000 (the date of the Note Repurchase Transaction) the Grupo Serla Note was paid off and a new commitment representing the Repurchase Note was set up. (Salas, 10/18/05, p. 54)

**C.    Goss Paid Bank One $5,175,858.50 To Repurchase The Grupo Serla Note.**

31.    Goss paid Bank One $5,175,858.50 to repurchase the Grupo Serla Note. The Repurchase Note was payable in installments as follows:

| Date | Amount |
|------|--------|
| 12/15/00 | $750,000 |
| 12/31/00 | $1,500,000 |
| 01/31/01 | $500,000 |
| 02/28/01 | $750,000 |
| 03/31/01 | $750,000 |
| 04/30/01 | $750,000 |
| 05/31/01 | Remaining principal balance |

(Tr. Ex. 21) Prior to filing for bankruptcy protection, Goss made all of the payments due pursuant to the Repurchase Note except the April and May, 2001 payments. (Page, 9/30/05, p. 44)

32.    In other words, in addition to paying Bank One $925,728.17 ($805,500.00 plus interest to repurchase 15% of the Grupo Serla Note), Goss repurchased the remainder of the Grupo Serla Note through the delivery of the Repurchase Note and actually paid Bank One an additional $4,250,000.00 pursuant to the Repurchase Note. (Tr. Exs. 14 + 21; Page, 9/30/05, p. 44) Thus, prior to filing for bankruptcy protection, Goss paid Bank One a total of $5,175,858.50 to repurchase the Grupo Serla Note. (Tr. Exs. 14 + 21; Page, 9/30/05, p.44)

14

III.    **Mr. Guarneros And His Companies Agreed To Sell The Printing Press Despite The**
**Fact They Had Not Paid For It.**

33.    After Goss repurchased the Grupo Serla Note, Mr. Guarneros and His

Companies actually sold the Printing Press to a third party despite the fact they had not yet paid

for it. (Tr. Ex. 29; Tr. Ex. 129, Adams Dep., p. 36)  The process began on or about May 23,

2001 when Mr. Guarneros and His Companies entered into a letter of intent with Quebecor

World Inc. ("Quebecor") (Tr. Ex. 23)  In the letter of intent, Quebecor agreed to acquire certain

"Select Assets" for $13,000,000 through a wholly owned Newco subsidiary, Quebecor World

Directory Mexico, S.A. de C.V. (Tr. Ex. 23)  The "Select Assets" included the Printing Press

which had been purchased from Goss. (Tr. Ex. 23)

34.    A condition precedent to the purchase was that the Printing Press and the other

Select Assets would be free and clear of all liens, claims or liabilities at closing. (Tr. Ex. 23, ST

234)  If the assets were not free and clear, Quebecor had the ability to withhold money as

necessary until the liens were removed.  (Guarneros, 10/5/05, p. 83 + 84)

35.    Quebecor placed a total value of $13,000,000.00 on all of the assets it purchased

and its decision to purchase the assets was based on that value. (Tr. Ex. 128, Twomey Dep.,

pages 13, 14, 34 + 35) Quebecor also put a specific value of $4,000,000.00 on the Printing

Press.  (Tr. Ex. 23, ST 257; Tr. Ex. 129, Adams Dep., p. 40)  The Printing Press was actually

the highest valued single asset Quebecor purchased in the sale. (Tr. Ex. 23, ST 257; Tr. Ex. 129,

Adams Dep. p. 35)  Moreover, the Printing Press had produced commercially saleable product

for Mr. Guarneros and His Companies and actually had nine or ten employees assigned to run

the press working multiple shifts. (Tr. Ex.29, ST 1669; Tr. Ex. 130; Guarneros Dep., p. 44 + 45;

 Guarneros, 10/31/05, not transcribed)

15

A. **The Agreement To Pay Goss $2,700,000.00.**

36.    Mr. Guarneros' only problem with Quebecor's offer to purchase the Printing

Press was that Mr. Guarneros and His Companies had not yet paid for the Printing Press. (Tr.

Exs. 14 + 118; Guarneros, 10/5/05, p. 45)  Mr. Guarneros understood this.  Specifically Mr.

Guarneros and His Companies understood that the Printing Press had to be free and clear of all

liens, claims and liabilities prior to closing on the sale to Quebecor. (Guarneros, 10/5/05, p.58)

In other words, Mr. Guarneros realized that he needed the Goss' liens released to get the money

from Quebecor. (Guarneros, 10/5/05, p. 87)

37.    Therefore, on or about June 25, 2001, after *four (4) years* of failing to pay *any*

principal on the Grupo Serla Note but only *four weeks* after receiving the letter of intent to

purchase the Printing Press for $4,000,000.00 as part of the $13,000,000.00 asset sale, Mr.

Guarneros came to Chicago and executed a handwritten agreement (hereinafter the "Settlement

Agreement") on behalf of his company, Grupo Serla, agreeing to pay Goss $2,700,000, in

exchange for the Printing Press, "as is, where is", and Goss' release of the lien. (Tr. Ex. 25)  At

that time, Grupo Serla had the ability to pay $2,700,000.00 to Goss from the sale proceeds.

(Guarneros, 10/5/05, p. 74)  The meeting occurred after the Note Repurchase Transaction.  At

the meeting, Goss told Mr. Guarneros that it owned the Grupo Serla Note (Guarneros, 10/5/05,

p. 72)

38.    The Settlement Agreement was subject only to approval by Goss management.

(Tr. Ex. 25)  Goss management approved the agreement. (Gaynor, 10/5/05, p. 190)  Guarneros

considered this agreement to be the final agreement between the parties on the subject.

(Guarneros, 10/5/05, p. 170)

16

### 1.    Bank One Was Notified Of The Settlement Agreement In the Amount of $2,700,000.00.

39.    On July 2, 2001, Joe Krasovec of Schiff Hardin & Waite, who had been representing both Goss and the Bank, told Bank One that Goss and Grupo Serla had met and reached an agreement. (Tr. Ex. 27)  At trial, Mr. Page (the lawyer for Bank One) repeatedly admitted that Bank One knew about the Settlement Agreement and that the Settlement Agreement had been executed prior to Bank One selling the Grupo Serla Note post-petition. (Page, 9/30/05, p. 47, 58 + 59)

### B.    The Contract To Sell The Press To Quebecor.

40.    Shortly after executing the Settlement Agreement with Goss, on July 5, 2001, Mr. Guarneros went back and executed the final agreement selling the Printing Press to Quebecor. (Tr. Ex. 29)  The Agreement was officially entitled the Acquisition of Assets of Grupo Serla By Quebecor World Directory Mexico (hereinafter the "Contract To Sell The Press To Quebecor").  (Tr. Ex. 29)  In this Contract To Sell The Press To Quebecor, Mr. Guarneros specifically represented to Quebecor that Grupo Serla had agreed to pay Goss $2,700,000.00 for the Printing Press and to accept the Printing Press in its present condition. (Tr. Ex. 29(a))

### 1.    Bank One Was Notified Of The Sale To Quebecor.

41.    On August 9, 2001 Goss notified Bank One that Quebecor bought the assets of Grupo Serla.  (Tr. Ex. 36)  Goss continued to notify Bank One periodically about the status of the sale.  So, for example, on September 20, 2001, Goss told Mark Page that the sale was supposed to close in November. (Tr. Ex. 43)  Goss also told Mr. Page on this same date that Grupo Serla told Goss that it would fund the payments of the Settlement Agreement from the proceeds of the sale. (Tr. Ex.43)

17

C.      **The Pledge Proceedings In Mexico.**

42.      When Mr. Guarneros and His Companies agreed to sell the Printing Press to

Quebecor (without having paid for it) Goss engaged Jorge Leon Orantes, a Mexican

commercial litigation lawyer associated with Goodrich, Riquelme & Associates for over 43

years, to enforce the Pledge Agreement. (Orantes, 9/19/05, p. 3)  Mr. Orantes testified at trial

that he did, in fact, file an application to enforce the Pledge in Mexico on two occasions (*i.e.* the

"Pledge Proceedings"). (Orantes, 9/19/05, p. 50)  However, the judge rejected the pledge sale

claim because he resolved it was necessary for Goss to present the original executed Grupo

Serla Note. (Orantes, 9/19/05, p. 54)

1.      **The Bank Was Notified Of The Pledge Proceedings In Mexico.**

43.      On August 9, 2001, Goss notified Bank One about the Pledge Proceedings. (Tr.

Ex. 36)  Specifically, Goss told Bank One that it had instructed its counsel to get an injunctive

case on file in Mexico based on the pledge included in the Sale and Purchase Agreement. (Tr.

Ex. 36)  Goss also told Bank One that it had asked Joe Krasovec to draft a letter to Quebecor's

attorney regarding the Pledge. (Tr. Ex. 36)  Goss told Bank One that both steps were aimed at

protecting the asset which served as collateral for the purchase price (Tr. Ex. 36)

IV.      **Goss Filed For Bankruptcy Protection.**

44.      On September 10, 2001, Goss filed a voluntary petition for relief pursuant to

Chapter 11 of the Bankruptcy Code (the "Petition Date"). (Bank Response To Trustee's

Proposed  Stipulation #19)  At this point, Bank One was aware that:  1) it had sold the Grupo

Serla Note to Goss; 2) Goss had already paid Bank One $5,175,858.50; 3) Mr. Guarneros and

18

His Companies were selling the Printing Press; 4) Grupo Serla had signed an agreement to pay

Goss $2,700,000.00; and 5) Goss had filed an action in Mexico to enforce its lien. (See, above.)

### A.    The Bank Analyzes Its Potential Recovery From The Goss Bankruptcy Estate.

45.    After Goss filed for Bankruptcy Protection, Bank One analyzed its potential

recovery from Goss' Bankruptcy Estate. Bank One did not like what is saw.

### 1.    Bank One Asked Goss For Information Regarding How Much It Would Receive From The Settlement.

46.    On September 20, 2001, Bank One asked Goss for an update on Goss'

discussions with Mr. Guarneros and His Companies as well as Goss' intentions with respect to

the proceeds of the Settlement Agreement with Grupo Serla. (Tr. Ex. 43)   Goss notified Bank

One that the asset sale to Quebecor, including the Printing Press, was supposed to close in

November and that Grupo Serla told Goss that it would fund the payments due under the

Settlement Agreement from the proceeds of the asset sale to Quebecor. (Tr. Ex. 43)

47.    Subsequently, on or about October 3, 2001, Goss also told Bank One that the

Settlement Agreement with Grupo Serla would be subject to approval by the bankruptcy court

and that it believed none of the proceeds of the Settlement Agreement would be allocated to

Bank One. (Tr. Ex. 46)  Instead, Goss believed the payments due to Bank One pursuant to the

Repurchase Note were a pre-petition liability and would be dealt with by the plan of

reorganization in the Chapter 11 proceedings. (Tr. Ex. 46)

19

2.    **The Bank Believed Little If Anything Would Be Recovered By**
**Operating Within The Bankruptcy Proceedings.**

48.    In order to see what this meant for Bank One, Mr. Page looked at the plan of

reorganization to discover what unsecured creditors might receive.  Mr. Page's testimony, as

quoted below, is most enlightening:

> "Q.    And, in fact, you looked at the plan of reorganization, right?
> A.    Yes.
> Q.    And under the plan of reorganization, the unsecured creditors might
>          receive stock or a small amount of cash, but it was not much, correct?
> A.    Right."  (Page, 9/30/05, p. 57 +58)

49.    Bank One subsequently committed its analysis to writing.  In its Credit Approval

Summary, Bank One describes its understanding that:  1) Goss was presently in Chapter 11 for

the second time in two and a half years; 2) the secured debt was presently trading at 10% to

20% of face value; and 3) if the Bank did not sell the Grupo Serla Note it would only receive its

pro-rata share of the equity of a reorganized Goss and whatever could be recovered through a

lawsuit against Grupo Serla in Mexico.  Based on this, the Bank believed little if anything

would be recovered unless it attempted to sell the Grupo Serla Note. (Tr. Ex. 91)

B.    **Bank One Notified Mr. Guarneros And His Companies That It Wanted Part**
**Of The Settlement.**

50.    Believing that "little if anything" would be recovered by Bank One if it operated

within the framework of the bankruptcy, Mr. Page (the lawyer for Bank One), sent a letter to

Mr. O'Connor (counsel for Mr. Guarneros and His Companies) merely one week after Goss

notified Bank One that it believed Goss' payment from the Settlement Agreement would not be

allocated to Bank One but that any settlement would be subject to court approval. (Tr. Ex. 49)

In Mr. Page's letter, Bank One claims that it seeks to be part of the settlement discussion with

20

Goss so that a "global resolution" can be reached. (Tr. Ex. 49)  In order to support this request,

Bank One represented that it had purchased the Grupo Serla Note and that Mr. Guarneros and

His Company remained fully obligated to Bank One on the Grupo Serla Note. (Tr. Ex. 49)

Bank One also represented that it had the right to enforce the security for the Grupo Serla Note.

(Tr. Ex. 49)  Prior to this time, Bank One had not done anything to try and settle with the

Foreign Defendants on its own.  (Page, 9/30/05, p.57)

51.     In addition to the letter, Mr. Page also called the lawyers for Mr. Guarneros and

His Companies. (Page, 9/30/05, p. 57)  Realizing that Bank One would recover little if anything

from the bankruptcy proceedings, Mr. Page told the lawyer for Mr. Guarneros and His

Companies that Bank One actually owned the Grupo Serla Note. (Page, 9/30/05, p. 57)

Specifically, he testified that:

> "Q.   On October 11[th], you spoke with Bill O'Connor, right?
> A.    I did.
> Q.    Mr. O'Connor thought that Goss owned the Grupo Serla note, correct?
> A.    I was under the impression that he thought that.
> Q.    You told him that that was not so, did you not?
> A.    That they owned the note?
> Q.    He gave you the impression that Goss owned the Grupo Serla note, and
>       you told him that's not so, right?
> A.    Right. (Page, 9/30/05, p. 58)

**1.     Bank One Knew The Settlement Agreement Was Signed When It
        Told Grupo Serla It Owned The Note.**

52.     Bank One knew that Grupo Serla had signed the Settlement Agreement with

Goss prior to telling Mr. Guarneros and His Companies that Bank One owned the Grupo Serla

Note. (Page, 9/30/05, p. 47, 57 + 58)  Mr. Page confirmed that at trial.  Specifically he testified

as follows:

| | |
|---|---|
| Q. | So on October 11, 2001, later that day, you sent a letter to William O'Connor, did you not? |
| A. | I sent a letter to him, yes. |
| Q. | And at that point you were aware that Grupo Serla had signed that handwritten agreement or document that's been marked as Plaintiff's Exhibit 21, correct? |
| A. | I was aware that they had an agreement in principle as to a settlement. |
| Q. | And you were aware they had executed a handwritten version, correct? |
| A. | I believe I knew it was handwritten yes. |
| Q. | And you knew it was executed, did you not. |
| A. | Yes." (Page, 9/30/05, p. 58) |

**2.     DuPage Litigation Counsel Notified Bank One Of The Conflict Of Interest Between Goss And Bank One.**

53.     On October 12, 2001, merely one week after Bank One discovered Goss did not

believe any of the settlement proceeds would be allocated to Bank One and that Bank One

would be an unsecured creditor, counsel for Bank One and Goss in the DuPage Litigation

advised Bank One of a conflict of interest between Goss and the Bank. (Tr. Ex. 54)

Specifically, on October 11, 2001 counsel for Goss in Mexico had requested DuPage Litigation

Counsel for Bank One and Goss to send documents to her in order to allow her to start the

proceedings for execution of the pledge. (Tr. Ex. 54)  The DuPage Litigation counsel for Bank

One and Goss responded by notifying Mexican counsel (and *Bank One*) that because of a

potential conflict of interest between Goss and Bank One, Mexican counsel should request the

information directly from Goss. (Tr. Ex. 54)

54.     On October 15, 2001, DuPage Litigation Counsel confirmed that he had

additional discussions with Bank One regarding the conflict of interest between Goss and Bank

One. (Bank Ex. 107)  Nevertheless, in spite of being notified by its own lawyer on several

occasions that there was a conflict between Bank One and Goss, Bank One subsequently

22

entered into a separate agreement to sell the Grupo Serla Note to a company it knew was

connected to Mr. Guarernos. (Tr. Ex. 88; Page, 9/30/05, p. 85)

### C.     The Contract To Sell The Press To Quebecor Is Modified To Specifically Pay Grupo Serla's Creditors, Including Goss.

55.     The Contract To Sell the Press To Quebecor originally provided that Mr.

Guarneros and/or His Companies would receive all of the $13,000,000.00 for assets which

included the Printing Press. (Tr. Exs. 23 + 29)  However, it required that the assets would be

free from all liens. (Tr. Exs.  23 + 29)  After realizing there were creditors making claims to the

assets of Mr. Guarneros and His Companies, the Contract To Sell The Printing Press To

Quebecor was modified to pay specified amounts to certain creditors. (Tr. Exs. 55 and 55 (a))

56.     On or about October 15, 2001, Mr. Guarneros and His Companies executed a

modification of the Contract To Sell The Press To Quebecor (the "Modified Agreement") in

which Quebecor, Grupo Serla and Editorial Comercial agreed to pay certain creditors (including

Goss) on November 15, 2005 through checks endorsed by Grupo Serla. (Tr. Exs. 55 and 55 (a))

Specifically, the Modified Agreement provided that:  a) the closing date would be moved up

from November 15, 2001 to October 15, 2001; b) the purchase price of the assets would remain

at $13,000,000.00;  c) the initial payment of $8,000,000.00 would be made on October 15,

2001; d) the initial payment would include one check in the amount of $1,600,000.00 in the

name of Grupo Serla  corresponding to Goss and one check in the amount of $200,000.00 in the

name of Grupo Serla corresponding to Goss; e) the initial payment of $8,000,000.00 would also

include checks totaling over $3,000,000.00 corresponding to other creditors of Grupo Serla; f)

Grupo Serla would endorse the checks to Goss (and the other creditors) and Quebecor would

deliver them on its own to each of the creditors; and g) the remaining $5,000,000.00 would be paid on November 25, 2001. (Tr. Exs. 55 + 55(a))

### 1.    Quebecor Issued Checks Endorsed To Goss.

57.    Pursuant to the Modified Agreement, Quebecor actually issued a check on October 16, 2001 payable to Grupo Serla but endorsed by Grupo Serla in favor of Goss in the amount of $1,600,000.00. (Tr. Ex. 57)  Likewise, on or about October 16, 2001, Quebecor issued another check payable to Grupo Serla but endorsed by Grupo Serla in favor of Goss in the amount of $200,000.00. (Tr. Ex. 58)

58.    These funds were directed to Goss at Mr. Guarneros' instruction.  (Guarneros, 10/05/05, p. 89)  In other words, the checks were issued at Mr. Guarneros' request. (Guarneros, 10/05/05, p.96)  It was Mr. Guarneros intent to pay Goss 100%. (Guarneros, 10/05/05, p. 89) He endorsed the checks to Goss.  (Guarneros, 10/05/05, p. 98)  The checks were supposed to be given to Goss as soon as Guarneros and His Companies figured out who actually owned the Grupo Serla Note.  (Guarneros, 10/05/05, p. 96 + 97)

### 2.    Bank One Prevented Goss From Receiving The $1,800,000.00 In Checks.

59.    Bank One, believing it would receive "little if anything" through the bankruptcy proceedings, now decided to meet surreptitiously with Mr. Guarneros and His Companies. Bank One did not notify Goss much less the Bankruptcy Court or  the Creditors Committee about the meeting. (Page, 9/30/05, p. 65)

60.    Shortly before the meeting, John Adams (a representative of Mr. Guarneros and His Companies) sent an e-mail to Mr. Guarneros notifying him of the present status of the sale to Quebecor, the Pledge Proceedings, the discussions with Bank One's lawyer (Mark Page), the

24

checks for Goss and the bankruptcy proceedings potential disadvantage. (Tr. Ex. 59; Tr. Ex.

129, Adams Dep., p. 57 + 58)  Specifically, Mr. Adams confirmed to Mr. Guarneros that:

    a.    he spoke with Goss;

    b.    Goss told him that it had instructed its lawyers in Mexico to do whatever
        was necessary to file a lien on the equipment in Mexico;

    c.    the closing of the asset sale had not taken place yet;

    d.    Bank One had contacted Bill O'Connor in writing (Guarneros was sent a
        copy) and claimed Bank One still owned the note;

    e.    he understood Goss had been making payments on the Note;

    f.    he was going to Chicago;

    g.    the first thing he was going to do when he got to Chicago was to go to
        Bank One and find out if Bank One owned the note ("we" have to know
        who owns the Note and what was in the agreement between Bank One
        and Goss");

    h.    Goss cannot make any agreement now without Court approval and/or
        creditor approval:  i.e. "whatever they say must first be agreed upon by
        the judge or the creditors committee.  They are the ones with the power to
        accept or reject any offer or to make any agreement";

    i.    we could have a meeting with both Bank One and Goss at the same time.
        They would have to agree on how the money would be split between the
        both of them.  If this has to happen the odds are they will never agree;
        and

    j.    Cuco told me today that you were sending me the checks by air to
        Oklahoma.  As soon as I receive those checks, I am leaving for Chicago;
        (Tr. Ex. 59)

With this very detailed understanding, Mr. Adams went to Chicago to meet with Bank One.

(Tr. Ex. 129, Adams Dep., p. 61-71)

**D.**    **Mr. Guarneros And His Companies Met With Bank One Through
Their Representatives In Chicago.**

61.    In Chicago, Mr. Adams met with William O'Connor and Sam Tenenbaum

(counsel for Mr. Guarneros and His Companies). (Tr. Ex. 129, Adams Dep., p. 61 - 70)  Mr.

Adams and counsel for Mr. Guarneros and His Companies then went to Bank One and met with

representatives of Bank One. (Tr. Ex. 129, Adams Dep., p. 70)  Bank One knew Mr. O'Connor

and Mr. Guarneros represented Mr. Guarneros and His Companies at that time. (Page, 9/30/05,

p.62) Goss was not at the meeting (Page, 9/30/05, p.62) and Mr. Page did not tell anyone else,

including the Bankruptcy Court or Debtor's Bankruptcy Counsel, about the meeting. (Page,

9/30/05, p. 65)

62.    At the meeting, John Adams or Sam Tenenbaum raised the issue of having Bank

One sell the Grupo Serla Note directly to the makers of the note.  (Page, 9/30/05, p. 63)  In fact,

the first document drafted by Mr. Page relating to the sale of the note to Mr. Guarneros' father's

company is based on this assumption. (Page, 9/30/05, p. 65; Tr. Ex. 70) Mr. Page also

confirmed at trial that Bank One knew Mr. Adams brought the money for the creditors. (Page,

9/30/05, p. 64)  Specifically, Mr. Page testified that Mr. Adams told him at the meeting that

there was a budget to resolve the claims of Grupo Serla's various creditors and that he had all of

the money available in the United States. (Page, 9/30/05, p.64)

63.    This promise of money was too much for Bank One to pass up.  Therefore, at the

meeting, Bank One (through its counsel Mark Page) again told Mr. Adams that Bank One

owned the Grupo Serla Note. (Tr. Ex. 129, Adams Dep., p. 68 + 69)  Based on this

representation, Mr. Guarneros and His Companies refused to meet further with Goss, and Mr.

Guarneros and His Companies instructed Quebecor to cancel the checks. (Tr. Ex. 129, Adams Dep., p. 68 + 69; Tr. Ex. 69(b) and(c))

### E.   Mr. Guarneros And His Companies Refused To Meet With Goss Because Bank One Represented It Owned The Note.

64.    Mr. Guarneros and His Companies had intended to meet with Goss through their lawyers and John Adams while he was in Chicago.  (Tr. Ex. 129, Adams Dep., p. 68 + 69) However, based on Bank One's representation that it owned the Grupo Serla Note, Mr. Adams called Goss after the meeting and refused to meet with Goss.  (Tr. Ex. 129, Adams Dep., p.68 + 69) Perhaps John Adams phrased it most succinctly by testifying to what he observed: "We got two people on different sides both say that they own the note and they – and with the note is all rights to that press.". (Tr. Ex. 129, Adams Dep., p. 61)   Bank One told him "Look, we're the owners of this press.  Goss isn't.  You're negotiating with the wrong people".  (Tr. Ex. 129, Adams Dep., p.56)  Therefore, there was no need to meet with Goss.

### F.   Quebecor Had Withheld $5,000,000.00 Pending Resolution Of Goss' Claim.

65.    While the Bank was attempting to convince Mr. Guarneros and His Companies that it owned the Grupo Serla Note and they should pay Bank One, Quebecor was aware of Goss' claims. (Tr. Ex. 40, 61, 69 + 69(a))  Pursuant to the Agreement To Sell The Press To Quebecor, Quebecor could withhold money as necessary if liens were not released. (Tr. Exs. 23 + 29)  In fact, Quebecor did withhold money for Goss. (Tr. Ex. 69 and 69(a))

### 1.    Quebecor Confirmed It Was Withholding Money For Goss.

66.    On October 29, 2001, pursuant to Goss' inquiry, Quebecor confirmed that certain funds were escrowed and remain to be paid on November 15, 2001. (Tr. Ex. 61)

27

Quebecor also confirmed that it had been directed to issue certain specific payments to various creditors including Goss on the closing. (Tr. Ex. 61)

67.    On November 15, 2001, Quebecor then wrote Guarneros and told him that: a) Goss' Attorney had notified Quebecor about the beginning of the Pledge Proceeding seeking the sale of the Printing Press; b) Goss indicated that the amount of the debt is $5,940,000.00; c) Quebecor had contemplated making a payment in the amount of $5,000,000.00 in fulfillment of the modified asset sale agreement; d) as a result of the notification by Goss, Quebecor was going to retain $5,000,000.00; and e) once Quebecor receives evidence that there is no contingency on the free use, possession and enjoyment of the Printing Press acquired by Quebecor, Quebecor will proceed to make the payment. (Tr. Exs. 69 and 69(a)).

### 2.    Due To Bank One's Actions, Grupo Serla Told Quebecor To Cancel The Checks.

68.    On November 15, 2001 Grupo Serla responded in writing to Quebecor. Grupo Serla related that as to the retention of the checks in the amount of $1,600,000.00 and $200,000.00 for Goss, Grupo Serla had been made aware that Goss no longer held the right for collection. (Tr. Exs. 69(b) + 69(c)) Bank One now had the collection rights on this debt. (Tr. Exs. 69(b) + 69(c)) Therefore, Grupo Serla has given back the checks to you so that they are canceled. (Tr. Exs. 69(b) + 69(c))  Grupo Serla also told Quebecor that it had been talking to Bank One with the objective of coming to an understanding on the payment. (Tr. Exs. 69(b) + 69(c))  Grupo Serla believed it would be able to solve this circumstance quickly so that new checks could be generated in place of those which were cancelled. (Tr. Exs. 69(b) + 69(c)) With that understanding, Grupo Serla told Quebecor it would appreciate it if the payment to Goss *would be stopped*.  (Tr. Exs. 69(b) + 69(c))

**G.**    **The Bank Sold The Grupo Serla Note To The Foreign Defendants Without Modifying The Automatic Stay.**

69.    Having succeeded in stopping the payments to Goss without notifying the

Bankruptcy Court or the Creditors, Bank One then proceeded to sell the Grupo Serla Note and

related items to an entity related to Mr. Guarneros and His Companies for $1,100,000.00. (Tr.

Exs. 88 + 106) Unfortunately, as a result: 1) Goss did not receive the $5,000,000.00 withheld by

Quebecor; 2) Goss did not receive the $2,700,000.00 Grupo Serla agreed to pay; and 3) Goss

did not receive the two checks totaling $1,800,000.00 which were already endorsed to Goss.

(Tr. Ex. 130, Guarneros Dep., p 90) Instead, Bank One received  $1,100,000.00. (Page, 9/30/05,

p. 100)

**1.**    **The "Union Industrial" Note Purchase Agreement.**

70.    Despite the fact that Bank One had already resold the Grupo Serla Note to Goss

in the Note Repurchase Agreement, Bank One subsequently sold the note to "Union Industrial"

a company allegedly owned by Mr. Guarneros' father. (Tr. Exs. 21, 88 + 106)

**a.**    **Union Industrial Was Guarneros' Company.**

71.    The interrelationship between "Union Industrial" and Mr. Guarneros and His

Companies is undeniable. (Guarneros, 10/5/05, p. 30-35) Guarneros admitted that: 1) he owns

97% of Grupo Serla and Editorial Comercial; 2) he previously owned 97% of "Union

Industrial"; 3) All three of these companies are located at 711 Suite C, Batriostismo Mexico

City; 4) the lawyer for all three is Oscar Sosa Gueterez; and 5) none of the three companies has

ever had any employees (Guarneros, 10/05/05,  p. 30-35; Tr. Ex. 130, Guarneros Dep., p. 24)

72.    Mr. Guarneros claimed he sold "Union Industrial" to his father about four (4)

yeas ago (coincidentally about the same time that "Union Industrial" purchased the Grupo Serla

Note). (Guarneros, 10/05/05, p. 31; Tr. Ex. 130, Guarneros Dep., p. 16 + 17)  Mr. Guarneros

testified at his deposition that there were no written documents regarding the sale of Union

Industrial. (Tr. Ex. 130, Guarneros Dep., p.16)  At trial, realizing the significance of this, Mr.

Guarneros revised his testimony to say that he does not remember any written documents but

there must be. (Guarneros, 10/05/05, p. 32)  In any event, he admits not providing any

documents regarding the alleged sale during the two years this litigation was pending.

(Guarneros, 10/05/05 p. 31 - 34)

### b.    The Negotiation Of The "Union Industrial" Note Purchase Agreement.

73.    The sale of the Grupo Serla Note to Union Industrial was accomplished through

two documents, another "Note Purchase Agreement" and an "Amended And Restated Note

Purchase Agreement" (collectively the "Union Industrial Note Purchase Agreement"). (Tr. Exs.

88 + 106)  The "first draft" was prepared by William O'Connor, Chicago counsel for Mr.

Guarneros and His Companies as well as Union Industrial Mexicana, S.A. de C.V. ("Union

Industrial"). (Tr. Ex. 75)  Specifically, on November 21, 2001, Mr. O'Connor sent Bank One

the first draft. (Tr. Ex. 75)  In his cover letter attached to the draft, Mr. O'Connor restated the

obvious to Bank One that "although we are anxious to close, we *do not wish to notify Goss* until

we have reached a signed agreement (emphasis added). (Tr. Ex. 75)

74.    In fact, Mr. Page did not send the Union Industrial Note Purchase Agreement to

Goss or anyone who might be looking out for Goss' (or its creditors') interests. (Page, 9/30/05,

p. 71 - 73 and p. 80 - 81) Realizing this mistake at trial, Mr. Page actually testified that *he* was

looking out for Goss' interests, *as well as Mr. O'Connor* counsel for *Mr. Guarneros and His*

*Companies*.  Mr. Page testified as follows:

30

> Q.    "Did you send it to anyone other than you who might be looking
> out for Goss' interests?
> A.    Other than me?
> Q.    Yeah.
> A.    I sent it to Mr. - - Oh.  I sent it to - -
> Q.    Who might be looking - -
> A.    - - Mr. O'Connor
> Q.    - - for Goss' interest.
> A.    I sent it to Mr. O'Connor.
> Q.    Well, Mr. O'Connor wasn't looking our for Goss' interests, was he?
> A.    Well, I guess he wanted to settle with them, but  . . .
> Q.    You think Mr. O'Connor was looking out for Goss's interests?
> A.    No.  I mean, he wanted to - - no.  He was looking out for his clients'
> interests.
> Q.    His clients were adverse to Goss, weren't they?
> A.    Yes, they had a dispute with Goss."  (Page, 9/30/05, p. 80-81)

In short, Bank One admitted at trial that it wholly failed to send the "Union Industrial Note

Purchase Agreement" to anyone truly looking out for Goss' (or its creditors') interests.

### c.    Bank One Intentionally Failed To Notify Goss Of the Negotiation Of The Union Industrial Note Purchase Agreement.

75.    On or about December 10, 2001, Bank One and Union Industrial actually

executed the first of the Union Industrial Note Purchase Agreements. (Tr. Ex. 88)  Prior to this

date, no one had notified Goss of the negotiation or the agreement. (Page, 9/30/05, p. 71-73 +

80-84)  Even when an agreement was reached, Bank One failed to notify bankruptcy counsel

for the Debtor or get the stay modified. (Page, 9/30/05, p. 97 + 98)

### d.    The Purchase Price.

76.    In the "Union Industrial Note Purchase Agreement", Bank One sold various

items in addition to the Grupo Serla Note. (Tr. Exs. 88 + 106)  For example, it purported to sell

the Repurchase Note (which was not generally assignable), the Pledge (which Goss was

currently attempting to enforce) and its proof of claim to Union Industrial, all for

31

$1,100,000.00. (Tr. Exs. 88 + 106)  Perhaps realizing that at least certain portions of the sale

clearly violated the automatic stay, Bank One refused to tell the Bankruptcy Court at trial what

amount of money Bank One received for the Grupo Serla Note as opposed to the other items

including its proof of claim. (Kaplan, 9/26/05, p. 99)  Even Ronnie Kaplan, who negotiated the

terms of the sale on behalf of Bank One, could not remember how the purchase price was

arrived at.  (Kaplan, 9/26/05, p. 99)

### 2.    Bank One Knew The Purchaser Of The Note Was Connected To The Makers Of The Note.

77.    In any event, before Bank One sold the Grupo Serla Note to Union Industrial, it

was aware "Union Industrial" was connected to Mr. Guarneros and His Companies, (i.e. the

Makers Of The Grupo Serla Note). (Page, 9/30/05, p. 85)  Mr. Page actually admitted this at

trial. (Page, 9/30/05, p. 85)  Interestingly, Mr. O'Connor, the lawyer who negotiated the sale of

the Grupo Serla Note to "Union Industrial" on behalf of Union Industrial, testified at trial he

negotiated the deal for Union Industrial pursuant to Sergio Guarneros' instructions. (O'Connor,

9/29/05, p. 83 + 84)

### 3.    Bank One Closed The "Union Industrial" Note Purchase Agreement.

78.    On December 12, 2001, the Bank internally approved the sale of the Grupo Serla

Note to Union Industrial. (Tr. Ex. 91)  The sale price was $1,100,000. (Tr. Exs. 91 + 106)  The

sale resulted in interest income of $671,000 for the Bank. (Tr. Ex. 91)  The bank received

$1,100,000.00 from the sale. (Page, 9/30/05, p.76)  Goss received nothing. (Page, 9/30/05, p.77)

79.    At the closing, Bank One gave the original Grupo Serla Note and the Pledge to

Mr. O'Connor, the lawyer for: 1) the makers of the note; 2) the defendants named in the Pledge

32

Proceedings; 3) the parties who sold the Printing Press to Quebecor; and 4) the parties who agreed to pay Goss $2,700,000.00 in the Settlement Agreement. (Page, 9/30/05, p. 99)

80.    Mr. Page made sure Bank One received the $1,100,000.00 wire transfer before he handed the original documents to Mr. O'Connor. (Page, 9/30/05, p. 76 + 100)  However, Mr. Page, the self-described person "looking out for Goss' rights" failed to get any money for Goss. (Page, 9/30/05, p. 100).

81.    No one from Bank One ever told the Foreign Defendants that any of the Foreign Defendants would have to pay Goss in addition to Bank One.  (Tr. Ex. 129, Adams Dep., p. 82-83, 196 + 197)

### 4.    Bank One Admitted It Knew The "Union Industrial" Note Purchase Agreement Would Effect The Settlement Agreement.

82.    At trial, Mr. Page actually admitted Bank One knew that the "Union Industrial Note Purchase Agreement" that Bank One entered into with the Foreign Defendants would cause the Foreign Defendants to "gain leverage" in their settlement discussions with Goss. (Page, 9/30/05, p. 102)  Bank One also knew that the Foreign Defendants were going to deny Goss had any rights, claims or remedies against Mr. Guarneros and His Companies as a result of the deal secretly negotiated between Bank One and the Foreign Defendants. (Tr. Ex. 106; BO 02820)  Once again, Bank One did not tell Goss that. (Page, 9/30/05, p.136)  Instead, Bank One entered into a joint defense agreement with the Foreign Defendants and swore under oath, in these proceedings that Union Industrial did in fact acquire ownership of the Grupo Serla Note on December 19, 2001.  (Page, 9/30/05, p.102; Tr. Ex. 124, Answer To Interrogatory No. 14)  In fact, when "Union Industrial" came before the Bankruptcy Court and first claimed in pleadings that it owned the Grupo Serla Note, Bank One received those pleadings (Page,

33

9/30/05, p. 102)  and Bank One did not file anything disputing that Union Industrial owned the

Grupo Serla Note. (Page, 9/30/05, p.102)

### 5. Bank One Executed Documents Post-Petition Intended To Prevent Goss From Receiving Money.

83.    On the very day the "Union Industrial Note Purchase Agreement closed,

December 19, 2001, Union Industrial wrote to Quebecor and advised Quebecor that Union

Industrial, not Goss, was the legitimate owner of the Grupo Serla Note, because it had

purchased the Grupo Serla Note from the Bank.  (Tr. Exs. 102 and 102(a))  Union Industrial

also told Quebecor that it was not reserving any right against Quebecor and the Printing Press

now belonged to Quebecor free and clear of any encumbrances. (Tr. Exs. 102 and 102 (a))

84.    Bank One's actions enabled Union Industrial to do this.  However, as if Bank

One's prior actions were not enough, on or about December 20, 2001, Ronnie Kaplan also

signed a letter To Whom It May Concern addressed to "Union Industrial – Mexico" *(with no*

*address)*, stating:

> "Re:  Goss Promissory Note
> To Whom It May Concern:
>
> Yesterday, Bank One sold its promissory note from Goss
> Graphics to Union Industrial.  William O'Connor has the signed
> documents.  The money from this transaction has been received
> by Bank One.  The only remaining issue is the receipt of an
> execution copy of the note purchase agreement signed by Union
> Industrial with all the pages initialed." (Tr. Ex. 107)

In short, Bank One did everything possible to frustrate Goss' attempt to collect on the Grupo

Serla Note, the Settlement Agreement, and through the Pledge Proceedings. (See, above.)

34